# EXHIBIT A

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

SANDRA TAYLOR                      :
and
TAWFIK BOULOS,                     :
              Plaintiffs,          :
                                   :   Civil Action No.
        v.                         :   1:05-CV-01175
                                   :   Judge Henry H.
OMNI HOTELS MANAGEMENT             :     Kennedy
CORPORATION, et al.,               :
                                   :
              Defendants.          :
                                   :
                                       Pages 1 - 203

                       - - - - -

                 Deposition of Tawfik Boulos
                      Washington, D.C.
                  Friday, December 9, 2005




Reported by:  Marian E. Cummings, Notary Public
Job No.:  171779
```

Tawfik Boulos                                                                December 9, 2005

Page 2

December 9, 2005
11:00 a.m.

Deposition of Tawfik Boulos, held at the offices of:

The Goldsmith Firm
1900 L Street, Northwest
Washington, D.C. 20036

Pursuant to notice, before Marian E. Cummings, a Notary Public of the District of Columbia.

Page 3

1  APPEARANCES:
2
3  The Goldsmith Law Firm
4  For the Plaintiffs
5      Suite 614
6      1900 L Street, Northwest
7      Washington, D.C. 20036
8      (202) 775-0040
9  BY: Kristen L. Walsh, Esq.
10     Leizer Z. Goldsmith, Esq.
11
12 The Coles Firm
13 For the Defendants
14     Suite 1825
15     3838 Oaklawn Avenue
16     Dallas, Texas 75219
17     (214) 443-7862
18 BY: Michael E. Coles, Esq.

Page 4

CONTENTS
EXAMINATION OF TAWFIK BOULOS                PAGE
MR. COLES                                    5
                 -0-

EXHIBITS
BOULOS DEPOSITION EXHIBITS:                 PAGE
1  - Resume                                  12
2  - Acknowledgement form                    27
3  - Handbook                                29
4  - Calendar of doctor visits              118
5  - form documenting doctor visit          120
6  - Form documenting doctor visit          121
7  - Form documenting doctor visit          122
8  - Chart                                  135
9  - Fax                                    126
10 - Letter 8-24                            140
11 - Termination documents                  168
12 - Interrogatory responses                189

(Exhibits are attached to deposition transcript.)
                 -0-

Page 5

                PROCEEDINGS
        Thereupon,
                TAWFIK BOULOS
the Witness, called for examination by counsel for the Defendants, and, after having been sworn by the notary, was examined and testified as follows:
        EXAMINATION BY COUNSEL FOR THE DEFENDANTS
            BY MR. COLES:
    Q   Could you state your name for the record, please?
    A   **Tawfik Boules.**
    Q   Spell that, please.
    A   **T-A-W-F-I-K, B-O-U-L-O-S.**
    Q   And sometimes I see references to you with the name Paul.
    A   **Yes.**
    Q   Is that part of your legal name?
    A   **No.**
    Q   But if I see Paul Boulos that is still you?
    A   **That is correct.**
    Q   What would you prefer that I call you?
    A   **Paul.**

Tawfik Boulos													December 9, 2005

Page 10

1  Q  And how long have you been married?
2  A  We have been married for, since 1992 but we
3  have been together for 23 years.
4  Q  Any children?
5  A  Yes.
6  Q  And how many?
7  A  Three.
8  Q  And how many currently live with you?
9  A  Two.
10 Q  What are the two that live with you, what are
11 their names?
12 A  Yazmeen, that's Y-A-Z-M-E-E-N, last name is
13 Boulos. And the second is Amir, A-M-I-R, again the last
14 name is Boulos.
15 Q  How old is Yazmeen?
16 A  Yazmeen is 16 and Amir is 15.
17 Q  Okay. And what is your third child's name?
18 A  The third child, his name is Michael Wieser,
19 W-I-E-S-E-R, and he is my wife's kid from her first
20 marriage.
21 Q  Okay. Have you adopted him?
22 A  No, I did not.

Page 11

1  Q  So he's a stepchild but not your child?
2  A  He's a stepchild but he lived with me all his
3  life.
4  Q  All right. And I want to sort of take you
5  back, what year were you born?
6  A  I was born 1952, October, 1952.
7  Q  I want to sort of trace your history of
8  employment.
9  A  Sure.
10 Q  So let's start, did you first graduate from
11 high school?
12 A  I did.
13 Q  Did you attend any post secondary schools?
14 A  I graduated from high school in Cairo, Egypt.
15 Q  What about beyond high school, did you attend
16 any college, trade schools or anything like that?
17 A  Yes, I attended Southeast London Technical
18 College and that's in Lewisham, London, England, and
19 that was in the year 1976 and I take a diploma of
20 physics, chemistry, biology. And after that I attended
21 the hotel school in London and I took two diplomas, one
22 in housekeeping and one in advanced housekeeping.

Page 12

1  Q  All right. And when did you get that last
2  degree in advanced housekeeping?
3  A  That was '84, '85.
4  Q  When did you get the first degree in
5  housekeeping?
6  A  '83, '84.
7  Q  All right. And since 1983, let's say, have
8  you been involved in hospitality management exclusively
9  since that time?
10 A  Yes.
11 Q  This might be easier, do you have exhibit
12 stickers?
13    (Exhibit Number 1 was marked for
14 identification.)
15    BY MR. COLES:
16 Q  I'm going to hand you Exhibit 1 which I
17 believe is your resume.
18 A  Uh-huh.
19 Q  Can you just look through Exhibit 1 and
20 confirm that that is in fact your resume?
21 A  Yes, this was the resume which was posted on
22 the Web site.

