Tawfik Boulos

December 9, 2005

---

**Page 122**

1  Q   All right. Now he says limited duty is
2  checked?
3  A   Yes, sir.
4  Q   With no lifting is the only limitation?
5  A   Yes, sir.
6  Q   So did you go to work through this period?
7  A   Yes, sir.
8  Q   Through the week of June 26th?
9  A   Yes, I did.
10  Q   All right. And Exhibit 7.
11      (Exhibit Number 7 was marked for
12  identification.)
13      BY MR. COLES:
14  Q   That's dated July 3rd, do you see that?
15  A   Yes.
16  Q   Now this one says No work?
17  A   Yes, sir.
18  Q   What changed between the June 26th visit and
19  the July 3rd visit?
20  A   I'm not quite sure but I think that when I
21  went to see Dr. Yu the first time he did x-rays for me
22  and when I went to see him on the later date which is

---

**Page 123**

1  the 7th, on July 3rd, was that July -- yeah, he did tell
2  me that he is not very happy with the results, what we
3  have seen, and he told me not to go to work. Basically
4  he mentioned some medical terms which I wasn't really
5  familiar, mentioned something about disk and herniated
6  disk and stuff like that. He said to me that I cannot
7  go to work.
8  Q   So this is the first time that you stopped
9  going to work?
10  A   Yes.
11  Q   So for essentially a month after the incident
12  you were going to work?
13  A   With limited duties, yes.
14  Q   Tell me about limited duties, what were you
15  doing?
16  A   The most painful thing was for me, at this
17  point of time it was walking. It was, every time I
18  stepped on the right it was sending sharp pain to the
19  back so I tried to avoid walking as much as I can which
20  is very difficult when you're in the housekeeping
21  department. I tried to stick to my paperwork and tried
22  to just direct the department and make sure that

---

**Page 124**

1  everybody is doing the job as much as I can.
2      I attended all the meetings, manager's
3  meetings, union meetings, if there was any union
4  disputes I attended all of those, morning meetings of
5  course which was very important, at least to let the
6  employees feel that there is some sort of supervisory
7  and direction there, that was basically what I was doing
8  during this month.
9  Q   And as of July 3rd to your knowledge had you
10  replaced Sandra Taylor?
11  A   As of?
12  Q   As of July 3rd, 2001 had Miss Taylor been
13  replaced?
14  A   I think at that point, I'm not quite sure but
15  I think at that point of time we did have a gentleman, I
16  cannot recall his name, he was from India or from
17  Pakistan, if you mention his name I'm sure that will
18  refresh my memory.
19      MR. COLES: Would it be possible to stop for a
20  minute? I need to check something.
21      (Off the record.)
22      BY MR. COLES:

---

**Page 125**

1  Q   Is that person Naseem Siddiqui? I'll take a
2  shot and if you think I'm wrong --
3  A   Naseem is I think N-A-S-E-E-M.
4  Q   And Siddiqui?
5  A   It's just one of those you can spell it a
6  hundred different ways.
7  Q   I'll take a shot at it, S-I-D-D-I-Q-U-I. If
8  you think it's different just let me know, is that okay?
9  A   That's fine.
10  Q   So you think he was on board before you took
11  this leave on July 3rd?
12  A   I'm not quite sure, I'm not -- that's a
13  possibility.
14  Q   Having said that essentially I assume you were
15  not walking the floor very often, if at all, during that
16  month?
17  A   No.
18  Q   I assume you weren't doing any room
19  inspections, if at all?
20  A   Not too many, no.
21  Q   I assume you weren't back and forth in the
22  laundry very often?

---

Tawfik Boulos

December 9, 2005

Page 126

1    A    The laundry, because of the proximity of the
2    laundry department to the housekeeping department which
3    is just like a few steps and just you go down the stairs
4    and you are in the laundry department. Because of the
5    proximity of the laundry department, yes, I was frequent
6    visitor of the laundry department but as walking the
7    public areas and rooms as I used to, no, the answer
8    would be no.
9    Q    So actually you know what, I'm going to go
10    ahead and make my less-than fabulous chart, I'm going to
11    redo that for a minute here, when we take our next break
12    I'll do that and have that as an exhibit.
13    A    Okay.
14        (Exhibit Number 9 was marked for
15    identification.)
16        BY MR. COLES:
17    Q    And we will call that Exhibit 8 which we will
18    enter into the record when that's completed during the
19    next break.
20        And Exhibit 9, well, actually one thing about
21    that chart and the reason I brought it up, so
22    effectively if your responsibilities under Exhibit 8

Page 127

1    were public areas, laundry and rooms, during that month
2    after you were injured you were effectively limited to
3    personally being involved in laundry on a regular basis
4    and not really as much rooms as public space?
5    A    Rooms and not as much.
6    Q    All right. And then Exhibit 9 now, this looks
7    again three weeks after your last visit, do you recall
8    if there's a visit between July 3rd and July 24th?
9    A    No.
10    Q    Okay. So as far as you know this is the next
11    note following the July 3rd note that's in Exhibit 7?
12    A    Yes, sir.
13    Q    So Exhibit 9 shows that you're out here for at
14    least two more weeks?
15    A    That's correct.
16    Q    And at this point has anything changed since
17    July 3rd as of July 24th?
18    A    No, nothing, nothing changed. What do you
19    mean by --
20        MS. WALSH: Objection.
21        BY MR. COLES:
22    Q    I mean in your personal health, are you

Page 128

1    better, worse?
2    A    The pain is still the same, sharp pain.
3    Q    Okay, no more frequent, no less frequent?
4    A    Same frequency, same kind of pain.
5    Q    What treatment are you undergoing at this
6    point?
7    A    At this point of time or what I was prescribed
8    was Tylenol 3 which is the extra strength pain killer.
9    Q    No rehabilitation?
10    A    No rehabilitation.
11    Q    So during the day essentially you're not to do
12    anything?
13    A    Exactly, the same, limited duty.
14    Q    I thought you were out of work.
15    A    No, I mean, what I mean is when I was working,
16    I was on the same limited duties when I'm off work. Now
17    I'm not going to work at all so I'm doing nothing but as
18    far as the pain, it is exactly the sharp pain, exactly
19    the same thing I was exercising since it started.
20    Q    What did they tell you would be the amount of
21    time you would be out of work?
22    A    I wasn't told that.

Page 129

1    Q    At some point you've been out of work now for
2    three weeks and for at least the next two weeks so we're
3    looking at five weeks?
4    A    Yes.
5    Q    You weren't asking them when can I go to work?
6    A    Yes, I was.
7    Q    And what did they tell you?
8    A    Dr. Yu informed me that there was a
9    possibility that I needed to be operated on and that was
10    his response, that we are going to have to go through
11    the MRIs and x-rays and some lab work you have to do or
12    whatever and that will form his decision what will be
13    his next step.
14    Q    Did you ever have MRIs and all these things
15    done?
16    A    Yes, I did.
17    Q    When did that happen?
18    A    I remember that I did have one MRI and Dr. Yu
19    was not happy with, I can't remember exactly when it
20    happened. I can't remember exactly when this happened,
21    if you again have anything to refresh my memory, I
22    appreciate it.

