# EXHIBIT B

# In The Matter Of:

## *Sandra Taylor, et al.   v.*
## *Omni Management Corp., et al.*

### Deposition of: Karen Treciak
### January 18, 2006

**Miller Reporting Company**

735 8th Street SE

Washington, DC USA 20003

(202) 546-6666

*Original File 0118TREC.TXT, 90 Pages*
*Min-U-Script® File ID: 3558495031*

## Word Index included with this Min-U-Script®

Case 1:05-cv-01175-HHK   Document 20-6   Filed 06/26/2006   Page 3 of 14
Omni Management Corp., et al.                                                     Deposition of Karen Treciak
                                                                                          January 18, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SANDRA TAYLOR, et al.,        :
    Plaintiffs,               :
    vs.                       : Civil Action
                              : No. 1:05-CV-01175
OMNI MANAGEMENT CORP.,        :
et al.,                       : Judge Henry H. Kennedy
    Defendants.               :

Washington, D.C.
Wednesday, January 18, 2006

The deposition of KAREN TRECIAK, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to Notice, in the offices of the Goldsmith Law Firm, 1900 L Street, N.W., Washington, D.C., convened at 1:28 p.m., before Sarah Harple, a notary public in and for the District of Columbia, when were present on behalf of the parties:

Page 2

APPEARANCES:

On behalf of the Plaintiffs:
    KRISTEN L. WALSH, ESQ.
    ADAM W. MARKER, ESQ.
    The Goldsmith Law Firm, LLC
    1900 L Street, N.W.
    Washington, D.C. 20036
    (202) 775-0040

On behalf of the Defendants:
    MICHAEL E. COLES, ESQ.
    The Coles Firm, P.C.
    Two Turtle Creek
    3838 Oaklawn, Avenue
    Dallas, Texas 75219
    (214) 443-7862

On behalf of Karen Treciak:
    DAVID P. DURBIN, ESQ.
    Jordan, Coyne & Savits, LLP
    1100 Connecticut Avenue, N.W.
    Washington, D.C. 20036
    (202) 496-2804

Page 3

CONTENTS
EXAMINATION BY COUNSEL FOR
WITNESS          PLAINTIFFS   DEFENDANTS
KAREN TRECIAK
    By Ms. Walsh    4, 89        —
    By Mr. Coles     —           86
            EXHIBITS
TRECIAK DEPOSITION           MARKED
Nos. 1 - 5                     89

Page 4

PROCEEDINGS

[1]  Whereupon,
[2]  KAREN TRECIAK
[3]  was called for examination by counsel for Plaintiffs
[4]  and, having been first duly sworn by the notary
[5]  public, was examined and testified as follows:
[6]        EXAMINATION BY COUNSEL FOR PLAINTIFFS
[7]               BY MS. WALSH:
[8]  Q: My name is Kristen Walsh, and I'm
[9]  representing Mr. Paul Boulos and currently Sandy
[10] Taylor in this case, Sandy Taylor versus Omni. This
[11] is Mr. Adam Marker, an associate in our firm. And
[12] could you state your full name for the record.
[13] A: It's Karen Treciak.
[14] Q: Okay, and is this your attorney today? Are
[15] you represented by David?
[16] MR. DURBIN: David Durbin.
[17] THE WITNESS: Yes.
[18] MR. DURBIN: And I can tell you, counsel,
[19] for the record that Zurich has retained me for
[20] purposes of representing Ms. Treciak for purposes of
[21] this deposition. That's their standard procedure

Page 5

[1]  with respect to providing courtesy defense to former
[2]  employees, which she is, when they are being
[3]  questioned about activities undertaken for Zurich.
[4]  So that is the reason that I'm here.
[5]  MS. WALSH: Okay. And Mr. Mike Coles is
[6]  here with us today.
[7]  MR. COLES: I'm here on behalf of Omni
[8]  Hotels, which would constitute actually two
[9]  defendants, Omni Hotels Management and Omni Hotels
[10] Corp.
[11]               BY MS. WALSH:
[12] Q: Have you spoken with either of these
[13] gentleman about this deposition today?
[14] A: Not — just that we were coming.
[15] Q: Just that you were coming?
[16] A: Uh-huh.
[17] Q: Have you ever been deposed before?
[18] A: Yes.
[19] Q: How many times?
[20] A: Maybe four or five.
[21] Q: In cases relating to your employment with
[22] Zurich or other—

Deposition of Karen Grecian
January 18, 2006
Case 1:05-cv-01175-HHK   Document 20-6   Filed 06/26/2006   Page 4 of 14
Sandra Taylor, et al. v.
Omni Management Corp., et al.

Page 14

[1] A: Go ahead, I'm sorry.
[2] Q: Clarify.
[3] A: At some point I could be handling a certain
[4] amount of, a certain—not specific employers, but
[5] just a caseload, and then if there was perhaps
[6] somebody vacated a position, I might move to that
[7] position to assume that caseload and that's what I'm
[8] saying. There was some transition.
[9] Q: Okay. Are you familiar with the Omni
[10] Shoreham Hotel?
[11] A: As a hotel that I've seen, yes.
[12] Q: Do you know whether the Omni Shoreham Hotel
[13] was a client of Zurich's?
[14] A: I know that they were a client, yes.
[15] Q: What was the relationship between Omni
[16] Shoreham and Zurich?
[17] A: Zurich provided the insurance coverage for
[18] their workers comp program.
[19] Q: Are you aware that Omni Management Group
[20] has several hotels?
[21] A: I don't recall the specifics on the—their
[22] program.

