**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **TAWFIK BOULOS,** | ) | |
| | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **1:05-CV-1175-HHK** |
| **OMNI HOTELS MANAGEMENT CORP.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

_____ )

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

## I.     BACKGROUND

This is a case of retaliatory termination.  Plaintiff Tawfik ("Paul") Boulos ("Boulos") was terminated after supporting one his subordinates' allegations of racial discrimination and harassment against Omni Hotels Management Corporation, which was doing business at its Omni Shoreham Hotel ("Omni" or "Defendant") in Washington, D.C.[1]  Although Omni denies retaliatory intent and claims, instead, that Boulos was terminated for cause, Boulos presents overwhelming evidence that such denials are pretextual, so that a trial on the merits is required under the applicable law.

---

[1]     Plaintiff consents to the dismissal of co-defendant Omni Hotels Corporation, as discovery revealed that entity to be a holding company which, despite having many commonalities with Omni Hotels Management Corp., had no operational responsibility to and no direct involvement in the events at issue.

## II.    STATEMENT OF FACTS

### Boulos Begins Work At The Omni Shoreham Hotel, Supervising Sandra Taylor; Elkhodary Is Boulos' Supervisor

Plaintiff Paul Boulos ("Boulos") began his employment with the Omni Shoreham Hotel in January of 2001 as the Director of Housekeeping. Deposition of Paul Boulos ("Boulos Dep.") at 13.  Boulos is Egyptian. Boulos Dec. ¶ 2.  Boulos' native language is Arabic. Boulos Dec. ¶ 3.

Boulos served as Executive Housekeeper at the Omni Shoreham Hotel.  Boulos Dec. ¶ 4.  When Boulos entered on duty at the Omni Shoreham, Sandra Taylor ("Taylor"), who is African American, was the Assistant Director of Housekeeping. Deposition of Peter Austin ("Austin Dep.") at 51-52. Boulos succeeded a woman, most likely Irene Chin, after an extended period of time in which Defendant had no executive housekeeper.  Boulos Dep. at 34-35.  Thus, Taylor, had performed the duties of the Director of Housekeeping for the prior half-year, as well as the duties of Assistant Director of Housekeeping, before Boulos was hired.  Austin Dep. at 13-14, 28; Boulos Dep. at 13, 34.

### Elkhodary Makes Racist Remarks Against Taylor; Elkhodary Demotes Taylor; Boulos Protests Elkhodary's Racist Remarks Internally

Said Elkhodary ("Elkhodary") was Director of Rooms at the Omni Shoreham Hotel and was Boulos' direct supervisor.  Boulos Dep. at 16. Almost immediately upon Boulos' arrival at the Omni Shoreham, Elkhodary, who like Boulos is Egyptian, began making racially offensive remarks to Boulos about Taylor and African American employees.  Boulos Dep. at 75-76, 93.

Elkhodary told Boulos that Boulos should avoid residing in College Park, Maryland, because "College Park is full of blacks.  Do you want your kids to go to

school full of black kids?"  Boulos Dep. at 76.  Elkhodary demoted Taylor from her

position as Assistant Director of Housekeeping to Laundry Manager in February of

2006.  Boulos Dep. at 59, 64.  Elkhodary repeatedly referred to Taylor as "el abda," which

is Arabic for "a slave."  Boulos Dep. at 78.

Boulos told the Human Resources Manager at that time, Nate Foxworth, about

Elkhodary's comments, and that he believed that Taylor was being demoted because of

her race. Boulos Dep. at 75-78.  However, Elkhodary continued to make these racially

discriminatory remarks even after Boulos spoke to Foxworth about them.  Boulos Dep.

at 80. Boulos had further conversations with Foxworth about Elkhodary's comments.

Boulos Dep. at 85-86.  Boulos never saw any indication that Foxworth reported his

complaint to anyone else or that any action was taken against Elkhodary.  Boulos Dep. at

80.

### Elkhodary Withholds Boulos' Evaluation
### And Continues To Harass Taylor

At one point, Elkhodary refused to give Boulos his 90-day evaluation until

Boulos would fire Taylor.  Boulos Dep. at 86.  Boulos regularly heard Elkhodary shout

and scream at Taylor.  Boulos Dep.at 87-88.  Thus, Elkhodary would stand behind

Taylor at meetings while Taylor addressed the room attendants she supervised and

"make faces" while Taylor was speaking.  Boulos Dep. at 91-92.

Around February 2001, Taylor was demoted by Elkhodary. Boulos Dep. at 64.

### Taylor Is Terminated And Files An EEOC Charge

Taylor's employment ended when she resigned under protest in April 2006.  On

June 12, 2001, Taylor filed an EEOC charge, which named Boulos as a witness to the

"College Park" comment and alleging discrimination on the basis of race and sex.

Deposition of Jean Allen ("Allen Dep.") Exhibit 4.[2]

### Boulos Suffers An On-The-Job Injury While Working At The Omni Shoreham Hotel; Boulos Seeks Medical Treatment And Uses Leave

On June 6, 2001, Boulos was pushing some heavy linen carts while at work when he felt a sharp pain in his back.  Boulos Dep. at 110-111. The pain kept getting worse, however, and on June 7, 2001, the next day, Boulos informed Elkhodary about the accident.  Boulos Dep. at 111-112.

Boulos continued working between June 7 and June 11, 2001.  Boulos Dep. at 113-115. However, on June 11, 2001, the pain in Boulos' back became intolerable and Elkhodary requested that Boulos go to George Washington Hospital's ("GW") Emergency Room for treatment.  Boulos Dep. at 191-92.

### Boulos Returns To Work With Medical Restrictions

The doctors at GW took Boulos out of work for two days, after which he could return to work on June 14 with restrictions.  Boulos Dep. at 116, 119; Austin Dep. Exh. 18 (GW Work limitation form).  These restrictions included minimal walking, no climbing, no heavy lifting above 10 pounds, no work above chest height, no pushing, pulling or twisting work, no carrying above 10 pounds, and no bending or stooping.  Austin Dep. Exh. 18.  The medical restrictions form instructed Boulos to return to GW for a follow up on June 18, 2001.  Boulos Dep. at 121; Austin Dep. Exh. 18.

Boulos indeed returned to the GW Emergency Room on June 18 as instructed, at which time he was provided a form indicating that he was to remain on altered duty,

---

[2]      Taylor was originally Boulos' co-plaintiff in this case; her claims were previously resolved by the parties and dismissed by stipulation

which included no heavy lifting above 10 pounds, no pushing, pulling or twisting work, no carrying above 10 pounds and no bending or stooping.  Austin Dep. Exh. 17 (Work limitation form dated 6-18-01).

The physicians in the Emergency Room told Boulos to seek treatment with an orthopedist named Dr. Warren Yu.  Boulos Dep. at 121. Boulos saw Dr. Yu on June 26, 2001, at which time Dr. Yu diagnosed back pain and a herniated disk and placed Boulos on limited duty, indicated as no lifting.  Boulos Dep. Exh. 6.

Boulos continued working on limited duty through the week of June 26, 2001. Boulos Dep. Exh 6.  However, Boulos would experience sharp pain in his back whenever he stepped on his right foot, and therefore tried to avoid walking during this time. Boulos Dep. at 123.

While on limited duty, Boulos completed all his paperwork, attended all the required meetings, such as union meetings and manager's meetings, and supervised the laundry, which was near his office, but avoided excessive walking due to the pain. Boulos Dep. at 123-124, 125-26.

### Defendant Attempts To Improperly Dissuade Boulos From Testifying Truthfully Regarding Taylor

On June 28, 2001, Defendant's Human Resources Director, Jean Allen ("Allen") called Boulos at home to discuss Taylor's EEOC Charge. Allen Dep. Exh. 5.  On June 29, 2001, Boulos met with Allen and her assistant, Vikki Finn, to discuss Taylor's EEOC charge.  Allen Dep. Exhs 5-6. At that time, Boulos told Allen that he believed Elkhodary had harassed and discriminated against Taylor based on her race.  Boulos Dep. at 96.

**<u>Dr. Yu Recommends Leave and Epidural Injections For Boulos;</u>**
**<u>Zurich Refuses Further Coverage</u>**

On July 3, 2001, Dr. Yu opined that Boulos should not be going to work.  Boulos

Dep. Exh. 7.  Boulos then remained out of work and on workers compensation through

the month of July, 2001.  Boulos Dec. ¶ 5.

