IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
TAWFIK BOULOS, )
)
)
    PLAINTIFF, )
)
v. ) CIVIL ACTION NO.
) 1:05-CV-1175-HHK
OMNI HOTELS MANAGEMENT CORP. )
)
)
    DEFENDANT. )
_____ )

### PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS THAT REQUIRE TRIAL ON THE MERITS

**Boulos Begins Work At The Omni Shoreham Hotel, Supervising Taylor; Elkhodary Is Boulos' Supervisor**

1. Plaintiff Paul Boulos ("Boulos") began his employment with the Omni Shoreham Hotel in January of 2001 as the Director of Housekeeping. Deposition of Paul Boulos ("Boulos Dep.") at 13.

2. Boulos is Egyptian. Boulos Dec. ¶ 2.

3. Boulos' native language is Arabic. Boulos Dec. ¶ 3.

4. Boulos served as Executive Housekeeper at the Omni Shoreham Hotel. Boulos Dec. ¶ 4.

5. When Boulos entered on duty at the Omni Shoreham, Sandra Taylor ("Taylor") was the Assistant Director of Housekeeping. Deposition of Peter Austin at 51-52.

6. Boulos succeeded a woman, most likely Irene Chin, after an extended period of time in which Defendants had no executive housekeeper. Boulos Dep. at 34-35.

7. Taylor, who is African American, had performed the duties of the Director of Housekeeping for the prior half year, as well as the duties of Assistant Director of Housekeeping, before Boulos was hired. Austin Dep. at 13-14, 28; Boulos Dep. at 13, 34.

8. Said Elkhodary was Director of Rooms at the Omni Shoreham Hotel and was Boulos' direct supervisor. Boulos Dep. at 16.

**Elkhodary Makes Racist Remarks Against Taylor; Elkhodary Demotes Taylor; Boulos Protests Elkhodary's Racist Remarks Internally**

9. Almost immediately upon Boulos' arrival at the Omni Shoreham, Elkhodary began making racially offensive remarks to Boulos about Taylor and African American employees. Boulos Dep. at 75-76, 93.

10. Elkhodary told Boulos he should not live in College Park, Maryland because "College Park is full of blacks, and added: "Do you want your kids to go to school full of black kids?" Boulos Dep. at 76.

11. Elkhodary demoted Taylor from her position as Assistant Director of Housekeeping to Laundry Manager in February of 2006. Boulos Dep. at 59, 64.

12. Elkhodary repeatedly referred to Taylor as "el abda," which is Arabic for "a slave." Boulos Dep. at 78.

13. Boulos told the Human Resources Manager at that time, Nate Foxworth, about Elkhodary's comments and that he believed that Taylor was being demoted because of her race. Boulos Dep. at 75-78.

14. Elkhodary continued to make these racially discriminatory remarks after Boulos spoke to Foxworth about Elkhodary's remarks. Boulos Dep. at 80.

15. Boulos never saw any indication that Mr. Foxworth reported his complaint to anyone else or that any action was taken against Elkhodary. Boulos Dep. at 80.

16. Boulos had additional conversations with Foxworth about Elkhodary's comments about Taylor. Boulos Dep. at 85-86.

Elkhodary Withholds Boulos' Evaluation And Continues To Harass Taylor

17. Elkhodary refused to give Boulos his 90-day evaluation until Boulos fired Taylor. Boulos Dep. at 86.

18. Boulos regularly heard Elkhodary shout and scream at Taylor. Boulos Dep. at 87-88.

19. Elkhodary would stand behind Taylor at meetings while Taylor addressed the room attendants she supervised and "make faces" while Taylor was speaking. Boulos Dep. at 91-92.

20. Around February 2001, Taylor was demoted by Elkhodary. Boulos Dep. at 64.

### Taylor Is Terminated And Files An EEOC Charge

21. Taylor's employment ended in April 2006.

22. On June 12, 2001, Taylor filed an EEOC charge, which named Boulos as a witness to the "College Park" comment and alleging discrimination on the basis of race and sex. Deposition of Jean Allen ("Allen Dep.") Exhibit 4.

**Boulos Suffers An On-The-Job Injury While
Working At The Omni Shoreham Hotel;
Boulos Seeks Medical Treatment And Uses Leave**

23. On June 6, 2001, Boulos was pushing some heavy linen carts while at work when he felt a sharp pain in his back. Boulos Dep. at 110-111.

24. The pain kept getting worse, however, and on June 7, 2001, the next day, Boulos informed Elkhodary about the accident. Boulos Dep. at 111-112.

