1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3   SANDRA TAYLOR            :
    and
4   TAWFIK BOULOS,           :

5         Plaintiffs,    :

6      v.            : Civil Action No.
                     1:05-CV-01175
7   OMNI HOTELS MANAGEMENT      : Judge Henry H.
    CORPORATION, et al.,        Kennedy
8                      :
    Defendants.
9                      :
                        Pages 1 - 203
10
                  - - - - -
11

12        Deposition of Tawfik Boulos

13            Washington, D.C.

14        Friday, December 9, 2005

15

16

17

18

19

20

21   Reported by:  Marian E. Cummings, Notary Public

22   Job No.: 171779

13

1    Q    Now that's not your current resume?

2    A    No.

3    Q    But I believe you started with Omni Hotels in

4  2001, late 2000, beginning of 2001?

5    A    Yes.

6    Q    Is this resume --

7    A    Did you say late what?

8    Q    Late 2000, late December, January 2001.

9    A    Yes.

10    Q    Is this resume Exhibit 1 accurate as of

11  December 2000?

12    A    Yes.

13    Q    And take a few minutes to look at each page.

14    A    Okay.  What was your last question?

15    Q    Is that resume Exhibit 1 accurate as of

16  December 2000?

17        MS. WALSH:  Okay.

18        THE WITNESS:  Yes.

19        BY MR. COLES:

20    Q    All right.  How did you come to the United

21  States from England?

22    A    I met my wife who is an American in London,

16

1    Q    So you're not sure which one they got your

2    information from?

3    A    I have no idea.

4    Q    Who contacted you?

5    A    Saed Elkhodary who was the director of rooms

6    division at the Omni and also Nate Foxworth who was the

7    director of HR at the Omni Shoreham.

8    Q    Just for the court reporter we'll spell all

9    those for her.  Said, S-A-I-D?

10    A    Depends which spelling you want.  People

11    sometimes spell it S-A-E-D because S-A-I-D is said, it's

12    not Saed.

13    Q    Have you ever seen Saed Elkhodary spell it

14    S-A-E-D?

15    A    No, I do not.  I'm not really familiar with

16    which, what spelling he was having his name.  I'm sure

17    I've seen it but I cannot tell you for sure.

18    Q    Okay, Elkhodary is E-L-K-H-O-D-A-R-Y?

19    A    Yes, that would be the correct spelling, yes.

20    Q    And the second person was Nate Foxworth?

21    A    Correct.

22    Q    F-O-X-W-O-R-T-H?

34

1    A    Yes.

2    Q    Who would that be?

3    A    Saed Elkhodary.

4    Q    What did he say about Sandra at the time?

5    A    He introduce Sandra to me as the assistant

6    executive housekeeper, he introduced her to me as she is

7    the one who would be responsible about the scheduling,

8    about the public areas, work in the public areas,

9    reporting to me any happenings in the housekeeping

10    department.  He also introduced her to me as a good

11    employee who won some awards in the Omni Shoreham as a

12    good employee.

13    Q    And what was your title that you were hired

14    under?

15    A    Executive director of housekeeping.

16    Q    It varied or --

17    A    No, that is, that is, in England you call it

18    solicitor, here you call it an attorney, it's the same

19    thing.

20    Q    But which name did they give you at the Omni

21    Shoreham?

22    A    At the Omni Shoreham I was the director of

35

1  housekeeping.

2    Q    Okay.  Who did you replace, do you know?

3    A    Who did I replace, I was told that there

4  was -- can I take a moment to remember?

5    Q    Sure.

6    A    I was told there was a lady from China if I'm

7  correctly remember and she resigned, I'm not quite sure

8  whether she resigned or whether she was separated from

9  the company but I believe there was a period of time

10  that they did not have a director of housekeeping there.

11    Q    All right.  And just throwing out a name,

12  Irene Chin, does that same familiar?

13    A    Well, the name rings a bell because I was told

14  that she's an Oriental lady.

15    Q    Okay.

16    A    But I couldn't really tell you exactly what

17  was her name.

18    Q    Right.  And from your understanding when you

19  met Sandra Taylor you said Saed told you she was a good

20  employee?

21    A    Uh-huh.

22    Q    All right.  So let's go sort of

59

1    Q    Okay, did you suggest anything else, any other

2  options?

3    A    No, I did not suggest any other options.  I

4  was asked whom I worked with before I came to the Omni

5  and I said that I was working with a gentleman in Dallas

6  and he was my assistant and I was asked if he was a good

7  assistant and I said yes, he was.

8    Q    Well, let's go back to the beginning, we sort

9  of jumped to the middle.  So Mr. Smith said --

10  Mr. Elkhodary asked how this can be accomplished,

11  Mr. Smith responds that essentially they can try to move

12  Miss Taylor.  How did Mr. Elkhodary respond to that?

13    A    Mr. Elkhodary responded by suggesting that she

14  will be demoted as a laundry manager/public area

15  manager.

16    Q    At which point you offered the response you

17  just told me?

18    A    Yes, I did.

19    Q    Then what was said next?

20    A    Nothing really after that, I mean it was just

21  left at this point.

22    Q    So essentially your statement that it probably

64

1    the director of HR at the time.  Like I mentioned before

2    I was asked to generate a job description for the

3    laundry and the public areas combined and I went to Nate

4    Foxworth office and I sat down with him and I voiced my

5    strong objection to two things, the first one is for

6    anyone to have the task of managing two departments

7    considered to be for two people to manage, and my second

8    objection was for the demotion of Sandra Taylor because

9    in my own professional opinion as her direct supervisor

10    I did not see that there is any need for her to be

11    demoted.

12    Q    And when did this conversation occur?

13    A    That conversation would be in, like I said,

14    mid February, late February, I don't remember exactly

15    when but it was around the time when Sandra was

16    initially demoted after that to her new position as

17    laundry manager/public area manager so that must have

18    happened right before that.

19    Q    All right.  And let me figure this out, when

20    you started, January 2001, who was in charge of the

21    laundry?

22    A    Who was in charge of the laundry?  Everyone is

75

1  the fact that someone is being demoted, you know,

2  because of the race, because of their color, and I have

3  no problems with Sandra's performance, she has been a

4  great employee, she has been performing her duties to

5  the best of her abilities and according to the tools

6  she's given to do the job.  And I also told him that I

7  object to the second part which is giving someone an

8  overwhelming responsibility of covering two major

9  departments.

10     Q    Okay.  And when you told Mr. Foxworth this did

11  you specifically tell him why you thought she was being

12  demoted because of her race?

13     A    Yes.

14     Q    What did you tell him?

15     A    I told him about the references Mr. Elkhodary

16  is making not only in English but in our own native

17  language when it comes to talking about Afro-Americans.

18     Q    And tell me about, and be clear here, tell me

19  about the specific comments that you told Mr. Foxworth

20  about.

21     A    Right, I mentioned to Mr. Foxworth that the

22  first time I was not really happy about Saed's comments

76

1   is when I went to him one day and I said Saed, I find a

2   nice apartment in an area in Maryland by the name of

3   College Park and he had a big smile on his face and I

4   said what is wrong and he said to me, you know what is

5   College Park?  I said no, I don't know what is College

6   Park.  He said College Park is full of blacks, do you

7   want your kids to go to school full of black kids?  My

8   response to him at that time, Saed, you haven't seen my

9   father, my father's came from upper Egypt, a place

10  called Luxor where he is as dark as any person you could

11  meet in the United States.  And you know he started

12  laughing he said well, you go ahead and do whatever but

13  if you want me to look for you for, in a good area he

14  used to live in Alexandria, Virginia, I think.  He said

15  if you want me to look for you in a nice area where you

16  don't have many blacks then I will help you.  And this

17  is exactly what I mentioned to Nate Foxworth.