Page 13

1  Q  Now that's not your current resume?
2  A  No.
3  Q  But I believe you started with Omni Hotels in
4  2001, late 2000, beginning of 2001?
5  A  Yes.
6  Q  Is this resume --
7  A  Did you say late what?
8  Q  Late 2000, late December, January 2001.
9  A  Yes.
10 Q  Is this resume Exhibit 1 accurate as of
11 December 2000?
12 A  Yes.
13 Q  And take a few minutes to look at each page.
14 A  Okay. What was your last question?
15 Q  Is that resume Exhibit 1 accurate as of
16 December 2000?
17    MS. WALSH: Okay.
18    THE WITNESS: Yes.
19    BY MR. COLES:
20 Q  All right. How did you come to the United
21 States from England?
22 A  I met my wife who is an American in London,

Tawfik Boulos

December 9, 2005

Page 26

1  A  I ended the trip by meeting, having a long
2  meeting with Saed in his office and I was offered the
3  job and I asked Saed to give me a couple of days to go
4  back and consult with my wife which I did. He called me
5  back and I told him that I would accept the offer and he
6  said that he is going to send overnight an offer letter
7  for my position.
8  Q  Okay. And did you get that offer letter?
9  A  Yes, I did.
10 Q  And did you sign it?
11 A  Yes, I did.
12 Q  All right. When did you officially begin your
13 employment, to the best of your knowledge?
14 A  To the best of my knowledge I know that I been
15 there the 1st of January.
16 Q  Okay, so you believe you started right at the
17 1st of January?
18 A  I believe so.
19 Q  And I assume you went through some sort of
20 training or orientation program?
21 A  Not at the very start.
22 Q  Not at the very start?

Page 27

1  A  No.
2  Q  When did you?
3  A  That must have been about two or three weeks
4  after that, after I started.
5  Q  But sometime in the month of January?
6  A  I believe so.
7  Q  I'm going to hand to you a couple of exhibits
8  here, try to get through these. I will give you Exhibit
9  2.
10        (Exhibit Number 2 was marked for
11 identification.)
12       BY MR. COLES:
13 Q  So Exhibit 2 says acknowledgement form at the
14 top, is that your signature at the bottom?
15 A  Yes, it is.
16       MS. WALSH: Can we go off the record for a
17 minute?
18       MR. COLES: Sure.
19         (Off the record.)
20       MS. WALSH: I want to go on the record and say
21 that this morning Mr. Coles gave me an associate's
22 handbook in request to our discovery response and

Page 28

1  there's no indication on the pages themselves that this
2  was the handbook that Mr. Boulos received.
3        MR. COLES: Actually, let's hand it to him and
4  is that your photocopy of the version or is that my
5  copy?
6        MS. WALSH: That's my copy.
7        MR. COLES: Okay, we'll flip through it
8  together.
9        BY MR. COLES:
10 Q  So do you remember, I realize it's been almost
11 five years now since you've seen this document?
12 A  If it is the same one I got when I was
13 employed, if you go to the last page it says
14 acknowledgment and associate name and signature,
15 shouldn't you have this and not this?
16 Q  I do have that, that's Exhibit 3, it's coming
17 up.
18 A  Okay, it is?
19 Q  Yes.
20 A  I really and honestly, I mean, when something
21 happened three and a half years ago or four years ago,
22 it's very hard for me to whether it's the exact thing,

Page 29

1  similar to it or not at all.
2  Q  Well, I'm going to ask you this specifically
3  then, is there anything about what you see in the
4  handbook that your attorney was mentioning that tells
5  you this is not it? For example, the cover had a
6  picture of a beach setting and this is a different cover
7  or anything like that, anything about it that says to
8  you no, no, this can't be it.
9  A  Honestly I cannot remember at all.
10        (Exhibit Number 3 was marked for
11 identification.)
12       BY MR. COLES:
13 Q  Fair enough. But I'll go ahead and give you
14 Exhibit 3 now so you can -- so you raised a good point
15 and I'll guess we'll go through and compare. Exhibit 3
16 I believe is your handbook acknowledgment.
17 A  That's correct.
18 Q  Now, as I look at Exhibit 3 versus the last
19 page of the handbook that your attorney was referencing
20 I don't see anything that suggests that these are
21 different.
22       MS. WALSH: Well, not the acknowledgment page,

713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532

Page 30

1  no.
2  BY MR. COLES:
3  Q   So the acknowledgement page may or may not
4  have changed but the acknowledgment page in the document
5  your attorney referenced which is the handbook appears
6  to be identical?
7  A   Yes, acknowledgement yes, I would say it is
8  identical.
9  Q   And just to clarify, the date of the
10 acknowledgment that you have here is January 10, 2000,
11 Exhibit 3?
12 A   Yes.
13 Q   And I believe that's just a mistake, that you
14 really meant 2001.
15 A   I would guess so. You know the beginning of
16 year how people make mistakes about the --
17 Q   Yes, that's what I assume.
18 A   I do it with my checks all the time.
19 Q   So given Exhibit 2 and Exhibit 3 and just to
20 clarify as well, Exhibit 2 I believe you did the same
21 thing with 2000 versus 2001?
22 A   Yes.

Page 31

1  Q   Is it your understanding that your orientation
2  occurred at about the same time that you signed these
3  documents?
4  A   Yes.
5  Q   Do you know if it occurred on the exact same
6  day that you signed these documents?
7  A   Like I said, I can't, I would say it is just
8  about that time.
9  Q   Approximately?
10 A   Yes.
11 Q   Now, again, it's been a while but can you
12 explain to me what you recall was Omni's policy on
13 harassment and discrimination?