713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532
33 (Pages 126 to 129)

December 9, 2005

Tawfik Boulos

---

Page 134

1    MR. COLES: Do you have the original here in
2    the office?
3        MS. WALSH: Off the record.
4        (Off the record.)
5    BY MR. COLES:
6    Q    Back on the record. We have the original of
7    Exhibit 9 and it appears, Mr. Boulos, that the words
8    from Tawfik Boulos have simply bled through the back?
9    A    Right.
10   Q    But this number written here appears to be
11   written in pencil on the back so that is what it's
12   supposed to be?
13   A    Right, and I can only here think of what I
14   normally do when I send faxes. What I do is I will
15   write the number of the fax on the back of the paper,
16   put the fax, the paper, and dial the number. And again
17   I'm only here speculating about what would have
18   happened.
19   Q    Fair enough.
20   A    Depending on my habit when I send fax so that
21   could be, and I'm not saying that it is, that would be
22   the number of the insurance company, Miss Treziak, I

---

Page 135

1    cannot tell you for sure.
2    Q    Okay, but just to be clear, as Exhibit 9 is
3    depicted what is on the left is what's on the back and
4    what is on the right is what's on the front? What's on
5    the right is the front and what's on the left is what's
6    on the back?
7    A    What is that?
8    Q    I'm just asking you to agree or disagree with
9    that statement.
10   A    Yeah.
11   Q    I just need that for the record to be sure
12   because we may not have the smaller original.
13   A    No problem, yes, I understand.
14       (Exhibit Number 8 was marked for
15   identification.)
16       BY MR. COLES:
17   Q    Great. That's number 9 there. Number 8 is
18   here, I've redone it versus the one I did when we were
19   discussing it, so just review it quickly.
20   A    Executive housekeeping.
21   Q    If you'll add it to your stack there of
22   exhibits. Let's see here, all right. Now, let's kind

---

Page 136

1    of pick up here. August, somewhere around the beginning
2    of August, we're not going to say necessarily when but
3    you're out for two weeks starting July 24th, I assume
4    you go to the doctor and just to clarify at least it
5    looks like on the back page of Exhibit 9 or next visit
6    August 7th at 2 p.m., it would be the back but it's the
7    left-hand side on this exhibit?
8        MS. WALSH: I have an objection just to the
9    evidence. I believe his first out of work was on July
10   3rd.
11       MR. COLES: But he was out of work for two
12   weeks as of July 24th.
13       MS. WALSH: Correct.
14       BY MR. COLES:
15   Q    And your next appointment is August 7th at 2
16   p.m. it appears, do you recall that?
17   A    No, but I mean I could not put it down for
18   anything, could be sometimes you get a telephone call,
19   you don't have anything but this paper and you write it
20   down I don't know if this is the appointment for the
21   doctor or something else.
22   Q    Well, let me ask you, did you ever return to

---

Page 137

1    work after July 3rd, 2001?
2    A    Yes.
3    Q    At the Omni Hotel?
4    A    Yes, I did.
5    Q    When did you return to work?
6    A    I returned to work on the 8th of September.
7    Q    Okay. So from the 24th when you got two weeks
8    that would take you to August the 7th?
9    A    Yes.
10   Q    And from August the 7th through September the
11   8th you were still out of work?
12   A    Yes.
13   Q    I'll just tell you that I don't have anything
14   related to that, do you know if there's documents that
15   are out there that you have that show your excuse from
16   work from August 7th to September 8th?
17   A    What kind of documents?
18   Q    Much the same as Exhibits 6, 7 and 9.
19   A    No, I don't have any of these documents, no.
20   Q    Do you know if you got documents to authorize
21   you to be out of work after August 7th?
22   A    No, I'm not aware of any documents.

---

Tawfik Boulos                                                    December 9, 2005

Page 138

1    Q   To your knowledge were you required to update
2  Omni or the insurance company about your authorization
3  to be out of work?
4    A   Yes.
5    Q   Do you know how you would have done that?
6    A   I would have, every time I took a note from my
7  doctor I would have either as you see here forwarded one
8  to Treziak or take it personally to the Omni Shoreham
9  Hotel myself.
10   Q   So just let me break this down into smaller
11 chunks then, to your knowledge did you receive any more
12 doctor authorizations to be out of work after Exhibit 9?
13   A   Yes, Dr. Yu told me not to go to work.
14   Q   And he gave you a paper to that effect?
15   A   I'm quite certain that he did.
16   Q   And you no longer have those pieces of paper?
17   A   No, I do not.
18   Q   What did you do with them?
19   A   I either gave them to, like I said, either
20 forward them to Treziak or give them to the Omni
21 Shoreham.
22   Q   Do you know how many separate sheets of paper

Page 139

1  that would be for that approximately one-month period?
2    A   No, I'm not aware of how many.
3    Q   And you see if you had faxed it to Karen
4  Treziak that wouldn't deprive you of the original?
5    A   No, it would not.
6    Q   But if you handed it to someone at the Omni
7  unless a photocopy was made that would deprive you of
8  the original.
9    A   Yes.
10   Q   So I'm trying to figure out both or either or
11 do you know?
12   A   I think there was only one time I did fax
13 something to Treziak as far as I remember. The rest of
14 the time I took the notes myself to the Omni Shoreham
15 myself.
16   Q   And why did you take them to the Omni instead
17 of faxing it to Tracey Treziak?
18   A   I was told that it would make things easier to
19 hand them myself and this way the gentleman who was
20 responsible about these kind of cases, he will take care
21 of it and we would make sure that either forward it to
22 the right person, I was told to if I can do it this way

Page 140

1  it's preferable to do it this way.
2    Q   Okay.  And you received monetary compensation?
3    A   Yes, I was.
4    Q   While you were out of work?
5    A   Yes, I was.
6    Q   Did that ever stop?
7    A   Yes, it did.
8    Q   When did it stop?
9    A   Stopped in either in July or August.
10   Q   It stopped in either July or August?
11   A   Or August, yes.
12   Q   Do you know why it stopped?
13   A   Yes, I do.
14   Q   Why did it stop?
15   A   It stopped because the insurance company felt
16 that I should return to work.
17   Q   All right.  I'll give you Exhibit 10.
18       (Exhibit Number 10 was marked for
19 identification.)
20       BY MR. COLES:
21   Q   Have you seen that letter before?
22   A   Yes.

Page 141

1    Q   When did you first see Exhibit 10?
2    A   When it was sent to me.
3    Q   Okay.  Just to be clear on something here, is
4  this sort of the time that you stopped receiving
5  benefits?
6    A   Yes, this was about the right time I stopped
7  receiving benefits, yes.
8    Q   And during the month of August were you in the
9  D.C. metropolitan area for the entire month?
10   A   Absolutely.
11   Q   And I ask because they apparently were not
12 able to reach you by telephone.
13   A   Yeah, but I discussed that with her already
14 when she called me on the phone, Miss Treziak.
15   Q   When did you discuss that with her?
16   A   She called me, after this I have the
17 conversation with her, after I received this letter I
18 called her on the phone and I questioned, the first
19 thing I said, you know, I really could not understand
20 how you would not reach me if I'm at home 24 hours a day
21 and her response was you must have been on the phone
22 when I called and the line was busy or something.  So I

Tawfik Boulos

December 9, 2005

**Page 142**

1  just finished the conversation and we went again into
2  the rest of whatever I called for.
3      Q    Okay, so she had the right phone number as far
4  as you know?
5      A    Oh yes, of course, definitely.
6      Q    Now you received this letter some time around
7  August 24th but probably not that day, I would assume?
8      A    Yeah, I can't recall exactly when I got the
9  letter but around that time, that would be correct.
10     Q    All right.  Now, prior to August 24th the
11 insurance company is paying you benefits for being out
12 of work?
13     A    Yes.
14     Q    And prior to August 24th the insurance company
15 is paying your medical bills?
16     A    Yes.
17     Q    After August 24th they are no longer paying
18 you benefits for being out of work?
19     A    That's correct.
20     Q    And they were no longer paying for your
21 medical bills?
22     A    That's correct.

**Page 143**

1      Q    As far as you know, I see here it references a
2  Dr. Gordon, is that as far as you know what changed the
3  sort of status of your case with the insurance company?
4      MS. WALSH:  Objection.
5      BY MR. COLES:
6      Q    Go ahead, you can answer the question if you
7  can.
8          As far as you know is that what changed the
9  decision in your case?
10     A    I think so.
11     Q    Okay, when did you go meet with Dr. Gordon?
12     A    I met with Dr. Gordon sometime during the
13 month of August.
14     Q    And why did you meet with Dr. Gordon?
15     A    I was, I received a call from Karen Treziak
16 and she informed me that I would need to go and see an
17 independent doctor.  She told me that I would be
18 contacted by the case nurse, a gentleman by the name of
19 Graff, I can't remember his first name.  Mr. Graff
20 contacted me and arranged for the examination.
21     Q    And did they tell you why they wanted you to
22 go meet with Dr. Gordon?