Page 15

[1] Q: Do you know whether Zurich insured all the
[2] Omni hotels?
[3] A: I do not know that either.
[4] Q: Is the workers comp insurance the only kind
[5] of insurance that Zurich provided Omni?
[6] A: I do not know.
[7] Q: Was that the only type of insurance you
[8] were involved?
[9] A: That would be the only for me.
[10] Q: How long were you—how long did you work on
[11] Omni's accounts?
[12] A: Unknown.
[13] Q: The entire two years you were there?
[14] A: I don't know. I do not know how long or
[15] how often. I do not know.
[16] Q: How long would it take a claim to resolve
[17] typically?
[18] A: It depends on the type of case that it is.
[19] Q: What's the shortest amount of time a claim
[20] could be resolved?
[21] A: Well, if there's no coverage, it's pretty
[22] instantaneous. I don't know if that—

Page 16

[1] Q: What's the longest you've ever seen one
[2] last in your personal experience?
[3] A: Are you talking about D.C., are you talking
[4] about Maryland, are you talking about—what
[5] jurisdiction are we talking about?
[6] Q: Is that an important fact as to how long it
[7] would last?
[8] A: Because all jurisdictions have different
[9] processes and means of a conclusion so yes, it does
[10] make a difference.
[11] Q: Okay. District of Columbia.
[12] A: They can go on indefinitely.
[13] Q: Just to clarify, did one person handle a
[14] particular policyholder, one person handle Omni's
[15] accounts?
[16] A: I don't know.
[17] Q: Do you know how the claims were
[18] distributed?
[19] A: Generally there's two ways. One is that
[20] some accounts did have a dedicated adjuster and so
[21] if a loss came in for that employer, a dedicated
[22] adjuster would be assigned that account, that claim.

Page 17

[1] Also the more—some of the accounts that didn't have
[2] a dedicated adjuster, a loss would be given to one
[3] of the administrative assistants and she would
[4] distribute according to volume and adjuster pending.
[5] Q: Were you a dedicated adjuster for anyone?
[6] A: No.
[7] Q: What was the procedure for filing a workers
[8] compensation claim? What would be the process from
[9] the first piece of paper and then the next step and
[10] the next step?
[11] MR. DURBIN: In the District of Columbia?
[12] MS. WALSH: In the District of Columbia.
[13] THE WITNESS: It's been a few years since
[14] I've handled a claim so I'm a little rusty on it.
[15] Generally an employee would report a loss to an
[16] employer or report a loss directly to the Workers
[17] Compensation Commission.
[18]             BY MS. WALSH:
[19] Q: And then what would happen?
[20] A: And then as the insurer, Zurich would have
[21] received notice of the claim and then it would have
[22] been assigned to an adjuster to investigate.

Case 1:05-cv-01175-HHK   Document 20-6   Filed 06/26/2006   Page 5 of 14
Omni Management Corp., et al.
January 18, 200(

Page 26

[1] recall.
[2] Q: You don't know whether you spoke to him
[3] about his claim or not?
[4] A: I don't.
[5] Q: Do you need to take a break?
[6] A: Huh?
[7] Q: Do you need a break?
[8] A: No, I just took a decongestant.
[9] Q: Other than yourself and Shar Harris, who
[10] else would have worked on Mr. Boulos's claim?
[11] A: I don't know. I don't know—I don't know
[12] who else would have worked on it. It depends on the
[13] case. I was only there a certain time period. I
[14] don't know if it was still going on or if I resolved
[15] it or whatever.
[16] Q: What other types of people employed by
[17] Zurich could have been involved in a workers
[18] compensation claims?
[19] A: The only other person would be a supervisor
[20] who would have general oversight for his unit.
[21] Q: Would was your supervisor?
[22] A: Robert Wicks.

Page 27

[1] Q: What did a supervisor do?
[2] A: He just concentrated on the reserving
[3] aspect of the file just to make sure that the case
[4] was going in the proper direction.
[5] Q: What do you mean "a proper direction"?
[6] A: That the adjuster was, you know, that the
[7] claim was being handled appropriately technically in
[8] accordance to the Workers Comp Act and also Zurich's
[9] best handling practices.
[10] Q: Did he review your work regularly?
[11] A: My work or just you are talking generally
[12] an adjuster's work.
[13] Q: Answer that first. Would the supervisor—
[14] A: He would review my work.
[15] Q: Have you ever heard the term "case nurse"?
[16] A: Yes.
[17] Q: What does that mean?
[18] A: It's a nurse case manager and that person
[19] would oversee the case from a medical aspect.
[20] Q: Is this someone employed by Zurich?
[21] A: It could be.
[22] Q: Could he or she be employed by someone

Page 28

[1] else?
[2] A: Absolutely.
[3] Q: What would determine that?
[4] A: Volume, you know, if Zurich's case managers
[5] were overwhelmed or jurisdictional, if they didn't
[6] have a case manager in the area close to where the
[7] injured worker was treating, they might vend it out
[8] to somebody who could give it more—
[9] Q: Did Zurich—I'm sorry?
[10] A: Being closer to the case as far as the
[11] treaters are concerned.
[12] Q: Did Zurich have contacts with other
[13] companies? If they became overloaded, they would
[14] make a call to company X?
[15] A: Yes, yes.
[16] Q: Did Zurich regularly assign workers comp
[17] claimant case nurses?
[18] A: Yes, regularly.
[19] Q: Did every workers comp case have a case
[20] nurse?
[21] A: No.
[22] Q: What percentage did?