**<u>Austin Prepares Unsent Letter on August 17, 2001, To Demand That</u>**
**<u>Boulos Return To Work By October 1, 2001,</u>**
**<u>And Offering Alternative Employment</u>**
**<u>If Boulos Is Unable To Return By October 1</u>**

It is undisputed (Austin admits) that Austin authorized a letter on August 17,

2001 to Boulos that was not sent, stating that Boulos needed to return to work by

***October 1, 2001***. See Exh. F hereto, Defendant's "stipulation" as to the August 17 date;

Austin Dep. Exh. 9; Austin Dep. at 129-30.  The August 17 letter states that Defendant

was ***willing to consider Boulos' "candidacy for any  position"*** (emphasis added), if he

was unable to return to work by October 1.  Austin Dep. Exh. 9

**<u>Boulos Is Required To Submit To Examination By A Zurich-Selected Doctor</u>**

In early August 2001, Zurich Insurance sent Boulos for an "independent medical

examination" of his condition.  Boulos Dep. at 143.  On August 6, Dr. Gordon, Zurich's

chosen doctor, examined Boulos. Boulos Dep. at 143-44. Dr. Gordon spent just

approximately three minutes on his examination of Boulos.  Boulos Dep. at 183-84.

**<u>Conflicting Doctors' Opinions Emerge; Zurich Denies Further Coverage And</u>**
**<u>Refuses To Provide Epidural Injections To Benefit Boulos' Back</u>**

Boulos received conflicting diagnoses regarding his back from his personal

physician, Dr. Yu, and Zurich's physician, Dr. Gordon.  Dr. Gordon disagreed with Dr.

Yu, finding that there was no limitation on Boulos' physical capacity as a result of a

work related injury.  Exhibit A hereto (IME report from Dr. Gordon).

On August 24, 2001, Karen Treciak from Zurich Insurance sent a letter to Boulos advising that Dr. Gordon found that "any problems you may be experiencing with your back are due to degenerative conditions and are not a result of your injury at work." Boulos Dep. Exh. 10.  That letter further advised that Boulos' benefits were being terminated effective August 24, 2001, that he was "being returned to work immediately," and that Zurich would not longer authorize any additional medical treatment. Boulos Dep. Exh. 10.  Zurich also refused to fund epidural shots to treat Boulos' back injury, as Dr. Yu had recommended.  Boulos Dep. at 131.

### Boulos Informs Allen That He Received a Cursory Examination From The Independent Physician

Soon after receiving the letter from Zurich terminating his benefits, Boulos contacted Allen regarding Zurich's determination.  Boulos Dep. at 148. Boulos told Allen that Dr. Gordon did not do a thorough examination.  Boulos Dep. at 148.  Allen documented this conversation as occurring on August 27, 2001, noting that Boulos claimed that "the independent physician only spent three minutes with him."  Exhibit B at 1822.  It is undisputed that Boulos was examined by Dr. Gordon in early August and that Defendant, through Allen, was aware of his conclusions not later than August 24. Exhibit B at 1823.

### As of August 27, 2001, Defendant Has No Plans To Fire Boulos Prior To His Expected September 25 Medical Evaluation

Allen wrote a memo to the file, which she has dated to August 27, 2001.  Exhibit B hereto at 1822-1825.  Therein, she recounts a three-way conversation between herself, Austin and Boulos that allegedly occurred on August 27, in which she inquired about whether Boulos would be able to work after a scheduled *September 25, 2001* medical evaluation.  Id.  Through her memo writing, Allen unmistakably implied that there were

*no plans to fire Boulos sooner than September 25, 2001, as of August 27 date of the conversation.* Id.

### Boulos Informs Defendant That He Will Testify That Omni Discriminated Against Sandra Taylor Because Of Taylor's Race

On an occasion in early September 2001, when Boulos came to the Omni Shoreham to turn in a doctor's note, Allen requested that he meet with her regarding Taylor's claim for unemployment. Boulos Dep. at 100. Allen asked Boulos if he was aware of the scheduled hearing regarding Sandra Taylor. Boulos Dep. at 100-01. Boulos, in fact, had received a notice requesting his presence at the hearing. Boulos Dep. at 101. Allen asked Boulos how he would testify at the hearing, to which Boulos responded by telling Allen that he would say that he felt Taylor had been harassed based on her race. Boulos Dep. at 100-101.

Allen then asserted to Boulos that: "as managers, we should stick together so we can benefit the corporation which we are working for." Boulos Dep. at 101. Allen repeated this statement several times during the course of the conversation. Boulos Dep. at 101-102.

Allen claims that she "[does] not remember saying that comment." Allen Dep. at 179. During the conversation, Boulos told Omni for the first time that he would actually testify in support of Taylor and against Defendant. Boulos Dep. at 100-101.

### Boulos Testifies Against Omni Before The Department of Employment Services In Sandra Taylor's Unemployment Benefits Hearing

On September 6, 2001, Boulos testified on Taylor's behalf in a hearing in a District of Columbia unemployment compensation hearing, which was attended by both Allen and Elkhodary. Allen Dep. at 75-76. In his testimony, Boulos stated that Taylor had been the victim of racial harassment and discrimination. Allen Dep. at 75-76.

General Manager Austin, Omni's principal decision maker, admits that Allen would have told him how Boulos testified. Austin Dep. at 67, 70.

### Allen and Austin Demand That Boulos Return to Work

Sometime before September 8, Allen and Austin spoke to Boulos on the telephone, at which time Austin inquired as to when Boulos would be returning to work. Boulos Dep. at 151-52; Allen Dep. Exh. 12 at 00005. In that conversation, Austin told Boulos that he had three options: (1) to return to work with no restrictions per Dr. Gordon's instructions; (2) resign; or (3) be terminated. Boulos Dep. at 153. Austin and Allen also repeatedly asked Boulos to get a release from his treating physician, Dr. Yu, before returning to work. Boulos Dep. at 153; Allen Dep. Exh. 12 at 000007. Boulos told Allen and Austin that he would attempt to return to work on September 8, despite Dr. Yu's refusal to release him to return to his duties. Boulos Dep. at 155-56.

### Omni Breaks From Its Past Practice By Failing To Review And Evaluate The Medical Information; Defendant's Witnesses Testify Contradictorily As To The Significance Of Zurich's Medical Report On Its Termination of Boulos

Austin testified that in a case where an employee had conflicting diagnoses from doctors, he "probably would go ahead and want all those for-and-against opinions to be reviewed by people above me to see what their insight would be under that kind of a circumstance" and that he would not have required that employee to return to work with this "upper-level review." Austin Dep. at 90-91.

Early in her deposition, Allen stated that she believed that Boulos had seen a *third* physician to reconcile the two conflicting diagnoses between his personal physician, Dr. Yu, and Zurich's Dr. Gordon. Allen Dep. at 90-91. Allen was incorrect in her belief.

9

Thus, Austin testified that under policy, he would have been required to "consult with the corporate office about the circumstances [of Boulos' diagnoses] and get their feedback on their recommendations." Austin Dep. at 146-47. However, Austin testified that he could not remember if he consulted with the corporate office regarding the conflicting opinions between Dr. Yu and Dr. Gordon. Austin Dep. at 147.

Allen testified that Boulos' employment was not terminated because of Dr. Gordon's examination. Allen Dep. at 132. Allen later testified, however, that the release from Dr. Gordon factored into management's decision that Boulos could, in fact, "work full time to assume his normal job responsibilities." Allen Dep. at 133.

Allen testified that she believed Boulos could come back to work "[b]ecause it had been determined after the examination that he was in a condition that he could come back and fulfill the responsibilities of his position." Allen Dep. at 133.

It is undisputed that neither Allen nor Austin ever made any attempt to reconcile the conflicting medical reports.

### Boulos Attempts To Return To Work On September 8; Austin Displays Hostile Attitude Toward Boulos And Threatens Boulos With Discipline Despite The Absence Of Poor Performance

On Saturday September 8, 2001, *two days after he testified at Taylor's hearing*, Boulos returned to work and reported, as instructed, to Peter Austin's office. Boulos Dep. at 156. Austin did not ask Boulos how he felt or any information as to his condition that day, and his manner was very hostile toward Boulos. Boulos Dep. at 156, 161-62. At that September 8 meeting, Austin threatened Boulos' employment by showing him, for the first time, a handwritten document called "Director of Housekeeping Expectations," which newly outlined Boulos' duties. The document states that: "Any evaluation of your performance will be based on your ability to complete the above. It is

expected that you will do it successfully.  These are minimum requirements and not all-inclusive.  Failure to move forward with tangible results will required the hotel to intervene in accordance with its progressive disciplinary process."  Boulos Dep. at 156; Austin Dep. at 131, 135-6, 139-41; Austin Dep. Exh. 10.

Austin articulated the threat included in the document to Boulos, despite Austin's inability to recall Boulos exhibiting any performance problems prior to his injury in June 2001.  Austin Dep. at 41-42, 117-18, 134, 137. Austin admitted that such a threat of discipline normally would not be made until repeated performance problems were noted and "coaching" had first occurred, which he did not claim had happened here. Austin Dep. at 117-120.

### Boulos Is Fired on September 10, 2001

After his September 8 meeting with Austin, Boulos went to his office to perform his duties. (Boulos Dep. at 158). Later that day, Boulos began to experience such severe pain that he went "in tears" to Austin's office to tell him that he could not continue working without his medication.  Boulos Dep. at 158.  Austin instructed Boulos to go home for the day and meet him in Allen's office on Monday, September 10.  Boulos Dep. at 159.