25. Boulos continued working between June 7 and June 11, 2001. Boulos Dep. at 113-115.

26. On June 11, 2001, the pain in Boulos' back became intolerable and Elkhodary requested that Boulos go to George Washington Hospital's Emergency Room ("GW") for treatment. Boulos Dep. at 191-92.

**Boulos Returns To Work With Medical Restrictions**

27. The doctors at GW took Boulos out of work for two days, after which he could return to work on June 14 with restrictions. Boulos Dep. at 116, 119; Austin Dep. Exhibit 18 (GW Work limitation form).

28. These restrictions included minimal walking, no climbing, no heavy lifting above 10 pounds, no work above chest height, no pushing, pulling or twisting work, no carrying above 10 pounds, and no bending or stooping. Austin Dep. Exh. 18.

29. The form instructed Boulos to return to GW for a follow up on June 18, 2001. Boulos Dep. at 121; Austin Dep. Exh. 18.

30. Boulos returned to the GW Emergency Room on June 18 as instructed at which time he was provided a form indicating that he was to remain on altered duty, which instructed that he was to engage in no heavy lifting above 10 pounds, no pushing,

pulling or twisting work, no carrying above 10 pounds and no bending or stooping. Austin Dep. Exh. 17 (Work limitation form dated 6-18-01).

31. The physicians in the Emergency Room told Boulos to see an orthopedist named Dr. Warren Yu. Boulos Dep. at 121.

32. Boulos saw Dr. Yu on June 26, 2001 at which time Dr. Yu diagnosed back pain and herniated disk and placed Boulos on limited duty, indicated as no lifting. Boulos Dep. Exhibit 6.

33. Boulos continued working on limited duty through the week of June 26, 2001. Boulos Dep. Exhibit 6.

34. Boulos experienced sharp pain in his back whenever he stepped on his right foot and tried to avoid walking during this time. Boulos Dep. at 123.

35. While on limited duty, Boulos completed his paperwork, attended all the required meetings, such as union meetings and manager's meetings, and supervised the laundry, which was near his office, but avoided excessive walking due to the pain. Boulos Dep. at 123-124, 125-26.

## Defendant Attempts To Improperly Dissuade Boulos From Testifying Truthfully Regarding Taylor

36. On June 28, 2001, Defendant's Human Resources Director, Jean Allen ("Allen") called Boulos at home to discuss Taylor's EEOC Charge. Allen Dep. Exhibit 5.

37. Boulos met with Allen and her assistant, Vikki Finn, on June 29, 2001, to discuss Taylor's EEOC charge. Allen Dep. Exhibits 5-6.

38. Boulos told Allen that he believed that Elkhodary harassed and discriminated against Taylor based on her race. Boulos Dep. at 96.

### Dr. Yu Recommends Further Leave and Epidural Injections For Boulos; Zurich Refuses Further Coverage

39. On July 3, 2001, Dr. Yu opined that Boulos should not be going to work. Boulos Dep. Exh. 7.

40. Boulos remained out on workers compensation through the month of July, 2001. Boulos Dec. ¶ 5.

### Austin Prepares Unsent Letter on August 17, 2001, To Demand That Boulos Return By October 1, 2001, And Offering Alternative Employment If Boulos Is Unable To Return By October 1

41. It is undisputed (Austin admits) that Austin authorized a letter on August 17, 2001 to Boulos that was not sent, stating that Boulos needed to return to work by October 1, 2001. See Exh. B hereto; Defendants' "stipulation" as to that date, Exhibit F hereto; Austin Dep. Exh. 9; Austin Dep. at 129-30. The August 17 letter states that Defendants were *willing to consider Boulos' "candidacy for any position"* (emphasis added), if he was unable to return to work by October 1. Austin Dep. Exh. 9.

### Boulos Is Required To Submit To Examination By A Zurich-Selected Doctor

42. In early August 2001, Zurich Insurance sent Boulos for an "independent medical examination" of his condition. Boulos Dep. at 143.

43. On August 6, Dr. Gordon, Zurich's chosen doctor, examined Boulos. Boulos Dep. at 143-44.

44. Dr. Gordon spent just approximately three minutes on his examination of Boulos. Boulos Dep. at 183-84.

### Conflicting Doctors' Opinions Emerge; Zurich Denies Further Coverage And Refuses To Provide Epidural Injections To Benefit Boulos' Back

45. Boulos received conflicting diagnoses regarding his back from his personal physician, Dr. Yu, and Omni's physician, Dr. Gordon.