18         And I also mentioned to him, you know, without

19  telling him the exact words of course because that

20  didn't matter at the time, I told him he just keeps

21  throwing in references in our own native language which

22  is not very nice if you try to translate it into

77

1  English.

2    Q    Well, I do need you to tell me the specific

3  comments that you told Mr. Foxworth about.  If you

4  didn't tell him about it --

5    A    No, I did not tell him exactly what is the

6  word in Egyptian.  I told him he is making references in

7  our language which is not very nice if you try to

8  translate it into English.

9    Q    Okay.

10    A    He referred to her as the black this and the

11  black that, not only her, but you know I had a couple of

12  supervisors on the floors which is Afro-American and

13  referring to the black this and the black that and I did

14  not like it and I told Nate Foxworth specifically I do

15  not like it.

16    Q    And just to be clear, I do need to separate

17  what you specifically told Nate Foxworth about, so if

18  you said, did you say the black this or did you say he

19  said the black --

20    A    No, I'm telling you exactly what I have told

21  Nate Foxworth.

22    Q    And what does "this" stand for, what is it

78

1   that he actually said?

2    A   Now you want me to tell you what he actually

3   said, not what I told Nate Foxworth?

4    Q   Yes.

5    A   He will repeatedly say the word elabda.  Now

6   the word elabda in Egyptian is in English a slave.

7    Q   A slave?

8    A   Yes.

9    Q   Now spell the word in Egyptian as it was

10   spelled.

11    A   I would say E-L-A-B-D-A.

12    Q    Okay.  Now what about when he would say black

13   this and black that?

14    A   He will say, in Egyptian again, he will say

15   the black lady in Egyptian, he will say the black lady,

16   go and see what your black lady is doing on the floor,

17   you know, go and see what is elabda doing on the floor

18   meaning the slave is doing on the floor.  And he will

19   repeatedly use the word "these people," and having about

20   70, 80 percent of my staff African-American, that meant

21   a lot to me.  That meant that there is a sort of

22   disrespect for this race, it meant that there is

80

1   needed to investigate it and make some sort of decision.

2   Q   Anything else that Mr. Foxworth said?

3   A   No, he was very sympathetic, I don't know

4   whether he was sympathetic because he is Afro-American

5   too but he was sympathetic and he said that he

6   understands what I have told him and he doesn't think

7   it, that it is right and he was going to document it.

8   Q   All right, and to your knowledge did anything

9   come out of that conversation, did anything occur as a

10  result of that conversation?

11  A   Not to my knowledge.

12  Q   Okay, after that conversation did

13  Mr. Elkhodary continue to make the comments that you

14  complained about?

15  A   Yes.

16  Q   So now let back up with respect to kind of

17  this, now I guess we're into March now of 2001, did this

18  change in titles and responsibilities actually occur?

19  A   What happened is that the next thing I was, I

20  went to Nate Foxworth's office.  I was told to go to

21  Nate Foxworth's office with Sandra to have a

22  conversation meaning that the purpose of the meeting was

85

1   She would also get the calls on her radio which is the

2   same, like we're all on the same frequency, go and

3   inspect such and such and such rooms.  So my first

4   conversation with Nate Foxworth what was these changes

5   for.

6       Q    Because there really was no change?

7       A    There was no change.  She is still being

8   pushed around but more than anything else now because

9   she is supposed to be laundry and public areas so there

10   is an extra pressure, what happened to the laundry, you

11   are the laundry manager, you are the public area

12   manager.  So really in honesty there was just nothing

13   changed but the pressure has increased, in my opinion of

14   course, and this is what was my conversation with Nate

15   Foxworth when I saw him the next time, the following

16   time.

17       Q    And what did he say in response to that?

18       A    He agreed one hundred percent, he told me I

19   see her suffering, I see that there is a lot of things

20   happening here which is just not fair.

21       Q    And then I guess any other conversation, at

22   least any other comments in that conversation?

86

1    A    No, that's it.  I think he asked me, he said

2  is Saed still continuing with his racial remarks and I

3  said yes.

4    Q    Did you ever ask Saed why he was having Miss

5  Taylor do the rooms work?

6    A    Yes, I did.

7    Q    What did he say?

8    A    His comment was that we need her out.

9    Q    And what did you say in response to that?

10    A    My response was why we need her out, because

11  she's not doing her job his response was.

12    Q    And your response to that?

13    A    My response is that I told him several times

14  do I get the impression that it's my duty to push her

15  out and he said yes, and let us make an agreement that

16  you are not going to get your 90 days evaluation before

17  Sandra is out.

18    Q    And when did that conversation occur?

19    A    When did that conversation occur?

20    Q    (Nodding).

21    A    Probably end of February, beginning of March,

22  middle of March, can't be very accurate but that was

87

1  like a deal.

2    Q    Did Saed want to get rid of any other

3  employees that you're aware of?

4    A    Not that I'm aware of, no.

5    Q    All right.  So I guess we are now into March

6  where the conversations with Nate Foxworth occurred with

7  Sandra Taylor and Saed is telling you you're not getting

8  your 90-day review?

9    A    Correct.

10    Q    When was the next conversation you had with

11  someone about Miss Taylor's performance?

12    A    That was, I mean it's very, very hard to tell

13  you when was the next time because like I mentioned

14  before that was a daily occurrence, that was something

15  happening a daily thing.  Saed will come every few days

16  to the housekeeping department, he will come to my

17  office which was adjacent to Sandra's office, he will

18  come to me, he will sit down, he would bring with him a

19  cup of coffee or sat down and talk or chat or talk about

20  a lot of things, nothing probably related to work at

21  all, we would have a conversation most of the time in

22  our language.  And then he would get out of my office,

88

1    he would go to Sandra's office, close the door and then

2    I would hear through the walls just like flimsy walls

3    you know all the shouting, the screaming, the abuses,

4    and that would be it.  And then he would come to my

5    office and he will say, again he would go on that she's

6    not doing what she's supposed to be doing which at this

7    point in time she was not supposed to be doing.

8    Q    Right.

9    A    And I brought that to his attention several

10   times and to, he did nothing about.

11   Q    Was Saed ever able to, as I mentioned before,

12   point to an objective measure that Miss Taylor was not

13   meeting?

14   A    No, he will just point to a problem.  He would

15   say well, the guest in room number so and so, and I'm

16   giving you an example here.

17   Q    Absolutely.

18   A    The guest in room number so and so was not

19   happy with his room cleanliness, he found hair on the

20   floor in the bathroom, how did that happen, why did she

21   not inspect those.  And I will say Saed, she's not

22   supposed to inspect the room, that's my job, that's

91

1    Q    Okay.  And so you still have, I would assume,

2    these sort of you said every week or two he would come

3    into the housekeeping area and have a conversation with

4    Miss Taylor?

5    A    Yeah.

6    Q    That still happened every week or two?

7    A    What was more fascinating is that he would

8    come sometimes to attend the morning meeting.  Every

9    morning the housekeeping department would have a meeting

10   before the housekeepers would go out in the rooms and

11   sort of like go and clean the rooms.  So we would have a

12   meeting with them, we would go and let the housekeepers

13   know what we have in the house, what is the occupancy,

14   what kind of groups we have in the house, what are our

15   expectations for that day.