14 A   Omni's harassment, no, I cannot remember no.
15 Three and a half years ago I cannot remember. If I look
16 at it right now and if I read it that probably will
17 refresh my memory but to memorize from three and a half
18 years ago, no, I cannot.
19 Q   As you sit here today do you believe that at
20 the time you were employed at Omni that you knew the
21 policy on harassment and discrimination?
22 A   Yes.

Page 32

1  Q   Are you certain of that?
2  A   Yes.
3  Q   Now, as we go through the process I do want to
4  sort of separate a couple of things out, you're aware
5  that there is a separate case pending regarding Sandra
6  Taylor, I assume?
7  A   Can you repeat the question?
8  Q   Are you aware that Sandra Taylor filed a
9  lawsuit in conjunction with you?
10 A   Yes, I am.
11 Q   And you may or may not be aware of the exact
12 claims in that lawsuit, I don't know.
13 A   No.
14 Q   I'm going to go through and sort of talk to
15 you a little bit about Sandra Taylor and as we go
16 through this I'm going to ask you questions that relate
17 to, for example, what you heard from Sandra Taylor, what
18 you may have said to Sandra Taylor and then also what
19 you may have told other people about Sandra Taylor.
20 A   I understand.
21 Q   So I do want to go through that very
22 meticulously, I'm just sort of giving you fair warning

Page 33

1  about that.
2  A   Yes, sir.
3  Q   All right. It's my understanding that your
4  claim is essentially that Sandra Taylor was
5  discriminated against based on her race and you opposed
6  that discrimination?
7  A   Yes, sir.
8      MS. WALSH: I want to let you know I object to
9  anything that happened after they have retained us as
10 their client [sic.] as perhaps subject to
11 attorney-client privilege. I'll have to hear your
12 question but I wanted to alert you to the possibility.
13     MR. COLES: I saw that in the discovery
14 responses.
15     MS. WALSH: Right.
16     BY MR. COLES:
17 Q   When did you first meet Sandra Taylor?
18 A   I met Sandra Taylor as on the first day I
19 started working at the Omni Shoreham which would be the
20 beginning of January.
21 Q   Okay. And in your first introduction to
22 Sandra Taylor did someone in particular introduce you?

Tawfik Boulos                                                              December 9, 2005

Page 34

1   A   Yes.
2   Q   Who would that be?
3   A   Saed Elkhodary.
4   Q   What did he say about Sandra at the time?
5   A   He introduce Sandra to me as the assistant
6   executive housekeeper, he introduced her to me as she is
7   the one who would be responsible about the scheduling,
8   about the public areas, work in the public areas,
9   reporting to me any happenings in the housekeeping
10  department. He also introduced her to me as a good
11  employee who won some awards in the Omni Shoreham as a
12  good employee.
13  Q   And what was your title that you were hired
14  under?
15  A   Executive director of housekeeping.
16  Q   It varied or --
17  A   No, that is, that is, in England you call it
18  solicitor, here you call it an attorney, it's the same
19  thing.
20  Q   But which name did they give you at the Omni
21  Shoreham?
22  A   At the Omni Shoreham I was the director of

Page 35

1   housekeeping.
2   Q   Okay. Who did you replace, do you know?
3   A   Who did I replace, I was told that there
4   was -- can I take a moment to remember?
5   Q   Sure.
6   A   I was told there was a lady from China if I'm
7   correctly remember and she resigned, I'm not quite sure
8   whether she resigned or whether she was separated from
9   the company but I believe there was a period of time
10  that they did not have a director of housekeeping there.
11  Q   All right. And just throwing out a name,
12  Irene Chin, does that same familiar?
13  A   Well, the name rings a bell because I was told
14  that she's an Oriental lady.
15  Q   Okay.
16  A   But I couldn't really tell you exactly what
17  was her name.
18  Q   Right. And from your understanding when you
19  met Sandra Taylor you said Saed told you she was a good
20  employee?
21  A   Uh-huh.
22  Q   All right. So let's go sort of

Page 36

1   chronologically.
2   A   When she was present, if I might add that. He
3   told me that when she was present.
4   Q   Did he say something different around that
5   same time when she was present?
6   A   I'm just saying that he told me that when he
7   introduce her to me, meaning she was in the room.
8   Q   Right, and I guess what's the significance
9   since you brought it up?
10  A   The significance is that you can introduce
11  someone to someone and they're not present.
12  Q   And Saed never did that?
13  A   No, he introduced her to me when she was
14  present, she was in the room when he introduced her.
15  Q   Did you get the sense that at the time he was
16  introducing you to Sandra Taylor that he didn't feel
17  like she was a good employee?
18  A   I'm just making clear that you understand that
19  when he introduced her to me, it was not like he was
20  mentioning her to me, he actually physically introduced
21  her to me.
22  Q   All right. So then in the month of January

Page 37

1   what was your opinion of Sandra Taylor's performance?
2   A   My first impression?
3   Q   Uh-huh.
4   A   A very hard-working young lady.
5   Q   Anything more?
6   A   Very sincere, honest, would go the extra mile
7   for the company, she loves her job, very proud of her
8   achievements, get along very well with her employees and
9   her employees respect her a lot because she leads by
10  example and more than anything really, really
11  hard-working lady, really hard-working lady.
12  Q   Obviously I've been involved in a lot more
13  lawsuits than you have, have you ever come across a
14  situation where you've known someone who worked hard but
15  wasn't very good at what they were working hard at?
16  A   What does that got to do with involved in
17  lawsuits?
18  Q   I've seen that through other lawsuits with
19  other employees.
20  A   On the other hand I have been working in
21  places probably more than you do.