**Page 144**

1      A    No.
2      Q    They just told you you need to meet with
3  Dr. Gordon?
4      A    They told me that I need to be examined by an
5  independent doctor, they didn't even mention his name.
6      Q    They didn't tell you why they were looking for
7  this at that point as opposed to some other point?
8      A    No.
9      Q    What did Dr. Gordon tell you?
10     A    Nothing.
11     Q    He never spoke one word to you?
12     A    Hello.
13     Q    He only said hello?
14     A    Can you sit down on the bench.  I sat down on
15 the bunch, he put one of those, I don't know, hammers
16 you hit the knee with, he knocked at my right knee a
17 couple of times, the left knee a couple of times, that
18 was it.
19     Q    So he did the reflex test on your knees?
20     A    Yes.
21     Q    And you left?
22     A    And he left, he left the room.

**Page 145**

1      Q    And then what happened?
2      A    Then I went outside in the waiting area.  By
3  this time Mr. Graff, the case nurse, went to the
4  doctor's office, he closed the door, he was inside there
5  for 10, 15 minutes and then he came out.
6      Q    The nurse did?
7      A    Yes.
8      Q    And then what happened?
9      A    The nurse offered to drive me to the nearest
10 Metro station and he informed me that the doctor decided
11 that I will return to work with very, very severe
12 limitations.
13     Q    Did he tell you what those severe limitations
14 were?
15     A    No, he did not.
16     Q    Did you ever learn what those limitations
17 were?
18     A    No, I did not.
19     Q    So did you ever ask anyone what those
20 limitations would be?
21     A    No, I did not.
22     Q    Any reason why you didn't ask?

Tawfik Boulos

December 9, 2005

Page 146

1    A   I didn't ask because later on I discovered

2  that there was nothing such as a severe limitation, I

3  was asked to go back to work with no limitations.

4    Q   Who told you that?

5    A   Who told me that?

6    Q   (Nodding).

7    A   This here.

8    Q   Where does it say there will be no

9  limitations?

10   A   It says they have to go back to work.

11   Q   Right, but my question is where does it say no

12  limitations?

13   A   Okay, what you mean who told me that there was

14  no limitation or where does it say in this letter there

15  was no limitations?

16   Q   I thought you said this letter said that there

17  would be no limitations?

18   A   This letter tells me to go back to work.

19  Obviously the first thing like I mentioned five minutes

20  ago when I received this letter my first response was to

21  call Miss Treziak.  I called Miss Treziak and I asked

22  her to explain to me what is in this letter.  She said

Page 147

1  to me that Dr. Gordon decided that you are, there's

2  nothing wrong with you, you need to go back to work

3  immediately with no limitation now whatsoever.

4      She also explained to me that my benefits,

5  from that date on my benefits no longer exist, that the

6  insurance company is not going to pay no longer for my

7  money, the check or to cover any medical expenses and

8  this is how I learned that there is no limitation on

9  return to work.

10   Q   So Miss Treziak specifically said to you --

11   A   Yes.

12   Q   -- there will be no limitations on your work?

13   A   Yes.

14   Q   Okay.  Did you talk to anyone else about

15  limitations in your work other than that?

16   A   Yes, I did.

17   Q   Who else?

18   A   I called my HR at work.

19   Q   Who did you talk to?

20   A   I talked to Jean Allen, the director of human

21  resources.

22   Q   What did you tell her?

Page 148

1    A   I told her that I'm very concerned about going

2  back to work with no limitations because that means that

3  I have to work with all the pain I'm suffering from

4  without any medications because the medications make me

5  very lousy when I take it.

6      And I voiced my concern about the way I was

7  examined by the doctor, I told her that I did not think

8  that he was professional, I did not think he was

9  thorough in his exam and I brought it to her attention

10  that as my employer, as the people who the person who

11  has the company paying premiums to this insurance

12  company to take care of their employees when they have

13  an accident I told her it is her duty to bring it to

14  their attention that they should do a better medical

15  examination.

16   Q   Did you also say this to Miss Treziak?

17   A   To who?

18   Q   Miss Treziak?

19   A   No, I didn't say that to Miss Treziak, I told

20  that to Jean Allen.

21   Q   Did you tell that to anyone else?

22   A   Yes.

Page 149

1    Q   Who else?

2    A   I spoke with Miss Treziak in a later date, I

3  can't remember exactly when and I told her that I don't

4  think that the examination that I went to was good

5  enough or proficient enough.

6    Q   Do you know when you had that conversation

7  with Miss Treziak?

8    A   No, it was just all right after I received

9  this letter.

10   Q   So but this is also before you returned to

11  work then?

12   A   You mean returned to work the 8th of --

13   Q   -- September?

14   A   Yes, sir.

15   Q   So between the 24th and the 28th how many

16  conversations did you have with Miss Treziak?

17   A   Two maybe.

18   Q   Did I say the 24th and the 8th?  I didn't

19  think so.  Between August 24th and September 8th how

20  many conversations did you have with Miss Treziak?

21   A   Two as far as I remember.

22   Q   Okay.  And that was the one where you first

Tawfik Boulos

December 9, 2005

Page 150

1  called about this letter?
2  A  Yes.
3  Q  Exhibit 10, and the second one was where you
4  told her a better examination was needed?
5  A  Yes.
6  Q  Between those two you spoke to Jean Allen?
7  A  Yes.
8  Q  Okay.
9  A  Right after I spoke to her, to Miss Treziak,
10  the first time I spoke with Jean Allen.
11  Q  Okay, other than those three phone calls or
12  conversations, I'll say, other than those three
13  conversations did you discuss this issue with anyone
14  else?
15  A  Oh yes.
16  Q  Who else?
17  A  With Jean Allen and two further calls where
18  Mr. Peter Austin was either on the speaker phone in
19  either her office or his office, I'm not quite aware of
20  that, and the second time where we were on the
21  conference call where he was in his office, she was in
22  her office and they were speaking to me at home.

Page 151

1  Q  So let's go with the next conversation after
2  your conversation with Jean Allen.
3  A  Yes.
4  Q  Who did you talk to next?
5  A  Jean Allen and Peter Austin.
6  Q  And approximately when was that?
7  A  That would be approximately the last week of
8  August, last ten days of August.
9  Q  And well, I mean it would have been a much
10  smaller window of time than that, it would have been
11  after the August 24th letter?
12  A  Yes.
13  Q  And I assume that the August 24 letter took a
14  day to get to you?
15  A  Uh-huh.
16  Q  And I assume you had a conversation with Miss
17  Treziak and Miss Allen on the day it got to you?
18  A  Yes.
19  Q  And on a minimum you would have had the
20  conversation the last five days of the month?
21  A  Possibly, like I said, I'm not really
22  completely sure about the exact dates.