Page 29

[1] A: Don't know.
[2] Q: Half?
[3] A: (Witness shook head.)
[4] Q: No idea?
[5] A: No, I really don't know. That would
[6] probably change day-to-day anyway depending on what
[7] type of case.
[8] Q: And can you tell me again what a case nurse
[9] does?
[10] A: They oversee the medical aspect of the
[11] file.
[12] Q: What exactly does "medical aspect" mean?
[13] Can you tell me what their daily activities would
[14] be?
[15] A: They are nurses, so they understand
[16] treatment programs and are able to communicate with
[17] doctors regarding what treatment is appropriate for
[18] an injured worker, they decipher medical records for
[19] us, work on return-to-work programs, and work with
[20] the employers as far as maybe transitional duty for
[21] an injured worker who is going to be going back to
[22] work.

Page 30

[1] Q: So a case nurse would actually work with
[2] the employer to get the employee back at some kind
[3] of job they can perform?
[4] A: It's just a three-way part. The
[5] adjuster—I mean the nurse case managers would talk
[6] to the doctor and the adjuster and we would all talk
[7] to also the employers to see if there is a way they
[8] can come back to work if we've got an injured worker
[9] could be at that place in their treatment that they
[10] could go back to a job.
[11] Q: So you worked with case nurses regularly?
[12] A: Yes.
[13] Q: Do you recall if Mr. Boulos had a case
[14] nurse?
[15] A: I do not.
[16] Q: If I told you that Mr. Boulos's had a case
[17] nurse called Patrick Graff, would that refresh your
[18] recollection?
[19] A: I recognize the name Patrick Graff, but I
[20] wouldn't know—you're saying that was who he had,
[21] then I recognize his name so that may be accurate.
[22] Q: You wouldn't any reason to think that was

Page 31

[1] incorrect?
[2] A: No.
[3] Q: Did you ever discuss Mr. Boulos's case with
[4] Mr. Graff?
[5] A: Sure, through the course of claims
[6] handling.
[7] Q: Do you recall discussing his case with
[8] Mr. Graff?
[9] A: No.
[10] Q: Do you say you did because you assumed that
[11] you would have?
[12] A: Yes.
[13] Q: Do you know Mr. Graff's current
[14] thereabouts?
[15] A: No.
[16] Q: Do you have any information on Mr. Graff?
[17] A: I do not believe he was a Zurich nurse.
[18] Q: Do claimants go to their own doctor or to a
[19] doctor selected by Zurich?
[20] A: One more time.
[21] Q: Do workers comp claimants go see a doctor
[22] of their choice or a doctor selected by Zurich?

Page 32

[1] A: Their choice. Let's backtrack a little
[2] bit. It depends on the state. Some states you can
[3] go to your own doctor, some states the employer
[4] tells you where to go, which is all within the act
[5] and so there is a difference.
[6] Q: Do you know about the District of Columbia?
[7] A: I believe he can go himself.
[8] Q: To a doctor of his choosing?
[9] A: (Witness shook head.)
[10] MR. DURBIN: You have to answer audibly.
[11] THE WITNESS: Yes.
[12] MR. DURBIN: Thank you.
[13] THE WITNESS: You didn't hear me rattle, is
[14] that what you're telling me?
[15]                 BY MS. WALSH:
[16] Q: Do you know if Mr. Boulos went to his own
[17] doctor?
[18] A: I do not know for a fact if he did.
[19] Q: Do you know if Mr. Boulos was examined by
[20] his doctor for his injury?
[21] A: I suppose he was examined.
[22] Q: But you don't know for a fact?

Page 33

[1] A: (Witness shook head.) No. Sorry.
[2] Q: Do you know what Mr. Boulos's diagnosis
[3] was?
[4] A: No, because I don't recall the injury.
[5] Q: If I told you that Mr. Boulos's treating
[6] physician's name was Dr. Warren Yu, would you have
[7] any reason to doubt this information?
[8] A: Warren Yu? No, I wouldn't doubt.
[9] Q: So you would accept this information as
[10] correct?
[11] MR. DURBIN: Objection.
[12]                 BY MS. WALSH:
[13] Q: You don't deny his treating physician was
[14] Dr. Yu?
[15] A: I don't recall.
[16] Q: Does the insurance company have to
[17] authorize treatment before it will pay benefits for
[18] the treatment?
[19] A: All right. One more time. Did the—
[20] Q: How are benefits paid is the question, and
[21] in general I mean what steps does a claimant have to
[22] go through in order to get Zurich to pay benefits

Samura Taylor, et al. v.
Omni Management Corp., et al.
Case 1:05-cv-01175-HHK   Document 20-6   Filed 06/26/2006   Page 7 of 14
Deposition of: Karen Trecia
January 18, 2006

Page 34

[1] for medical treatment?
[2] A: He would need to submit an authorization to
[3] be off of work from a treating physician.
[4] Q: An actual authorization to be off from
[5] work, he has to get a doctor's note that says you
[6] can't go to work?
[7] A: Yes.
[8] Q: What if he wants—what if the doctor
[9] prescribes treatment X, whatever treatment X happens
[10] to be. How does that work? Does the claimant have
[11] to get permission to get treatment X or does he get
[12] treatment X and then file a claim for coverage
[13] afterward?
[14] A: Actually, authorization does need to be
[15] given before treatment.
[16] Q: What's the procedure for getting treatment
[17] approved for coverage?
[18] A: The physicians are to contact the workers
[19] compensation carriers and discuss either by report
[20] or verbally a treatment plan and the recommendation
[21] for the specific treatment.
[22] Q: Are you the workers comp carrier that you