On September 10, 2001, Boulos arrived at Allen's office as instructed and met with Allen and Austin and another employee.  Boulos Dep. at 159-60. Austin told Boulos that he needed to know if Boulos could return to work "in the full capacity … as the executive housekeeper without the talk about pain and all this.  And if you cannot do that then this is an honorable way for you which is to resign and if these two options are not open for you then there is a third one which will not be your choice but then I will take it and I will . . . terminate you. "  Boulos Dep. at 160.

Boulos testified that Austin was hostile toward him during this meeting as well. Boulos Dep. at 161.  Inded, Austin "never asked [him] about how [he felt.]"  Boulos Dep. at 156. Austin had never projected this hostile attitude toward Boulos before.  Boulos Dec. ¶ 6.

During this meeting, Boulos begged Austin to give him a few more days to see if his condition improved or to come up with money to pay for epidural injections to help his back.  Boulos also asked for unpaid leave in order that he might have more time to recover from his injury.  Boulos Dep. at 163-64. In addition, Boulos requested that Austin modify his job duties so that he could continue in his position as Director of Housekeeping. Boulos Dep. at 165.  Boulos was merely requesting that Austin "work with [him]" around his injury so that Boulos could keep his job.  Boulos Dep. at 165-66.

Austin refused to give Boulos more time to recover or modify his job duties. Boulos Dep. at 166. Instead, Austin fired Boulos.  Austin Dep. at 96.

**Omni Refuses To Modify Boulos' Duties, Without Justification,
Despite Having Done So For Him Previously, Before Boulos Testified Against It**

Austin testified that, as General Manager, he could have altered Boulos' job duties to accommodate his physical injury but chose not to do so.  Austin Dep. at 173. Thus, Austin admitted that a Director of Housekeeping on light duty would be responsible for "doing the schedule, processing payroll, doing the requisitions for purchasing, purchase orders, meet[ing] with vendors, if possible, . . . anything that would still allow them to do administrative work." Austin Dep. at 79.

The scenario described by Austin is precisely the arrangement that prevailed when Boulos was placed on light duty for nearly one month immediately ***after his***

12

*injury* in June 2001, *but before his testimony* against Omni.  See Austin Dep. Exhs. 17,

18.

### Omni Reverses Its Prior Inclination To Allow Injured Employees To Return With Modified Job Duties After Boulos' Testimony Against Omni, By Refusing To Do So And Instead Firing Boulos

Austin strangely testified that if Boulos had been able to return to work, even in a

diminished capacity, he would have allowed it.  Austin Dep. at 121-22.  Austin testified

in his deposition that he didn't offer Boulos light duty because "he seemed to be in

pain."  Austin Dep. at 120.  Austin testified that "based on my observations of [Boulos],

the way he was moving, I didn't feel that he would be able to perform."  Austin Dep. at

120.  Austin also testified that he did not believe that the fact that the independent

medical examiner spent just few minutes with Boulos would have impacted his decision

to terminate Boulos' employment, "because [he] needed a director of housekeeping."

Austin Dep. at 112.

However, Austin admitted that he *could* have altered Boulos' job duties.  Austin

Dep. at 173.  Allen also participated in the decision to terminate Boulos.  Austin Dep. at

9.  Allen testified contradictorily that the position of Director of Housekeeping was "not

the type of job that can be altered."  Allen Dep. at 207. Allen also testified falsely that

after September 11, 2001, Omni Shoreham did not offer light duty.  Allen Dep. at 221.

Austin contradicted Allen regarding the post- 9/11 situation, testifying that Omni

Shoreham did offer light duty after September 11, 2001.  Austin Dep. at 110.

In addition, it is undisputed that Sandra Taylor, the assistant Executive

Housekeeper was the highest-ranked employee in Housekeeping until Boulos was hired

in December 2000 or January of 2001.  Austin Dep. at 13-14, 28; Boulos Dep. at 13.   There

was no Director of Housekeeping through much of her tenure, however, and Taylor was

in fact merely an *Assistant* Director of Housekeeping. Boulos Dep. at 34. Thus, Defendant operated under Austin for an extended period prior to Boulos' testimony *without an Executive Housekeeper*.

In view of all this, Defendant has utterly failed to show that an operational need caused it to fire Boulos. Tellingly, when asked if he offered Boulos a "light duty" opportunity at the time of the firing, Austin responded by asserting not that he did or did not do so, but evasively, that he "knows" Boulos never "asked". Austin Dep. at 105. In fact, as shown, Fact No. 92, Boulos *did* ask.

Austin testified that he did not modify Boulos' job duties "[f]or continuity with all our decision making in terms of being able to make sure that everybody was performing at the level they were required to do by their job descriptions." Austin Dep. at 173-174. However, managers within the Omni Shoreham have altered job duties for employees in addition to the significant example of the prior accommodation of Boulos. For instance, supervisor Charles Briggs purchased wrist supports and ergonomic chairs for employees suffering from carpal tunnel syndrome. Briggs reported directly to Austin. Deposition of Charles Briggs at 34-35, 38-39.

### Although It Admits Boulos' Injury Was Real, Omni Falsely Asserts Through This Litigation That Boulos Committed Poor Performance By Refusing To Return To Work Against His Doctor's Orders, Despite The Fact That It Repeatedly Instructed Boulos At The Time Of The Injury And Absence From Work, That He Could Not Return To Work Without His Doctor's Release

In his Interrogatory No. 12, Boulos asked Omni:

If you allege that any aspect of Plaintiffs' performance was unsatisfactory, state each and every fact in support of your allegation. If you allege that Plaintiffs were not in conformity with or violated any policies, procedures or practices, identify that policy, procedure or practice and describe how each Plaintiff's behavior departed from it.

Defendant responded:

> . . . Defendant alleges that Plaintiff Boulos was unwilling to work after being cleared to return to work. . .

Exhibit C hereto.

Thus, Defendant has sworn that Boulos' performance and/or behavior violated its policies, since "Boulos was unwilling to work after being cleared to return to work. . ." by Zurich's doctor. Exhibit C. But previously, until Boulos testified against it, Defendant repeated over and over again that Boulos was *forbidden* from working without clearance from his *personal* physician. Indeed, as late as August 31, 2001, Allen told Boulos that Defendant "needed a release from Dr. Yu when he returned to work on Saturday 9/9/01." Exh. B at 1825.

On September 5, 2001, the day before the Taylor unemployment hearing, Austin and Allen were still inquiring about whether Dr. Yu had released Boulos to work, and Boulos informed them that he had not. Exhibit D hereto at 0009. However, when Boulos arrived at the hotel on September 8, 2001 in pain, two days after testifying, he *was* suddenly not merely permitted, but indeed required, by Omni to attempt to work.

### Though Austin Claims He *Would* Have Rehired Boulos, Omni Formally Notes That Boulos Is *Not* Eligible For Rehire

Upon terminating Boulos, on its Personnel Information Form, Jean Allen checked that Boulos was not eligible for rehire, citing "special circumstances." Allen Dep. Exh. 1. Allen testified that although she checked the box, she did not remember why she marked that Boulos was ineligible for rehire. Allen Dep. at 153. Allen testified that: "if somebody is terminated for employment with the company, they are not eligible for rehire." Allen Dep. at 155.

However, Austin contradictorily testified that he *would* have rehired Boulos. Austin Dep. at 100, 149. Austin admitted that he knew of no reason why Boulos would be ineligible for rehire, Austin Dep. at 100, 149-150. Austin also could not explain why Boulos was ineligible for rehire and did not know the meaning of "special circumstances." Austin Dep. at 150.

Contrary to Defendant's prior indications, upon being fired, Boulos was offered no expectation of future employment upon healing. Boulos Dec. ¶ 7.

### Boulos Is Immediately Replaced By A Candidate Who Was Obviously Selected Before Austin's September 8 and 10 Ultimatum To Boulos Requiring His Return To Work

Only four days passed after Boulos' firing before Austin filled Boulos' position. Austin Dep. at 156 and Exhibit 20. Austin testified self-servingly, however, that it took 45-60 days to replace Boulos. Austin Dep. at 98.

It is apparent that Defendant had selected a replacement before it offered Boulos the so-called "option" of returning to work in full capacity on September 10, 2001.

### Omni Attempts To Create The Untruthful Impression That Boulos Resigned

Allen wrote a memo to the file dated September 10, 2001 stating falsely that Boulos "wanted us to terminate his employment so that he could receive unemployment benefits. We agreed to termination of employment." Exhibit E hereto (Vol 3, Tab 32 Bates stamp 002186). Austin testified conveniently that he could not recall if Boulos resigned. Austin Dep. at 93.

Boulos denies asking to be terminated; he knew that he was not eligible for unemployment benefits because of his injury. Boulos Decl. ¶ 8. He also denies "agreeing" to termination—he told Omni he wanted to keep his job. Boulos Dec. ¶ 9.

Austin admits that Boulos is generally truthful. Austin Dep. at 62.