6

46. Dr. Gordon disagreed with Dr. Yu, finding that there was no limitation on Boulos' physical capacity as a result of a work related injury. Exhibit A hereto (IME report from Dr. Gordon).

47. On August 24, 2001, Karen Treciak from Zurich Insurance sent a letter to Boulos advising that Dr. Gordon found that "any problems you may be experiencing with your back are due to degenerative conditions and are not a result of your injury at work." Boulos Dep. Exh. 10.

48. That letter further advised that Boulos' benefits were being terminated effective August 24, 2001, that he was "being returned to work immediately," and that Zurich would not longer authorize any additional medical treatment. Boulos Dep. Exh. 10.

49. Zurich also refused to fund epidural shots to treat Boulos' back injury, as Dr. Yu had recommended. Boulos Dep. at 131.

### Boulos Informs Allen That He Received a Cursory Examination From The Independent Physician

50. Soon after receiving the letter from Zurich terminating his benefits, Boulos contacted Allen regarding Zurich's determination. Boulos Dep. at 148.

51. Boulos told Allen that Dr. Gordon did not perform a thorough examination. Boulos Dep. at 148.

52. Allen documented this conversation as occurring on August 27, 2001, noting that Boulos claimed that "the independent physician only spent three minutes with him." Exhibit B hereto (Memo to file by Jean Allen dated 8/27/201 (Bates No. 001822)).

53. It is undisputed that Boulos was examined by Dr. Gordon in early August and that Defendant, through Allen, was aware of his conclusions not later than August 24. Exhibit B hereto (Allen Filememo) at 1823.

### As of August 27, 2001, Defendant Has No Plans To Fire Boulos
### Prior To His Expected September 25 Medical Evaluation

54. Allen wrote a memo to the file, which she has dated to August 27, 2001 Exhibit B hereto at 1822-1825.

55. Therein, she recounts a three-way conversation between herself, Austin and Boulos, that allegedly occurred on August 27, in which she inquired about whether Boulos would be able to work after a scheduled September 25 medical evaluation. Id.

56. Through her memo writing, Allen unmistakably implied that there were no plans to fire Boulos sooner than September 25, 2001, as of August 27 date of the conversation. Id.

### Boulos Informs Defendant That He Will Testify
### That Omni Discriminated Against Sandra Taylor Because Of Taylor's Race

57. On an occasion in early September 2001, when Boulos came to the Omni Shoreham to turn in a doctor's note, Allen requested that he meet with her regarding Taylor's claim for unemployment. Boulos Dep. at 100.

58. Allen asked Boulos if he was aware there was a hearing regarding Sandra Taylor. Boulos Dep. at 100-01.

59. Boulos, in fact, had received a notice requesting his presence at the hearing. Boulos Dep. at 101.

60. Allen asked Boulos how he would testify at the hearing, to which Boulos responded by telling Allen that he would say that he felt Taylor had been harassed based on her race. Boulos Dep. at 100-101.

8

61. Allen then asserted to Boulos that: "as managers, we should stick together so we can benefit the corporation which we are working for." Boulos Dep. at 101.

62. Allen repeated this statement several times during the course of the conversation. Boulos Dep. at 101-102.

63. Allen claims that she "[does] not remember saying that comment." Allen Dep. at 179.

64. During the conversation, Boulos told Omni for the first time that he would actually testify in support of Taylor and against the Defendants. Boulos Dep. at 100-101

### Boulos Testifies Against Omni Before The Department of Employment Services In Sandra Taylor's Unemployment Benefits Hearing

65. On September 6, 2001, Boulos testified on Taylor's behalf in an unemployment hearing at the District of Columbia Department of Employment Services, which was attended by both Allen and Elkhodary. Allen Dep. at 75-76;

66. In his testimony, Boulos stated that Taylor had been the victim of racial harassment and discrimination. Allen dep. at 75-76.

67. General Manager Austin, the principal decision maker, admits that Allen would have told him how Boulos testified. Austin Dep. at 67, 70.

### Allen and Austin Demand That Boulos Return to Work

Sometime before September 8, Allen and Austin spoke to Boulos on the telephone, at which time Austin inquired as to when Boulos would be returning to work. Boulos Dep. at 151-52; Allen Dep. Exh. 12 at 5.

68.     In that conversation, Austin told Boulos that he had three options: (1) to return to work with no restrictions per Dr. Gordon's instructions; (2) resign; or (3) be terminated.  Boulos Dep. at 153.