16        And after she was demoted or supposedly to be

17   demoted to a new position, Saed would come to the

18   morning meeting and Sandra would be still doing her

19   duties prior to her demotion meaning standing at the top

20   of the stairs addressing the housekeepers, encouraging

21   them, you know, telling them what they're supposed to be

22   doing, telling them about what we have in the house.

92

1  And he would be standing right behind her, she would be

2  standing at the top of the stairs and he would be

3  standing right behind her and I would be standing behind

4  the ladies on the other side of the room and I would see

5  him make faces while she's speaking, trying to put her

6  down in front of the ladies, interrupting her, making

7  some stupid comments about what she was saying.

8       And that again was something to undermine her,

9  the way I understood it it was trying to undermine

10  someone, trying to ridicule someone in front of their

11  employees.  So that was something started to happen.  It

12  didn't happen before but it started to happen on a

13  regular basis after she was demoted, asked to perform

14  duties which she was not supposed to be doing, and yet

15  being ridiculed when she's doing those duties.

16       MS. WALSH:  Whenever, you mentioned we could

17  take a short lunch break.

18          (Off the record.)

19       BY MR. COLES:

20     Q    Mr. Boulos, I think that we have discussed

21  each of the specific meetings that you recall regarding

22  Miss Taylor's performance, are there any other meetings

93

1  that you're aware of that we have not discussed that you

2  specifically recall conversations from that meeting?

3    A    No.

4    Q    Changing tracks a bit, can you tell me the

5  first time that you heard Mr. Elkhodary make comments

6  regarding Miss Taylor's race in particular?

7    A    I cannot tell you a particular date but I can

8  tell you as early as the first few days in my employment

9  with the Omni Shoreham.

10    Q    And then any other people that made comments

11  that you considered racist?

12    A    No.

13    Q    Just Mr. Elkhodary?

14    A    Yes.

15    Q    Any other person present during these comments

16  besides you?

17    A    No.

18    Q    All these with you alone?

19    A    Always with me alone, most of it in our native

20  language.

21    Q    Mostly but not exclusively?

22    A    No.

96

1  Saed Elkhodary's comments were within the Omni Shoreham?

2    A    Yes, sir.

3    Q    When did you talk to Jean Allen about these

4  comments?

5    A    Jean Allen is my, I talked with her about this

6  when she called me in regards to Sandra's filing

7  unemployment and she discussed with me a few issues at

8  those meetings.

9    Q    What were those issues?

10    A    She discussed with me my opinion about

11  Sandra's performance and also about Saed's treatment of

12  Sandra.

13    Q    And what did you tell Jean Allen about those

14  two issues?

15    A    I expressed my opinion about Sandra's

16  performance, that I was satisfied with her performance,

17  I also informed her about Saed's harassment and

18  misbehavior and racial --

19    Q    What did she, Jean Allen, say in response to

20  that?

21    A    There wasn't really, she was listening.

22    Q    She didn't say anything else?

100

1   called that second meeting?

2      A    The second meeting nobody called it.  I was

3   basically in the office getting one of the doctor's

4   notes for the administrative assistant whose office is

5   just outside Jean's office and she saw me standing

6   outside and she asked me to step into her office when I

7   finished what I was doing.

8      Q    So she requested you meet with her?

9      A    Yes.

10     Q    But it was just because you happened to be

11  there?

12     A    Yes.

13     Q    You didn't know or she didn't anticipate you

14  being there as far as you know?

15     A    I have no idea if that's what happened.

16     Q    And then did she speak first?

17     A    Yes.

18     Q    In this meeting, the second meeting?

19     A    Yes.

20     Q    What did she say?

21     A    She asked me if I was aware of the fact that

22  there is a hearing, and I told her yes, I am aware.  I

101

1  received, by this time I received some sort of document

2  from a hearing board that I need to be there and she

3  asked me what would be my response.

4      Q     And what did you tell her?

5      A     I told her that my response would be that I

6  felt that Sandra was being harassed based on her race

7  and I felt that she was performing her duties and I told

8  her that she was not provided with the tools to do the

9  job.  I told her specifically about all the abuses which

10  Saed was performing every day basically day in and day

11  out, and that's what I told her.

12     Q     And what did she say in response to that?

13     A     She mentioned something to the fact that we as

14  managers, we should stick together so we can benefit the

15  corporation which we are working for.

16     Q     And what did you say in response to that?

17     A     My response was that I will tell the truth no

18  matter what.

19     Q     And what did she say?

20     A     She told me that her feelings was that we

21  should stick together as managers so we can benefit the

22  corporation we are working for.

102

1    Q    She just said that again?

2    A    Yes, she mentioned it several times.

3    Q    And I mean what was the next thing you said

4    after that?

5    A    I was sticking again to what I told her once,

6    and once again I will tell the truth as I saw it and as

7    I felt it and as I existed in the middle of it so I was

8    going to tell the truth.

9    Q    So you're going back and forth essentially,

10   she's saying we should stick together you're saying I'm

11   going to tell the truth?

12   A    Uh-huh.

13   Q    Who was the first person to break that back

14   and forth?

15   A    There was no breakage, that was the end of it.

16   She wished me, you know, soon to return to work and that

17   my back would get better and that the conversation

18   changed to kind of that direction and that was the end

19   of it.  She asked me a couple of questions about how I

20   feel in my back.

21   Q    Right, okay.  And is that the last

22   conversation you had with someone at Omni regarding Miss

110

1    Q    Did Saed say he was happy about it?

2    A    Oh yes.

3    Q    Good job whatever, anything like that?

4    A    He didn't tell me good job at all because I

5    wasn't in that, he was congratulating himself.

6    Q    What did he say?

7    A    He said that's it, we got rid of her.  He was

8    happy, his body language, his facial expressions, he was

9    extremely happy about the fact that Sandra was no longer

10    with Omni.

11    Q    All right.  Did you have any further

12    discussions with Saed about Sandra Taylor after that?

13    A    No.

14    Q    Now, I understand that you were injured at

15    work?

16    A    Yes, sir.

17    Q    Tell me how that happened.

18    A    It happened on the morning of the 6th of June.

19    At this point of time we have a mechanical failure in

20    the chute system in the housekeeping department and that

21    meant that the entire system was on hold, we needed to

22    send all our linen to an outside contractor.  The

111

1  delivery trucks returned our linen very early in the

2  morning on the 6th.

3      At that point of time I did not have any

4  housemen to move the linen.  But at the same time we

5  needed the linen in the housekeeping area because we

6  needed it to be distributed to the floors where the

7  housekeeping closet is so the ladies can perform their

8  duties.  I attempted to go and move cart after cart and

9  I think it was my third or fourth cart, I was pushing it

10  from the loading dock to the housekeeping area when I

11  felt sharp pain in my back.

12  Q    And what happened after that?

13  A    I thought to myself that probably it's just

14  going to go away, it's one of those things you feel a

15  bit of pain and it's just going to go away.

16  Q    And what happened after that?

17  A    Well, the pain continued so I took it easy for

18  the rest of the day and I sat at my desk trying to do

19  some paperwork and stuff of this sort and I went home.

20  Q    And what happened at home?

21  A    The pain continued but at home, you know, I

22  had my hands on some pain killers and I just took a

112

1  couple of Tylenol or whatever we had, it eases the pain

2  a little, and I went to work the following day.