22  Q   I guess I need you to answer the question I

Tawfik Boulos                                                                December 9, 2005

Page 42

1 complaints about the cleanliness of rooms during your
2 tenure?
3   A   We would get, of course.
4   Q   Now, you worked at several hotels?
5   A   Yes.
6   Q   Given the size of the hotel did you get about
7 an average number of complaints, below average, above
8 average?
9   A   From my 30 years experience working in
10 housekeeping department when we do a comment card sort
11 of count we will consider anything below 90 percent
12 satisfaction from the guest, we would consider that
13 below standard. Anything above a 90 percent would be
14 considered in the industry as a satisfactory result.
15  Q   And what about at the Omni?
16  A   The Omni?
17  Q   Yes.
18  A   The Omni we, as far as I remember, in the
19 first, after the first month or the second month, I
20 cannot remember exactly but I remember that very, very
21 clear that we had a big celebration because the Omni
22 Shoreham housekeeping department made the biggest jump

Page 43

1 in the rating among all other Omni Hotels when it comes
2 to cleanliness, guest satisfaction. And it was done by
3 I don't know which company, I can't remember the company
4 which Omni used to hire to do their, maybe you can help
5 me there, I don't know if you know about this company or
6 not, but they have a company which does their market
7 research to find out how much satisfaction or
8 dissatisfaction from the guests and we came first among
9 all other Omni Hotels. This is on the records.
10  Q   Okay. I'm sorry, go ahead.
11  A   And for me that is very satisfying, those
12 results.
13  Q   And then the second thing you said was sort of
14 reviewing or checking rooms, how many rooms were
15 supposed to be checked each day?
16  A   Rooms are checked normally by the director of
17 housekeeping, the assistant director of housekeeping and
18 the room inspectors or we call them floor supervisors,
19 and every day I would go out and I would inspect between
20 20 to 25 rooms. In particular the director of
21 housekeeping, first priority would be inspect the VIP
22 arrivals and then we'll randomly inspect different rooms

Page 44

1 or different room attendants. The assistant would do
2 the same thing but the floor supervisors are supposed to
3 inspect every arrival.
4   Q   Okay, and just to be clear, my question though
5 was how many rooms were supposed to be inspected?
6   A   How many rooms?
7   Q   Yes.
8   A   Every room in the hotel when it comes to
9 arrival is supposed to be inspected in the hotel
10 industry.
11  Q   By the floor supervisor?
12  A   Either by the director of housekeeping, the
13 assistant director of housekeeping or the floor
14 supervisor.
15  Q   And how many rooms were to be inspected by the
16 director of housekeeping?
17  A   On average I inspected daily between 20 and 25
18 rooms.
19  Q   My question is not how many did you, my
20 question is how many were you supposed to inspect?
21  A   There wasn't any policies about how many rooms
22 the director of housekeeping is supposed to inspect but

Page 45

1 the policy of any successful hotel in the industry is
2 that every room is supposed to be inspected, especially
3 when it comes arrivals.
4   Q   And then what about Miss Taylor as the
5 executive assistant housekeeper, was there a number of
6 rooms she was supposed to review?
7   A   She was to inspect a similar number of rooms.
8   Q   How many is that?
9   A   20 to 25.
10  Q   To your knowledge did she do that while you
11 were employed there?
12  A   Yes.
13  Q   To your knowledge did she do that before you
14 were employed there?
15  A   I don't know.
16  Q   Did you ever hear any comments or criticisms
17 that she didn't do that?
18  A   No, I didn't.
19  Q   Then the last thing you mentioned was supplies
20 for cleaning the rooms and stocking the rooms?
21  A   Yes.
22  Q   Were there ever any issues with supplies at

Tawfik Boulos                                                                                    December 9, 2005

### Page 46

1  the hotel?
2  A  Yes.
3  Q  What were the issues?
4  A  The main issue is that, and this is, I
5  experience this about the second or the third week when
6  I started with the Omni. Sandra Taylor was, one of her
7  duties was to go and do an inventory and according to
8  the inventory she would go and issue a PO, purchasing
9  order, and these purchasing orders will be reviewed by
10 myself, signed by myself, forwarded to Saed Elkhodary.
11 In the capacity of the director of housekeeping he would
12 have to approve it, review it, return it back to the
13 housekeeping department so we can go ahead and order
14 whatever we need.
15     What was the normal thing and it happened very
16 frequently that we will forward the PO, the PO will be
17 kept in his office for so long for unknown reason to
18 myself or to Sandra and in the meantime the supplies are
19 getting depleted and that caused a huge problem when it
20 comes to supplying the room attendants with the tools so
21 we can get good results.
22 Q  And are all supplies then for the room

### Page 47

1  attendants obtained from outside vendors, nothing is
2  generated internally?
3  A  No, nothing is generated internally.
4  Q  And you don't know why they were sitting in
5  Mr. Elkhodary's office?
6  A  I will tell you from past experience that some
7  rooms division managers, they would look and say let me
8  save some money on this month, let me keep the PO for
9  next month so I will look good in front of my bosses
10 that I'm spending less money than I'm supposed to and in
11 the meantime the department is running short.
12 Q  Do you know that that's what happened?
13 A  No, I'm just telling you what I think it is
14 from my experience.
15 Q  All right, but your experience at other
16 hotels?
17 A  Yes.
18 Q  Okay. You said the public areas being
19 cleaned, what are the objective measures of whether or
20 not the public areas are clean?