Page 152

1  Q  What did you say in the second conversation
2  with Jean Allen?
3  A  That was with Jean Allen and Peter Austin, the
4  general manager.
5  Q  Right.
6  A  At that point of time Mr. Peter Austin was
7  mainly concerned about when I'm going to go back to
8  work.
9  Q  Right.
10  A  And I let him know that I am just as eager to
11  go back to work providing that I go back to work without
12  the pain, number one, I cannot go to work with the pain;
13  and number two, I cannot go against my treating
14  physician. And number 3, again I brought to her
15  attention all my notes about my observations about the
16  examination of the independent doctor, Dr. Gordon, that
17  was mainly the content of the conversation.
18  Q  You said you brought to their attention your
19  notes, are these written notes?
20  A  No, my observations.
21  Q  Okay, how did either Mr. Austin --
22  A  There's a difference between observations and

Page 153

1  notes.
2  Q  How did Mr. Austin or Miss Allen respond to
3  you?
4  A  In a way that his response, him in particular,
5  his response was that to put me in front of a few
6  options, and he told me bluntly the options. Option
7  number one is to return to work with no restrictions as
8  Dr. Gordon said; option number two is to resign; option
9  number three is to lose my job or get terminated,
10  whichever way. And he specifically asked me to go to my
11  treating physician, Dr. Yu, and ask him to release me to
12  go back to work.
13  He said that several times during the
14  conversation, Jean Allen said that also. Jean Allen was
15  mostly talking to me about that there is ways of
16  appealing against the decision of the insurance company
17  and all that and he was mainly concentrating on coming
18  back to work or else.
19  Q  During the period August 24th through
20  September 8th were you paid at all?
21  A  No.
22  Q  Okay. And assuming this conversation with

713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532
39 (Pages 150 to 153)

Tawfik Boulos

December 9, 2005

Page 154

1 Peter Austin and Jean Allen, you got three options?

2    A    Yes.

3    Q    I take it from your description you didn't

4 like those options?

5    A    No.

6    Q    What was the option that you wanted?

7    A    The option I wanted is to get the medical

8 treatment so I can get myself, my injuries treated so I

9 can get better so I can go back and function at my full

10 capacity and full duty.

11    Q    So the option you wanted was continue having

12 the insurance company pay for medical?

13    A    Uh-huh.

14    Q    Continue having the insurance company pay what

15 salary that they were paying?

16    A    Yes.

17    Q    Go through the medical treatment?

18    A    Yes.

19    Q    And ultimately return to work if you are able

20 at some point in the future?

21    A    Yes.

22    Q    With your job still held open for you?

Page 155

1    A    Yes.

2    Q    Did you tell anyone that's what you wanted to

3 do?

4    A    Yes.

5    Q    And I assume they said no?

6    A    Yes.

7    Q    And that was the second conversation with Jean

8 Allen, the first with Mr. Austin that you just told me

9 about?

10    A    That conversation was with both of them.

11    Q    Was there another conversation with Jean Allen

12 and Mr. Austin?

13    A    Yes.

14    Q    When was that?

15    A    That must have happened in the last days of

16 August or the very beginning of September and, again, it

17 was more or less a replica and in addition to that I was

18 going through the request of Dr. Yu about my epidural

19 injection and I brought it to her attention that Dr. Yu

20 is saying that it's very important that I have this

21 epidural injection, of course that could relieve the

22 pain and that could mean me returning to work and again,

Page 156

1 I was not getting anywhere, it was the option or else.

2    Q    Okay. So you returned to work on September

3 8th?

4    A    Yes, I did.

5    Q    And tell me about that first day.

6    A    I went to work on the 8th, I think I was there

7 around 9 o'clock in the morning. As the hospital

8 arranged, I was to meet Mr. Peter Austin in his office

9 which I did. My recollection was that he was hostile to

10 me, he was not friendly. He never asked me about how I

11 feel, not even a single time. He asked me to sit down

12 and he brought in what I can describe to you as a job

13 description, whether it was a job description or not it

14 wasn't titled as a job description, it was more or less

15 things I have to do now that I can back on duty. And it

16 was highlighted around the areas of walking the public

17 areas so many times, inspecting so many rooms and so on

18 and so forth.

19    Q    And those would be the things you normally did

20 as the director of housekeeping?

21    A    Absolutely.

22    Q    And I take it from what you're describing, and

Page 157

1 tell me if I'm wrong, essentially what you're saying is

2 he highlighted the parts where you had to walk around?

3    A    Yes.

4    Q    And you were, I'm going to assume, unhappy

5 about that walking around part?

6    A    I wasn't unhappy, I was just totally, I

7 wasn't --

8    Q    Dissatisfied?

9    A    I was disgusted.

10    Q    Because of this walking around that you would

11 have to do?

12    A    No, no, that was not why I was disgusted,

13 please do not put words in my mouth. I was disgusted

14 because of his attitude towards one of his employees who

15 is supposed to be suffering from an injury and in severe

16 pain.

17    Q    Did you tell him that?

18    A    No, I did not.

19    Q    What did you tell him?

20    A    I didn't tell him anything.

21    Q    Did you say I'll do what you ask me to do?

22    A    He asked me to sign it, I signed it and he

713.524.4600
3401 LOUISIANA, SUITE 300
40 (Pages 154 to 157)

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532

Tawfik Boulos

December 9, 2005

Page 158

1   asked me to leave, and I went to my office.
2      Q    And then what happened?
3      A    Then the pain started, severely, mildly to
4   start with because I took my medication the night before
5   so in the morning you're still feeling okay, you can
6   manage from the night before and as the time goes by the
7   effect of the medication goes and the pain just
8   continues to go up and up and up until it comes to the
9   point where you can't take it no more. So I went to his
10  office, I was in tears.
11     Q    He being Peter Austin?
12     A    Yes, I was in tears not because of anything
13  else, because of the pain. I went to his office and I
14  told him I just can't, I cannot continue, I need to take
15  my medication. And my wife in the morning, she put the
16  bottle of Tylenol in my pocket and she said to me just
17  take it in case. I said I cannot take any medication
18  while I'm working, she said just take it with you.
19        So I went to him and I said I can't, and he
20  said to me well, go home and you come and see us on
21  Monday and meet me in Jean Allen's office on Monday
22  morning because the following day was the Monday so he

Page 159

1   asked me to come in.
2      Q    And that would be Monday, the 10th of
3   September?
4      A    Yes.
5      Q    Did you come in on Monday?
6      A    Yes.
7      Q    Did you come in on Sunday?
8      A    No, he asked me not to.
9      Q    And what happened on Monday?
10     A    I went to the human resources to Jean Allen's
11  office. I cannot recall that if he was there already or
12  he came a few minutes after I arrived, and he asked me,
13  Jean Allen did not do all of the talking. He asked a
14  young lady who was doing an administrative assistant
15  role to come to the office.
16     Q    You don't know who that was?
17     A    I can't recall the name.
18     Q    And her title was administrative assistant to
19  Jean Allen?
20     A    I can't remember but she was a young lady who
21  did my termination paper.
22     Q    When you say did it, you mean wrote it?

Page 160

1      A    Yes, she did.
2      Q    Stacey Johnson maybe?
3      A    That could be right.
4      Q    All right. So in the room it's you, Peter
5   Austin, this woman, maybe Stacey, maybe not, and Jean
6   Allen?
7      A    That's correct.
8      Q    The four of you?
9      A    That's correct.
10     Q    And who said what to begin?
11     A    Well, Peter Austin started talking and they
12  said well, we cannot continue like this any longer, you
13  need to make a decision and I need to know this decision
14  right now. I need to know if you are capable of coming
15  to work here in the full capacity or as the executive
16  housekeeper without the talk about pain and all this.
17  And if you cannot do that then this is an honorable way
18  for you which is to resign and if these two options are
19  not open for you then there is a third one which will
20  not be your choice but then I will take it and I will
21  separate your service from the company, I will terminate
22  you.