Page 35

[1] refer to? You said physicians have to contact a
[2] carrier?
[3] A: An insurance carrier, insurance company,
[4] yes.
[5] Q: So the physician would contact Zurich?
[6] A: Yes.
[7] Q: The physician would contact you?
[8] A: Or the case manager. When I say "case
[9] manager", nurse case manager.
[10] Q: Once—for example, once Paul Boulos's claim
[11] was transferred to Shar Harris to you, did you work
[12] on it exclusively as far as being a claims
[13] specialist?
[14] A: I don't know if another person came in at
[15] any other point and handled it in an interim basis
[16] for whatever reason. Again, there was a lot of
[17] transition going on.
[18] Q: Let me clarify just to make sure that I
[19] understand what you said. The physician would
[20] contact the nurse case manager to discuss treatment
[21] options?
[22] A: Yes, he would call and—yes, it would be a

Page 36

[1] joint discussion.
[2] Q: Would the physician contact you?
[3] A: Generally it would go through the nurse and
[4] then the nurse would discuss with me.
[5] Q: Did claimants ever get treatment in general
[6] based on your experience there? Did the claimant
[7] ever get treatment and then try to get workers comp
[8] benefits—not benefit, workers comp coverage. I'm
[9] not quite up on the terms in the industry. Did
[10] anyone ever go to the doctor, get treatment and then
[11] try to get Zurich to cover it later? Has that
[12] happened?
[13] A: Yes.
[14] Q: Can you give Mae an example of how that
[15] would be handled?
[16] A: Well, if the treatment is appropriate, then
[17] there wouldn't be a problem. The problem comes in
[18] if it's not an appropriate type of treatment or a
[19] question as to whether or not that's the appropriate
[20] treatment for that case.
[21] Q: Do I understand correctly that the proper
[22] procedure, however, is on to get authorization prior

Page 37

[1] to treatment?
[2] A: Yes.
[3] Q: In cases—would there ever be a case where
[4] Zurich would contact the physician first to discuss
[5] the patient's treatment?
[6] A: The nurse case manager could contact the
[7] doctor to discuss treatment options and jointly come
[8] up with a plan.
[9] Q: Would the nurse case manager keep records
[10] of these types of discussions, do you know?
[11] A: I don't know what they would to.
[12] Q: Does an employer have any input into
[13] whether a claimant receives benefits?
[14] A: No.
[15] Q: Have you ever had an employer try to
[16] influence whether or not a claimant received
[17] benefits?
[18] A: It's come up at some point. I can't
[19] remember anything specifically, but I'm sure it has
[20] occurred at some point.
[21] Q: What would be Zurich's stance on—
[22] A: Zurich handles the files according to the

Page 38

[1] way the Workers Comp Act is and what their—as I
[2] said before, what their best practices are and if
[3] somebody is legally owed, then benefits would be
[4] paid.
[5]    Q: You stated that it may be the case where
[6] employers tried to influence when a claimant
[7] received benefits, you can't remember any details?
[8]    A: No, I can't remember any employers but
[9] we're talking in generalities. I'm sure it has come
[10] up.
[11]    Q: Can you remember a general scenario without
[12] remembering exactly who did it or what company was
[13] involved?
[14]    A: No, I personally cannot.
[15]    Q: Does an employer have any input into the
[16] treatment a claimant receives?
[17]    A: No.
[18]    Q: Not in any case?
[19]    A: No.
[20]    Q: Do insurance companies and Zurich in
[21] particular here ever send a claimant for independent
[22] medical evaluation?

Page 39

[1]    A: Has Zurich ever sent?
[2]    Q: A claimant?
[3]    A: Oh yes, absolutely.
[4]    Q: When is that done, under what
[5] circumstances?
[6]    A: A couple circumstances. One is an
[7] evaluation on permanency, if this person has a
[8] permanent injury, they want to know the percentage
[9] of disability. The second is a second opinion
[10] regarding a diagnosis, a third would be a second
[11] opinion regarding a treatment plan, a fourth could
[12] be an evaluation on what may be preexisting.
[13] Another one would be causal relationship. Those are
[14] just off the top of my head.
[15]    Q: What would trigger a request for an
[16] independent medical exam, an IME?
[17]    A: What would trigger it?
[18]    Q: Yes.
[19]    A: Well, I listed all the reasons why we could
[20] do it, so it would be my opinion that maybe a—or a
[21] case handler I should say, maybe they feel like it's
[22] time to get a second opinion or the nurse case

Page 40

[1] manager. Sometimes of employee isn't pleased with
[2] their treating physician and wants to get a second
[3] opinion.
[4]    Q: What would the—let me just make sure that
[5] I understand. Could you look at the file and decide
[6] that you needed an independent exam? Would that be
[7] a call that you would make as a claims specialist?
[8]    A: I could make that call, yes.
[9]    Q: Have you made those calls in the past?
[10]    A: Absolutely.
[11]    Q: Or it could be the nurse case manager that
[12] determined that an IME would be needed?
[13]    A: They wouldn't determine it, they would
[14] discuss it with the case manager. The nurse will
[15] not schedule, but they might make a recommendation,
[16] say I think we need to have a second opinion.
[17]    Q: Recommendation to?
[18]    A: It would be to me as an adjuster or just an
[19] adjuster.
[20]    Q: Okay. Do you recall ever speaking to
[21] anyone at Omni about Mr. Boulos's claim?
[22]    A: No.

Page 41

[1]    Q: Did you ever speak to anyone at Omni?
[2]    A: I don't recall any Omni conversations.
[3]    Q: Do you know someone named Jean Allen?
[4]    A: Jean Allen in relation to Omni?
[5]    Q: Yes.
[6]    A: No. It doesn't sound familiar.
[7]    Q: Did you ever speak with Ms. Allen about
[8] Mr. Boulos?
[9]    A: I don't recall Ms. Allen.
[10]    Q: Do you deny speaking to Jean Allen about
[11] Mr. Paul Boulos?
[12]    MR. DURBIN: Object to the form of the
[13] question. Go ahead, you can try to answer.
[14]    THE WITNESS: I don't recall Ms. Allen, so
[15] I don't recall any conversation.
[16]        BY MS. WALSH:
[17]    Q: So you don't recall one way or the other?
[18]    A: No. I have a friend by the name of Jean
[19] Allen, but it has nothing to do with that.
[20]    MR. DURBIN: You've answered the question.
[21]    THE WITNESS: I know, thank you.
[22]        BY MS. WALSH:

Case 1:05-cv-01175-HHK   Document 20-6   Filed 06/26/2006   Page 9 of 14

Deposition of: Karen Freciak
January 18, 2006
Sandra Taylor, et al.   v.
Omni Management Corp., et al.