### III.    ARGUMENT: THE MOTION FOR SUMMARY JUDGMENT MUST BE DENIED

#### A.    APPLICABLE PRINCIPLES FOR SUMMARY JUDGMENT

The standards for considering whether to grant or deny a motion for

summary judgment are well established:

> Under Rule 56(c) of the [F.R.C.P.], summary judgment is to be granted
> only "if the pleadings, depositions, answers to interrogatories, and
> admissions on file together with the affidavits, if any, show that there is
> no genuine issue as to any material fact and that the moving party is
> entitled to judgment as a matter of law.  The district judge, in ruling on a
> summary judgment motion, must assume the truth of the nonmovant's
> evidence, and draw all justifiable inferences in that party's favor.  Bayer v.
> United States Dep't of the Treasury, 294 U.S. App. D.C. 44, 956 F.2d 330,
> 333 (1992), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249
> (1986).

"The judge's function is not himself to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial."

Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986).   The court must view the evidence

in the light most favorable to the nonmoving party and must not assess witness

credibility.  See Aka v. Washington Hosp. Ctr., 332 U.S. App. D.C. 256, 156 F.3d 1284,

1288, 1298 (D.C. Cir. 1998) (en banc); Mackey v. United States, 8 F.3d 826, 829 (D.C. Cir.

1993).  "Of course, a party seeking summary judgment always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying

those positions of the 'pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).

Furthermore, "the record must show the movant's right to [summary judgment]

with such clarity as to leave no room for controversy," and must demonstrate that the

opposing party "would not be entitled to [prevail] under any discernible circumstances." McKinney v. Dole, 765 F. 2d 1134, 1135 (D.C. Cir. 1985,), citing Williams v. W.M.A.T.A., 721 F.2d at 1415.  The burden of making such a showing is on the party moving for summary judgment.  McKinney v. Dole, 765 F.2d at 1134-35.

**B.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT HERE, SINCE BOULOS HAS PRESENTED SUFFICIENT EVIDENCE OF RETALIATORY MOTIVE AND/OR PRETEXT, WITH REGARD TO BOULOS' CLAIM THAT DEFENDANT UNLAWFULLY TERMINATED HIM IN RETALIATION FOR HIS PROTECTED ACTIVITY, IN VIOLATION OF § 1981**

**1.    APPLICABLE PRINCIPLES SUPPORTING BOULOS' CLAIM OF UNLAWFUL RETALIATION UNDER 42 U.S.C. § 1981**

42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  Retaliation claims brought under that provision are recognized in this circuit.  See Welzel v. Bernstein, 2006 U.S. Dist. LEXIS 45754 (D.D.C. 2006) (citing Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 693 (2d Cir. 1998); Andrews v. Lakeshore Rehab. Hosp., 140 F.3d 1405, 1412-13 (11th Cir. 1998); Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 259 (8th Cir. 1996); Glymph v. D.C., 211 F. Supp. 2d 152, 153 (D.D.C. 2002).

Summary judgment is unavailable in a discrimination or retaliation action where a plaintiff presents sufficient evidence "from which a reasonable jury could find that the decision to terminate Plaintiff was motivated" by discriminatory reasons.  Rishel v. Nationwide Mut. Ins. Co., 297 F. Supp. 2d 854, 866 (D.N.C. 2003). Thus, if a plaintiff can demonstrate that there is a genuine issue of material fact that his termination was motivated by an impermissible criterion, he survives a defendant's motion for summary

judgment. Id., citing Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc., 285 F. Supp. 2d 1180, 1197 (D. Iowa 2003).

Discrimination and retaliation are as susceptible to proof by circumstantial evidence as any other factual issue. U.S. Postal Svc. B'd of Governors v. Aikens, 460 U.S. 711 (1983). "Since direct evidence of discriminatory treatment is rarely present [in an employment discrimination case], plaintiff ordinarily must rely on 'circumstantial' rather than direct evidence to infer such motivation." Jones v. Trailways Corp., 477 F.Supp. 642, 646 (D.D.C. 1979). See Also Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288-89 (D.C. Cir. 1998).

Discrimination or retaliation can always be proved by circumstantial evidence alone; employer confessions or admissions, otherwise known as "direct evidence," are not required. Reeves v. Sanderson Plumbing, 530 U.S. 133 (2000). In Reeves, Justice O'Connor wrote for the Court that this holding was consistent with the general principle of law that a jury may consider a party's dishonesty as evidence of guilt. The unanimous opinion made it clear that the fact finder may find for the employee based on inferences alone, except in the rare instance of a case where the employer's asserted rationale is disproved, but there exists independent evidence that discrimination did not really motivate the adverse action. Reeves was consistent with the Supreme Court's earlier holding in Hicks v. St. Mary's Honor Center, 509 U.S. 502, 511 (1993), that in Title VII- type cases, "the fact-finder's disbelief of the reasons put forward by defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination."

The plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." Texas Department of Community Affairs v.

Burdine, 450 U.S. 248, 252-253 (1981).  The burden "is not onerous."  Id.  Once a plaintiff

has established a *prima facie* case, however modest it may appear, the burden shifts to

the defendant to articulate some legitimate, nondiscriminatory reason for the challenged

action.  Guerra v. Dept. of the Treasury, 42 FEP Cases 1149, 1152 (D.D.C. 1987), citing

Burdine, 450 U.S. at 254.  "To accomplish this, the defendant must clearly set forth,

through the introduction of admissible evidence, the reasons for the [adverse personnel

action].  The explanation provided must be legally sufficient to justify a judgment for the

defendant."  Id. at 255.  "The reasonableness of the employer's reasons may of course be

probative of whether they are pretexts.  In general, the more idiosyncratic or

questionable the employer's reasons, the easier it will be to expose it as a pretext, if

indeed it is one."  Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n. 6 (1st Cir. 1979).

If the defendant meets its burden of production, "the plaintiff must then offer

sufficient evidence to create a genuine issue of material fact either (1) that the

defendant's reason is not true, but is instead a pretext for discrimination (pretext

alternative); or (2) that the defendant's reason, while true, is only one of the reasons for

its conduct, and another 'motivating factor' is the plaintiff's protected characteristic

(mixed-motives alternative).'"  Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir.

2004).

The McDonnell Douglas burden-shifting framework originated in the Title VII

context also applies to § 1981 retaliation claims. Carney v. American Univ., 331 U.S.

App. D.C. 416, 151 F.3d 1090, 1092-93 (D.C. Cir. 1998). "Like claims of discrimination,

claims of retaliation are governed by the McDonnell Douglas burden-shifting scheme."

Id.  As adapted from the McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), line of

cases, in order to establish a *prima facie* case of retaliation, the plaintiff must show (1) that

he engaged in protected activity; (2) that the employer took an adverse employment action against him; and (3) that there was a nexus between the adverse action and the exercise of his rights." Cones v. Shalala, 199 F.3d 512 (D.C. Cir. 2000); Carter-Obayuwana v. Howard University, 764 A.2d 779 (D.C. 2001), citing McKenna v. Weinberger, 234 App. D.C. 297, 729 F.2d 783, 790 (D.C. Cir. 1984); Arthur Young & Co., 631 A.2d at 367. Carney v. American Univ., 331 U.S. App. D.C. 416, 151 F.3d 1090, 1095 (D.C. Cir. 1998) (citing Mitchell v. Baldrige, 245 U.S. App. D.C. 60, 759 F.2d 80, 86 (D.C. Cir. 1985); Glymph v. D.C., 211 F. Supp. 2d 152, 154 (D.D.C. 2002). Where there is close temporal proximity between the protected activity and the adverse action, the facts are sufficient to establish the requisite causal connection. Cones, 199 F.3d at 521.

## 2.   BOULOS HAS ESTABLISHED A PRIMA FACIE CASE OF RETALIATION

Defendant does not dispute that Boulos engaged in protected activity or that he was subject to an adverse employment action. Indeed, Boulos made Defendant well aware that he believed that Elkhodary had discriminated against and harassed Sandra Taylor. It is undisputed that, as shown in the facts, ¶ 60, Boulos informed Defendant that he would testify on Taylor's behalf in a hearing before the District of Columbia Department of Employment Services Unemployment Compensation Board, and then did so, at that hearing which was attended by both Allen and Elkhodary, on September 6, 2001. At that time, it is undisputed that Boulos testified that Taylor had been the victim of racial harassment and discrimination. As shown in the facts, ¶ 67, General Manager Austin, the primary decision maker, admits that Allen would have told him how Boulos testified. It is also undisputed that Boulos satisfies the second *prima facie* element, since his employment was terminated.