69.     Austin and Allen also repeatedly asked Boulos to get a release from his treating physician, Dr. Yu, before returning to work.  Boulos Dep. at 153; Allen Dep. Exh. 12 at 7.

70.     Boulos told Allen and Austin that he would attempt to return to work on September 8, despite Dr. Yu's refusal to release him to return to his duties.  Boulos Dep. at 155-56.

### Omni Breaks From Its Past Practice By Failing To Review And Evaluate The Medical Information; Defendant's Witnesses Testify Contradictorily As To The Significance Of The Zurich's Medical Report On Their Termination of Boulos

71.     Austin testified that in a case where an employee had conflicting diagnoses from doctors, he "probably would go ahead and want all those for-and-against opinions to be reviewed by people above me to see what their insight would be under that kind of a circumstance" and that he would not have required that employee to return to work with this "upper-level review." Austin Dep. at 90-91.

72.     Early in her deposition, Allen stated that she believed that Boulos had seen a *third* physician to reconcile the two conflicting diagnoses between his personal physician, Dr. Yu, and Zurich's Dr. Gordon.  Allen Dep. at 90-91.

73.     Allen was incorrect in her belief.

74.     Austin testified that under policy, he would have been required to "consult with the corporate office about the circumstances [of Boulos' diagnoses] and get their feedback on their recommendations."  Austin dep. at 146-47.

75. However, Austin testified that he could not remember if he consulted with the corporate office regarding the conflicting opinions between Dr. Yu and Dr. Gordon. Austin Dep. at 147.

76. Jean Allen testified that Boulos' employment was not terminated based on the IME's examination. Allen Dep. at 132.

77. Allen later testified, however, that the release from the IME factored into their decision that Boulos could, in fact, "work full time to assume his normal job responsibilities." Allen Dep. at 133.

78. Allen testified that she believed Boulos could come back to work "[b]ecause it had been determined after the examination that he was in a condition that he could come back and fulfill the responsibilities of his position." Allen Dep. at 133.

79. Neither Allen nor Austin ever made any attempt to reconcile the conflicting medical reports.

**Boulos Attempts To Return To Work On September 8;**
**Austin Displays Hostile Attitude Toward Boulos And Threatens**
**DisciplineDespite Lacking Any Knowledge Of Any Poor Performance**

80. On Saturday September 8, two days after he testified at Taylor's hearing, Boulos returned to work and reported, as instructed, to Peter Austin's office. Boulos Dep. at 156.

81. Austin did not ask Boulos how he felt or any information as to his condition that day, and his manner was very hostile toward Boulos. Boulos Dep. at 156, 161-62.

82. At that September 8 meeting, Austin threatened Boulos' employment by showing him, for the first time, a handwritten document called "Director of

11

Housekeeping Expectations," which freshly outlined Boulos' duties. The document states that: "Any evaluation of your performance will be based on your ability to complete the above. It is expected that you will do it successfully. These are minimum requirements and not all-inclusive. Failure to move forward with tangible results will required the hotel to intervene in accordance with its progressive disciplinary process." Boulos Dep. at 156; Austin Dep. at 131, 135-6, 139-41; Austin Dep. Exh. 10.

83. Austin articulated this threat to Boulos despite Austin's inability to recall Boulos exhibiting any performance problems prior to his injury in June 2001. Austin Dep. at 41-42, 117-18, 134, 137.

84. Austin admitted that such a threat of discipline normally would not be made until repeated performance problems were noted and "coaching" had first occurred, which he did not claim had happened here. Austin Dep. at 117-120.

### Boulos Is Fired on September 10, 2001

85. After his September 8 meeting with Austin, Boulos went to his office to perform his duties. Boulos Dep. at 158.

86. Later that day, Boulos began to experience such severe pain that he went "in tears" to Austin's office to tell him that he could not continue working without his medication. Boulos Dep. at 158.

87. Austin instructed Boulos to go home for the day and meet him in Jean Allen's office on Monday, September 10. Boulos Dep. at 159.

88. On Monday, September 10, 2001, Boulos arrived at Allen's office as instructed at which time he met with Allen and Austin and another employee. Boulos Dep. at 159-60.

89. Austin told Boulos that he needed to know if Boulos could return to work "in the full capacity … as the executive housekeeper without the talk about pain and all this. And if you cannot do that then this is an honorable way for you which is to resign and if these two options are not open for you then there is a third one which will not be your choice but then I will take it and I will . . . terminate you. " Boulos Dep. at 160.