3     Q     And how was work the next day?

4     A     Again when I didn't, when the effect of the

5  pain killers was gone I started to feel pain, you know,

6  and it was just getting worse.

7     Q     When did you finally tell somebody about the

8  injury?

9     A     I told, it was very obvious for everyone, I

10  was walking funny, I was walking, I couldn't really put

11  a lot of pressure on my right foot and I informed Saed

12  about the accident.

13     Q     Was there anyone with you when you were

14  injured?

15     A     There might have.  The hallway when I was

16  pushing the cart there was a lot of people there working

17  out of the departments but I was the only one in the

18  housekeeping department at that early time in the

19  morning and no, when I was pushing the cart there was

20  nobody around at that point of time.

21     Q     So you told Saed and what did he say?

22     A     He said to me why don't you go home and give

113

1  it a rest but the first thing he said well, let's go and

2  file an accident report.

3    Q   And did you file the accident report?

4    A   Yes, I did.

5    Q   And what did you do after that, first who did

6  you file it with?

7    A   With the security department.

8    Q   Do you remember a particular person?

9    A   You're supposed to file it with the director

10  of security or his assistant whose name at the time I'm

11  sorry, I can't remember.

12     MS. WALSH:  Can I point out I haven't seen a

13  copy of the accident report.

14     MR. COLES:  I haven't either.

15     BY MR. COLES:

16    Q   What did you do after that?

17    A   After that Saed asked me to take it easy and

18  not to put too much pressure on my back and not to do

19  anything which will make it worse and to go home early.

20  And I pointed to him that we are a little bit short

21  after, at this point of time we didn't have Sandra and

22  we didn't have a replacement so it was a little bit

114

1   short in our part and I needed to put the extra mile

2   there to get things going so I felt that my presence

3   there is very necessary and I tried to complete the day.

4       Q    Did you complete the day?

5       A    Yes, I did.

6       Q    That's the day after the accident?

7       A    Yes, sir.

8       Q    And what about the next day?

9       A    It went the same thing, same thing until the

10   11th when the pain started to really, really get to

11   bother me a lot and this is when Saed asked me to go to

12   the George Washington Hospital emergency department.

13       Q    And before that time when Saed told you to go

14   to the George Washington emergency department, how many

15   times did he tell you to go seek medical attention

16   before that?

17       A    He didn't.

18       Q    I thought you said me that he told you on the

19   second day?

20       A    To file an accident report.

21       Q    That's all he said?

22       A    Yes, he asked me did you file an accident

115

1  report yesterday, I said no.  He said well, go ahead and

2  file an accident report which I did.

3     Q    And the person that you filed it with, did

4  they talk to you about going to see a doctor?

5     A    No, they just take it from you, a description

6  of what happened and that's about it.

7     Q    So then Saed finally says on the 11th you need

8  to go to the George Washington --

9     A    He said to me go to the George Washington

10  Hospital and I went to the human resources department,

11  they called a taxi for me, the human resources

12  department, and I went to the George Washington

13  emergency department.

14     Q    And there you met with the doctor, I assume?

15     A    Yes, sir.

16     Q    And what did you learn from the doctor?

17     A    I did not learn a lot.  They examined me and

18  they brought, he brought a pink slip, I'm not even quite

19  sure whether it was a female or a male doctor, I cannot

20  really remember, but they said to me, they put me on

21  some, I think it was a couple of days no work and then

22  after that they put me on some work restrictions.

116

1    Q    Okay.  And so from the date of the injury

2    which was June 6th --

3    A    Yes.

4    Q    -- until June 11th did you miss any work?

5    A    No.

6    Q    And after June 11th did you miss any work?

7    A    After June 11th?

8    Q    Yes, of 2001?

9    A    Of course.

10    Q    Okay.  What was the first day that you did not

11    show up for work?

12    A    I think, if my recollection was right the

13    doctor gave me two days not to go to work at all.

14    Q    Okay.

15    A    And then after that go to work with certain

16    limitations.

17    Q    So the 12th and the 13th you stayed away from

18    work?

19    A    Yes.

20    Q    The 14th go back to work with restrictions?

21    A    I think so.

22    Q    Did you go back to work?

119

1    A    That's correct.

2    Q    And then starting on Thursday there's the A

3   which it means altered duties?

4    A   Yes.

5    Q    Through Sunday?

6    A   Yes.

7    Q    And then on Monday which would be June 18th

8   you're scheduled to return, does that mean return to

9   work?

10    A   I'm not sure about that.

11    Q    Because it also at the very bottom says

12   followup appointment 6-18?

13    A   Yes.

14    Q    So I don't know if that's return to work or

15   return to the doctor?

16    A    Return to the doctor, I believe.

17    Q    You don't know for sure?

18    A    Well, now that you have drawn my attention to

19   what was written at the bottom I believe that what they

20   said on this particular date I need to return to the

21   emergency department.

22    Q    Okay.  But that, is it possible that that

121

1        BY MR. COLES:

2    Q    All right, that's Exhibit 5.  Now, this looks

3    to me like this is the return trip the 18th of June?

4    A    Correct.

5    Q    So did you work that week of the 18th as far

6    as you can tell here?

7    A    Yes, sir.

8    Q    Then you went to see an orthopedic person as

9    well?

10    A    Yeah, that particular day when I went on the

11    18th back to the emergency department, this is when they

12    issued me with this particular document here and they

13    told me that I needed to go and see an orthopedist ASAP.

14    Q    And is that the Dr. Yu you mentioned?

15    A    Yes.

16        (Exhibit Number 6 was marked for

17    identification.)

18        BY MR. COLES:

19    Q    All right, I'll give you Exhibit 6 now.  Now,

20    is that, that looks to me to be the first note from

21    Dr. Yu?

22    A    Yes, sir.

123

1    the 7th, on July 3rd, was that July -- yeah, he did tell

2    me that he is not very happy with the results, what we

3    have seen, and he told me not to go to work.  Basically

4    he mentioned some medical terms which I wasn't really

5    familiar, mentioned something about disk and herniated

6    disk and stuff like that.  He said to me that I cannot

7    go to work.

8       Q    So this is the first time that you stopped

9    going to work?

10      A    Yes.

11      Q    So for essentially a month after the incident

12   you were going to work?

13      A    With limited duties, yes.

14      Q    Tell me about limited duties, what were you

15   doing?

16      A    The most painful thing was for me, at this

17   point of time it was walking.  It was, every time I

18   stepped on the right it was sending sharp pain to the

19   back so I tried to avoid walking as much as I can which

20   is very difficult when you're in the housekeeping

21   department.  I tried to stick to my paperwork and tried

22   to just direct the department and make sure that

124

1  everybody is doing the job as much as I can.

2      I attended all the meetings, manager's

3  meetings, union meetings, if there was any union

4  disputes I attended all of those, morning meetings of

5  course which was very important, at least to let the

6  employees feel that there is some sort of supervisory

7  and direction there, that was basically what I was doing

8  during this month.

9    Q    And as of July 3rd to your knowledge had you

10  replaced Sandra Taylor?

11    A    As of?

12    Q    As of July 3rd, 2001 had Miss Taylor been

13  replaced?

14    A    I think at that point, I'm not quite sure but

15  I think at that point of time we did have a gentleman, I

16  cannot recall his name, he was from India or from

17  Pakistan, if you mention his name I'm sure that will

18  refresh my memory.

19      MR. COLES:  Would it be possible to stop for a

20  minute?  I need to check something.

21          (Off the record.)