21 A  Again, it is very similar, more or less it is
22 similar to the rooms. If you want to consider the

### Page 48

1  public areas as just one huge room it will be the same
2  procedures which will be a walkthrough in the morning by
3  the director of housekeeping. Normally it is done
4  depending on the construction of the housekeeping
5  department, sometimes you'll have a public area manager,
6  sometimes you'll have --
7  Q  I'm going to interrupt you, Mr. Boulos, and
8  normally I will try not to interrupt you but I'm only
9  asking you about what's happened at the Omni, not what
10 happened in the industry.
11 A  What happened at the Omni Shoreham I will do a
12 walkthrough first thing in the morning, that will
13 normally be done as soon as I step foot in the Omni
14 before even I go to my office and that will be any time
15 between 6 and 6:30 in the office. I will walk all the
16 public areas, I will take notes of what needed to be
17 done, what is clean and what is not, the projects and
18 sort of like to make project for the day and then go and
19 try to get areas which needed special attention and then
20 go through the day activities. If we have meetings in
21 certain rooms, conventions in certain areas, then we
22 need to focus on this area.

### Page 49

1      I will have a meeting after my walkthrough and
2  this meeting would be with the assistant director of
3  housekeeping which is Sandra and the only manager we
4  have which is Angela, I can't remember her last name,
5  and then sort of plan for whatever needed to be done for
6  that particular day to keep the public areas of the
7  hotel in good shape.
8  Q  And so what about that was an objective
9  measure for how the public areas were maintained?
10 A  I don't understand the question.
11 Q  Well, maybe the term objective may be what
12 we're sort of dealing with. When I say objective you
13 gave me 90 percent on the guest cards.
14 A  Okay.
15 Q  That's a number, and if you get 89 we know
16 that's under, 91 we know that's over, so it's an
17 objective measure as opposed to subjective which is I
18 look at it and I say good enough to me.
19 A  Yes.
20 Q  So what can you tell me that was an objective
21 measure of the cleanliness of the public areas?
22 A  It would be the same as on the rooms.

Tawfik Boulos                                                                December 9, 2005

**Page 94**

1  Q  Other than Mr. Foxworth who else did you talk
2  to regarding these comments made by Saed Elkhodary, and
3  I'm limiting it to first the period between January and
4  June 2001?
5  A  Nobody, just Mr. -- what was the dates again?
6  Q  January through June of 2001.
7  A  I don't remember anybody else now.
8  Q  And I assume you don't have any recordings of
9  these comments or anything like that?
10 A  No.
11 Q  Never made any recordings of any sort?
12 A  No.
13 Q  Do you know of anyone that heard similar
14 comments?
15 A  No, I'm not aware of anybody.
16 Q  Have you ever talked to anyone about comments
17 that they independently heard?
18 A  No, I did not.
19 Q  Let's move to from June 2001 through the end
20 of September 2001, who did you talk to about comments
21 that Saed Elkhodary made?
22 A  Can you say the dates again, please?

**Page 95**

1  Q  June through September 2001.
2  A  June through September, that would be Jean
3  Allen, the director of human resources, the one that
4  took Nate Foxworth's place. That would be assistant at
5  the time, Vicki Finn. I don't recall anybody else. I
6  might have, I do not, I cannot remember exactly when
7  Mr. Foxworth left the property, he was also involved in
8  an accident, if I remember correctly, I don't know when
9  that happened but if he was still with the Omni at that
10 time then I would have had definitely some sort of
11 conversation with him.
12 Q  You said at that time, at what time?
13 A  Between those.
14 Q  Between June and September 2001?
15 A  Yes.
16 Q  And if he wasn't there then you didn't have
17 conversations with him?
18 A  Exactly.
19 Q  Anyone outside of the Omni Shoreham but still
20 employed by Omni and its various units?
21 A  Yes.
22 Q  So the only people you talked to regarding

**Page 96**

1  Saed Elkhodary's comments were within the Omni Shoreham?
2  A  Yes, sir.
3  Q  When did you talk to Jean Allen about these
4  comments?
5  A  Jean Allen is my, I talked with her about this
6  when she called me in regards to Sandra's filing
7  unemployment and she discussed with me a few issues at
8  those meetings.
9  Q  What were those issues?
10 A  She discussed with me my opinion about
11 Sandra's performance and also about Saed's treatment of
12 Sandra.
13 Q  And what did you tell Jean Allen about those
14 two issues?
15 A  I expressed my opinion about Sandra's
16 performance, that I was satisfied with her performance,
17 I also informed her about Saed's harassment and
18 misbehavior and racial --
19 Q  What did she, Jean Allen, say in response to
20 that?
21 A  There wasn't really, she was listening.
22 Q  She didn't say anything else?

**Page 97**

1  A  Not that I recall. I mean she was basically
2  listening to my comments.
3  Q  I mean, well, I assume you made the statement
4  and she didn't just say, okay, thank you and good-bye or
5  maybe she did?
6  A  She basically, that's what she said, you know,
7  I'm going to do something about this, talk to whoever
8  she was supposed to. I cannot recall what I said,
9  that's why I'm saying I remember what I said to her, I
10 remember the general idea of the meeting but I do not
11 remember what did I say exactly or what she said exactly
12 but I can recall the meeting itself, what was it about,
13 it was basically about the unemployment of Sandra.
14 Q  And Miss Allen called that meeting with you?
15 A  Yes, she did.
16 Q  And do you remember when?
17 A  I can't recall exactly, I think it's around
18 September, the beginning of September.
19 Q  And that was the first time you spoke Miss
20 Allen about that --
21 A  That was actually the first time I spend any
22 amount of time with her, I think she was new at that

Tawfik Boulos																																			December 9, 2005

Page 98

1  time.