Page 161

1      Q    And I think you said Austin was, I don't know
2   if the right word was upset during your first meeting?
3      A    Hostile.
4      Q    Hostile?
5      A    Yes.
6      Q    Was he hostile in this meeting?
7      A    Yes.
8      Q    Why do you think he was hostile in the first
9   meeting?
10     A    Why he was hostile in the first meeting, I
11  don't know.
12        MS. WALSH: Objection.
13        THE WITNESS: I have no idea why he was
14  hostile, I did not really ask him.
15        BY MR. COLES:
16     Q    That's fine. Do you have an explanation as to
17  why he was hostile in the second meeting?
18        MS. WALSH: Objection.
19        THE WITNESS: I can only describe for you what
20  I have seen.
21        BY MR. COLES:
22     Q    Right, and I'm actually asking you what may

713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532
41 (Pages 158 to 161)

Tawfik Boulos

December 9, 2005

Page 162

1  sound like a silly question but I do need to know that
2  there was nothing that he said to say this is why I'm so
3  upset or hostile or anything like that?
4      A    No.
5      Q    There's no information that you have as to why
6  he was so hostile?
7      A    There is no way for me to find out why he was
8  so hostile but he was hostile.
9      Q    No one came to you later and said, you know,
10  Mr. Austin was hostile because whatever?
11      A    No.
12      Q    So you have this meeting on the 10th?
13      A    Yes, sir.
14      Q    He gives you the three options?
15      A    Yes, sir.
16      Q    The same three options as before?
17      A    Yes, sir.
18      Q    Did you present him with your option?
19      A    Yes, I did.
20      Q    And what did he say in response to that?
21      A    No.
22      Q    And what was said after that, did you ask him

Page 163

1  why?
2      A    Yes.
3      Q    And what did he say?
4      A    He tell me we need somebody to come and work
5  full capacity right this second.
6      Q    So then what was said after that?
7      A    What was said, I opened the options, I said
8  give me some time, give me a few days, maybe things will
9  improve, maybe my back will feel better, maybe I can
10  come up with even some money so I can go and have the
11  epidural injection on my own expenses although I knew
12  that this was difficult.
13          I was pleading for time and I was pleading for
14  my job and I even, I started saying things which I
15  wasn't quite sure about, like is there any way I can
16  have a family leave, is there any way I can have
17  personal leave, for instance, is there any way I can
18  have medical leave of absence.
19          I wasn't asking for, it came to the point
20  where I wasn't asking for anything on their part, I
21  wasn't asking for even the insurance to pay anything, I
22  wasn't asking for a check to be re-sent to me, I was

Page 164

1  asking for time so I can go and just take care of, maybe
2  my back would get better.  The answer was no.
3      Q    And were you looking to be paid your salary
4  during the leave?
5      A    No, I wasn't.
6      Q    So you were willing to take a leave without
7  pay?
8      A    Yes.
9      Q    Try to recover, get the injections on your
10  own, if you could, and see if you could return to work?
11      A    Yes.
12      Q    In your mind at that time how was what you
13  were willing to do that I just outlined different from
14  resigning and then coming back to be reemployed later
15  potentially?
16      A    Resigning and coming to be reemployed, I don't
17  understand.
18      Q    What would have been different in your mind
19  had you taken a leave, not been paid, gotten the
20  injection if you could find a way to get that done, how
21  is that different from resigning, trying to get the
22  injection and seeing if you could return to work later?

Page 165

1      A    When you resign a position, in my opinion of
2  course, if you resign a position, that does not entitle
3  you anymore to your job, you resigned.
4      Q    So -- I'm not sure if you were finished.
5      A    I'm finished.
6      Q    So what you were really looking for on top of
7  what I just described was the ability to come back and
8  get your job?
9      A    Yes, I loved my job.
10      Q    You wanted them to specifically hold it open
11  for you?
12      A    No, I did not say anything about open for me
13  or not open for me.  What I suggested basically, please
14  let me repeat what I said, please give me a few days,
15  maybe I can go and do something and come back and be
16  able to work.  Please can you work with me and give me
17  some work where, with some modification so I can work
18  and at the same time be able to keep my job, work with
19  me.  I mean that my whole idea was try to help me and
20  work with me.
21      Q    And when you say a few days, can you give me
22  an idea of how many days you're talking about?

Tawfik Boulos

December 9, 2005

Page 166

1    A    No, I just said help me, give me a few days,
2    maybe I'll get better and be able to come back to work.
3    That was one plea for my job, the second one was can we
4    work on some leave, and the third was, you know, if you
5    guys can just work with me, if you can give me some
6    modification in my work so I can work around my injury
7    and at the same time, you know, keep a job. Well, the
8    answer in all options I tried was no.
9    Q    To your knowledge within the Omni Shoreham
10    staffing structure as of September 2001 were there any
11    positions that were nonwalking, nonstanding positions?
12    A    I'm not aware of whether the Omni Shoreham had
13    or didn't have, no, I'm not aware of any.
14    Q    I'm not saying if you're aware of what Omni
15    had or didn't have, I'm saying are you aware of a
16    specific position that did not require walking or
17    standing?
18    A    There's positions where you are required to be
19    sitting down, office work a lot of time.
20    Q    What are those positions?
21    A    A PBX operator an administrative assistant for
22    someone, somebody who answers the phone, somebody who

Page 167

1    worked on documents, computer work, all this I would
2    consider jobs requesting people to sit down more than
3    anything else.
4    Q    All right. Are you qualified to be a PBX
5    operator?
6    A    Yes, I am.
7    Q    And I don't know about administrative
8    assistant positions or these computer and document
9    positions, do you have a specific title?
10    A    No. I mean if you know, for example, when I
11    have someone working for me in the housekeeping
12    department as an administrative position I get to give
13    them some training on the system, how to do the filing,
14    help you do this and help you do that and after that
15    they are on their on. It's not a miracle someone can
16    learn how to do something like filing and stuff like
17    that.
18    MS. WALSH: When you get to a point can we
19    take a short break?
20    BY MR. COLES:
21    Q    Probably two minutes here.
22    Are you aware, were you aware at the time or

Page 168

1    are you aware now of any opening for a PBX operator at
2    the time, September 2001?
3    A    No.
4    Q    What about any administrative assistant
5    positions?
6    A    No, I'm not.
7    Q    What about any other computer type position?
8    A    I'm not aware.
9    Q    And you weren't at the time?
10    A    I was not at the time, no.
11    MR. COLES: Okay, let's go ahead and take a
12    break.
13    (A brief recess was taken.)
14    (Mr. Goldsmith joined the proceedings.)
15    (Exhibit Number 11 was marked for
16    identification.)
17    BY MR. COLES:
18    Q    All right. Let's go through here.
19    A    Is that my statement?
20    Q    Yes, anything with an exhibit sticker on it is
21    yours until the end of deposition at which time you
22    should give it to the court reporter.

Page 169

1    I'm handing you a series of documents.
2    MS. WALSH: I want to point out I've never
3    seen this last page.
4    MR. COLES: It should have been produced.
5    MS. WALSH: I have these first two pages but
6    not the third. It should have been produced but it
7    wasn't.
8    MR. COLES: Well, if it wasn't it was an
9    oversight but it certainly was intended to be produced.
10    BY MR. COLES:
11    Q    And this document I don't think we need to go
12    through too much, I just want to be sure first of all,
13    the date of the document, it appears there's a couple of
14    different dates and that's what I'm really focused on on
15    page 2 of Exhibit 11 it says that you were interviewed
16    on 9-10 of '01.
17    A    Interviewed?
18    Q    Yes. Do you see date interviewed at the very
19    bottom?
20    A    Yes.
21    Q    9-10-01?
22    A    Yes.