Page 46

[1] Boulos's independent medical examiner?
[2] A: It says a Dr. Gordon.
[3] Q: Are you familiar with Dr. Gordon?
[4] A: You know, when I read this, no, I don't
[5] know which Dr. Gordon we're talking about.
[6] MS. WALSH: I'm going to be submitting this
[7] as an exhibit.
[8]          BY MS. WALSH:
[9] Q: Okay, and based on your review of this
[10] letter today, what does it state was Dr. Gordon's
[11] opinion of Mr. Boulos's physical condition?
[12] A: According to the letter, it states that his
[13] injury to his back problems are related to
[14] degenerative conditions rather than an injury from
[15] work and—you want me to continue?
[16] Q: No. Is this a standard letter a workers
[17] compensation claimant might receive?
[18] A: None of them are standard. They're all
[19] unique to a particular circumstances on a case.
[20] Q: So no form letters?
[21] A: No.
[22] Q: What kind of information would be contained

Page 47

[1] in an independent medical examiner's report?
[2] A: It would be medical history, a
[3] summarization of medical records that were provided
[4] with—provided when the—to the examining physician,
[5] what else would be in there? His evaluation, the
[6] doctor, the IME doctor, the independent medical
[7] examination doctor, his examination of the injured
[8] worker and his analysis and diagnosis and treatment
[9] plan as well as basically his opinion.
[10] Q: The letter states that this report was
[11] submitted to Zurich. Was the report submitted to
[12] you?
[13] A: Yes.
[14] Q: Would you have reviewed the report?
[15] A: Yes.
[16] Q: Do you have any recollection of this
[17] particular report?
[18] A: Nothing outside of what I summarized in
[19] this letter.
[20] Q: So you really can't tell me what exactly
[21] was contained in this report?
[22] A: The IME report, no.

Page 48

[1] Q: Dr. Gordon's report for Paul Boulos
[2] referenced in this letter?
[3] A: Right, no, just based on what I'm saying is
[4] all I have.
[5] Q: Who made the decision to terminate
[6] Mr. Boulos's workers comp benefits?
[7] A: I did.
[8] Q: And what did you base this decision on?
[9] A: The opinion of the independent medical
[10] examination.
[11] Q: What do you base your answer on today?
[12] A: Pardon?
[13] Q: Are you basing this answer on your memory
[14] or on the contents of this letter?
[15] A: On the contents of the letter.
[16] Q: Did anyone approve your decision or are you
[17] final authority?
[18] A: I don't recall in this case.
[19] Q: Did anyone from Omni participate in making
[20] the decision to terminate his benefits?
[21] A: Did anyone at Omni?
[22] Q: From Omni participate in the decision to

Page 49

[1] terminate his benefits?
[2] A: I don't recall. I doubt it, though.
[3] Q: You say you doubt it. Would you deny it?
[4] A: Would I deny that they had any part of it?
[5] Yes, because it's really not their decision.
[6] Q: From what you know from working at Zurich,
[7] would they still have Dr. Gordon's report on file?
[8] A: I think it was a long time ago. Unknown.
[9] Q: I'm sorry?
[10] A: I would imagine they have it in an archived
[11] section, but I don't know 100 percent.
[12] Q: What happens to closed files?
[13] A: They're saved for a certain period of time
[14] according to the statutes.
[15] Q: The statute dictates how long?
[16] A: Yeah, that in addition to the insurance
[17] carriers, you know, what their protocol is and their
[18] processes and whatnot.
[19] Q: Do you know Zurich's protocol?
[20] A: No.
[21] Q: Do you know if they destroy it or ship it
[22] off somewhere?

Page 54

[1] actual injury is not a work-related injury.
[2] **Q:** Any other reasons?
[3] **A:** That the IME felt he would not be a good
[4] candidate, it would not be successful. That's all I
[5] can think of right off.
[6] **Q:** Do you know if epidural injections were
[7] expensive?
[8] **A:** I don't even know what the cost is.
[9] Unknown.
[10] **Q:** Does the cost of treatment factor into
[11] whether or not Zurich would pay for a treatment?
[12] **A:** No.
[13] **Q:** So if a treating physician prescribes
[14] something that Zurich thought was appropriate, the
[15] fact that it was more or less amount of money wasn't
[16] part of the decision whether or not to grant
[17] benefits?
[18] **A:** No, as long as it was going to benefit the
[19] injury.
[20] **Q:** Would Zurich ever deny coverage of a
[21] treatment prescribed by a treating physician?
[22] **A:** Yes.

Page 55

[1] **Q:** Under what circumstances?
[2] **A:** A second opinion would indicate that it was
[3] not an appropriate treatment or would not be of any
[4] benefit.
[5] **Q:** Any other reasons?
[6] **A:** Those two just immediately pop to mind.
[7] **Q:** Would Zurich deny coverage of a treatment
[8] prescribed by the treating without a second opinion?
[9] **A:** Generally no.
[10] **Q:** You said generally no, could there be a
[11] case where they would?
[12] **A:** I can't say. You're asking for black and
[13] white and I'm sure there's a circumstance somewhere
[14] that would say that they would, but I can't think of
[15] any.
[16] **Q:** And I may have asked you this and if I did,
[17] apologize. Did you know that Dr. Yu prescribed
[18] epidural injections for Mr. Boulos?
[19] **A:** I don't recall.
[20] **Q:** You can't recall any information at all as
[21] to epidural or Mr. Boulos's—
[22] **A:** (Witness shook head.)