Boulos can also easily establish the requisite causal connection between his protected support for Taylor and his termination. Only four (two business) days elapsed between Boulos' testimony at Taylor's unemployment compensation hearing and his termination. Such strong timing evidence alone is sufficient to satisfy the *prima facie* requirement of causation. Barbour v. Merrill, 759 F. 2d 80, 86 (D.C. Cir. 1985); Gleklen v. Democratic Congressional Campaign Comm., Inc., 199 F.3d 1365, 1368 (D.C. Cir. 2000) (gap of a few weeks between protected activity and adverse action sufficient to establish causal connection); Cones v. Shalala, 199 F.3d 512 (D.C. Cir. 2000) (gap of several weeks elapsed between plaintiff's discrimination complaints and refusal to consider the plaintiff for a position was sufficient to infer causal connection). Moreover, as we argue in more detail below, at that same pivotal moment, Defendant refused to provide Boulos similar treatment in the event of medical difficulties that it had previously allowed prior to his adverse testimony, took on a harsh hostile attitude against Boulos, threatened him with discipline for poor performance although it admits that his performance was not evaluated poorly at the time, re-wrote his job description to make it more onerous in relation to his physical condition, noted in its official records that he could not be rehired, and engaged in a variety of other acts that indicated a relationship between the protected activity and the firing.

Defendant contends that the fact that Allen knew in July 2001 that Boulos believed that Sandra Taylor had been racially harassed and discriminated against breaks any causal connection between Boulos' protected activity of testifying against Omni and

his termination.[3]  Def. Br. at 10.  First, the fact that Boulos had engaged in protected

activity through his July meeting with Allen hardly negates his claim, but instead

strengthens it.  Thus, the temporal proximity between that protected conduct and the

firing on September 10 also would reveal the requisite causal connection even if Boulos

had never actually testified, since the firing occurred less than two months after the

protected conversation.  See Gleklen, Cones (both cited above).

In any event, during the July meeting, Allen merely asked Boulos his perception

of the situation involving Taylor and Elkhodary, and received Boulos' pro-Taylor

response.  A much different situation arose in late August and early September.  As

shown in the facts, ¶ 60-61, at that time Allen directly asked Boulos how he would

testify at the hearing.  After Boulos told Allen that he intended to support Taylor at the

hearing, Allen told Boulos "as managers, [they] should stick together so [they] can

benefit" Omni.

At any time before the hearing, Boulos could have bowed to Defendant's

pressure to "stick together" to "benefit" Omni and not testified in Taylor's favor at the

hearing. He never did.   Before the Taylor unemployment hearing, Boulos had not yet

gone "public" in his support of Taylor.  A reasonable juror could and should find that

Allen and Austin waited to see how Boulos would actually testify before intensifying

their retaliation against him for not "sticking together" with Omni-- by firing him, and

that a causal connection between the protected activity and the firing is thereby shown.

Defendant also contends that the fact that Zurich Insurance released Boulos to

return to work and Boulos allegedly could not perform his job duties upon his return to

---

[3]        Neither Allen nor Austin ever denied that they knew that Boulos supported and testified in favor
of Sandra Taylor at the unemployment compensation hearing.  See Austin Dep. at 172.  It is undisputed that
Allen interviewed Boulos regarding Taylor's EEOC charge and attended the hearing.

work in September 2001 breaks the causal connection.  While Defendant may argue that this fact justifies the firing, it cannot assist Defendant in negating the existence of a causal connection, where they fired Boulos two business days after he opposed them in sworn testimony, in direct contravention of its instruction that he not do so. Moreover, as shown in the facts, ¶ 41, 54-56, as of August 27, 2001, and after Defendant was aware of Zurich's decision to clear Boulos to work, Defendant still planned to permit Boulos until at least September 25, if not October 1, to heal before firing him.  However, after Boulos' September 6 testimony, he was fired promptly *on September 10*.  Accordingly, Defendant's contention that Zurich's decision broke the causal chain is obviously completely incorrect.  It was well after Zurich rendered that decision, and only after— right after-- Boulos testified for Taylor, that Defendant decided to purge Boulos immediately.

Defendant (Br. at 10) contends that the fact that Boulos allegedly could not perform his job duties and was ineligible for light duty or a leave of absence "destroys any causal connection."  However, whether or not Boulos was eligible for "light duty" or a leave of absence is actually a disputed fact in this case.  Defendant has not disputed that Boulos requested a modification of his duties after Zurich terminated his workers' compensation benefits.  Austin admitted that, as General Manager, he could have altered Boulos' job duties to accommodate his physical injury, even if Boulos was no longer on workers' compensation.  See Facts¶ 103.  He cannot help but admit that he did so just a few months earlier, in June, when Boulos was first injured.  Austin Dep. Exhs. 16, 17.  Defendant offered no evidence whatsoever that Boulos would not soon have been able to perform his duties even with such modification.  If Defendant had been

willing to temporarily modify Boulos' duties, it could well be that no leave of absence would have been necessary.

Austin's preference to summarily fire the workplace-injured Boulos rather than provide the accommodations he had permitted just a couple of months earlier, or some other consideration, hardly negates the causal connection between Boulos' protected activity and his firing.  Defendant cannot overcome the fact that Boulos' employment was terminated four days after Boulos' anti-Omni testimony at Sandra Taylor's hearing, despite prior plans to give Boulos more time. Plaintiff Boulos, therefore, has shown the requisite causal connection and established a *prima facie* case of retaliation.[4]

### 3.    DEFENDANT'S MOTION MUST BE DENIED BECAUSE DEFENDANT HAS FAILED TO SATISFY THE REQUIREMENT OF FED. R. CIV. P. 56(c), THAT IT PRESENT PROBATIVE EVIDENCE IN SUPPORT OF ITS PURPORTED "LEGITIMATE, NONDISCRIMINATORY" REASON FOR FIRING BOULOS

As stated above, summary judgment is to be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (Emphasis added).

In a discrimination or retaliation case, the moving defendant carries a burden of providing "proof by offering evidence of the reason for the plaintiff's rejection. . ." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 518-519 (U.S. 1993).  "By establishing a prima facie case, the plaintiff in a Title VII action creates a rebuttable 'presumption that the employer unlawfully discriminated against' [her]. To rebut this presumption, 'the defendant must clearly set forth, through the introduction of admissible evidence, the

---

[4]    Defendant's contentions regarding Boulos' ability to perform more properly belong in the context of the pretext discussion, and are treated further herein.

reasons for the plaintiff's rejection.' In other words, the defendant must 'produc[e]

evidence that the plaintiff was rejected, or someone was preferred, for a legitimate,

nondiscriminatory reason.'" King v. Palmer, 250 U.S. App. D.C. 257 (D.C. Cir. 1985).  See

Also Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 714 (1983) (quoting Texas

Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255, n. 8, (1981).

Accordingly, where a defendant in an employment discrimination case fails to

provide evidence to rebut the presumption that the employer unlawfully discriminated

against her with competent evidence, summary judgment must be denied.  See King v.

Palmer, 250 U.S. App. D.C. 257 (D.C. Cir. 1985), Postal Service Bd. of Governors v.

Aikens, 460 U.S. at 714 (1983) (quoting Texas Dept. of Community Affairs v. Burdine,

450 U.S. at 253-54 (1981).

Here, it cannot possibly be the case that summary judgment should be granted,

because Defendant has failed to provide evidence to support a legitimate,

nondiscriminatory reason for having fired Boulos.  Rather, after tellingly declining to

offer deposition testimony or affidavits from its decision maker(s) setting forth a reason

for the termination, Defendant (Br. at 10-12) merely argues that "Plaintiff Boulos' own

testimony confirms that Omni's  reason for terminating Plaintiff Boulos – because he

was unable to perform his job duties.  Thus, although Defendant asserts that Boulos has

admitted facts that might theoretically have supported his firing of Boulos for physical

inability to perform, Defendant failed to provide the affidavits, deposition testimony or

other evidence that would show that that or any other nondiscriminatory reason

actually motivated the firing. The Seventh Circuit has noted that a plaintiff can avoid

summary judgment in a discharge case by showing that the employer's proffered

reasons did not actually motivate the discharge.  Collier v. Budd Co., 66 F.3d 886, 890

(7th Cir. 1995). Obviously, summary judgment cannot be granted where, as here, Defendant failed to provide any *evidence* to support that notion that its proffered "reason(s)" as the reasons that ***actually motivated the discharge***. In this context, any statements made by Boulos regarding his physical condition at the time of his firing shed no light on whether Defendant was motivated by that condition or, alternatively-- and as Boulos staunchly maintains—by retaliatory animus, when it chose to fire Boulos.[5] In this context, Defendant's failure to provide any evidence from its decision makers to explain the reasoning for Boulos' firing is fatal. Summary judgment cannot be granted and a trial date should be scheduled in this case.

**4. BOULOS PROVES RETALIATORY INTENT BY SHOWING DEFENDANT'S HOSTILE STATE OF MIND AT THE TIME OF THE FIRING, AND THROUGH CIRCUMSTANTIAL EVIDENCE THAT DEFENDANT'S ASSERTED REASONS FOR HIS FIRING ARE PRETEXTS FOR RETALIATION**

a. **Introduction**

Once the Plaintiff has shown a causal connection between protected activity and an adverse action, even absent direct evidence of retaliatory animus, there must be a trial if there is evidence that the employer's explanation is pretextual.