90. Boulos testified that Austin was hostile toward him during this meeting as well. Boulos Dep. at 161. Indeed, Austin "never asked [him] about how [he felt.]" Boulos Dep. at 156. Austin had never projected this hostile attitude toward Boulos before he testified against the company. Boulos Dec. ¶ 6.

91. Boulos testified that during this meeting he begged Austin to give him a few more days to see if his condition improved or to come up with money to pay for epidural injections to help his back. Boulos also asked for unpaid leave in order that he might have more time to recover from his injury. Boulos Dep. at 163-64.

92. Boulos also requested that Austin modify his job duties so that he could continue in his position as Director of Housekeeping. Boulos Dep. at 165.

93. Boulos requested only that Austin "work with [him]" around his injury so that Boulos could keep his job. Boulos Dep. at 165-66.

94. Austin refused to give Boulos more time to recover or modify his job duties. Boulos Dep. at 166.

95. Instead, Austin terminated Boulos. Austin Dep. at 96.

**Omni Refuses To Modify Boulos' Duties, Without Justification,
Despite Having Done So For Him Previously, Before Boulos Testified Against It**

96. Austin testified that, as General Manager, he could have altered Boulos' job duties to accommodate his physical injury but chose not to do so. Austin Dep. at 173.

97. Thus, Austin admitted that a Director of Housekeeping on light duty would be responsible for "doing the schedule, processing payroll, doing the requisitions for purchasing, purchase orders, meet[ing] with vendors, if possible, . . . anything that would still allow them to do administrative work." Austin Dep. at 79.

98. The scenario described by Austin is precisely the arrangement that was made for Boulos when Boulos was placed on light duty for nearly one month after his injury in June 2001, but before his testimony against Omni. See Austin Dep. Exhs. 17, 18.

**Omni Contradicts Its Admitted Inclination To Allow Injured Employees
To Return With Modified Job Duties, By Refusing To Do So And Instead
Firing Boulos After His Testimony Against Omni**

99. Austin testified that if Boulos had been able to return to work, even in a diminished capacity, he would have allowed it. Austin Dep. at 121-22.

100. Austin testified in his deposition that he didn't offer Boulos light duty because "he seemed to be in pain." Austin Dep. at 120.

101. Austin testified that "based on my observations of [Boulos], the way he was moving, I didn't feel that he would be able to perform." Austin Dep. at 120.

102. Austin also testified that he did not believe that the fact that the independent medical examiner spent just few minutes with Boulos would have impacted his decision to terminate Boulos' employment, "because [he] needed a director of housekeeping." Austin Dep. at 112.

103. However, Austin admitted that he *could* have altered Boulos' job duties. Austin Dep. at 173.

104. Allen also participated in the decision to terminate Boulos. Austin Dep. at 9

105. Allen testified contradictorily that the position of Director of Housekeeping was "not the type of job that can be altered." Allen Dep. at 207.

106. Allen also testified falsely that after September 11, 2001, Omni Shoreham did not offer light duty. Allen Dep. at 221.

107. Austin testified, however, that this statement was not true and the Omni Shoreham did offer light duty after September 11, 2001. Austin Dep. at 110.

108. In fact, it is undisputed that Sandra Taylor, the assistant Executive housekeeper was the highest-ranked employee in Housekeeping until Paul Boulos was hired in December 2000 or January of 2001. Austin Dep. at 13-14, 28; Boulos Dep. at 13.

109. Although there was no Director of Housekeeping through much of her tenure, Taylor was in fact merely an *Assistant* Director of Housekeeping. Boulos Dep. at 34.

110. Thus, Defendant operated under Austin for an extended period prior to Boulos' testimony *without an Executive Housekeeper*.

111. Defendants have utterly failed to show that an operational need caused them to fire Boulos.

112. Tellingly, when asked if he offered Boulos a "light duty" opportunity at the time of the firing, Austin responded by asserting not that he did or did not do so, but evasively, that he "knows" Boulos never "asked". Austin Dep. At 105.

113. In fact, as shown above, Fact No. 92, Boulos did ask.

**114.** Austin testified that he did not modify Boulos' job duties "[f]or continuity with all our decision making in terms of being able to make sure that everybody was performing at the level they were required to do by their job descriptions." Austin Dep. at 174.

115. However, managers within the Omni Shoreham have altered job duties for employees in addition to the prior accommodation of Boulos. For instance, supervisor Charles Briggs purchased wrist supports and ergonomic chairs for employees suffering from carpal tunnel syndrome. Briggs reported directly to Austin. Deposition of Charles Briggs at 34-35, 38-39.