22      BY MR. COLES:

125

1    Q    Is that person Naseem Siddiqui?  I'll take a

2  shot and if you think I'm wrong --

3    A    Naseem is I think N-A-S-E-E-M.

4    Q    And Siddiqui?

5    A    It's just one of those you can spell it a

6  hundred different ways.

7    Q    I'll take a shot at it, S-I-D-D-I-Q-U-I.  If

8  you think it's different just let me know, is that okay?

9    A    That's fine.

10    Q    So you think he was on board before you took

11  this leave on July 3rd?

12    A    I'm not quite sure, I'm not -- that's a

13  possibility.

14    Q    Having said that essentially I assume you were

15  not walking the floor very often, if at all, during that

16  month?

17    A    No.

18    Q    I assume you weren't doing any room

19  inspections, if at all?

20    A    Not too many, no.

21    Q    I assume you weren't back and forth in the

22  laundry very often?

126

1     A    The laundry, because of the proximity of the

2   laundry department to the housekeeping department which

3   is just like a few steps and just you go down the stairs

4   and you are in the laundry department.  Because of the

5   proximity of the laundry department, yes, I was frequent

6   visitor of the laundry department but as walking the

7   public areas and rooms as I used to, no, the answer

8   would be no.

9     Q    So actually you know what, I'm going to go

10   ahead and make my less-than fabulous chart, I'm going to

11   redo that for a minute here, when we take our next break

12   I'll do that and have that as an exhibit.

13     A    Okay.

14         (Exhibit Number 9 was marked for

15   identification.)

16         BY MR. COLES:

17     Q    And we will call that Exhibit 8 which we will

18   enter into the record when that's completed during the

19   next break.

20         And Exhibit 9, well, actually one thing about

21   that chart and the reason I brought it up, so

22   effectively if your responsibilities under Exhibit 8

131

1  understood from him in the simple medical terms that

2  there was a nerve, there was a pressure on the nerve and

3  that was causing the pain.

4    Q    All right.  And what did they tell you they

5  were going to do to fix that?

6    A    What I understood again, and I'm really

7  guessing on what I understand because again I'm not a

8  doctor that there was two options, option number one is

9  operating to remove the pressure from the nerve, and

10  option number two is to try what you call an epidural

11  injection which will more or less relieve the pressure

12  on the nerve and therefore the pain.

13    Q    Did you ever have either procedure done?

14    A    No, because when I went, when Dr. Yu applied

15  for the epidural injection it was denied by the

16  insurance company.

17    Q    So are you better now, as we sit here today?

18    A    Right now?

19    Q    Yes.

20    A    I still feel the pain every now and then but

21  yes, I'm much better than those times, yes.

22    Q    You're fully capable of working now?

143

1    Q    As far as you know, I see here it references a

2    Dr. Gordon, is that as far as you know what changed the

3    sort of status of your case with the insurance company?

4        MS. WALSH:  Objection.

5        BY MR. COLES:

6    Q    Go ahead, you can answer the question if you

7    can.

8        As far as you know is that what changed the

9    decision in your case?

10    A    I think so.

11    Q    Okay, when did you go meet with Dr. Gordon?

12    A    I met with Dr. Gordon sometime during the

13    month of August.

14    Q    And why did you meet with Dr. Gordon?

15    A    I was, I received a call from Karen Treziak

16    and she informed me that I would need to go and see an

17    independent doctor.  She told me that I would be

18    contacted by the case nurse, a gentleman by the name of

19    Graff, I can't remember his first name.  Mr. Graff

20    contacted me and arranged for the examination.

21    Q    And did they tell you why they wanted you to

22    go meet with Dr. Gordon?

144

1    A    No.

2    Q    They just told you you need to meet with

3  Dr. Gordon?

4    A    They told me that I need to be examined by an

5  independent doctor, they didn't even mention his name.

6    Q    They didn't tell you why they were looking for

7  this at that point as opposed to some other point?

8    A    No.

9    Q    What did Dr. Gordon tell you?

10   A    Nothing.

11   Q    He never spoke one word to you?

12   A    Hello.

13   Q    He only said hello?

14   A    Can you sit down on the bench.  I sat down on

15  the bunch, he put one of those, I don't know, hammers

16  you hit the knee with, he knocked at my right knee a

17  couple of times, the left knee a couple of times, that

18  was it.

19   Q    So he did the reflex test on your knees?

20   A    Yes.

21   Q    And you left?

22   A    And he left, he left the room.

148

1    A    I told her that I'm very concerned about going

2    back to work with no limitations because that means that

3    I have to work with all the pain I'm suffering from

4    without any medications because the medications make me

5    very lousy when I take it.

6            And I voiced my concern about the way I was

7    examined by the doctor, I told her that I did not think

8    that he was professional, I did not think he was

9    thorough in his exam and I brought it to her attention

10   that as my employer, as the people who the person who

11   has the company paying premiums to this insurance

12   company to take care of their employees when they have

13   an accident I told her it is her duty to bring it to

14   their attention that they should do a better medical

15   examination.

16   Q    Did you also say this to Miss Treziak?

17   A    To who?

18   Q    Miss Treziak?

19   A    No, I didn't say that to Miss Treziak, I told

20   that to Jean Allen.

21   Q    Did you tell that to anyone else?

22   A    Yes.

151

1    Q    So let's go with the next conversation after

2    your conversation with Jean Allen.

3    A    Yes.

4    Q    Who did you talk to next?

5    A    Jean Allen and Peter Austin.

6    Q    And approximately when was that?

7    A    That would be approximately the last week of

8    August, last ten days of August.

9    Q    And well, I mean it would have been a much

10    smaller window of time than that, it would have been

11    after the August 24th letter?

12    A    Yes.

13    Q    And I assume that the August 24 letter took a

14    day to get to you?

15    A    Uh-huh.

16    Q    And I assume you had a conversation with Miss

17    Treziak and Miss Allen on the day it got to you?

18    A    Yes.

19    Q    And on a minimum you would have had the

20    conversation the last five days of the month?

21    A    Possibly, like I said, I'm not really

22    completely sure about the exact dates.

152

1    Q    What did you say in the second conversation

2    with Jean Allen?

3    A    That was with Jean Allen and Peter Austin, the

4    general manager.

5    Q    Right.

6    A    At that point of time Mr. Peter Austin was

7    mainly concerned about when I'm going to go back to

8    work.

9    Q    Right.

10    A    And I let him know that I am just as eager to

11    go back to work providing that I go back to work without

12    the pain, number one, I cannot go to work with the pain;

13    and number two, I cannot go against my treating

14    physician.  And number 3, again I brought to her

15    attention all my notes about my observations about the

16    examination of the independent doctor, Dr. Gordon, that

17    was mainly the content of the conversation.

18    Q    You said you brought to their attention your

19    notes, are these written notes?

20    A    No, my observations.

21    Q    Okay, how did either Mr. Austin --

22    A    There's a difference between observations and

153

1  notes.

2    Q    How did Mr. Austin or Miss Allen respond to

3  you?

4    A    In a way that his response, him in particular,

5  his response was that to put me in front of a few

6  options, and he told me bluntly the options.  Option

7  number one is to return to work with no restrictions as

8  Dr. Gordon said; option number two is to resign; option

9  number three is to lose my job or to get terminated,

10  whichever way.  And he specifically asked me to go to my

11  treating physician, Dr. Yu, and ask him to release me to

12  go back to work.