2  Q  And what about, you said, Vicki Finn?
3  A  Vicki Finn is her assistant.
4  Q  Now let's do a couple of quick spellings here,
5  Jean, is that J?
6  A  Jean Allen is director of human resources.
7  Q  Is it J-E-A-N or do you know?
8  A  I think it's J-E-A-N.
9  Q  And then Allen, A-L-L-E-N?
10 A  Yes.
11 Q  And then Vicki, do you know?
12 A  V-I-C-K-I, Finn.
13 Q  Finn is F-I-N-N?
14 A  I would think so, yes.
15 Q  So when did you have the conversation with
16 Vicki Finn?
17 A  Vicki Finn, I cannot recall whether she was
18 present at the first conversation I had with Jean Allen
19 or whether she was present at the second conversation
20 which I have with Jean Allen. I did not have entire
21 conversation with Vicki Finn, Vicki Finn was present in
22 the office.

Page 99

1  Q  So when was the first conversation with Jean
2  Allen?
3  A  Like I said before it was in the early days of
4  September.
5  Q  When was the second conversation with Jean
6  Allen?
7  A  Towards the end of July.
8  Q  Is that possible? I would think the first
9  conversation would have to be the one in July and the
10 second would be the one in September.
11 A  Just one second. Yeah, July, one was in July
12 and one was at September.
13 Q  Okay. And you've told me --
14 A  Sorry.
15 Q  You told me about one conversation just a few
16 minutes ago?
17 A  Yes.
18 Q  Was that the first one or the second one?
19 A  The first conversation which was on July, that
20 was the one which we spoke about Sandra's unemployment
21 complaint.
22 Q  And then tell me about the second one, who

Page 100

1  called that second meeting?
2  A  The second meeting nobody called it. I was
3  basically in the office getting one of the doctor's
4  notes for the administrative assistant whose office is
5  just outside Jean's office and she saw me standing
6  outside and she asked me to step into her office when I
7  finished what I was doing.
8  Q  So she requested you meet with her?
9  A  Yes.
10 Q  But it was just because you happened to be
11 there?
12 A  Yes.
13 Q  You didn't know or she didn't anticipate you
14 being there as far as you know?
15 A  I have no idea if that's what happened.
16 Q  And then did she speak first?
17 A  Yes.
18 Q  In this meeting, the second meeting?
19 A  Yes.
20 Q  What did she say?
21 A  She asked me if I was aware of the fact that
22 there is a hearing, and I told her yes, I am aware. I

Page 101

1  received, by this time I received some sort of document
2  from a hearing board that I need to be there and she
3  asked me what would be my response.
4  Q  And what did you tell her?
5  A  I told her that my response would be that I
6  felt that Sandra was being harassed based on her race
7  and I felt that she was performing her duties and I told
8  her that she was not provided with the tools to do the
9  job. I told her specifically about all the abuses which
10 Saed was performing every day basically day in and day
11 out, and that's what I told her.
12 Q  And what did she say in response to that?
13 A  She mentioned something to the fact that we as
14 managers, we should stick together so we can benefit the
15 corporation which we are working for.
16 Q  And what did you say in response to that?
17 A  My response was that I will tell the truth no
18 matter what.
19 Q  And what did she say?
20 A  She told me that her feelings was that we
21 should stick together as managers so we can benefit the
22 corporation we are working for.

Tawfik Boulos                                                                December 9, 2005

Page 102

1   Q   She just said that again?
2   A   Yes, she mentioned it several times.
3   Q   And I mean what was the next thing you said
4   after that?
5   A   I was sticking again to what I told her once,
6   and once again I will tell the truth as I saw it and as
7   I felt it and as I existed in the middle of it so I was
8   going to tell the truth.
9   Q   So you're going back and forth essentially,
10  she's saying we should stick together you're saying I'm
11  going to tell the truth?
12  A   Uh-huh.
13  Q   Who was the first person to break that back
14  and forth?
15  A   There was no breakage, that was the end of it.
16  She wished me, you know, soon to return to work and that
17  my back would get better and that the conversation
18  changed to kind of that direction and that was the end
19  of it. She asked me a couple of questions about how I
20  feel in my back.
21  Q   Right, okay. And is that the last
22  conversation you had with someone at Omni regarding Miss

Page 103

1   Taylor?
2   A   No, there was another conversation with Chuck
3   Wings.
4   Q   Say that again.
5   A   His name was Chuck Wings.
6   Q   W-I-N-G?
7   A   I would think yeah, W-I-N-G-S, his name was
8   Chuck Wings.
9   Q   When did that conversation occur?
10  A   I cannot recall exactly again when this
11  conversation took place but it definitely took place
12  before the hearing of.
13  Q   Okay, and the hearing did go forward?
14  A   Yes, it did.
15  Q   And you testified?
16  A   Yes, I did.
17  Q   Were you testifying in person?
18  A   Yes, I did.
19  Q   Where was the hearing, do you remember?
20  A   No, I can't recall. It wasn't, I can't, I
21  think it was in D.C., it was in the D.C. area, it wasn't
22  in Maryland.

Page 104

1   Q   All right. Are there any other conversations
2   you've had regarding Sandra Taylor that you've not yet
3   told me about related to her performance, and I'm
4   speaking now January through the end of September of
5   2001?
6   A   I might have but I'm cannot recall right now.
7   Q   You can't remember anything else?
8   A   I can't remember anything else.
9   Q   Is there any document you could look at that
10  would help you remember any conversation?
11  A   If I would have one.
12  Q   Do you remember a document that exists that
13  would help you remember?
14  A   No, I can't, I can't remember right now.
15  Q   No diary?
16  A   No.
17  Q   Notes?
18  A   No.
19  Q   Calendar?
20  A   No.
21  Q   Nothing like that that you know of that exists
22  that would help you remember?