713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532
43 (Pages 166 to 169)

Tawfik Boulos

December 9, 2005

Page 170

1  Q    And we've just been talking about your
2  conversation with Peter Austin and Jean Allen and an
3  unknown woman, potentially Stacey Johnson?
4  A    Yes.
5  Q    Was that the end of your employment as far as
6  you knew?
7  A    Yes.
8  Q    So you never returned to the Omni for work
9  after that date?
10  A    No, sir.
11  Q    Did you ever return to the Omni at all after
12  that date?
13  A    No, sir.
14  Q    So on the first page of Exhibit 11 which looks
15  like it's dated 9-14 and 9-10 by the various people that
16  signed off, those dates are after you were terminated?
17  A    Yes, sir.
18  Q    Okay. Let's see here, and on page 2 of
19  Exhibit 11, the cursive writing at the top of the page,
20  is that your writing or someone else's?
21  A    No, that's not my writing.
22  Q    Okay. And I guess it's signed by Stacey

Page 171

1  Johnson at the bottom. Was she filling this out when
2  she spoke to you or do you know?
3  A    Yes, she was.
4  Q    She was filling it out?
5  A    Uh-huh.
6  Q    The woman that was writing all this whether it
7  was Stacey Johnson or not was filling it out?
8  A    Yes.
9  Q    So you may not be able to read much of this
10  but I want to make sure I've got it all right. It says,
11  "Do you understand the reason for your termination?
12  Yes, but do not agree." That's the first line; is that
13  correct?
14  A    Yes.
15  Q    Second line, "Based on department needing
16  leadership and that I cannot fulfill due to my physical
17  condition." Do you see that the same as I do?
18  A    Yes, I do.
19  Q    Does that sound like an opinion or a feeling
20  that you had or expressed at this time?
21  A    I've expressed that and much, much, much more.
22  Q    But at this time, that's my question, at this

Page 172

1  time?
2  A    At this time, yes, I did express that and much
3  more.
4  Q    Okay. Explain this opinion to me because as
5  it's written here I don't quite know if I understand it.
6  A    Which one?
7  Q    It says here, "Based on department needing
8  leadership and that I cannot fulfill due to my physical
9  condition." I guess I don't understand the whole
10  department needing leadership, what does that mean?
11  A    I understood, it says here, "Do you understand
12  that the reason for your termination?" It does not say
13  what is your opinion about why you were terminated so
14  basically I said what I was told by Peter Austin that
15  the department is in need of leadership and because of
16  my physical condition I cannot fulfill this role and
17  therefore he is terminating me.
18  Q    So it's not that the department needs
19  leadership and your leadership is lacking, this is not a
20  performance issue?
21  A    No, this is not what I was talking about.
22  Q    Okay, I just wanted to be sure of that.

Page 173

1  Second question, "Do you agree with the reason and why"?
2  You said you disagree. And then it says, "Hotel is
3  aware of physical condition of an," and I don't know
4  what that word is.
5      MS. WALSH: Accident?
6      THE WITNESS: Something here on property?
7      BY MR. COLES:
8  Q    Yeah, I mean the syntax doesn't make sense so
9  that's why I'm confused. "Hotel is aware of physical
10  condition of an accident is possible, but accident here
11  on property." Let me ask you, you don't know what that
12  word is there, do you?
13  A    No, I do not.
14  Q    All right. We've gone through your concerns
15  about your termination. Are there other issues that you
16  haven't yet told me about in terms of why you did not
17  believe you should be terminated?
18  A    I think I've mentioned to you all the
19  circumstances except for the fact that I feel that I
20  have been discriminated against.
21  Q    Discriminated against based on what?
22  A    Based on my testimony on behalf of Sandra

713.524.4600
3401 LOUISIANA, SUITE 300
44 (Pages 170 to 173)

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532

Tawfik Boulos

December 9, 2005

Page 174

1  Taylor.
2  Q   Okay.  And let's hold that for a second then.
3  A   Sure.
4  Q   At least what we see here doesn't appear to
5  relate to anything new as far as you know?
6  A   Yes.
7  Q   So what you've told me about plus the
8  discrimination, those are the only two issues you have
9  with the termination?
10  A   Yes.
11  Q   Okay.  The last one, "What suggestions do you
12  have to make Omni Hotels a better place to work"?  It
13  says essentially, "To be realistic of circumstances,
14  departments understaffed, ask managers above and beyond
15  duty," is that how you read that?
16  A   Can you please repeat reading it?
17  Q   I read it and again it's somebody else's
18  handwriting, it says, To be realistic, hyphen, of
19  circumstances, departments unstaffed, ask managers above
20  and beyond duty?
21  A   Basically what she took 15 or 20 minutes of me
22  telling her about different things and she just sort of

Page 175

1  compacted it and that's why neither me or you can
2  understand what is written down here.
3  Q   Okay.  Is this meeting, they call it an
4  interview?
5  A   Exit interview.
6  Q   Exit interview, is this just with you and the
7  woman who's writing this down?
8  A   That's right, and it took place to the HR
9  office.
10  Q   So Peter Austin wasn't there?
11  A   No.
12  Q   Jean Allen wasn't there?
13  A   No.
14  Q   Okay.  Let's see here, I guess that's it for
15  that one.  You mentioned a second ago that you think you
16  were being discriminated against because of your
17  testimony in support of Miss Taylor?
18  A   Yes.
19  Q   Did anyone ever tell you anything to the
20  effect of no, you really shouldn't have supported Sandra
21  Taylor or anything that connected the termination and
22  your support of Miss Taylor?

Page 176

1  A   As I said before, I was told in Jean Allen's
2  office that as managers we should stick together so the
3  corporation which we are working for can benefit.
4  Q   Right, but my specific question is did anyone
5  ever have a conversation where your termination and your
6  support of Miss Taylor were brought up at the same time?
7  A   No.
8  Q   Okay.  So there wasn't a statement, we
9  wouldn't be doing this if you hadn't supported Miss
10  Taylor?
11  A   No.
12  Q   I need to get that threshold question out of
13  the way.  Next, in terms of the decision to terminate
14  you, as far as you understand who actually made that
15  decision?
16  A   Who actually made that decision, I couldn't
17  tell you.
18  Q   No one said I've decided to terminate you or
19  anything like that?
20  A   Peter Austin was the one who told me that he
21  is terminating me.
22  Q   Okay.  Was Saed Elkhodary involved in this

Page 177

1  process at all as far as you know?
2  A   He was not there when I was told.  I am not
3  aware whether he was involved or not.
4  Q   Did you ever talk to him about it?
5  A   No.
6  Q   Other than Miss Allen, Mr. Austin, and a woman
7  who we think is Stacey Johnson, did you talk to anyone
8  else at Omni about your termination?
9  A   No.
10  Q   Okay.  Are there other conversations that you
11  have with those three people that you have not yet told
12  me about today, specifically related to your
13  termination?
14  A   Not to the best of my recollection, no.
15  Q   And are there other contents of those
16  conversations that you've already told me about that you
17  have not yet disclosed?
18  A   No, but that's not to say that there is things
19  I just can't remember right now.
20  Q   Fair enough.  I'm just asking to make sure
21  that there's not something that you, I've been waiting
22  to tell you about this part or now that you've asked me

Tawfik Boulos                                                          December 9, 2005

Page 182

1    Q    Then let's be clear about something, I want to
2    clarify what you told me before and what I think you're
3    saying now.  Is it your understanding that Sandra Taylor
4    was specifically told these racially derogatory
5    statements?
6    A    No, I never said that.
7    Q    I just want to be sure that's not the case.
8    A    No.
9    Q    So what did Mr. Wings say after that, or did
10   you have something else to add?
11   A    End of the conversation, that's it.
12   Q    And you never spoke to him again?
13   A    No, that's the only time I heard his name,
14   that's the only time I heard his voice.
15   Q    Did he like give you a phone number to call
16   him back if you --
17   A    Never, never.
18   Q    Nothing?
19   A    Never.
20   Q    And I assume that you've not had any dealings
21   with him or anyone else in Omni's HR since you left?
22   A    No.