Page 56

[1] **Q:** Answer out loud.
[2] **A:** No, I don't recall.
[3] **Q:** Did Mr. Boulos's treating physician
[4] disagree with the diagnosis of your independent
[5] medical examiner?
[6] **A:** I don't recall.
[7] **Q:** Did you know that of the time of your
[8] letter in August of 2001 Mr. Boulos's treating
[9] physician, Dr. Yu, refused to release him to return
[10] to work?
[11] **A:** I'm sorry, I don't recall.
[12] **Q:** This letter—in this letter you terminate
[13] Mr. Boulos's benefits, is this correct?
[14] **A:** Yes.
[15] **Q:** Would the fact that a treating physician
[16] had not released a workers comp claimant be relevant
[17] to your decision?
[18] **A:** One more time.
[19] **Q:** I'm asking in general since you don't
[20] remember this case.
[21] **A:** Right.
[22] **Q:** Say you had a claimant who had a second

Page 57

[1] opinion releasing him, his treating physician had
[2] not released him, would this factor into your
[3] decision to end benefits?
[4] **A:** We would—yes, the second opinion would
[5] factor—we would factor in the second opinion in our
[6] decision about terminating benefits, yes.
[7] **Q:** What was the general procedure for handling
[8] a conflict between a treating physician and a second
[9] opinion, an IME?
[10] **A:** It would go to a workers compensation
[11] hearing and the Commission would make a decision.
[12] **Q:** In every case?
[13] **A:** Yes, if we both felt very strongly with,
[14] you know, if the IME doctor felt very strongly about
[15] that, you know, what are the issue is and the
[16] treating physician felt very strongly, then both
[17] parties would move towards a hearing at the workers
[18] comp level and the Commission, again, would make a
[19] decision. Am I answering your question?
[20] **Q:** You're answering, but we're just going to
[21] break it down. We have a situation where the
[22] claimant has a treating physician with one

Page 42

[1] **Q:** Did you ever get a request from an employer
[2] to send a claimant for an independent medical exam?
[3] **A:** From an employer? No, I don't believe I
[4] have.
[5] **Q:** Did anyone from Omni request that Paul
[6] Boulos be sent for independent medical exam?
[7] **A:** I do not recall.
[8] **Q:** If you had gotten a request from an
[9] employer to send a claimant for an independent
[10] medical exam, what would your response be?
[11] **A:** If I had gotten a request from an employer?
[12] **Q:** Uh-huh.
[13] **A:** It's not their call.
[14] **Q:** And you base this answer on what
[15] information that it's not their call?
[16] **A:** Because they retained us to him for claims,
[17] again, according to the workers compensation laws
[18] for that state and our expertise.
[19] **Q:** What could happen if Zurich didn't handle
[20] the claim properly?
[21] **A:** What would happen?
[22] **Q:** What are the various results?

Page 43

[1] **MR. DURBIN:** I'm going to object to the
[2] form of the question. I don't understand what
[3] "claim properly" and "what would happen"—
[4]     **BY MS. WALSH:**
[5] **Q:** She states that Zurich handles the claims
[6] according to—
[7] **A:** Best practices.
[8] **Q:** —best practices. What would the result be
[9] if Zurich violated its best practices?
[10] **A:** I don't know what the outcome would be if
[11] they did.
[12] **Q:** Why did Zurich follow best practices?
[13] **A:** It gives them a process that all the
[14] adjusters need to follow in accordance to what the
[15] corporation feels is appropriate for handling
[16] workers compensation or what other types of claims
[17] there is.
[18] **Q:** Does Zurich have to comply with each
[19] jurisdiction's workers compensation laws?
[20] **A:** Yes.
[21] **Q:** We'll revisit that later. Did Jean Allen
[22] request that Mr. Boulos be sent for an independent

Page 44

[1] medical exam?
[2] **MR. DURBIN:** Object to the form of the
[3] question.
[4] **MS. WALSH:** What's your objection?
[5] **MR. DURBIN:** She doesn't even remember the
[6] name Jean Allen, so it assumes facts not in
[7] evidence.
[8] **THE WITNESS:** I don't know.
[9]     **BY MS. WALSH:**
[10] **Q:** So you state that you can't recall ever
[11] speaking to anybody at Omni about Mr. Boulos at all?
[12] **A:** I do not.
[13] **Q:** If requested to, could you have released
[14] the name of an independent medical examiner to a
[15] treating physician?
[16] **A:** One more time.
[17] **Q:** If Mr. Boulos's treating physician asked
[18] for the name of his independent medical examiner,
[19] could you tell him?
[20] **A:** Yes.
[21] **Q:** Would you refuse to provide that pertinent
[22] information if requested?

Page 45

[1] **A:** I don't see that I would.
[2] **Q:** Do you know who the independent medical
[3] examiner in Mr. Boulos's case was?
[4] **A:** No, I don't.
[5] **Q:** I'm going to show you this document. If
[6] you could read this.
[7] **A:** Okay.
[8] **Q:** Are you finished?
[9] **A:** Yes.
[10] **Q:** Could you identify this document?
[11] **A:** It is a letter August 24, '01 directed to
[12] Tawfik Boulos regarding his—a summary of his
[13] independent medical examination.
[14] **Q:** Okay. Is this your insurance at the
[15] bottom?
[16] **A:** Yes, it is.
[17] **Q:** Do you recall drafting this?
[18] **A:** I don't recall.
[19] **Q:** Do you have any reason to doubt that this
[20] is yours?
[21] **A:** No, I don't doubt this is mine.
[22] **Q:** And who does the letter state is Dr.