The United States Court of Appeals for the D.C. Circuit has set forth what is required of a plaintiff at this stage of the applicable analysis, holding that:

> Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination

---

[5]    Defendant (Br. at 12) misleadingly cites Boulos' testimony regarding his physical condition, but tellingly omit any reference to Boulos' request for a few more days before he was required to return, or to the fact that he requested modified duties. Thus, any deposition testimony by Boulos that he could not perform his job duties on September 10 is taken out of context and is not dispositive of the central issue, namely, why was Boulos fired specifically on September 10, 2001?

that may be available to plaintiff (such as independent evidence of
discriminatory statements or attitudes on the part of the employer) or any
contrary evidence that may be available to the employer (such as
evidence of a strong track record in equal opportunity employment).

 Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998).

   One form of evidence from which a jury may be able to infer discriminatory
intent is "evidence the plaintiff presents to attack the employer's proffered explanation
for its actions." McGill v. MuNoz, 2000 U.S. App. Lexis 2418 (D.C. Cir. 2000), citing Aka,
156 F.3d at 1288, 1298 (noting that the "sufficiency of the finding of pretext to support a
finding of discrimination depends on the circumstances of the case").

   Boulos must show either "that the asserted reasons were insufficient to explain
the employer's decision or were not applied in a nondiscriminatory fashion, or [prove]
that a discriminatory reason more likely motivated the employer." Burdine, supra, 450
U.S. at 256; McDonnell-Douglas Corp. v. Green, 411 U.S. at 804-05.

      Here, Defendant (Br. at 10) asserts, without evidentiary substantiation (see
"3", above), that Boulos was terminated because he "had a release to full duty but could
not perform the requirements of his position."  Assuming, *arguendo*, that Defendant's
Motion is not denied on account of the striking absence of any *evidence* in its submission
supporting its "legitimate, nondiscriminatory reason" for the firing, Plaintiff must show
Defendant's explanation to be pretextual and/or that other evidence supports a finding
of intentional retaliation. He now does so.

**b. Defendant Attempted to Deter Boulos From Testifying in Taylor's Support, Implicitly Requesting That He Lie On Omni's Behalf, And Boulos Refused. The Fact Finder Could Reasonably Infer That Defendant's Firing of Boulos Immediately After He Defied Omni And Testified Against The Company Was Motivated By Retaliatory Animus**

The significance to Defendant of Boulos' particular activity—testifying that his supervisor had discriminated against and harassed one of their common subordinates on account of her race, is evidenced by the fact that Defendant cannot plausibly maintain that it was somehow above the fray—accepting of its Housekeeping Director's free expression of his opinion, whatever that might be—or unconcerned with Boulos' testimony against it, since Omni *directly attempted to stop Boulos from engaging in that protected activity*. Thus, it is undisputed that Jean Allen—a participant in Defendant's decisional process-- directly asked Boulos how he would testify at the hearing. When Boulos informed her that he would back Taylor's claims of racial harassment and discrimination, Allen repeatedly responded to him that "as managers, we should stick together so we can benefit the corporation which we are working for." Facts ¶ 60-61. Allen does not deny that she made this statement; rather she says she cannot recall whether she did. Allen Dep. at 179. It is also undisputed that Boulos declined to "stick together," and indeed, testified against management *in Allen's and Elkhodary's personal presence*, at the Taylor unemployment hearing.

Allen's comments and Boulos' subsequent refusal to "stick together" and instead to tell the truth at Taylor's unemployment hearing amount to powerful, classic evidence that Defendant likely harbored a retaliatory motive. Indeed, one court has characterized similar evidence as "direct evidence of the company's retaliatory motive."[6] <u>Kaible v. U.S.</u>

---

[6]  Retaliatory motive may also be proved, in any case, by inference. <u>Price v. Thompson</u>, 380 F.3d 209, 213 (4th Cir. 2004) ("Price has established a prima facie case of discrimination because a reasonable trier of fact could conclude that Robbins knew of the protected activity. . .").

<u>Computer Group</u>, 27 F. Supp. 2d 373, 380 (D.N.Y. 1998).  In <u>Kaible</u>, plaintiff maintained

that a decision maker said he could not believe that plaintiff would hurt his company by

"telling the truth" to the company's lawyers who were conducting an in-house sexual

harassment investigation.  He also accused the plaintiff therein of not being part of "the

team." The Court found that these were classic remarks evidencing retaliatory motive,

and, as such, supported the plaintiff's claim and mandated a trial.

 A similar case, <u>Crockwell v. Blackmon-Mooring Steamatic, Inc</u>., 627 F. Supp. 800,

803 (D. Tenn. 1985), is also instructive.  There, the plaintiff informed supervisors that a

subordinate (McGhee) was offended by sexual comments.   When plaintiff asked the

supervisor to insist that the offending employee (Plattner) apologize for the remarks, the

supervisor (Thornton) replied that enduring such remarks was part of the job and that

plaintiff's subordinate either had to accept it or to "hit the clock." Plaintiff informed the

supervisor that his subordinate was a good worker and that plaintiff hated to lose her.

Plaintiff also expressed his own opinion that the harassment of her subordinate was

wrong. During a second conversation, plaintiff again said it was unfair to subject his

subordinate to harassment in order to maintain her job and requested that management

do something to stop it. Management fired the plaintiff several hours later.  The Court

found that the content of plaintiff's conversations with management demonstrated a

discriminatory motivation on management's part, which, together with the timing and

other facts demonstrating pretexts, led it to deny summary judgment.  See Also <u>Wallace

v. DTG Operations, Inc</u>., 442 F.3d 1112, 1122 (8th Cir. 2006) (manager's remarks to

protesting employee that he feared her complaints would impede beneficial "kidding"

in the workplace show retaliatory intent).

 Based on the above, Defendant's own words demonstrate its retaliatory motive

in firing Boulos just a few days after he testified against them and in contravention of its direct request that he "stick together" at Taylor's unemployment hearing. Summary judgment must accordingly be denied, and a trial on the merits held.

      c.    **The Timing And Sequence Of Defendant's Initiation Of Hostile Actions Against Boulos Demonstrates Pretext**

          i.    **The Timing of the Firing Is Powerful, Decisive Evidence Of Pretext; Defendant Did Not Even Begin Considering Firing Boulos Until After It Discovered His Support for Taylor's Opposition to Discrimination**

As noted above, Boulos was fired within four calendar and two business days after he testified against Defendant at Taylor's unemployment hearing, where he bravely asserted that race discrimination was practiced against Taylor. The firing was just a few weeks after Defendant first discovered that Boulos intended to support Taylor against them at the unemployment hearing. When a defendant has eschewed firing its employee for a given reason, but then cited that as the motivating reason when it later fires the employee immediately after the employee engages in protected activity, a jury may find the employer's actions pretextual. See Ferguson v. Small, 225 F. Supp. 2d 31, 39-40 (D.D.C. 2002).

The D.C. Circuit has recognized that timing evidence of this sort may serve to rebut an employer's proffered legitimate reason. Ferguson v. Small, 225 F. Supp. 2d 31, 39 (D.D.C. 2002), citing Cones v. Shalala, 199 F.3d at 512, 521 n.2 (D.C. Cir. 2000). See Also Jalil v. Avdel Corporation, 873 F.2d 701, 709 (3rd Cir. 1989) (timing rebuts defendant's proffered explanation"), citing Dillon v. Coles, 746 F.2d 998 (3d Cir. 1984). See Womack v. Munson, 619 F.2d 1292, 1298 (8th Cir. 1990). Where the timing is so very proximate—a mere several days—and the conditions cited by the employer had existed prior to the protected activity but had not caused a firing at that earlier time, summary

judgment must be denied.  In this case, Defendant was well aware that Boulos had

physical difficulties and was on unpaid leave, but apparently considered him an asset

until he testified against it, at which point moved within two days to eliminate him.

Trial is required to ascertain Defendant's real motive under such circumstances.

> **ii.     Austin's Decision To Terminate Boulos** *Immediately-- In Early
> September--* **Upon Boulos' Testimony That Defendant Discriminated
> Against Taylor, After Austin Had Previously Drafted A Letter On
> August 17 Permitting Boulos Until** *October 1* **To Return To Work, And
> After Defendant Had Indicated On August 27 That Boulos Would Have
> At Least Until After His Anticipated Medical Examination On**
> *September 25*, **Demonstrates That Boulos Was Not Fired On September
> 10 Simply Because He Was Unable To Carry Out All Of His Duties At
> That Time**

Although Defendant understandably claims to have needed an Executive

Housekeeper, it was only when Boulos testified in support of Taylor that Defendant

decided he had to be fired ***immediately***, without any further opportunity to heal and

without the benefit of any workplace accommodations.  Indeed, Defendant indicated in

written documents that are before this Court, that it intended to permit Boulos to remain

an additional several weeks, at a minimum, until they suddenly cut him off when he

angered them with his testimony.

Thus, Austin admits that he drafted a letter requesting that Boulos return to

work by ***October 1, 2001*** (Austin Dep. Exh. 9 at 2235).  Defendant "stipulates" that the

letter requesting return by October 1 was last edited on ***August 17, 2001***. See Facts ¶41.