### Although It Admits Boulos' Injury Was Real, Omni Falsely Asserts Through This Litigation That Boulos Committed Poor Performance By Refusing To Return To Work Against His Doctor's Orders, Despite The Fact That It Repeatedly Instructed Boulos At The Time Of The Injury And Absence From Work, That He Could Not Return To Work Without His Doctor's Release

116. Austin did not believe that Boulos was faking his injury. Austin Dep. at 95.

117. In his Interrogatory No. 12, Boulos asked Omni:

> If you allege that any aspect of Plaintiffs' performance was unsatisfactory, state each and every fact in support of your allegation. If you allege that Plaintiffs were not in conformity with or violated any policies, procedures or practices, identify that policy, procedure or practice and describe how each Plaintiff's behavior departed from it.

> Defendants responded:

> . . . Defendant alleges that Plaintiff Boulos was unwilling to work after being cleared to return to work. . .

Exhibit C hereto.

118. Thus, Defendant has sworn that Boulos' performance and/or behavior violated its policies, since "Boulos was unwilling to work after being cleared to return to work. . . " by Zurich's doctor. Exhibit D.

16

119. Previously, until Boulos testified against it, Defendant repeated over and over again that Boulos was *forbidden* from working without clearance from his *personal* physician. Thus, as late as August 31, 2001, Allen told Boulos that Defendants "needed a release from Dr. Yu when he returned to work on Saturday 9/9/01." Exhibit B at 2192.

120. On September 5, 2001, the day before the unemployment hearing, Austin and Allen were still inquiring about whether Dr. Yu had released Boulos to work, and Boulos informed them that he had not. Exhibit D hereto (Allen Filememo Bates No. 0009).

121. However, when Boulos arrived at the hotel on September 8, 2001, two days after testifying, he *was* permitted by Omni to attempt to work.

### Though Austin Claims He Would Have Rehired Boulos, Omni Formally Notes That Boulos Is Not Eligible For Rehire

122. Upon terminating Boulos, on its Personnel Information Form, Jean Allen checked that Boulos was not eligible for rehire citing "special circumstances." Allen Dep. Exhibit 1.

123. Allen testified that although she checked the box, she did not remember why she marked that Boulos was ineligible for rehire. Allen Dep. at 153.

124. Allen testified that: "if somebody is terminated for employment with the company, they are not eligible for rehire." Allen Dep. at 155.

125. Austin contradictorily testified that he *would* have rehired Boulos. Austin Dep. at 100, 149. Austin admitted that he knew of no reason why Boulos would be ineligible for rehire, Austin Dep. at 100, 149-150.

126. Austin also could not explain why Boulos was ineligible for rehire and did not know the meaning of "special circumstances." Austin Dep. at 150.

17

127.    Boulos was offered no expectation of future employment upon healing. Boulos Dec. ¶ 7.

### Boulos Is Immediately Replaced By A Candidate Who Was Obviously Selected Before Austin's September 8 and 10 Ultimatum To Boulos Requiring His Return To Work

128.    Only four days passed after Boulos' termination before Austin filled Boulos' position.  Austin Dep. at 156.

129.    Austin testified self-servingly, however, that it took 45-60 days to replace Boulos.  Austin Dep. at 98.

130.    It is apparent that Defendant had selected a replacement before it offered Boulos the so-called option of returning to work in full capacity on September 10, 2001.

### Omni Attempts To Create The Untruthful Impression That Boulos Resigned

131.    Allen wrote a memo to the file dated September 10, 2001 stating falsely that Boulos "wanted us to terminate his employment so that he could receive unemployment benefits. We agreed to termination of employment."  Exhibit E hereto (Vol 3, Tab 32 Bates stamp 002186).

132.    Boulos knew that he was not eligible for unemployment benefits because of his injury and never asked to be terminated.  Boulos Decl. ¶ 8.

133.    Austin testified conveniently that he could not recall if Boulos resigned. Austin Dep. at 93.

134.    Boulos denies asking to be terminated in order to receive unemployment. He also denies "agreeing" to termination—he told Defendants that he wanted to keep his job.  Boulos Dec. ¶ 9.

135.    Austin admits that Boulos is generally truthful. Austin Dep. at 62.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/s/
_____
Leizer Z. Goldsmith
D.C. Bar No. 419544
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015
Tel:  202-895-1506
Fax: 202-318-0798