13        He said that several times during the

14  conversation, Jean Allen said that also.  Jean Allen was

15  mostly talking to me about that there is ways of

16  appealing against the decision of the insurance company

17  and all that and he was mainly concentrating on coming

18  back to work or else.

19    Q    During the period August 24th through

20  September 8th were you paid at all?

21    A    No.

22    Q    Okay.  And assuming this conversation with

155

1    A    Yes.

2    Q    Did you tell anyone that's what you wanted to

3    do?

4    A    Yes.

5    Q    And I assume they said no?

6    A    Yes.

7    Q    And that was the second conversation with Jean

8    Allen, the first with Mr. Austin that you just told me

9    about?

10    A    That conversation was with both of them.

11    Q    Was there another conversation with Jean Allen

12    and Mr. Austin?

13    A    Yes.

14    Q    When was that?

15    A    That must have happened in the last days of

16    August or the very beginning of September and, again, it

17    was more or less a replica and in addition to that I was

18    going through the request of Dr. Yu about my epidural

19    injection and I brought it to her attention that Dr. Yu

20    is saying that it's very important that I have this

21    epidural injection, of course that could relieve the

22    pain and that could mean me returning to work and again,

156

1    I was not getting anywhere, it was the option or else.

2    Q    Okay.  So you returned to work on September

3    8th?

4    A    Yes, I did.

5    Q    And tell me about that first day.

6    A    I went to work on the 8th, I think I was there

7    around 9 o'clock in the morning.  As the hospital

8    arranged, I was to meet Mr. Peter Austin in his office

9    which I did.  My recollection was that he was hostile to

10   me, he was not friendly.  He never asked me about how I

11   feel, not even a single time.  He asked me to sit down

12   and he brought in what I can describe to you as a job

13   description, whether it was a job description or not it

14   wasn't titled as a job description, it was more or less

15   things I have to do now that I can back on duty.  And it

16   was highlighted around the areas of walking the public

17   areas so many times, inspecting so many rooms and so on

18   and so forth.

19   Q    And those would be the things you normally did

20   as the director of housekeeping?

21   A    Absolutely.

22   Q    And I take it from what you're describing, and

158

1    asked me to leave, and I went to my office.

2    Q    And then what happened?

3    A    Then the pain started, severely, mildly to

4    start with because I took my medication the night before

5    so in the morning you're still feeling okay, you can

6    manage from the night before and as the time goes by the

7    effect of the medication goes and the pain just

8    continues to go up and up and up until it comes to the

9    point where you can't take it no more.  So I went to his

10    office, I was in tears.

11    Q    He being Peter Austin?

12    A    Yes, I was in tears not because of anything

13    else, because of the pain.  I went to his office and I

14    told him I just can't, I cannot continue, I need to take

15    my medication.  And my wife in the morning, she put the

16    bottle of Tylenol in my pocket and she said to me just

17    take it in case.  I said I cannot take any medication

18    while I'm working, she said just take it with you.

19        So I went to him and I said I can't, and he

20    said to me well, go home and you come and see us on

21    Monday and meet me in Jean Allen's office on Monday

22    morning because the following day was the Monday so he

159

1   asked me to come in.

2   Q    And that would be Monday, the 10th of

3   September?

4   A    Yes.

5   Q    Did you come in on Monday?

6   A    Yes.

7   Q    Did you come in on Sunday?

8   A    No, he asked me not to.

9   Q    And what happened on Monday?

10   A    I went to the human resources to Jean Allen's

11   office.  I cannot recall that if he was there already or

12   he came a few minutes after I arrived, and he asked me,

13   Jean Allen did not do all of the talking.  He asked a

14   young lady who was doing an administrative assistant

15   role to come to the office.

16   Q    You don't know who that was?

17   A    I can't recall the name.

18   Q    And her title was administrative assistant to

19   Jean Allen?

20   A    I can't remember but she was a young lady who

21   did my termination paper.

22   Q    When you say did it, you mean wrote it?

160

1    A    Yes, she did.

2    Q    Stacey Johnson maybe?

3    A    That could be right.

4    Q    All right.  So in the room it's you, Peter

5  Austin, this woman, maybe Stacey, maybe not, and Jean

6  Allen?

7    A    That's correct.

8    Q    The four of you?

9    A    That's correct.

10    Q    And who said what to begin?

11    A    Well, Peter Austin started talking and they

12  said well, we cannot continue like this any longer, you

13  need to make a decision and I need to know this decision

14  right now.  I need to know if you are capable of coming

15  to work here in the full capacity or as the executive

16  housekeeper without the talk about pain and all this.

17  And if you cannot do that then this is an honorable way

18  for you which is to resign and if these two options are

19  not open for you then there is a third one which will

20  not be your choice but then I will take it and I will

21  separate your service from the company, I will terminate

22  you.

161

1    Q    And I think you said Austin was, I don't know

2    if the right word was upset during your first meeting?

3    A    Hostile.

4    Q    Hostile?

5    A    Yes.

6    Q    Was he hostile in this meeting?

7    A    Yes.

8    Q    Why do you think he was hostile in the first

9    meeting?

10    A    Why he was hostile in the first meeting, I

11    don't know.

12        MS. WALSH:  Objection.

13        THE WITNESS:  I have no idea why he was

14    hostile, I did not really ask him.

15        BY MR. COLES:

16    Q    That's fine.  Do you have an explanation as to

17    why he was hostile in the second meeting?

18        MS. WALSH:  Objection.

19        THE WITNESS:  I can only describe for you what

20    I have seen.

21        BY MR. COLES:

22    Q    Right, and I'm actually asking you what may

162

1   sound like a silly question but I do need to know that

2   there was nothing that he said to say this is why I'm so

3   upset or hostile or anything like that?

4      A    No.

5      Q    There's no information that you have as to why

6   he was so hostile?

7      A    There is no way for me to find out why he was

8   so hostile but he was hostile.

9      Q    No one came to you later and said, you know,

10  Mr. Austin was hostile because whatever?

11     A    No.

12     Q    So you have this meeting on the 10th?

13     A    Yes, sir.

14     Q    He gives you the three options?

15     A    Yes, sir.

16     Q    The same three options as before?

17     A    Yes, sir.

18     Q    Did you present him with your option?

19     A    Yes, I did.

20     Q    And what did he say in response to that?

21     A    No.

22     Q    And what was said after that, did you ask him

163

1  why?

2  A    Yes.

3  Q    And what did he say?

4  A    He tell me we need somebody to come and work

5  full capacity right this second.

6  Q    So then what was said after that?

7  A    What was said, I opened the options, I said

8  give me some time, give me a few days, maybe things will

9  improve, maybe my back will feel better, maybe I can

10  come up with even some money so I can go and have the

11  epidural injection on my own expenses although I knew

12  that this was difficult.

13        I was pleading for time and I was pleading for

14  my job and I even, I started saying things which I

15  wasn't quite sure about, like is there any way I can

16  have a family leave, is there any way I can have

17  personal leave, for instance, is there any way I can

18  have medical leave of absence.

19        I wasn't asking for, it came to the point

20  where I wasn't asking for anything on their part, I

21  wasn't asking for even the insurance to pay anything, I

22  wasn't asking for a check to be re-sent to me, I was

164

1   asking for time so I can go and just take care of, maybe

2   my back would get better.  The answer was no.

3     Q   And were you looking to be paid your salary

4   during the leave?

5     A   No, I wasn't.

6     Q   So you were willing to take a leave without

7   pay?