Page 105

1   A   No.
2   Q   Let's move to your actual employment at the
3   hotel. You were, I believe, a salaried exempt employee;
4   is that right?
5   A   Uh-huh.
6   Q   Do you recall if you took in your first six
7   months of employment at Omni a lot of time off, very
8   little time off, no time off?
9   A   No time off.
10  Q   Were you even entitled to time off at that
11  point?
12  A   I just worked seven days a week.
13  Q   Were you entitled to paid time off?
14  A   During this period, you mean?
15  Q   Yes.
16  A   Not that I'm aware of.
17  Q   Okay, so but you were there every day for that
18  6-month period?
19  A   Yes, I was.
20  Q   Is there a way to verify that you did punch in
21  or anything like that?
22  A   No, as a manager you don't punch in, you're on

Tawfik Boulos                                                                December 9, 2005

Page 110

1  Q  Did Saed say he was happy about it?
2  A  Oh yes.
3  Q  Good job whatever, anything like that?
4  A  He didn't tell me good job at all because I
5  wasn't in that, he was congratulating himself.
6  Q  What did he say?
7  A  He said that's it, we got rid of her. He was
8  happy, his body language, his facial expressions, he was
9  extremely happy about the fact that Sandra was no longer
10 with Omni.
11 Q  All right. Did you have any further
12 discussions with Saed about Sandra Taylor after that?
13 A  No.
14 Q  Now, I understand that you were injured at
15 work?
16 A  Yes, sir.
17 Q  Tell me how that happened.
18 A  It happened on the morning of the 6th of June.
19 At this point of time we have a mechanical failure in
20 the chute system in the housekeeping department and that
21 meant that the entire system was on hold, we needed to
22 send all our linen to an outside contractor. The

Page 111

1  delivery trucks returned our linen very early in the
2  morning on the 6th.
3     At that point of time I did not have any
4  housemen to move the linen. But at the same time we
5  needed the linen in the housekeeping area because we
6  needed it to be distributed to the floors where the
7  housekeeping closet is so the ladies can perform their
8  duties. I attempted to go and move cart after cart and
9  I think it was my third or fourth cart, I was pushing it
10 from the loading dock to the housekeeping area when I
11 felt sharp pain in my back.
12 Q  And what happened after that?
13 A  I thought to myself that probably it's just
14 going to go away, it's one of those things you feel a
15 bit of pain and it's just going to go away.
16 Q  And what happened after that?
17 A  Well, the pain continued so I took it easy for
18 the rest of the day and I sat at my desk trying to do
19 some paperwork and stuff of this sort and I went home.
20 Q  And what happened at home?
21 A  The pain continued but at home, you know, I
22 had my hands on some pain killers and I just took a

Page 112

1  couple of Tylenol or whatever we had, it eases the pain
2  a little, and I went to work the following day.
3  Q  And how was work the next day?
4  A  Again when I didn't, when the effect of the
5  pain killers was gone I started to feel pain, you know,
6  and it was just getting worse.
7  Q  When did you finally tell somebody about the
8  injury?
9  A  I told, it was very obvious for everyone, I
10 was walking funny, I was walking, I couldn't really put
11 a lot of pressure on my right foot and I informed Saed
12 about the accident.
13 Q  Was there anyone with you when you were
14 injured?
15 A  There might have. The hallway when I was
16 pushing the cart there was a lot of people there working
17 out of the departments but I was the only one in the
18 housekeeping department at that early time in the
19 morning and no, when I was pushing the cart there was
20 nobody around at that point of time.
21 Q  So you told Saed and what did he say?
22 A  He said to me why don't you go home and give

Page 113

1  it a rest but the first thing he said well, let's go and
2  file an accident report.
3  Q  And did you file the accident report?
4  A  Yes, I did.
5  Q  And what did you do after that, first who did
6  you file it with?
7  A  With the security department.
8  Q  Do you remember a particular person?
9  A  You're supposed to file it with the director
10 of security or his assistant whose name at the time I'm
11 sorry, I can't remember.
12    MS. WALSH: Can I point out I haven't seen a
13 copy of the accident report.
14    MR. COLES: I haven't either.
15    BY MR. COLES:
16 Q  What did you do after that?
17 A  After that Saed asked me to take it easy and
18 not to put too much pressure on my back and not to do
19 anything which will make it worse and to go home early.
20 And I pointed to him that we are a little bit short
21 after, at this point of time we didn't have Sandra and
22 we didn't have a replacement so it was a little bit

Tawfik Boulos                                                                December 9, 2005

Page 114

1  short in our part and I needed to put the extra mile
2  there to get things going so I felt that my presence
3  there is very necessary and I tried to complete the day.
4    Q  Did you complete the day?
5    A  Yes, I did.
6    Q  That's the day after the accident?
7    A  Yes, sir.
8    Q  And what about the next day?
9    A  It went the same thing, same thing until the
10 11th when the pain started to really, really get to
11 bother me a lot and this is when Saed asked me to go to
12 the George Washington Hospital emergency department.
13   Q  And before that time when Saed told you to go
14 to the George Washington emergency department, how many
15 times did he tell you to go seek medical attention
16 before that?
17   A  He didn't.
18   Q  I thought you said me that he told you on the
19 second day?
20   A  To file an accident report.
21   Q  That's all he said?
22   A  Yes, he asked me did you file an accident

Page 115

1  report yesterday, I said no. He said well, go ahead and
2  file an accident report which I did.
3    Q  And the person that you filed it with, did
4  they talk to you about going to see a doctor?
5    A  No, they just take it from you, a description
6  of what happened and that's about it.