Page 183

1    Q    Any other conversations that you can recall
2    that we have not discussed in full?
3    A    No, sir.  Like I said, again, there may be but
4    I cannot remember right now.
5    Q    So is it your belief that had you not
6    supported Sandra Taylor in her claim of discrimination
7    that Omni would not have terminated you in September
8    2001?
9    A    Yes, sir.
10   Q    What do you base that belief on?
11   A    On the sequence of evidence.
12   Q    Sequence of events?
13   A    Yes.
14   Q    And outline that sequence that you rely on
15   with what happened first, second and third, that
16   sequence.
17   A    The sequence of events when I got injured on
18   the job, I get called at home saying how I was, how I
19   feel, we hope you return back to work and we hope you
20   feel better soon, and anything we can do to you to make
21   you feel better, and let us know how things are going
22   with the insurance company so we can go out there and

Page 184

1    get them to start things working for you, no problems.
2          Then all of a sudden when I go to Jean Allen's
3    office and I get to ask about how I'm going to testify
4    and when I stand up and say this is what I'm going to
5    say and I'm going to say the truth as it happened and
6    then I go to court actually or whatever you want to call
7    it, and I testify, all of a sudden I get calls from
8    Treziak telling me that I was, I spoke to Jean Allen and
9    she said to me that the Omni Shoreham needs you to go
10   back to work right away and your doctor doesn't
11   understand what he is doing.
12         And then after that, they refer me to an
13   independent doctor and the independent doctor decides
14   upon three minutes of examination that I'm fit to go
15   back and do whatever work required without any
16   limitation.  And then the fact that nobody wants to work
17   anything with me, nobody cares what happens to myself or
18   to my family, that lead me to believe that this was
19   pretty much calculated.
20   Q    And let's back up to take that in chunks then.
21   Miss Treziak calls you up and says I talked to Jean
22   Allen, they need you come back, you need to see a doctor

Page 185

1    for another opinion.
2    A    Not only that, she also tells me that I need
3    to lie on a hard floor instead of lying on the bed
4    because she experienced something similar to my case in
5    the past and that the remedy to my case will not be
6    following Dr. Yu's instruction, but to lie on a hard
7    floor on couple of days and that should take care of the
8    problem.
9    Q    And you think Miss Treziak told you these
10   things because you were supporting Sandra Taylor?
11   A    I don't know, I'm not here to tell you what
12   she did and what she did it for, I'm just telling you
13   that the sequence of events, like I said before, it
14   shows, it showed me that I had been targeted for my
15   stand on Sandra Taylor.
16   Q    But I need to be very specific, is it your
17   contention that what Miss Treziak said and did in your
18   case is based upon your support of Sandra Taylor?
19   A    I don't know.
20   Q    Is it your contention that Miss Treziak acted
21   on instructions from the Omni Hotel?
22   A    I do not know.

Tawfik Boulos

December 9, 2005

Page 186

1  Q  Is it your contention that you were told to
2  see Dr. Gordon because you supported Sandra Taylor?
3  A  I have no idea.
4  Q  Is it your contention that Dr. Gordon, I
5  guess, reviewed your case in the way he did because you
6  supported Sandra Taylor?
7  A  Again, I don't know.
8  Q  And you know the statement "I don't know" is a
9  tricky one so let me sort of clarify what I'm hearing, I
10  don't know, we can sort of make sure what you're saying
11  and what I'm hearing is accurate.  When you say I don't
12  know to a question about what you believe, I understand
13  your telling me you don't know what you believe versus
14  if I ask you did Dr. Gordon talk to Miss Treziak or to
15  Jean Allen and you say I don't know, you don't know if
16  he talked to her but if I say do you believe he did,
17  you're telling me you don't know what you believe?
18  A  What I'm saying is very clear.  What I'm
19  saying that the sequence of events, it showed me very
20  clearly, it gives me a very clear idea that I was
21  targeted because of my stance on Sandra Taylor's hearing
22  and for standing what is right and that is what I am

Page 187

1  saying.
2  MS. WALSH:  And I'm going to object to any
3  questions that ask my client to draw a legal conclusion.
4  BY MR. COLES:
5  Q  Fair enough.  I'm just asking you, now that
6  I've sort of told you what I understand you mean by I
7  don't know, when you said I don't know to my questions
8  about Miss Treziak and Dr. Gordon do you stand I don't
9  know as your answer?
10  A  Absolutely, I don't know why they did that
11  because when somebody, in my opinion when somebody does
12  something could be for that reason, I don't know.  I'm
13  not here going to sit down and speculate but you are
14  asking me a specific question and I'm giving a specific
15  answer.  The sequence of events gives me a clear
16  evidence that I was targeted for my stance and that's
17  what I'm going to tell you.
18  Q  Okay, next question then.  With respect to how
19  you were treated by the Omni Hotel after August 24th,
20  okay, after the letter from the insurance company --
21  A  Yes.
22  Q  -- are you aware of cases at the Omni Hotel

Page 188

1  that were treated differently?
2  A  No.
3  Q  Are you aware of people that had the same
4  circumstances as you?
5  A  No.
6  Q  Are you aware of people who got better
7  treatment than you?
8  A  No.
9  Q  Okay.  So going through that sequence of
10  events now do you believe that somehow the Omni Hotel
11  would have done something different for you after August
12  24th had you not supported Sandra Taylor?
13  A  Yes, I do.
14  Q  What do you think the Omni Hotel would have
15  done differently?
16  A  Maybe I would have still been on the insurance
17  company's list of employees who should continue with
18  their medical treatment, and having my medical treatment
19  probably would have resulted in my back injury getting
20  treated which would have resulted in me going back to
21  work.  That's how I see it different.
22  Q  Is that the only thing that would have been

Page 189

1  different?
2  A  Yes, that would have been different.
3  Q  All right.  I'm going to give this to you just
4  to make sure.  What I have would be your interrogatory
5  responses and you probably don't use the word
6  interrogatory in your daily life.
7  A  No, I don't.
8  Q  You're better off for it.  By interrogatory
9  what we mean is sort of question and answer and so I
10  want you to take a look at Interrogatory Number 2 and
11  I've labeled your interrogatory responses as Exhibit 12.
12  (Exhibit Number 12 was marked for
13  identification.)
14  MS. WALSH:  Also I'd like to go on record
15  about the typo that we spoke about prior to, when we get
16  to that point.
17  MR. COLES:  Well, you can go ahead and clear
18  it up right now if you'd like.
19  MS. WALSH:  Okay.  On page five in our
20  response we put sometime on or about August 6, 2001
21  Mr. Boulos testified at Taylor's unemployment
22  compensation hearing as to Elkhodary's racial harassment

713.524.4600
3401 LOUISIANA, SUITE 300
48 (Pages 186 to 189)

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532

Tawfik Boulos                                                    December 9, 2005

**Page 190**

1  and discrimination against Taylor. It should be on or
2  about August 26th.
3      BY MR. COLES:
4      Q    All right. Turn to page 3 and you'll see sort
5  of several short paragraphs and if you go up four from
6  the bottom?
7      A    Okay.
8      Q    And I believe it says, "Sometime in August of
9  2001 Jean Allen threatened Mr. Boulos with retaliatory
10 action," do you see that?
11     A    Yes.
12     Q    "If he testified favorably at Taylor's
13 unemployment compensation hearing." What was the
14 retaliatory action that Miss Allen threatened you with?
15     A    In the context that she reminded me several
16 times.
17     MS. WALSH: First, objection.
18     BY MR. COLES:
19     Q    Okay, go ahead.
20     MS. WALSH: Go ahead, answer as you understand
21 it.
22     THE WITNESS: She, as much as I understood it

**Page 191**

1  and I felt it at the time, that repeating several times
2  that as managers we should stick together in order to
3  benefit the corporation we are working for, that felt to
4  me like that I should go on the stand and change my
5  intention of going out there and saying the truth.
6      BY MR. COLES:
7      Q    Okay, but specifically now what action were
8  you threatened with if you didn't change your statement?
9      A    She did not really tell me what was going to
10 happen to me if I didn't.
11     Q    Fair enough.
12     MS. WALSH: I also want to point out that your
13 interrogatory asks what the legal claims are and our
14 legal contentions are set forth in the complaint.
15     BY MR. COLES:
16     Q    Okay. Let's see here.
17     A    Are we on the same page?
18     Q    Yes, but I think we've covered that one. All
19 right, let's see here, I think we've covered most of
20 these, I just want to make sure we haven't missed any.
21     I believe you told me that Mr. Elkhodary told
22 you to go to the hospital on the 11th of June after your

**Page 192**

1  accident?
2      A    Yeah.
3      Q    I asked you because I thought you told me that
4  he had said go to the hospital one time before that?
5      A    No.
6      Q    He did not?
7      A    No.
8      Q    Page five, sixth paragraph on page five?
9      A    Yes.
10     Q    You read that, that sentence there?
11     A    Yes.
12     Q    So which is correct?
13     A    The 11th.
14     Q    And nothing on the 7th?
15     A    No, on the 7th probably he told me on that
16 particular day to go home early or something like that
17 but on the 7th I did not go to the hospital or he did
18 not tell me to go to the hospital the 7th.
19     Q    Okay. You mentioned once before that you were
20 going to try to do the epidural and you weren't sure you
21 could afford it. How much does an epidural injection
22 cost?