Sandra Taylor, et al.   v.
Omni Management Corp., et al.

Deposition of: Karen Trecia
January 18, 200[?]

Page 58

[1] diagnosis. For whatever reason Zurich has sent the
[2] claimant for a second opinion. Their diametrically
[3] opposed. One says he's fine to work, the other says
[4] he's not fine to work. What would your next step
[5] be?
[6]   A: It would be to go to a hearing.
[7]   Q: When you say "go to a hearing", where would
[8] you go?
[9]   A: To the Workers Compensation Commission.
[10]   Q: The D.C. workers comp?
[11]   A: D.C. workers comp in this case.
[12]   Q: Zurich would go itself? Zurich would
[13] initiate this hearing?
[14]   A: Generally the injured workers would
[15] initiate it or if they're represented by counsel,
[16] the attorney representing the injured worker would
[17] file for a hearing and then all parties would go.
[18]   Q: What if the worker didn't initiate the
[19] hearing?
[20]   A: His right is to, in fact, I think one of
[21] the papers that is sent to them is their right to
[22] file for a hearing on I'm going to say "contested

Page 59

[1] issues".
[2]   Q: What papers are sent to a claimant?
[3]   A: One of the things that I'm—I hope I'm not
[4] getting my jurisdictions mixed up here, but they
[5] have a right under the Workers Comp Act to present a
[6] case at the workers compensation level on any
[7] disputes regarding their claim.
[8]   Q: Is this standard paperwork sent to a
[9] claimant?
[10]   A: Yes.
[11]   Q: Have you ever advised a claimant as to this
[12] process?
[13]   A: If they're represented by counsel, I do not
[14] advise them.
[15]   Q: If they're not represented by counsel,
[16] would you advise them?
[17]   A: Yes.
[18]   Q: Have you ever done so in the fast?
[19]   A: Yes, I have advised injured workers that
[20] that's an option.
[21]   Q: Do you recall whether or not you advised
[22] Mr. Boulos of this option?

Page 60

[1]   A: No, I do not.
[2]   Q: In general, if you can, since we're
[3] speaking in general procedures at Zurich, if you
[4] were aware as a claims specialist of two differing
[5] opinions between the treating and the IME, would
[6] Zurich take any action if the employee failed to do
[7] so?
[8]   A: Generally no.
[9]   Q: So the burden is on the employee?
[10]   A: Let me backtrack. I do not know if in D.C.
[11] they do.
[12]   Q: They do what?
[13]   A: That they file—they can file for a hearing
[14] themselves. So I would answer that as I don't know
[15] because I'm not recalling D.C. clearly.
[16]   Q: That's fine, but I'm not sure what you're
[17] not recalling clearly. They filed—just say again
[18] what you're trying to tell me. Rephrase it.
[19]   A: Okay, you were asking—
[20]   Q: I asked if the burden was on the employee
[21] and then you kind of thought—
[22]   A: The employee generally files for a hearing.

Page 61

[1] I don't recall in D.C. if the employer, and when I
[2] mean "employer", I meant really the carrier because
[3] we all—if the insurer can file for a hearing on an
[4] issue such as this. I know in some states you can.
[5] I just don't remember D.C.
[6]   Q: Does Zurich have any obligation to file if
[7] there are conflicting opinions?
[8]   A: I don't know if they do in D.C.
[9]   Q: Do you believe that Dr. Gordon gave Paul
[10] Boulos a thorough and competent exam?
[11]   MR. DURBIN: Object to the form of the
[12] question. Foundation.
[13]   THE WITNESS: I don't know.
[14]               BY MS. WALSH:
[15]   Q: Or you denied benefits based on his exam?
[16]   A: I would assume that he gave him a thorough
[17] exam, but I don't have the report to—
[18]   Q: And you can't recall what was in his
[19] report?
[20]   A: Refresh—right.
[21]   Q: Do you know how long these independent
[22] medical exams typically last?

Deposition of [illegible] January 18, 2006
Case 1:05-cv-01175-HHK   Document 20-6   Filed 06/26/2006   Page 13 of 14
Sandra Taylor, et al. v. Omni Management Corp., et al.

Page 62

[1] A: They can last anywhere from maybe half an
[2] hour to maybe three, four hours depending on the
[3] type of injury and the scope of the exam.
[4] Q: Would it be unusual for an exam to last
[5] only about three minutes?
[6] A: I would think that was unusual.
[7] Q: Have you ever had any reports from a
[8] claimant that the independent medical exam was
[9] cursory, five minutes or less?
[10] A: No, I do not recall any of that.
[11] Q: If you had information that the exam only
[12] lasted approximately three minutes, would that
[13] affect your decision on—would that affect how you
[14] viewed the independent medical examiner's report?
[15] MR. DURBIN: Objection, speculation. Go
[16] ahead.
[17] THE WITNESS: Actually, if the exam ended
[18] up being quite shortened, there was an obvious
[19] reason for it.
[20]        BY MS. WALSH:
[21] Q: What would those reasons be?
[22] A: Perhaps an uncooperative injured worker,

Page 63

[1] which is generally what we find. Somebody doesn't
[2] show up timely or is not cooperative in the
[3] examination, and then a doctor would likely look at
[4] the medical records that have been sent to him, all
[5] his prior medical records and formed an opinion
[6] based on what little examination he could do, if
[7] any, and what his analysis of the prior medical
[8] records were to form an opinion.
[9] Q: Could it also be the case that the doctor
[10] just didn't do a thorough exam?
[11] A: That could be, but, you know, we're relying
[12] that they are doing a thorough exam. That's why we
[13] send them to a doctor for the exam.
[14] Q: Do you as a claims specialist give the
[15] treating physician's opinion any deference?
[16] A: Do I do what?
[17] Q: As a claims specialist, do you give the
[18] treating physician's opinion any deference as
[19] opposed to the IME's?
[20] A: It depends on who the treating physician
[21] is.
[22] Q: Why?