Austin does not deny that at one time, he planned to allow Boulos until ***October 1*** to

heal.  Austin Dep. at 163. Yet, he also admits, as he must that he later moved the

mandatory return date up by three weeks, to ***September 10, 2001***.  Austin Dep. at 130.

That change occurred only after Boulos testified on September 6.

In addition, Allen wrote a memo to the file, which she has dated to August 27, 2001. Facts ¶52; Allen Exh. 12. Therein, she recounts what she described as a three-way conversation between herself, Austin and Boulos, that allegedly occurred on August 27, 2001, in which she inquired about whether Boulos would be able to work after a scheduled *September 25* medical evaluation. Although it is several pages long, Allen's memo in no way even suggests that Boulos was informed or already understood that he would have to be back to work by September 8 or be fired. To the contrary, the memo strongly implies that Defendant had no plans to fire Boulos sooner than September 25, as of that August 27 conversation. Id.

It is undisputed that Defendant subsequently fired Boulos on September 10, four days after Boulos testified for Taylor, without ever permitting him any such extended period to comply with Defendant's desires as to his ability to perform, such as the August 17 letter with the October 1 return date had contemplated.

Defendant's sudden change of heart with regard to permitting Boulos advance notice and an opportunity to heal rather than immediately firing him, in the days immediately following Boulos' anti-Omni testimony, could easily be relied upon by the jury as key evidence of retaliatory animus. This evidence provides powerful support for Boulos' contention that summary judgment must be denied.

### iii.    Defendant's Creation Of A New Job Description And Threat Of Potential Discipline For The First Time And Without Reason Or Provocation, Immediately After Boulos Testified Against The Company, Defies Its Contention That It Simply Needed A Healthy Executive Housekeeper

Defendant did not fire Boulos on account of any performance deficiencies, and he was not being accused of such prior to his September 6, 2001 testimony. Facts ¶84. Indeed, Defendant does not even now contend that Boulos exhibited performance

problems before his injury.  Facts ¶ 83-84. Yet, on September 8, 2001, for the first time

ever, Boulos was warned that "the progressive disciplinary process [would] take place,"

if he did not satisfy the requirements of a new description of his duties, which were then

presented to him for the very first time.  Id.  Austin threatened discipline despite an

admitted usual practice of not so threatening employees until after a repeat of

performance problems.  Facts ¶15.

The threat of discipline was based on whether Boulos successfully satisfied a

brand new list of duties, presented to him for the first time on September 8, two days

after his testimony.  Thus, when Boulos went to Austin's office that day, he was

presented with a document listing the duties of an Executive Housekeeper and that

Austin "highlighted around the areas of walking the public areas so many times,

inspecting so many rooms and so on…" Boulos Dep. at 156.  Austin Dep. Exhibit 11.

Austin was completely incapable of providing any rationale for suddenly creating a new

job description immediately after Boulos testified against the company.  When asked

why a "Task Expectations" list was shown to Boulos *upon his return,* Austin

ambiguously stated: "[c]larity of expectation," thereby attempting to sidestep the issue.

Austin Dep. at 131.  Under these circumstances, a jury could easily conclude that

Defendant created a new job description and threatened Boulos' employment because of

his testimony against it.

> **iv.    Defendant Blacklisted Boulos From Future Employment After
> His Testimony On September 6, 2001, That Defendant Discriminated
> Against And Racially Harassed Sandra Taylor, Despite Its Having
> Expressed Prior Willingness To Consider His "Candidacy For Any
> Comparable Position" As Of August 17, 2001**

As shown in the facts and noted elsewhere, ¶ 41, Austin admits that he

authorized a letter on August 17, 2001 to Boulos that was not sent, stating that Boulos

needed to return to work by October 1, 2001.  The August 17 letter also states that Defendant was *willing to consider Boulos' "candidacy for any comparable position"* (emphasis added), if Boulos was unable to return to work by October 1.

Defendant's willingness to employ Boulos in *any* position changed decidedly after Boulos' testimony on September 6, 2001.  Thus, when he was fired on September 10, four days after testifying for Taylor, Boulos was offered no expectation of future employment upon healing.  To the contrary, Defendant, as shown in the facts, ¶ 123, prepared a "Personnel Information Form," by which Defendant documented Boulos' "involuntary resignation" for its permanent records, and Allen noted that Boulos was "not eligible for rehire."

As shown in the facts, ¶ 124, Allen testified that although she checked the "not eligible" box, she did not remember why.  Austin admitted that he knew of no reason why Boulos would be ineligible for rehire, ¶ 126, thus implicitly conceding that Defendant had no legitimate reason for classifying him as ineligible.  It is clear then, that Defendant classified Boulos as ineligible for rehire for reasons it is unable to explain.  The firing contradicted its earlier expression—made just three weeks earlier-- of willingness to rehire Boulos and even accommodate him with different duties should he be unable to resume his duties as Housekeeping Director. Defendant's permanent notation that Boulos was ineligible for rehire occurred despite the fact that its legal position is that it terminated Boulos solely for physical inability to perform, and not poor performance or misconduct.

The obvious inference to draw from the timing and sequence of events is that Boulos was documented as "ineligible for rehire" just after his September 6 testimony that Defendant discriminated against Sandra Taylor, because Defendant was so angry

with that testimony that it could no longer countenance Boulos ever returning under any circumstances. See Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1122-23 (8th Cir. 2006) (inferring retaliation from employer's resort to a false interpretation of its policies in denying transfer to protesting employee).

As Defendant has not even attempted to offer an alternative explanation, trial is required to permit the jury to determine whether the animus that obviously motivated Defendant's decision to blacklist Boulos from any future employment despite its earlier willingness—expressed right before the firing-- to take him back and work with him, also motivated it to fire Boulos.

> **v.    Austin's Hostile Attitude Toward Boulos Upon Boulos'
> Return To Work On September 8, And Austin's Denial
> That He Was Hostile, Demonstrate Pretext**

A decision maker's hostile demeanor can further demonstrate a retaliatory animus. Bell v. Clackamas County, 341 F.3d 858, 866 (9th Cir. 2003) (significance of an angry glare is within the province of the jury).   Contrary to Defendant's contentions that it essentially fired Boulos more in sorrow than in anger, Austin was hostile to Boulos upon his return to work on September 8 and 10.  Indeed, Austin "never asked [him] about how [Boulos felt.]"  As shown in the facts, Austin had never projected this hostile attitude toward Boulos before.  This suddenly antagonistic attitude immediately after Boulos asserted his right and responsibility to tell the truth to the unemployment office, can easily lead a factfinder to infer retaliatory intent and precludes summary judgment in Defendant's favor in this case.

vi.    **Defendant's Modification of Boulos' Job Duties After He Was Initially Injured But Before He Protested Discrimination, And Subsequent Refusal To Do The Same Thing After His Protected Anti-Discrimination Testimony, Demonstrates That Defendant's Assertion That Such Modifications Are Outside Company Policy Is Pretextual**

When asked whether Boulos' job responsibilities could have been "alter[ed] . . . even temporarily so he could perform," rather than be fired, Allen testified that the position of Director of Housekeeping was "not the type of job that can be altered."  See Facts ¶106.  Austin, however, knew specifically how the Director of Housekeeping position could have been altered to accommodate Boulos' condition.  As shown in the Facts ¶98, Austin admitted that a Director of Housekeeping on light duty would be responsible for "doing the schedule, processing payroll, doing the requisitions for purchasing, purchase orders, meet[ing] with vendors, if possible, . . . anything that would still allow them to do administrative work."

In fact, as documents (Austin Dep. Exhs. 16, 17) before the Court show, See Facts ¶99, the altered Executive Housekeeper scenario described by Austin is precisely the arrangement that was made for Boulos when Boulos was placed on light duty for nearly one month after his injury initially occurred in June 2001.  Nonetheless, despite this precedent and the fact that Defendant possessed a release for Boulos to return to work from Zurich's doctor, and despite the fact that Boulos requested job modification (See Facts ¶93), it is undisputed that Austin elected to fire Boulos rather than attempt a similar modification.  The jury may infer from the timing of Defendant's choice not to follow its earlier pattern, together with the other evidence, that Defendant was motivated by retaliatory animus in firing Boulos.

**vii.    Defendant's Assertion That Boulos Violated Company Policy By Failing To Attend Work Despite Being "Cleared" To Work By** *Zurich's* **Physician, Though In Contravention Of Its Many Prior Statements That Boulos Was Forbidden From Returning Without Clearance From His** *Personal* **Physician, Dr. Yu, Represents A Dramatic Shift In Defendant's Approach After Boulos Testified Against The Company, And Therefore Demostrates Defendant's Effort To Cover Up Its Retaliatory Motive**

In his Interrogatory No. 12, Boulos asked Omni:

If you allege that any aspect of Plaintiffs' performance was unsatisfactory, state each and every fact in support of your allegation.  If you allege that Plaintiffs were not in conformity with or violated any policies, procedures or practices, identify that policy, procedure or practice and describe how each Plaintiff's behavior departed from it.