8     A   Yes.

9     Q   Try to recover, get the injections on your

10   own, if you could, and see if you could return to work?

11     A   Yes.

12     Q   In your mind at that time how was what you

13   were willing to do that I just outlined different from

14   resigning and then coming back to be reemployed later

15   potentially?

16     A   Resigning and coming to be reemployed, I don't

17   understand.

18     Q   What would have been different in your mind

19   had you taken a leave, not been paid, gotten the

20   injection if you could find a way to get that done, how

21   is that different from resigning, trying to get the

22   injection and seeing if you could return to work later?

165

1    A    When you resign a position, in my opinion of

2    course, if you resign a position, that does not entitle

3    you anymore to your job, you resigned.

4    Q    So -- I'm not sure if you were finished.

5    A    I'm finished.

6    Q    So what you were really looking for on top of

7    what I just described was the ability to come back and

8    get your job?

9    A    Yes, I loved my job.

10    Q    You wanted them to specifically hold it open

11    for you?

12    A    No, I did not say anything about open for me

13    or not open for me.  What I suggested basically, please

14    let me repeat what I said, please give me a few days,

15    maybe I can go and do something and come back and be

16    able to work.  Please can you work with me and give me

17    some work where, with some modification so I can work

18    and at the same time be able to keep my job, work with

19    me.  I mean that my whole idea was try to help me and

20    work with me.

21    Q    And when you say a few days, can you give me

22    an idea of how many days you're talking about?

166

1    A    No, I just said help me, give me a few days,

2    maybe I'll get better and be able to come back to work.

3    That was one plea for my job, the second one was can we

4    work on some leave, and the third was, you know, if you

5    guys can just work with me, if you can give me some

6    modification in my work so I can work around my injury

7    and at the same time, you know, keep a job.  Well, the

8    answer in all options I tried was no.

9    Q    To your knowledge within the Omni Shoreham

10    staffing structure as of September 2001 were there any

11    positions that were nonwalking, nonstanding positions?

12    A    I'm not aware of whether the Omni Shoreham had

13    or didn't have, no, I'm not aware of any.

14    Q    I'm not saying if you're aware of what Omni

15    had or didn't have, I'm saying are you aware of a

16    specific position that did not require walking or

17    standing?

18    A    There's positions where you are required to be

19    sitting down, office work a lot of time.

20    Q    What are those positions?

21    A    A PBX operator an administrative assistant for

22    someone, somebody who answers the phone, somebody who

173

1  Second question, "Do you agree with the reason and why"?

2  You said you disagree.  And then it says, "Hotel is

3  aware of physical condition of an," and I don't know

4  what that word is.

5        MS. WALSH:  Accident?

6        THE WITNESS:  Something here on property?

7        BY MR. COLES:

8    Q    Yeah, I mean the syntax doesn't make sense so

9  that's why I'm confused.  "Hotel is aware of physical

10  condition of an accident is possible, but accident here

11  on property."  Let me ask you, you don't know what that

12  word is there, do you?

13    A    No, I do not.

14    Q    All right.  We've gone through your concerns

15  about your termination.  Are there other issues that you

16  haven't yet told me about in terms of why you did not

17  believe you should be terminated?

18    A    I think I've mentioned to you all the

19  circumstances except for the fact that I feel that I

20  have been discriminated against.

21    Q    Discriminated against based on what?

22    A    Based on my testimony on behalf of Sandra

174

1  Taylor.

2    Q    Okay.  And let's hold that for a second then.

3    A    Sure.

4    Q    At least what we see here doesn't appear to

5  relate to anything new as far as you know?

6    A    Yes.

7    Q    So what you've told me about plus the

8  discrimination, those are the only two issues you have

9  with the termination?

10    A    Yes.

11    Q    Okay.  The last one, "What suggestions do you

12  have to make Omni Hotels a better place to work"?  It

13  says essentially, "To be realistic of circumstances,

14  departments understaffed, ask managers above and beyond

15  duty," is that how you read that?

16    A    Can you please repeat reading it?

17    Q    I read it and again it's somebody else's

18  handwriting, it says, To be realistic, hyphen, of

19  circumstances, departments unstaffed, ask managers above

20  and beyond duty?

21    A    Basically what she took 15 or 20 minutes of me

22  telling her about different things and she just sort of

179

1    A    Some time after Sandra was terminated.

2    Q    Before or after you were no longer going to

3    work?

4    A    I was, at that point of time I was no longer

5    at work, I was at home either on, you know, days where I

6    couldn't go to work and then after that went on

7    restricted duties or when I was completely off work.

8    Q    So let me make sure I've got this right, you

9    were still an employee at Omni?

10    A    Yes, I was.

11    Q    So this is before August 24th?

12    A    Yes.

13    Q    So you had at least been told not to go to

14    work for the first time?

15    A    Yes.

16    Q    So it's after July 3rd?

17    A    Yes.

18    Q    And you don't know when in that period but

19    somewhere in that approximate two months?

20    A    Yes.

21    Q    He called you at home and had you ever spoken

22    to him before?

183

1    Q    Any other conversations that you can recall

2   that we have not discussed in full?

3    A    No, sir.  Like I said, again, there may be but

4   I cannot remember right now.

5    Q    So is it your belief that had you not

6   supported Sandra Taylor in her claim of discrimination

7   that Omni would not have terminated you in September

8   2001?

9    A    Yes, sir.

10    Q    What do you base that belief on?

11    A    On the sequence of evidence.

12    Q    Sequence of events?

13    A    Yes.

14    Q    And outline that sequence that you rely on

15   with what happened first, second and third, that

16   sequence.

17    A    The sequence of events when I got injured on

18   the job, I get called at home saying how I was, how I

19   feel, we hope you return back to work and we hope you

20   feel better soon, and anything we can do to you to make

21   you feel better, and let us know how things are going

22   with the insurance company so we can go out there and

184

1  get them to start things working for you, no problems.

2      Then all of a sudden when I go to Jean Allen's

3  office and I get to ask about how I'm going to testify

4  and when I stand up and say this is what I'm going to

5  say and I'm going to say the truth as it happened and

6  then I go to court actually or whatever you want to call

7  it, and I testify, all of a sudden I get calls from

8  Treziak telling me that I was, I spoke to Jean Allen and

9  she said to me that the Omni Shoreham needs you to go

10  back to work right away and your doctor doesn't

11  understand what he is doing.

12      And then after that, they refer me to an

13  independent doctor and the independent doctor decides

14  upon three minutes of examination that I'm fit to go

15  back and do whatever work required without any

16  limitation.  And then the fact that nobody wants to work

17  anything with me, nobody cares what happens to myself or

18  to my family, that lead me to believe that this was

19  pretty much calculated.

20  Q    And let's back up to take that in chunks then.

21  Miss Treziak calls you up and says I talked to Jean

22  Allen, they need you come back, you need to see a doctor

191

1   and I felt it at the time, that repeating several times

2   that as managers we should stick together in order to

3   benefit the corporation we are working for, that felt to

4   me like that I should go on the stand and change my

5   intention of going out there and saying the truth.

6        BY MR. COLES:

7   Q    Okay, but specifically now what action were

8   you threatened with if you didn't change your statement?

9   A    She did not really tell me what was going to

10  happen to me if I didn't.

11  Q    Fair enough.

12       MS. WALSH:  I also want to point out that your

13  interrogatory asks what the legal claims are and our

14  legal contentions are set forth in the complaint.