7    Q  So then Saed finally says on the 11th you need
8  to go to the George Washington --
9    A  He said to me go to the George Washington
10 Hospital and I went to the human resources department,
11 they called a taxi for me, the human resources
12 department, and I went to the George Washington
13 emergency department.
14   Q  And there you met with the doctor, I assume?
15   A  Yes, sir.
16   Q  And what did you learn from the doctor?
17   A  I did not learn a lot. They examined me and
18 they brought, he brought a pink slip, I'm not even quite
19 sure whether it was a female or a male doctor, I cannot
20 really remember, but they said to me, they put me on
21 some, I think it was a couple of days no work and then
22 after that they put me on some work restrictions.

Page 116

1    Q  Okay. And so from the date of the injury
2  which was June 6th --
3    A  Yes.
4    Q  -- until June 11th did you miss any work?
5    A  No.
6    Q  And after June 11th did you miss any work?
7    A  After June 11th?
8    Q  Yes, of 2001?
9    A  Of course.
10   Q  Okay. What was the first day that you did not
11 show up for work?
12   A  I think, if my recollection was right the
13 doctor gave me two days not to go to work at all.
14   Q  Okay.
15   A  And then after that go to work with certain
16 limitations.
17   Q  So the 12th and the 13th you stayed away from
18 work?
19   A  Yes.
20   Q  The 14th go back to work with restrictions?
21   A  I think so.
22   Q  Did you go back to work?

Page 117

1    A  Yes, I did.
2    Q  How was that?
3    A  What do you mean?
4    Q  Were you able to do your job?
5    A  With restrictions.
6    Q  With the restrictions in place.
7    A  I was but the pain was very, very intense.
8    Q  So other than the 12th and the 13th did you
9  miss any days of work?
10   A  Absolutely, whenever the doctors said to me
11 that I cannot go to work this is when I missed work.
12   Q  What was the next day that you recall missing
13 work?
14   A  After there the certain limitations, the
15 restrictions on the work I do, I was scheduled to go and
16 see Dr. Yu in the George Washington Hospital, he's
17 specialized in this kind of injuries, and when I went to
18 see him he put me on some restrictions and then after
19 that when I went to see him again this is when he
20 started, he told me you cannot go to work and I cannot
21 quote exactly but I know that if I can see the dates of
22 the notes I got from him I'm sure I would remember.

Tawfik Boulos                                                                December 9, 2005

Page 118

1  Q  Okay, let's kind of go through some of these
2  real quick. Some of these are not very clear so we'll
3  take them one at a time and sort of see what we know
4  here. We're on Exhibit 4, I believe.
5       (Exhibit Number 4 was marked for
6  identification.)
7       BY MR. COLES:
8  Q  I'll do this one first so that we can talk
9  about it because I frankly can't tell much about this
10 one.
11 A  It's a bad copy.
12 Q  Yeah. I believe, and you can tell me if this
13 is right, this is I think dated June 11th of '01 at the
14 bottom right corner?
15 A  Yes.
16 Q  All right. And I believe in the sort of
17 calendar at the middle of the page?
18 A  Yes.
19 Q  The day Monday is June 11th?
20 A  Yes.
21 Q  And there's no work on June 11th, 12th and
22 13th?

Page 119

1  A  That's correct.
2  Q  And then starting on Thursday there's the A
3  which it means altered duties?
4  A  Yes.
5  Q  Through Sunday?
6  A  Yes.
7  Q  And then on Monday which would be June 18th
8  you're scheduled to return, does that mean return to
9  work?
10 A  I'm not sure about that.
11 Q  Because it also at the very bottom says
12 followup appointment 6-18?
13 A  Yes.
14 Q  So I don't know if that's return to work or
15 return to the doctor?
16 A  Return to the doctor, I believe.
17 Q  You don't know for sure?
18 A  Well, now that you have drawn my attention to
19 what was written at the bottom I believe that what they
20 said on this particular date I need to return to the
21 emergency department.
22 Q  Okay. But that, is it possible that that

Page 120

1  means return to work?
2  A  No.
3  Q  It's not possible at all?
4  A  No.
5  Q  You're one hundred percent sure of that?
6  A  Absolutely.
7  Q  Okay. And on which day did you -- you
8  returned to work you said obviously it's on the 14th,
9  when was the next time that you missed work? Can you
10 tell based on this or do you need more information?
11 A  I went to work every day except the two days
12 which is Monday the 11th and Tuesday the 12th.
13 Q  Okay. At least every day on this calendar?
14 A  Yes, sir.
15 Q  Give you Exhibit 5.
16      (Exhibit Number 5 was marked for
17 identification.)
18      MS. WALSH: I apologize for the quality of
19 that, I didn't realize that the scan would be --
20      MR. COLES: I think the original is pretty bad
21 as well.
22      MS. WALSH: It is but it's better than that.

Page 121

1       BY MR. COLES:
2  Q  All right, that's Exhibit 5. Now, this looks
3  to me like this is the return trip the 18th of June?
4  A  Correct.
5  Q  So did you work that week of the 18th as far
6  as you can tell here?
7  A  Yes, sir.
8  Q  Then you went to see an orthopedic person as
9  well?
10 A  Yeah, that particular day when I went on the
11 18th back to the emergency department, this is when they
12 issued me with this particular document here and they
13 told me that I needed to go and see an orthopedist ASAP.
14 Q  And is that the Dr. Yu you mentioned?
15 A  Yes.
16      (Exhibit Number 6 was marked for
17 identification.)
18      BY MR. COLES:
19 Q  All right, I'll give you Exhibit 6 now. Now,
20 is that, that looks to me to be the first note from
21 Dr. Yu?
22 A  Yes, sir.