**Page 193**

1      A    As I remember I was told at the time it was
2  around $700.
3      Q    For Miss Taylor, she complained to you about
4  the way Saed Elkhodary treated her?
5      A    Yes.
6      Q    Did she ever say that it was because of her
7  race?
8      A    She got the feeling, yes, she told me that she
9  felt that it was because of her race.
10     Q    Did she tell you why she had the feeling?
11     A    No, she didn't.
12     Q    Did you tell her to go talk to someone about
13 it?
14     A    I told her to go talk to someone in the HR.
15     Q    To you know if she did?
16     A    I believe she did.
17     Q    Who did she talk to?
18     A    I believe she talked to Nate Foxworth.
19     Q    Do you remember when?
20     A    That would be before she was demoted to
21 laundry manager/public area manager.
22     MR. COLES: All right. Why don't we take

713.524.4600
3401 LOUISIANA, SUITE 300
ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002
713.524.4951
1.800.767.9532
49 (Pages 190 to 193)

Tawfik Boulos

December 9, 2005

Page 194

1  about a five-minute break and I'll see if we have
2  anything else to go through.
3        (Off the record.)
4     BY MR. COLES:
5     Q   Let's see here, a couple of things to make
6  sure I got all this right here.  Your current employment
7  is with, make sure I get this right, where are you
8  currently employed?
9     A   Whitetail Club, Idaho but I'm no longer with
10 them.  Starting October the 10th the company changed
11 hands, there's new management there so I'm currently
12 unemployed.
13    Q   So were you terminated or did you resign?
14    A   No, no, it was not terminated, it was laid
15 off.
16    Q   Okay, and you were the executive housekeeper?
17    A   Yes, I was.
18    Q   Who is the current executive housekeeper
19 there?
20    A   I don't think they have one.
21    Q   Did they just cut the staff entirely?
22    A   Yeah, what is happening that they moved more

Page 195

1  or less from the hotel business into the real estate
2  business, they are now building condominiums on the golf
3  course and all this so mostly the management was laid
4  off like the director of food and beverage, the director
5  of housekeeping, so as of October 10th I was laid off.
6     Q   Couple of followup questions, Saed Elkhodary,
7  did he ever tell you that he did not like
8  African-Americans?
9     A   Yes.
10    Q   Specifically, I don't like African-Americans?
11    A   Yes.
12    Q   When did he tell that?
13    A   He told me that they are lazy.
14    Q   No, when did he tell you that?
15    A   Numerous occasions, numerous occasions
16 starting after a few days I started there and it went on
17 every time when I almost met him he was, this was his
18 joke, this was his line, this was his way of making fun.
19    Q   Did anyone else ever overhear these comments?
20    A   I don't know if anyone ever heard it or not
21 but most of the time he was talking to me in Egyptian.
22 In his office he would talk to me in Egyptian most of

Page 196

1  the time, in front of other staff he would talk to me in
2  English, of course, and in front of other staff if we
3  were sitting around, let us say on a break in the lunch
4  room or something, he would talk to me in either
5  language but he would never mention those things in
6  front of anyone else, no.
7     Q   So never in front of anyone else would he say
8  this?
9     A   No, not in my presence.
10    Q   As far as you know?
11    A   As far as I know, yes.
12    Q   Is it your position that Omni Hotels actually
13 interfered or obstructed with your worker's compensation
14 benefits?
15    A   I believe so.
16    Q   Do you have any information that suggests that
17 Omni Hotels was at all able to control your worker's
18 compensation benefits?
19    A   Yes, I believe it's their duty to.
20    Q   Do you have any information or evidence on
21 that?
22    A   My evidence is that when I tell my employer

Page 197

1  that I was examined by a doctor for three minutes
2  without even touching my back, that should alert my
3  employer to go out there and say we are paying good
4  premiums for insurance company to take a good care of
5  our employees and you are not doing so.  So that is, in
6  my opinion is a good evidence that my employer did not
7  do what they are supposed to do to take care of their
8  employees.
9     Q   But at least as I conceive of it, and you can
10 tell me if you have a different definition, that's not
11 the obstructing the benefits.  That may not be following
12 up as you want them to but that's not on the front end
13 obstructing the benefits in the first place.
14    A   It might be on the surface but it might be
15 when you really go beyond the surface.
16    Q   Explain that, I'm not sure I understand what
17 you mean.
18    A   Meaning that if my company understood that by
19 a doctor who did not examine me professionally and
20 decide on his, in his opinion that I am fit and ready to
21 go back to work without any limitation, by agreeing in
22 principle about this although I have alerted them about

December 9, 2005

Tawfik Boulos

Page 198

1 the way which I was examined by him, by them not doing
2 anything about it they might be part of blocking my
3 benefits and stopping my benefits.
4    Q  Any other obstruction of your benefits other
5 than what you just told me?
6    A  Well, if my benefits is stopped, it's stopped.
7    Q  But I mean as you told me of how they
8 obstructed your benefits, I'm asking you did they
9 obstruct your benefits in any other way besides what you
10 just told me about?
11    A  No.
12    Q  Have you seen a therapist or psychiatrist in
13 the last four years?
14    A  No, I haven't seen a psychiatrist.
15    Q  Any mental health professional?
16    A  No.
17    Q  Have you experienced any loss of sleep,
18 anything like that?
19      MS. WALSH: Objection.
20      BY MR. COLES:
21    Q  Go ahead.
22    A  When?

Page 199

1    Q  In the last four years.
2    A  Yes, I did.
3    Q  When was that?
4    A  Most of it when I was having the severe pain,
5 that was due to the fact that whether I was taking pain
6 killers or not taking pain killers the pain was
7 incredible and that kept me up daytime, nighttime, it
8 did not really matter. Yes, I did lose sleep, yes, I
9 did.
10    Q  Any feeling that you were unable to handle
11 your personal obligations at any point in time in the
12 last four years?
13    A  No.
14      MS. WALSH: Objection.
15      BY MR. COLES:
16    Q  No thoughts of suicide, anything like that?
17    A  No.
18    Q  Nothing. All right, in terms of your lost
19 income have you calculated how much money you lost?
20    A  No, I did not.
21    Q  Okay. What was your salary at the Omni
22 Shoreham?

Page 200

1    A  I believe 65-, I believe so.
2    Q  I always ask this as sort of a wrap up
3 question, over time we've discussed a lot of different
4 things today, any information that you've given me that
5 you now think is not accurate?
6    A  Not to the best of my knowledge, no.
7    Q  Anything you now remember differently, any
8 changes to your testimony that you were aware that you
9 need to make to clear up something you said before?
10    A  No, sir.
11    Q  Anything you omitted but want to now add to a
12 prior answer that you gave?
13    A  Nothing at the time, I can't remember. I
14 might have but for the time being I can't remember.
15    Q  Any answers that I've prevented you from
16 finishing that you wanted to finish that we never got
17 back to?
18    A  No, I didn't feel that, no.
19      MR. COLES: All right, pass the witness.
20      MS. WALSH: Before I redirect can I have a
21 minute?
22      MR. COLES: Sure.

Page 201

1      (Off the record.)
2      MS. WALSH: I don't have any questions.
3      (Whereupon, at 4:28 p.m. the deposition of
4 TAWFIK BOULOS was concluded.)
5      * * * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532
51 (Pages 198 to 201)