Page 64

[1] A: There are some treating physicians that are
[2] more, what is the word, they're better treaters.
[3] Their capabilities are better, their opinion is
[4] strong—I'm not sure I'm wording this all correctly.
[5] There's a lot more value put on their opinions than
[6] some others.
[7] Q: Do you have any opinion as to Dr. Yu's
[8] reputation?
[9] A: No.
[10] Q: Are you familiar with him at all?
[11] A: No.
[12] Q: And this may be a similar answer but
[13] slightly different. When would a treating
[14] physician's opinion not be heeded by Zurich?
[15] A: The same reason, his opinion might not—he
[16] might not be well respected within the community and
[17] his opinion doesn't carry much weight.
[18] Q: Have you ever had a case where the employer
[19] discusses your decision not to follow the advice of
[20] the treating physician?
[21] A: Do I recall a case, no.
[22] Q: Not in your experience in the industry

Page 65

[1] you've never had—
[2] A: I do not recall a case.
[3] Q: Have you ever been involved in a case where
[4] the employer wanted to ignore the independent
[5] medical examination?
[6] A: No, not that I recall.
[7] Q: Did the employers generally stay out of it?
[8] A: As far as decision making, yes. And
[9] decision making in terms of the claim handling.
[10] Q: You've never had an employer call you and
[11] say you cut off benefits from this employee, we
[12] think you're just wrong?
[13] A: That they would call and say that us
[14] terminating the benefits would be wrong?
[15] Q: Yes.
[16] A: I don't recall them—any conversation of
[17] any employer questioning that, because it was all
[18] based on, you know, investigation.
[19] Q: So Omni wouldn't have done that in this
[20] case since you say "no employer"?
[21] MR. DURBIN: Objection, speculation,
[22] there's no recollection. It's been stated

Page 86

[1] MS. WALSH: Yes.
[2] **EXAMINATION BY COUNSEL FOR DEFENDANTS**
[3] **BY MR. COLES:**
[4] Q: Just a few questions here. You mentioned
[5] that it's rare for an employer to get involved in
[6] sort of influencing how a case proceeds?
[7] A: Yes.
[8] Q: Is it rare enough to so that when it
[9] happens you sort of make a mental note of that?
[10] A: Yeah, I would make a mental note.
[11] Q: Is it rare enough so that if it happened in
[12] a particular case, that case might stand out in your
[13] recollection?
[14] A: Not all the time.
[15] Q: Well, but you don't have any recollection
[16] of it happening in this case?
[17] A: No, not at all.
[18] Q: I just want to run through at least maybe
[19] yes or no questions, so you can say yes or no if
[20] possible.
[21] How much—does an employer have any say in
[22] determining if an injury is compensable?

Page 87

[1] A: No.
[2] Q: Does an employer have any say in
[3] determining how long before a person is released to
[4] return to work?
[5] A: No.
[6] Q: Does an employer have any say in
[7] determining what benefits would be paid to an
[8] employee?
[9] A: No.
[10] Q: Does an employer have any say in
[11] determining when benefits will be terminated?
[12] A: No.
[13] Q: All right. Does an employer have any
[14] involvement concerning whether or not you should get
[15] an IME?
[16] A: No.
[17] Q: Does an employer have any involvement in
[18] determining what are the consequences based on the
[19] results of the IME?
[20] A: No.
[21] Q: Does an employer have any involvement in
[22] determining whether or not an employee is qualified

Page 88

[1] to return to work?
[2] A: No.
[3] Q: All right. With respect to the two
[4] physicians, an IME versus a treating physician, how
[5] is the IME picked? How is that person identified?
[6] A: Two ways, one through the nurse case
[7] manager who might know that—whatever the issue may
[8] be, this doctor has a specialty in it, or the second
[9] way is through a vendor who has a number of
[10] physicians that we use.
[11] Q: To your knowledge, does the IME physician
[12] have to be somehow qualified or reviewed before they
[13] can be eligible to conduct an IME on behalf of
[14] Zurich?
[15] A: There is a selection process, but I don't
[16] know what it is.
[17] Q: But not just any doctor in the phone book
[18] could be selected for an IME today?
[19] A: No.
[20] Q: What about for a treating physician? Is
[21] there anything—any way that a doctor in the phone
[22] book would not be allowed to be a treating

Page 89

[1] physician?
[2] A: No, they can treat.
[3] Q: Anybody can treat as a doctor?
[4] A: Yeah, depending on that jurisdiction.
[5] Q: Okay. Let's see here. That's it. Pass
[6] the witness.
[7] MR. DURBIN: I have no questions.
[8] MS. WALSH: I just want to follow up on one
[9] thing that he said.
[10] **FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS**
[11] **BY MS. WALSH:**
[12] Q: You stated—he asked if it would be rare
[13] enough that an employer would become involved in the
[14] decision about benefits that you would remember it?
[15] A: Uh-huh.
[16] Q: But there might be cases where you don't
[17] remember it, is that what you testified to?
[18] A: Well, there could be cases that I don't
[19] recall.
[20] MS. WALSH: Okay.
[21] MR. DURBIN: And we'll waive signature.
[22] (Plaintiff's Exhibits 1 - 5