Defendant responded:

. . . Defendant alleges that Plaintiff Boulos was unwilling to work after being cleared to return to work. . .

Defendant has taken the position that "Boulos was unwilling to work after being cleared to return to work. . . " by Zurich's doctor, within a context in which, until Boulos testified against it, Defendant repeated over and over again that he was *forbidden* from working without clearance from his *personal physician*.  Thus, on August 31, 2001, Allen told Boulos that Defendant "needed a release from Dr. Yu when he returned to work on Saturday 9/9/01." Facts ¶120.  On September 5, *the very last day before the unemployment hearing*, Austin and Allen were still inquiring about whether Dr. Yu had released Boulos to work, and Boulos informed them that he had not.  Facts ¶121. Nonetheless, when Boulos arrived at the hotel on September 8, two days after testifying, he *was* permitted—indeed required-- by Omni to attempt to work when it knew he really couldn't.  Nor may Defendant claim that it viewed release by Dr. Gordon, Zurich's hand-picked second opinion, as an adequate substitute for Dr. Yu's approval. Thus, it is undisputed that Boulos was examined by Dr. Gordon in early August and

that Defendant, through Allen, was aware of his conclusions not later than August 24 —

more than 2 weeks before September 10.  Facts ¶53.

The facts reveal plainly that it was not Dr. Gordon's release that changed

Defendant's approach to Boulos' return to work, but rather, some other factor.  Jurors

should easily infer that the factor was Defendant's desire to create conditions in which it

could fire Boulos and claim the bogus justification related in the response to

Interrogatory No. 12, that Boulos had violated company rules by refusing to return to

work.  This attempt to fabricate a seemingly legitimate explanation for the retaliatory

firing of Boulos' — which Defendant has apparently abandoned in filing this Motion

because of its obvious falsity-- powerfully illustrates the overall falsity of Defendant's

feigned "reasons" for firing Boulos and warrants trial on the merits.

    **d.**    <u>**Defendant's Other False Statements Relating To The Firing Demonstrate Pretext**</u>

        **i.**    **Austin's False Assertion That Boulos Failed To Ask For Light Duty Is Pretextual**

As shown in the Facts ¶ 93, Boulos testified that he requested that Austin modify

his duties rather than fire him.  Austin, however, when asked if he offered Boulos a

"light duty" opportunity, responded by asserting that he "knows" Boulos never asked.

Facts ¶ 91.  As shown in the prior section, Austin could easily have permitted Boulos to

perform duties in a fashion similar to what he had previously authorized in June, but

chose not to.  Assuming the truth of Boulos' testimony, as this Court must in the

summary judgment context, the jury could easily infer that Austin is lying in denying

that Boulos requested job modification, in order to justify his refusal to do what he

admittedly could easily have done (See Facts ¶112) instead of firing Boulos.  A trial is

necessary to permit the jury to make that credibility determination.

      ii.     **Defendant Did Not Fire Boulos On Account Of Any Immediate Operational Need For A Full-Time Executive Housekeeper, As Illustrated By The Fact That They Previously Left The Position Vacant For An Extended Period Before Hiring Boulos**

Defendant's need to immediately fire Boulos is extremely dubious.  Thus, as shown in the facts ¶7, Austin was content to operate the Omni Shoreham without an Executive Housekeeper for more than half a year in 2000, immediately before Boulos was hired.  It is undisputed that Sandra Taylor, the assistant Executive housekeeper was the highest-ranked employee in Housekeeping until Paul Boulos was hired in December 2000 or January of 2001.   Facts ¶7, 109.  Taylor, however, was in fact merely an *Assistant* Director of Housekeeping.  Facts ¶109.

In view of Defendant's having operated under Austin for an extended period without an Executive Housekeeper, together with Austin's admission that he could have altered Boulos' job duties  (Facts ¶100, 104), Defendant has utterly failed to show that an operational need caused them to fire Boulos on September 10, 2001 rather than offering him the fairer treatment that he sought.

      iii.    **Austin's Testimony And Defendant's Argument That Omni Does Not Make Accommodations To Physical Needs Of Its Employees Absent A Doctor's Note Requesting The Accommodation, Is Pretextual**

Defendant appears to argue, based on Siddiqui and Ghebregiorgis' deposition testimony, that Omni would ordinarily not modify job duties or allow any accommodation for an employee, without a doctor's note calling for the accommodation. See Def.'s Material Fact No. 56.  Charles Briggs, the Comptroller for the Omni Shoreham Hotel testified (Fact ¶ 9), however, that he had previously accommodated an employee with an injury (and who was not covered by workers compensation).  Briggs testified

that he purchased wrist supports and an ergonomic chair for an employee who suffered from carpal tunnel syndrome even though she did not have a doctor's note requiring such equipment.  Briggs Dep. at 38.  Briggs reported directly to Austin.  Facts ¶ 116. Defendant's assertion of this excuse for its unwillingness to entertain any job modifications further shows pretext.

> **iv.    Austin's Statement That He *Did Not* Consider Boulos Ineligible For Rehire, Despite Formal Documentation Stating To The Contrary, Shows Pretext**

As noted above, Defendant blacklisted Boulos by documenting in its formal records that he "involuntarily resigned" and was "ineligible for rehire." Allen testified that Boulos was ineligible because "if somebody is terminated for employment with the company, they are not eligible for rehire."  Facts ¶ 125.  Austin testified, however, that he could not "think of a reason why [Boulos] would not have been able to return," and that he would have considered rehiring Boulos. Facts ¶ 126.

Furthermore, as discussed infra, in a letter drafted sometime around August 17, 2001, before Boulos' anti-company testimony, Austin stated that: "If you are unable to return and perform the designated responsibilities of the position, your employment with the hotel will be terminated.  If you are able to return at a later date, we will reconsider you[r] candidacy for any comparable position that is available at the time. " See Facts ¶ 41.  Thus, Austin admits that he fired Boulos four days after Boulos' testimony, after drastically cutting the amount of time he would permit Boulos to heal, without a willingness to modify his duties in any way, and signed off on treating Boulos as ineligible for hire.  Unable to defend that position in litigation, however, Austin now admits that Boulos should not have been treated as ineligible for rehire. Defendant's decision maker is unable to relate a consistent and credible explanation for the

September 10, 2001 firing of Paul Boulos.  Under these circumstances, the key inconsistencies in Defendant's explanations render those explanations useful in this case only to Plaintiff Boulos, for purposes of permitting the fact finder to reach the logical inference that the real motivation behind the firing was retaliatory animus toward Boulos.

   **e.    Attempts To Influence Boulos To Resign And Or Portray His Firing As A Resignation Evidence Pretext**

In a post-termination memo, Allen wrote that Boulos "told us that he wanted us to terminate his employment so that he could receive unemployment benefits.  We agreed to termination of employment."  Facts ¶131.  Austin testified that he could not recall if Boulos resigned.  Facts ¶134.  Boulos denies asking to be terminated in order to receive unemployment.  See Facts ¶135.  He also denies "agreeing" to termination—he told Defendant that he wanted to keep his job.  See Facts ¶135.  Attempts to recast a firing as a resignation—which would have supported the perfect defense that there was no adverse employment action undertaken against Boulos-- are the oldest pretextual trick in the book.  Defendant's assertions that Boulos resigned when it is now completely clear that he was fired, warrant a trial.

   5.        **DEFENDANT'S REMAINING CONTENTIONS IN SUPPORT OF ITS ACTIONS ARE UNAVAILING**

      **a.    Boulos Does Not Contend that Zurich's Termination of Boulos' Workers' Compensation Benefits Is Evidence of Retaliation**

Defendant appears to believe that Plaintiff's case is premised on the fact that Zurich terminated Boulos' workers' compensation benefits.  This assertion seems to be based on the following testimony by Boulos:

> "when I tell my employer that I was examined by a doctor for three
> minutes without even touching my back, that should alert my employer
> to go out there and say we are paying good premiums for insurance
> company to take a good care of   our employees and you are not doing so.
> So that is, in my opinion is a good evidence that my employer did not do
> what they are supposed to do to take care of their employees."

Boulos Dep. at 197.

As we previously noted, Defendant seeks to distract the Court from the true

issue by focusing on Zurich's termination of workers' compensation benefits.  Plaintiff's

evidence of retaliation is not based on Zurich's actions but rather actions undertaken by

Allen and Austin—Defendant's decision makers.  Thus, Defendant's argument that the

intervention of a third party – Zurich – defeats Boulos' claim are inapposite, and should

be rejected by this Court.

## IV.    CONCLUSION

For all the reasons set forth above, Defendant's Motion for Summary Judgment

should be denied, and a jury trial held.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/s/

_____
Leizer Z. Goldsmith
D.C. Bar No. 419544
5335 Wisconsin Avenue NW
Suite 4400
Washington, D.C. 20015
Tel:  202-895-1506
Fax: 202-318-0798