15       BY MR. COLES:

16  Q    Okay.  Let's see here.

17  A    Are we on the same page?

18  Q    Yes, but I think we've covered that one.  All

19  right, let's see here, I think we've covered most of

20  these, I just want to make sure we haven't missed any.

21       I believe you told me that Mr. Elkhodary told

22  you to go to the hospital on the 11th of June after your

192

1  accident?

2    A    Yeah.

3    Q    I asked you because I thought you told me that

4  he had said go to the hospital one time before that?

5    A    No.

6    Q    He did not?

7    A    No.

8    Q    Page five, sixth paragraph on page five?

9    A    Yes.

10    Q    You read that, that sentence there?

11    A    Yes.

12    Q    So which is correct?

13    A    The 11th.

14    Q    And nothing on the 7th?

15    A    No, on the 7th probably he told me on that

16  particular day to go home early or something like that

17  but on the 7th I did not go to the hospital or he did

18  not tell me to go to the hospital the 7th.

19    Q    Okay.  You mentioned once before that you were

20  going to try to do the epidural and you weren't sure you

21  could afford it.  How much does an epidural injection

22  cost?

197

1   that I was examined by a doctor for three minutes

2   without even touching my back, that should alert my

3   employer to go out there and say we are paying good

4   premiums for insurance company to take a good care of

5   our employees and you are not doing so.  So that is, in

6   my opinion is a good evidence that my employer did not

7   do what they are supposed to do to take care of their

8   employees.

9       Q    But at least as I conceive of it, and you can

10  tell me if you have a different definition, that's not

11  the obstructing the benefits.  That may not be following

12  up as you want them to but that's not on the front end

13  obstructing the benefits in the first place.

14      A    It might be on the surface but it might be

15  when you really go beyond the surface.

16      Q    Explain that, I'm not sure I understand what

17  you mean.

18      A    Meaning that if my company understood that by

19  a doctor who did not examine me professionally and

20  decide on his, in his opinion that I am fit and ready to

21  go back to work without any limitation, by agreeing in

22  principle about this although I have alerted them about

**The George Washington University Hospital**

UHS

Department of Emergency Medicine

**Work Limitation Form**



791258

Name

MR#   E/R   INS 001
BOULOS , TAWFIK
A# Acct #04861976 MR 3204266
10-04-1952  DOS  06-18-01
6 POB WESTCHESTER PAR  MD
COLLEGE PARK       207400000
H Date of Service 2-2346
202-23        Patient Identification

Patient's Name: _____

Provisional Diagnosis/Medical Condition: _lower back chain___

### WORK STATUS CALENDAR

1. Please fill in today's date in the following calendar under the day of the week.
2. Please fill in the employee's work status in the calendar by indicating the appropriate abbreviation in the box of the calendar below.

Abbreviations:  N=No work   A=Altered duty   R=Regular Duty

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| Week 1 | Week 1 A | Week 1 A | Week 1 A | Week 1 A | Week 1 A | Week 1 |
| Week 2 | Week 2 | Week 2 | Week 2 | Week 2 | Week 2 | Week 2 |

### ALTERED DUTY

Altered (light) Duty Restrictions (**Check all that are appropriate**):

- ☐ Must wear splint
- ☐ Use walking aid (cane or crutches)
- ☐ No use of _____ (part of body)
- ☑ No Walking
- ☐ Sitting work
- ☐ No work at heights/No climbing
- ☐ No climbing stairs/ladder
- ☑ No heavy lifting above _18_ pounds
- ☐ Other _____

- ☐ No work above chest height
- ☑ No pushing, pulling or twisting work
- ☐ Keep wound clean and dry. Elevate often.
- ☑ No Carrying above _12_ pounds
- ☐ No performing repetitive movements with _____ (body part)
- ☐ No standing
- ☑ No bending/stooping
- ☐ Elevate, Ice x 20 min 3-4x/d

**EXHIBIT 5**

Follow Up Appt: _Orthopedics ASAP  494-4311_

I have read and understand the above instructions. X _____

Attending Physician Signature

PATIENT'S SIGNATURE
Date  6/18/01

79 1958 (8/97)   White - Medical Records   Yellow - Employer   Pink - Patient

# DEPARTMENT OF ORTHOPAEDIC SURGERY

☐ Robert J. Neviaser, M.D.        ☐ Panos A. Labropoulos, M.D.
   **(202) 994-4386**                     **(202) 994-4388**

☑ Warren D. Yu, M.D.            ☐ Kenneth M. Fine, M.D.
   **(202) 994-4380**                     **(202) 994-4311**

☐ James A. Shaw, M.D.
   **(202) 994-4384**

DATE: _6/26/01_

PATIENT: _Boulos, Tawfik_

WAS EXAMINED TODAY FOR: _BACK PAIN /_
_Lumiated dish_

FOLLOW-UP VISIT: _following MRI_

WORK STATUS:
   FULL DUTY _____
   LIMITED DUTY __✓__    _No lifting_
   NO WORK _____

**RESTRICTIONS: _V/o Dr. Warren yu/_

_(signature)_

THE GEORGE WASHINGTON UNIVERSITY MEDICAL FACULTY ASSOCIATES
2150 PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20037

EXHIBIT
_6_

## DEPARTMENT OF ORTHOPAEDIC SURGERY

☐ Robert J. Neviaser, M.D.          ☐ Panos A. Labropoulos, M.D.
**(202) 994-4386**                         **(202) 994-4388**

☐ Warren D. Yu, M.D.                 ☐ Kenneth M. Fine, M.D.
**(202) 994-4380**                         **(202) 994-4311**

☐ James A. Shaw, M.D.
**(202) 994-4384**

DATE: _7/3/01_

PATIENT: _TAWGIK  BOULOS_

WAS EXAMINED TODAY FOR: _Back  pain_

FOLLOW-UP VISIT: _3 weeks ._

WORK STATUS:
      FULL DUTY_____
      LIMITED DUTY _____
      NO WORK ___ _X_ ___

**RESTRICTIONS:

THE GEORGE WASHINGTON UNIVERSITY MEDICAL FACULTY ASSOCIATES
2150 PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20037



EXHIBIT
7



August 24, 2001

Tawfik Boulos
6200 W Chester Pk Dr, Apt 1712
College Park, MD  20740

RE:    Claim #:          2660155672-001
       Insured:          Omni Shoreham Hotel
       Date of Loss:     06/06/01
       Claimant:         Tawfik Boulos

**Zurich North America**

**Claims**
P.O. Box 195008
Charlotte, NC
28219-5008

Telephone (800) 808-6412
Fax (704) 367-5361
http://www.zurichna.com

Dear Mr. Boulos:

Although I have tried to contact you to discuss your claim I have not been successful; no one answers the phone and you do not have an telephone answering system in place.

We are in receipt of Dr. Gordon's independent medical report that summarizes examination of you. Based on the exam, it is his opinion that any problems you may be experiencing with your back are due to degenerative conditions and are not a result of your injury at work. As such:

1.  You are being returned to work, immediately. Your employer has been advised of your ability to return to work.
2.  We will not authorize any additional medical treatment.
3.  Your temporary total disability benefits will be paid through today, 8/24/01. I will not be paying any additional benefits after this date.

I would have preferred to discuss this with you by phone but, again, my efforts to reach you have been unsuccessful. Should you have any further questions regarding this matter, please contact me to discuss.

Very truly yours,
Zurich Insurance Company

Karen Treciak
Karen Treciak
Claim Specialist
(410) 527-3089



EXHIBIT
10