1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3

4      SANDRA TAYLOR and              )

5      TAWFIK BOULOS,                 )

6             Plaintiffs,             )

7             -vs-                    )  No. 1:05-CV-1175-HHK

8      OMNI HOTELS MANAGEMENT         )

9      CORPORATION and OMNI HOTELS    )

10     CORPORATION,                   )

11            Defendants.             )

12

13            The deposition of PETER AUSTIN, called

14     for examination pursuant to Notice and the Rules of

15     Civil Procedure for the United States District

16     Courts pertaining to the taking of depositions,

17     taken before Wendy A. Killen, a notary public

18     within and for the County of Cook and State of

19     Illinois, at 200 North LaSalle Street, Suite 300,

20     Chicago, Illinois, on the 6th day of March, 2006,

21     at the hour of 9:00 a.m.

22

23     REPORTED BY:  WENDY A. KILLEN, CSR

24     LICENSE NO.:  084-003772

1     A.    30 minutes north.

2     Q.    How long have you worked there?

3     A.    I've worked for Pyramid Hotels since about

4     October 3rd; at the Radisson Hotel for one week.

5     Q.    What hotel did you work at before

6     Radisson?

7     A.    I was at the North Shore Skokie Hotel in

8     Skokie, Illinois.

9     Q.    What is your position at the Radisson?

10    A.    Currently, I am a consultant.

11    Q.    What do you do as a consultant?

12    A.    Currently, right now I am outplacing the

13    employees from the sale of the North Shore Skokie

14    Hotel, help finding them work.

15    Q.    What was your position at the North Shore

16    Skokie Hotel?

17    A.    General manager.

18    Q.    Do you have any plans to leave your

19    current job?

20    A.    No.

21    Q.    Do they have any plans to give you another

22    job?

23    A.    Yes.

24    Q.    And what are your future employment plans,

Page 13

1      A.    They said they wanted to make a leadership

2   change.

3      Q.    After all of those years?

4      A.    Yes.

5      Q.    Was that a surprise?

6      A.    Yes.

7      Q.    Did they provide you any additional

8   explanation other than we want to make a leadership

9   change?

10      A.    No.

11      Q.    Did they give you any kind of package?

12      A.    Yes.

13      Q.    What was your termination date?

14      A.    June 15, 2005.  It was a Wednesday,

15   8:30 a.m.

16      Q.    So you remember this quite well?

17      A.    Very well.

18      Q.    Do you like your new position?

19      A.    Yes.

20      Q.    That's good.

21            It always helps the quality of life to

22   like your job.

23      A.    Yes, it does.

24      Q.    Well, as you've probably already surmised,

1    we are going to talk about the time you were the

2    general manager at the Omni Shoreham?

3         A.    Yes.

4         Q.    I believe you told me that you were the

5    general manager there from May of 2000 to March of

6    2004?

7         A.    Yes.

8         Q.    Is that the only position you held at the

9    Omni Shoreham?

10        A.    I had another position that was titled

11   area managing director.

12        Q.    During what time period did you hold that

13   position?

14        A.    I'm thinking late 2001, for two years,

15   until 2003.

16        Q.    Late 2003?

17        A.    I'm not too sure about those dates.

18        Q.    That's approximate.

19              So you were general manager and then you

20   were the area --

21        A.    Managing director.

22        Q.    And then you went back to being --

23        A.    General manager.

24        Q.    -- general manager?

Page 28

```
 1   the issues that we had with it and understanding

 2   how it worked and how to best utilize it

 3   effectively for the operation.

 4        Q.   You said that was installed in 1999 or

 5   2000 sometime?

 6        A.   I just don't know for sure, but I am

 7   guessing at that time.  It was before I arrived.

 8        Q.   And you say that Mr. Boulos had experience

 9   with this kind of equipment?

10        A.   Yes.

11        Q.   Who was director of housekeeping before

12   Mr. Boulos?

13        A.   I don't know if Sandra Taylor was the

14   acting director of housekeeping at that time before

15   Paul.

16        Q.   What about prior to her?

17        A.   I think when I arrived in the hotel, it

18   was Sandra Taylor.  I'm not sure if we had anybody

19   in between Sandra and Paul or not.  I can't

20   remember.  I don't know.

21        Q.   Can you remember prior to Sandra?

22        A.   No, I can't, because when --

23        Q.   Were you there?

24        A.   I was there.  And Sandra was the acting
```

Page 41

1    terms of the business agent, Mable Boatwright,

2    bringing anything to our attention that she felt

3    the ladies were bringing to her attention, and then

4    my own general impressions in terms of how I felt

5    how clean the hotel was or how well the ladies in

6    housekeeping were performing.

7        Q.    How did you feel about Mr. Boulos'

8    performance?

9        A.    Oh, I liked Paul.  I thought Paul had a

10    great deal of experience and I was particularly

11    happy with the fact that he understood the tunnel

12    washer and being able to make sure that we were at

13    our best in terms of what it was producing for us.

14        Q.    So during the time he was there, you were

15    generally satisfied?

16        A.    Yes.

17        Q.    What about Said?

18        A.    I was satisfied with him as well.

19        Q.    Based on your conversations with Said, how

20    did he feel about Mr. Boulos' performance?

21        A.    Well, I can remember -- I don't -- I don't

22    think there were any issues raised that were of a

23    large concern.  I do believe if anything was

24    raised, it would have been documented somewhere.

Page 42

1       Q.    Do you recall whether Mr. Boulos had any

2    performance problems documented?

3       A.    No, I don't.

4       Q.    Did you ever give him a performance

5    review?

6       A.    No, I did not.

7       Q.    Would that have been your responsibility?

8       A.    No.  That would have been Said's.

9       Q.    Would you have signed off on that type of

10   review?

11      A.    Yes, I would have.

12      Q.    Do employees at the Omni receive a 90-day

13   review?

14      A.    New hires receive a 90-day review.

15      Q.    Would Mr. Boulos have received a 90-day

16   review?

17      A.    Yes.

18      Q.    Is that a policy with Omni that employees,

19   new hires, receive a 90-day review?

20      A.    Yes.

21      Q.    Is it enforced?

22      A.    Yes.

23      Q.    If I told you that Mr. Boulos didn't

24   receive a 90-day review, could you explain why

1    everything.

2        Q.    Did you read these reports?

3        A.    Yes.

4        Q.    Did she also report to you verbally?

5        A.    Yes.

6        Q.    Did you keep a copy of these reports?

7        A.    No.

8        Q.    You mentioned Sandra Taylor earlier.

9              What was her position again?

10       A.    She was assistant executive housekeeper.

11   And I believe at the time that I came to the

12   property, she was also the interim director of

13   engineering -- director of housekeeping.  Sorry.

14   That's the other person, director of engineering on

15   EOC, that makes it seven.  Sorry.

16       Q.    Why was she interim director of

17   housekeeping?

18       A.    I don't believe the hotel at that time had

19   a success in getting a director of housekeeping, so

20   Sandra was basically in charge of the housekeeping

21   department on a daily basis.

22       Q.    Do you know how long she had done that

23   before you stepped in?

24       A.    No, I do not know.

1     Q.    Did she perform all of the duties of the

2 director of housekeeping in this interim time?

3     A.    I believe so.  As time allowed, yes.

4     Q.    Did Ms. Taylor ever complain that anyone

5 at Omni harassed or discriminated against her?

6     A.    Yes.

7     Q.    Who would this be?

8     A.    Sandra would have complained against Said

9 Elkhodary.

10     Q.    When you say earlier you couldn't remember

11 any other complaints --

12     A.    Right.

13     Q.    -- but you can remember Ms. Taylor's?

14     A.    Right.

15     Q.    Why didn't you put that in the list?

16     A.    I guess that's above and beyond what we

17 were discussing I guess is the way I assumed it.

18     Q.    Any other complaints that you remember?

19     A.    Sandra would have been probably it.

20     Q.    So Keeley and Taylor?

21     A.    Yes.

22     Q.    Anybody else?

23     A.    Not that I can remember.

24     Q.    Regardless of level?

1    A.    Right.

2    Q.    And how did you find out about

3  Ms. Taylor's complaint?

4    A.    I can't remember.  I'm not sure if she

5  surfaced it through human resources and they came

6  to see me.  So I'm not too sure how that was

7  surfaced.

8    Q.    Do you remember who the director of human

9  resources was at the time?

10    A.    I believe it was Jean Allen.  I believe it

11  was Jean.  I'm not sure.  It could have been Pam

12  Morgan.

13    Q.    What do you remember about her complaints?

14    A.    I can't specifically remember them.

15    Q.    Do you remember anything about them?

16    A.    Only I think in terms of looking back, I

17  think she would have felt that said was demanding.

18  I remember another complaint about Reeta Rahman,

19  front office manager.

20    Q.    Can you spell the last name?

21    A.    I am going to guess R-a-h-m-a-n, first

22  name R-e-e-t-a.

23    Q.    What did she complain about?

24    A.    She was the front office manager.  She

Page 54

1    complained about Said when she was director of

2    rooms.  She reported to Reeta she felt he was very

3    demanding and always insisting on things being done

4    and felt that he was condescending to her.

5         Q.   What was Ms. Rahman's race?

6         A.   Excuse me?

7         Q.   Her race?

8         A.   Oh, she would have been -- I'm not sure.

9    It would have been Hindi, Pakistani, Indian.  I'm

10   really not too sure.

11        Q.   What about Said, what was his race?

12        A.   He was Egyptian.

13        Q.   And Reeta Rahman was a woman, correct?

14        A.   Yes.

15        Q.   Said is a male?

16        A.   Yes.

17        Q.   Just for the record, what is your race?

18        A.   Caucasian.

19        Q.   Do you recall whether or not Ms. Taylor

20   filed an EEOC charge against Omni?

21        A.   Yes.

22        Q.   Did she?

23        A.   Yes.

24        Q.   Did you ever see that charge?

```
 1      A.   I may have.  I just can't remember

 2  specifically.

 3      Q.   Would it have been common for you to

 4  review a charge?

 5      A.   Yes.

 6      Q.   Was Ms. Taylor's charge or complaint

 7  investigated?

 8      A.   Yes.

 9      Q.   What can you tell me about that

10  investigation?

11      A.   Again, it would have gone through human

12  resources.  They would have done interviews and

13  then they would have gone ahead and surfaced the

14  finding of their interviews to myself.

15          And the regional directors of human

16  resources, anything that was filed with the EEOC, I

17  wouldn't have been surprised if one of them came to

18  the property and also did an investigation as well

19  or been directly involved in the investigation,

20  either Chuck Wing or Paul Pinto.

21      Q.   Regarding Sandra Taylor specifically, do

22  you remember the results of the investigation?

23      A.   No.

24      Q.   Do you recall whether Jean Allen ever gave
```

Page 56

1    you a report?

2         A.    No.   It doesn't mean that she didn't.   I

3    just don't remember that.

4         Q.    Can you remember any conversation you had

5    with Jean Allen regarding any investigation?

6         A.    No.

7         Q.    Do you remember what happened to Sandra

8    Taylor?

9         A.    Sandra was gone before I left, and I

10   honestly can't remember if she resigned or was

11   terminated.

12        Q.    Did Jean Allen ever discuss Mr. Boulos

13   with you?

14        A.    Not that I can remember.

15        Q.    Let me back up.   Let me break this down a

16   little bit.

17              In the context of -- you may not remember.

18        A.    Right.

19        Q.    I asked you a very general question and

20   was going to break it down.   If you don't remember,

21   I am not badgering you.   I am just breaking it

22   down.

23        A.    Understood.

24        Q.    In the context of Sandra Taylor's

Page 57

```
 1   complaints or charge, did Jean Allen ever discuss

 2   Mr. Boulos with you?

 3       A.   I don't remember.

 4       Q.   Do you recall whether Jean Allen ever told

 5   you about her conversation she had with Mr. Boulos

 6   about Sandra Taylor?

 7       A.   I don't remember.

 8       Q.   Did you personally ever discuss Sandra

 9   Taylor's claims with Mr. Boulos?

10       A.   I don't remember and I don't think so, but

11   I don't remember.

12       Q.   Did Mr. Boulos ever tell you his opinion

13   about how Said treated Ms. Taylor?

14       A.   I don't remember.

15       MS. WALSH:  I am going to submit this as the

16   next exhibit.

17                         (Whereupon, Austin Deposition

18                          Exhibit No. 2 was marked for

19                          identification.)

20   BY MS. WALSH:

21       Q.   Have you ever seen this document before?

22       A.   No.  I don't recall seeing it before.

23       Q.   Could you review the document and tell me

24   if you are familiar with the contents?
```

1    A.    Yes.

2    Q.    Yes what?

3    A.    I am aware of the contents.  Sorry.

4    Q.    How did you become aware of -- well,

5    actually, let's just back up.

6         Were you aware that Sandra Taylor claimed

7    that Said had said that there were too many blacks

8    in the Beltsville/College Park area?

9    A.    Yes.  It was a paralegal who had called me

10   from Omni Hotels.

11   MR. COLES:  I am going to instruct the witness

12   not to discuss conversations with anybody at the

13   legal department at Omni.

14   MS. WALSH:  Okay.  That's fair.

15   BY MS. WALSH:

16   Q.    While you were the general manager at the

17   Omni Shoreham, were you aware that Sandra Taylor

18   claimed that Said had discriminated against her

19   based on her race?

20   A.    No.

21   Q.    Do you believe that you had seen this

22   document?

23   A.    Yes.

24   Q.    Can you read Roman Numeral III at the

Page 59

1    bottom of this?

2        A.    I believe that I was discriminated against

3    based upon my race, black, and sex, female, in

4    violation of Title VII of the Civil Rights Act of

5    1964, as amended.

6        Q.    So would it be fair to say that you

7    believe that you have read the document, correct?

8        A.    Yes.

9        Q.    Would it be fair to say that you were

10   aware that Sandra Taylor was claiming race

11   discrimination?

12       A.    Yes.

13       Q.    Does this refresh your memory regarding

14   any of her allegations?

15       A.    Yes.

16       Q.    Can you tell me what you remember now?

17       A.    In terms of reading the document and her

18   feeling that she was discriminated against, yes.

19   In terms of anything specifically relating to my

20   experience, with her and Said, no.

21       Q.    Do you recall that Sandra Taylor alleged

22   that he called her names?

23       A.    No.

24       Q.    Do you recall that Sandra Taylor

Page 60

1   complained that Said yelled at her?

2        A.   I can't remember.

3        Q.   Do you remember whether or not Mr. Boulos

4   was supportive of Ms. Taylor?

5        A.   I can't remember or not.  I just don't

6   remember.

7        MS. WALSH:  Could we take a five-minute break?

8        MR. COLES:  Sure.

9        THE WITNESS:  Sure.

10                    (Whereupon, a short break was

11                     taken.)

12   BY MS. WALSH:

13        Q.   Did Jean Allen tell you that she

14   interviewed Mr. Boulos regarding Sandra Taylor's

15   claims?

16        A.   I don't remember.

17        Q.   Do you recall whether Jean Allen told you

18   that Mr. Boulos would have told her that Said used

19   derogatory Arabic names towards Ms. Taylor?

20        A.   No.

21        Q.   Do you recall her saying that the word

22   elobin was used?

23        A.   No.

24        Q.   Mr. Boulos claimed that elobin means slave

1    in Arabic.

2        A.    Okay.

3        Q.    Do you recall whether or not Jean Allen

4    told you that Mr. Boulos was going to support

5    Sandra Taylor in her allegations against Omni?

6        A.    I believe she did, yes.

7        Q.    What did she say to you?

8        A.    I believe it would have been just a matter

9    of fact in terms of that particular statement.

10        Q.    Do you think Said discriminated against

11    Sandra Taylor?

12        A.    No.

13        Q.    Why not?

14        A.    I don't believe he did because in my

15    observations and interactions with him, he never

16    gave any behavior that would indicate to me that he

17    had any type of racist feelings towards anybody.

18        Q.    Do you believe Said told Mr. Boulos that

19    he shouldn't live in College Park because there

20    were too many blacks?

21        A.    No.

22        Q.    Do you believe Mr. Boulos was lying?

23        A.    Yes.

24        Q.    Why was this again?

Page 62

```
 1      A.   Because my observations and interactions

 2  with Said, he never demonstrated any kind of

 3  behavior or tendencies that would indicate to me

 4  that he was racist to anybody.

 5      Q.   Do you believe that Said called Ms. Taylor

 6  elobin?

 7           Do you believe Mr. Boulos was lying about

 8  that?

 9      A.   Yes.

10      Q.   Why would Mr. Boulos lie?

11      A.   I don't know.

12      Q.   Would you generally consider Mr. Boulos to

13  be a truthful person?

14      A.   Yes.

15      Q.   But you believe he was not truthful in

16  this respect?

17      A.   Yes.

18      Q.   What would Mr. Boulos have gained from

19  supporting Sandra Taylor?

20      A.   I don't know.

21      Q.   Why would he have lied for her?

22      A.   I don't know.

23      Q.   Did Mr. Boulos ever tell you his opinion

24  of Sandra Taylor?
```

1    Sandra Taylor's charges?

2       A.    No.

3       Q.    But you do believe you read the document

4    at the time it was written?

5       A.    Yes.

6       Q.    Would you have received a copy of this

7    document?

8       A.    I believe so.

9       Q.    Would you have kept your own copy of this

10   document?

11      A.    Probably temporarily.

12      Q.    Okay.  Thank you.

13            Now, is it true that you just testified

14   that you don't recall speaking to Mr. Boulos about

15   Ms. Taylor having an unemployment compensation

16   hearing?

17      A.    Speaking to Paul directly about Sandra

18   Taylor's -- yes, I don't recall that.

19      Q.    Did you speak to Jean Allen about her?

20      A.    About Sandra having an unemployment --

21   yes, I'm sure I did.

22      Q.    Do you remember that conversation?

23      A.    Not specifically, no.

24      Q.    But you remember that it occurred?

1       Q.    Did you ever discuss with Allen the fact

2    that Mr. Boulos supported Ms. Taylor?

3       A.    I may have.  I just don't remember

4    specifically.

5       Q.    Would you deny that you talked to her

6    about the fact that Mr. Boulos supported

7    Ms. Taylor?

8       A.    No.

9       Q.    Well, you said earlier that you don't

10   believe Mr. Boulos was telling the truth about

11   Said's alleged treatment?

12      A.    Right.

13      Q.    But you also stated that you felt

14   noncommittal about --

15      A.    Paul's testimony.

16      Q.    Can you explain that?

17      A.    I guess it's just my wanting to make sure

18   that the information that we have is surfaced

19   correctly and that all parties that are involved

20   with it have the same information and that it's

21   beyond my decision-making process.

22           So I don't feel that -- if somebody is

23   going to go ahead and offer testimony that's

24   harmful to the hotel, I don't think it's my

1    light-duty jobs?

2        A.    Yes.  We were told to create whatever job

3    we could to help an individual get back to work.

4        Q.    Who told you this?

5        A.    Well, it was generally understood I guess

6    is the best way to put it.  It was up to your

7    discretion to be able to see if you could do that.

8        Q.    Could a director of housekeeping be placed

9    on light duty?

10       A.    Yes.  Even though they are management,

11    yes, they could be.

12       Q.    What would be a light-duty director of

13    housekeeping job?

14       A.    The light-duty director of housekeeping

15    job would be the schedule, doing the schedule,

16    processing payroll, doing the requisitions for

17    purchasing, purchase orders, meets with vendors, if

18    possible, so anything that would still allow them

19    to do administrative work.

20            They could meet hopefully with their

21    employees in terms of doing any kind of performance

22    appraisals, but anything I guess that would not

23    involve any kind of physical activity like picking

24    up boxes or pushing things around.

Page 90

1       A.    Well, I think because we'd have to be fair

2    and do that with everybody if we did it with one

3    individual.  Being such a large hotel and it wasn't

4    our policy to go ahead and give advances, I don't

5    believe we did.

6       Q.    Did Mr. Boulos ever receive a release to

7    return to work?

8       A.    I don't recall.

9       Q.    Did you ask Mr. Boulos to come back to

10   work?

11      A.    Yes.

12      Q.    If you asked him to come back to work,

13   would it be fair to say he probably received a

14   release?

15      A.    That would be fair.

16      Q.    What would be your position as general

17   manager on an employee that had gotten conflicting

18   diagnoses?

19            For example, if one doctor said an

20   employee could come back to work and another

21   doctor said he can't, what would your response be?

22      A.    Well, I probably would go ahead and want

23   all those for-and-against opinions to be reviewed

24   by people above me to see what their insight would

Page 91

1    be under that kind of a circumstance.  I think it's

2    a gray area and would need to be better defined.

3        Q.    First of all, what people above you?

4        A.    It would have been regional director of

5    human resources, probably Stan Williams as well.

6        Q.    Would you have required that employee to

7    return to work?

8        A.    I don't know.

9        Q.    Would you have required that employee to

10   return to work without this upper-level review?

11       A.    I don't believe so.

12       Q.    Can you recall any situation where you had

13   an injured employee with conflicting medical

14   opinions?

15       A.    No.

16       Q.    So Mr. Boulos injured his back and at some

17   point you asked him to come back to work?

18       A.    Yes.

19       Q.    Can you tell me about that?

20       A.    That would have been a meeting in my

21   office.  I would have asked Paul to come in.  Jean,

22   I believe, would have been present or somebody from

23   human resources certainly would have been present.

24   I would not have done the meeting alone.  It was a

1      A.    I believe it was that following Monday.

2      Q.    What happened?

3      A.    I don't believe he could stay all day.  I

4    think he expressed the fact that he was in too much

5    pain and he had to leave, that he couldn't do his

6    job.  So he decided it would be best for him to

7    leave.

8      Q.    What do you mean best for him to leave?

9      A.    That obviously he was in pain and he

10   didn't feel he could continue for the day, continue

11   his job as director of housekeeping.

12     Q.    Did he ever come back to work for another

13   day?

14     A.    Not that I recall I believe that was his

15   last day.

16     Q.    Did he quit?

17     A.    I don't remember if he officially resigned

18   or not.  I don't remember.  I think I remember the

19   following day was September 11th, and after that, I

20   don't know what happened in terms of the specifics

21   of what was the activity with Paul or not.  I just

22   don't recall that.

23          That next day being September 11th, I just

24   lost that.  I just don't remember what our

1              Then I think I feel that our discussions

2    gave us this option, a meeting with Paul, and

3    asking him to come back to work.

4        Q.    Did you discuss creating a light-duty

5    option with Stan Williams?

6        A.    I can't recall that.

7        Q.    What did Mr. Williams say about the fact

8    that Paul was out?

9        A.    On worker's compensation?

10       Q.    Uh-huh.

11       A.    What his opinion was?

12       Q.    Uh-huh.

13       A.    I'm not sure.  I mean Stan would have

14   dealt with this in terms of the information that he

15   had and conversations with me about Paul.  I don't

16   recall his opinion about it one way or the other.

17       Q.    Did Mr. Williams ever tell you he thought

18   Mr. Boulos was faking his injury?

19       A.    I don't recall that.

20       Q.    You don't believe Mr. Boulos was faking

21   his injury?

22       A.    No, I don't.

23       Q.    Mr. Williams agreed you needed an

24   executive housekeeper in place?

Page 96

1    A.    Yes.

2    Q.    Tell me about your discussion with

3    Mr. Wing.

4    A.    It would have been along the same lines

5    as -- almost the same as Mr. Williams.

6    Q.    These discussions occurred verbally or

7    through some other meeting?

8    A.    Verbally over the phone.

9    Q.    Who made the decision to terminate

10   Mr. Boulos' employment?

11   A.    I would have thought it probably would

12   have been with me at the hotel level with everybody

13   else's feedback.

14   Q.    Did Jean Allen participate in the

15   decision?

16   A.    We certainly would have had discussions

17   about it, yes.

18   Q.    Who would you consider the final decision

19   maker?

20   A.    Myself.

21   Q.    Why was Mr. Boulos terminated?

22   A.    Because he couldn't perform his duties as

23   an executive housekeeper of the hotel, director of

24   housekeeping of the hotel.

1       A.   Yes.

2       Q.   Who filled the position after Mr. Boulos?

3       A.   I think it was -- I'm trying to

4    remember -- Quentin Legg.

5       Q.   Did you hire Mr. Legg?

6       A.   Yes, I would have.

7       Q.   How did you become aware of him?

8       A.   I don't remember.  I mean I think we

9    probably would have advertised for the director of

10   housekeeping position and Quentin would have

11   applied.  I'm not too sure how we would have done

12   that or how the name was supplied to me as a

13   candidate or not.

14      Q.   Did you interview him?

15      A.   Yes.

16      Q.   It's Quentin Legg?

17      A.   Uh-huh.

18      Q.   What made you hire Quentin Legg?

19      A.   Lots of energy, upbeat, seemed positive,

20   polished, youthful, experienced, so he seemed to be

21   able to perform the role.

22      Q.   How long did it take to replace

23   Mr. Boulos?

24      A.   45, 60 days.

1          I think he was not as good as Paul when it

2     came to the laundry.  I think they both were

3     fairly -- all of the administrative tasks, payroll,

4     scheduling and stuff, fairly equal when it came to

5     that.

6          Q.   Do employees who are leaving go to exit

7     interviews?

8          A.   Yes, they do.

9          Q.   Did Mr. Boulos have an exit interview?

10         A.   Not that I remember specifically.

11         Q.   Were you involved in his exit interview?

12         A.   No.

13         Q.   If there had been an available position,

14    could Mr. Boulos have returned to Omni after he

15    recovered?

16         A.   I believe so.

17         Q.   Do you deny he could have returned?

18         A.   Do I deny it?

19         Q.   Uh-huh.

20         A.   No.

21         Q.   Why wouldn't he have been able to return?

22         A.   I can't think of a reason why he would not

23    have been able to return.

24         Q.   While he was out for his injury on

Page 105

1  worker's compensation before you asked him to

2  return?

3       A.    I believe Paul was injured in June and

4  then I believe the meeting we had in terms of

5  coming back to work would have been in September,

6  so three months.

7       Q.    And you asked him to come back then

8  because the hotel was busy?

9       A.    Yes, have him come back, yes.  We needed a

10  director of housekeeping.

11       Q.    Was the hotel not busy earlier in the

12  year?

13       A.    It was busy earlier in the year, yes.

14       Q.    Why didn't you ask him to come back in

15  July?

16       A.    That's the summer season and the summer

17  season, July and August, there isn't as much

18  activity as the fall convention season.

19       Q.    Did you offer Mr. Boulos a light-duty

20  opportunity?

21       A.    No.  I don't believe I offered Paul a

22  light-duty opportunity.

23       Q.    Why not?

24       A.    I know he didn't ask.  But also I don't --

1    A.    Yes.

2    Q.    Would you have authorized the change in

3    the policy regarding light duty?

4    A.    In terms of not offering it?

5    Q.    Yes.

6    A.    I would not have authorized that, no.

7    Q.    If I told you that Jean Allen represented

8    during Paul Boulos' worker's compensation

9    proceeding that Omni did not offer light duty after

10    9/11, would you have any reason to disbelieve this?

11    A.    I would have no reason to disbelieve it.

12    Q.    Why would she make this statement?

13    A.    I don't know.

14    Q.    Was it a true statement?

15    A.    I can't remember offering Paul Boulos

16    light duty.

17    Q.    No.  If Jean Allen represented that Omni

18    as a hotel no longer had light duty after 9/11,

19    would that be true?

20    A.    No, to my -- no.  We would still have

21    light duty.

22    Q.    If I told you that she had, in fact, made

23    this statement, made this representation, would you

24    have any reason to doubt it?

Page 112

1    interest to fire him?

2        A.    The decision that was made was in the best

3    interest of the hotel.

4        Q.    Was Mr. Boulos a consideration?

5        A.    Absolutely.

6        Q.    Do you recall Mr. Boulos telling you that

7    the doctor who gave him the second opinion only

8    spent a couple of minutes with him, maybe three

9    minutes with him?

10       A.    I don't recall.

11       Q.    Do you deny that Mr. Boulos' IME only

12   spent three minutes with him?

13       A.    No.

14       Q.    Would that have impacted your decision to

15   terminate his employment?

16       A.    I don't know.  I don't think it would

17   simply because I needed a director of housekeeping.

18       Q.    Could the Omni Shoreham have given

19   Mr. Boulos an advance to receive epidural

20   injections for his back?

21       A.    I don't -- could we have?

22       Q.    Uh-huh.

23       A.    Well, we certainly could have, but I don't

24   believe we did.

1    before Paul went out on worker's compensation.

2        Q.    Do you recall when Sandra Taylor filed her

3    EEOC charge?

4        A.    No, I do not.

5        Q.    Does looking at a document refresh your

6    recollection?

7        A.    Yes.

8        Q.    If I referred to you Exhibit Number 2

9    marked today, would that refresh your recollection?

10       A.    Yes.

11       Q.    Could you please tell me when that was

12   signed, when that was filed?

13       A.    It looks like June 12, 2001.

14       Q.    Okay.

15       A.    June 12th of 2001.

16       Q.    And would this review have been done after

17   it came to light that Mr. Boulos was going to

18   support Sandra Taylor in her race discrimination

19   claim?

20       A.    I do not know.

21       Q.    Well, does July 2nd follow June 12th?

22       A.    Yes.

23       Q.    But you told me before, correct, that you

24   don't remember any performance problems with

1    Mr. Boulos?

2        A.    Correct.

3        Q.    Generally speaking, how would you address

4    a performance problem?

5        A.    Generally speaking?

6        Q.    Uh-huh.

7        A.    Define what the performance issue is, then

8    meet with the person having the performance issue

9    and review that with them.

10       Q.    And then what after you reviewed the

11   problem?

12       A.    See about any corrective action that could

13   be taken for improvement, agree upon that

14   corrective action, and then put it in place.

15       Q.    Would this be in writing?

16       A.    Yes.

17       Q.    Would you consider this to be discipline?

18       A.    I would call it coaching for improved

19   performance.

20       Q.    You wouldn't call it discipline?

21       A.    No.

22       Q.    Would an employee who had performance

23   problems be subject to progressive discipline

24   procedures?

Page 119

1      A.    If they occurred again, yes.

2      Q.    If the performance problems occurred

3  again, what would happen?

4      A.    Then it would be a written warning.  They

5  would be asked to improve again.  It would be a

6  defined measure of success, and then that would be

7  reviewed at a specific timeframe.

8      Q.    You would consider poor performance

9  misconduct?

10     A.    Poor performance as misconduct, yes.

11     Q.    You would consider poor performance to be

12  misconduct?

13     A.    Yes.

14     Q.    Subject to progressive discipline?

15     A.    Yes.

16     Q.    Was this Omni's policy or yours?

17     A.    Omni's.

18     Q.    Would poor performance be listed under the

19  categories to which progressive discipline would be

20  applied?

21     A.    There were various categories for ratings,

22  yes.

23     Q.    But the first time you wouldn't consider

24  it discipline?

Page 120

1    A.    No.   The first is a coaching session,

2  coaching for improved performance.

3    Q.    Did you ever coach Mr. Boulos on his

4  performance?

5    A.    Not that I can remember.

6    Q.    Are you a doctor?

7    A.    No.

8    Q.    Are you qualified to gauge a person's

9  physical abilities?

10    A.    No.

11    Q.    Could you diagnose Mr. Boulos?

12    A.    No.

13    Q.    When you stated earlier that you didn't

14  offer him light duty because he seemed to be in

15  pain, what makes you qualified to make that

16  determination?

17    A.    I'm not.

18    Q.    Why did you make that determination?

19    A.    Based on my observations of Paul, the way

20  he was moving, I didn't feel that he would be able

21  to perform.

22    Q.    But you stated earlier that directors of

23  housekeeping are hard to find and valuable

24  employees; would that be correct?

Page 121

1      A.    Absolutely.

2      Q.    Wouldn't it have been in Omni's best

3  interest to give it a try?

4      A.    I don't know.  I think at that time I

5  needed to go ahead and make decisions for our

6  business.  Our business required having a director

7  of housekeeping.

8      Q.    If Mr. Boulos had been able to come back

9  at 75 percent capacity, would that have been in

10  Omni's best interest?

11      A.    If he had been given a work release?

12      Q.    Yes.

13      A.    If he had been given a work release to

14  return to work, yes.

15      Q.    If Mr. Boulos had been given a release

16  from a doctor to return to work and could have come

17  back at 50 percent capacity, would you have allowed

18  him to come back?

19      A.    Yes.

20      Q.    What if he had come back with a release at

21  35 percent capacity?

22      A.    Yes.

23      Q.    25 percent capacity?

24      A.    Yes.

Page 122

1    Q.    Is there a point at which that you would

2  have said no, you are not useful enough for us

3  regardless and you cannot come back?

4    A.    As long as he had a work release, we would

5  have put him on, taken him back, found something or

6  done something.

7    Q.    And he wanted to return, of course?

8    A.    Yes, of course.

9    MS. WALSH:    I am going to submit this document

10  as the next exhibit.

11                              (Whereupon, Austin Deposition

12                               Exhibit No. 6 was marked for

13                               identification.)

14  BY MS. WALSH:

15    Q.    Mr. Austin, could you review and tell me

16  if you've ever seen this document before?

17    A.    Yes.

18    Q.    Where have you seen it?

19    A.    Because it's in e-mail format to me, I

20  would have seen it at the hotel.

21    Q.    Can you describe it for the record?

22    A.    This is an e-mail from Jean Allen to me,

23  Peter Austin, subject, Paul Boulos, done on

24  August 9th of 2001.

Page 129

1    Q.    Do you recognize that handwriting?

2    A.    I will guess and say Jean Allen.

3    Q.    Is it your handwriting?

4    A.    No.

5    Q.    Did you draft this letter?

6    A.    I don't remember.

7    Q.    Do you deny you drafted this letter?

8    A.    No.

9    Q.    Did Jean Allen draft this letter?

10   A.    She may have.

11   Q.    Would Jean Allen have signed your name to

12   a letter?

13   A.    No.

14   Q.    So at some point you reviewed this letter

15   if your name is at the bottom?

16   A.    Yes.

17   Q.    Can you read, please, the sentence that

18   starts based on this decision?  It's in the middle

19   of the second paragraph.

20   A.    Based on this decision, I need you to

21   resume your position as executive housekeeper by

22   Monday, October 1, 2001.

23   Q.    When was this letter drafted?

24   A.    It doesn't have a date.

1    Q.    Can you recall from personal recollection

2  when this letter was drafted?

3    A.    No, I honestly do not.

4    Q.    Why did you say October 1st?

5    A.    I don't remember.

6    Q.    Why did it change to September 8th?

7    A.    I don't remember.

8    Q.    Would you read the last sentence of that

9  paragraph, please?

10    A.    If you are able to return at a later date,

11  we will reconsider your candidacy for any

12  comparable position that is available at the time.

13    Q.    You testified earlier that you would

14  reconsider hiring Paul if --

15    A.    Yes.

16    Q.    -- he reapplied; is that correct?

17    A.    Yes.

18                    (Whereupon, Austin Deposition

19                     Exhibit No. 10 was marked for

20                     identification.)

21  BY MS. WALSH:

22    Q.    Would you please look at this document and

23  tell me if you recognize it?

24    A.    This is my handwriting, so I do recognize

Page 131

1    it.

2        Q.    Take a minute to review it and please

3    identify it for the record.

4        A.    Yes.  It's a handwritten document that is

5    my handwriting listing the expectations for the

6    director of housekeeping.

7        Q.    Do you recall when this document was

8    written?

9        A.    No, I don't recall when.

10       Q.    Can you give me a general idea of why this

11   document was written?

12       A.    Clarity of expectations.

13       Q.    Was this written prior to the time Paul

14   came back to work?

15       A.    I honestly don't know.

16       Q.    Would you deny that you wrote it before

17   Paul returned to work?

18       A.    No.

19       Q.    Now, would it be correct to say that the

20   first paragraph talks about 18 issues in Lucia

21   Ortega's housekeeping assessment of September 7th?

22       A.    Yes.

23       Q.    And the second paragraph states the 26

24   checklist items?

1          (Whereupon, Austin Deposition

2          Exhibit No. 12 was marked for

3          identification.)

4    BY MS. WALSH:

5        Q.    Could you please review and tell me if you

6    have seen this document before?

7        A.    Yes.

8        Q.    Where have you seen it?

9        A.    At the Omni Shoreham Hotel.

10        Q.    Can you tell me what it is?

11        A.    It's the 26 checklist tasks.

12        Q.    The same 26 checklist items that are

13    identified in your handwritten memo?

14        A.    Yes.

15        Q.    So would it be fair to say these are the

16    two documents you were referencing when you wrote

17    this note?

18        A.    Yes.

19        Q.    Now, you stated earlier that Mr. Boulos

20    hadn't had any performance problems?

21        A.    As far as my memory, yes.

22        Q.    Mr. Boulos had been injured, correct?

23        A.    Yes.

24        Q.    You stated he was in pain, correct?

1    A.    Yes.

2    Q.    Did I ask you when this was written?

3    A.    You asked me and I said I didn't remember.

4    Q.    Was this ever shown to Paul?

5    A.    That I don't remember.  I think I

6  referenced September 7th in the handwritten -- is

7  that separate from this other exhibit that was

8  handed out?

9    Q.    No.  You are correct.

10    A.    September 7th.

11    Q.    Can you read the last sentence of the

12  first paragraph?

13    A.    Target dates are to be established today,

14  September 8th.

15    Q.    Would it be fair to say this document was

16  written on September 8th?

17    A.    Yes.

18    Q.    Did you meet with Paul Boulos on

19  September 8th?

20    A.    That was a Saturday.  Yes.

21    Q.    Did you go over this memo with Mr. Boulos?

22    A.    I can't remember.

23    Q.    Would you deny that you went over the 26

24  checklists and the 18 issues?

1      A.    No.

2      Q.    So you have an injured worker with no

3  prior performance problems sitting in your office

4  his first day back and your meeting starts off with

5  here are the 26 things you have to do and the 18

6  things that are wrong, if you don't do them right,

7  we are going to subject you to progressive

8  discipline?

9      A.    No.  That's not how the meeting starts.

10      Q.    Well, correct me, please.  How did the

11  meeting start?

12      A.    I asked him how he is doing, how he's

13  feeling.  Then we would go ahead and talk about the

14  need for having a director of housekeeping in the

15  hotel, how busy we've been, how sorry we are that

16  he is not in the hotel performing the job because

17  our volume is very strong and we very much need to

18  have him back in the hotel, we want to have him

19  performing as director of housekeeping, we want him

20  back, and we want to give him this list so he

21  understands what the expectation is for when he

22  does come back as a director.

23      Q.    You stated earlier, however, someone

24  without performance problems wouldn't be subjected

1    to progressive discipline; their first visit would

2    be a coaching?

3        A.    Yes.

4        Q.    Why with Paul Boulos was it mentioned

5    here?

6        A.    Well, I think because he had previous

7    coaching with Said in terms of some

8    performance-related issues.

9        Q.    So Said had coached him earlier?

10       A.    Yes.  I believe it's in one of these

11   exhibits.

12       Q.    Would you be referencing the exhibit that

13   was created after he was no longer at work?

14       A.    I believe you are correct, yes.  That was

15   documented after in July, when Paul left in June.

16       Q.    How could Said have coached Paul on his

17   performance when he was no longer working?

18       A.    It would have been difficult at best.

19       Q.    Do you have any personal knowledge that

20   Said ever coached Paul on his performance?

21       A.    Do I personally, no.

22       Q.    Have you ever seen a document showing that

23   Said coached Paul on his personal performance?

24       A.    No, I don't remember seeing one.

Page 139

1      A.   I am sure there could be items that are

2   missing.

3      MS. WALSH:   I am going to submit this as the

4   next exhibit.

5                     (Whereupon, Austin Deposition

6                      Exhibit No. 13 was marked for

7                      identification.)

8   BY MS. WALSH:

9      Q.   Could you review this document and tell me

10  if you have seen it before?

11     A.   Yes.

12     Q.   Can you identify this document, please?

13     A.   This is a handwritten document, my

14  handwriting, on September 8th of 2001 recapping a

15  meeting I had with Paul Boulos.

16     Q.   Did you regularly keep records of your

17  meetings with employees?

18     A.   Yes.

19     Q.   Every time an employee came into your

20  office, you made a handwritten note?

21     A.   No.   I had scheduled one-on-ones, so I

22  would meet with a division head once a week, once

23  every other week.   I would write down what we

24  discussed in handwriting.   I would put it in my

1    file for our discussion in the next two weeks.

2        Q.    Why did you document this meeting?

3        A.    This meeting?

4        Q.    Yes.

5        A.    I felt it was important to be able to

6    document what was discussed.

7        Q.    Why?

8        A.    I felt it was necessary to be able to do

9    so because I wanted to be able to have an accurate

10   representation of the meeting.

11       Q.    Could you read the heading?

12       A.    9:05 a.m., meeting with Paul Boulos.

13       Q.    Written on what date?

14       A.    September 8th of 2001.

15       Q.    Could you read the first bullet point,

16   please?

17       A.    Walks gingerly, but able to move without

18   shuffling feet.

19       Q.    Didn't you testify earlier he was in a lot

20   of pain and he was shuffling his feet?

21       A.    Yes.

22       Q.    Can you explain the discrepancy?

23       A.    Lapse in memory.

24       Q.    So which is correct?

1       A.      I don't remember.

2       Q.      Can you please read the sentence, please,

3   beginning with reviewed cover page?

4       A.      Reviewed cover page, Lucia Ortega's

5   18-point assessment, 26-point checklist.

6       Q.      Just go ahead and read that whole

7   paragraph.

8       A.      This is the expectation and Paul was told

9   he will be successful with it.  If not, his

10  performance will be measured against each point of

11  the documents and the progressive disciplinary

12  process will take place.

13      Q.      So would it be fair to say you did discuss

14  these documents with Mr. Boulos?

15      A.      Yes, that is fair to say that.

16      Q.      Did you, in fact, discuss these two

17  documents with Mr. Boulos?

18      A.      Yes.

19      Q.      Would you consider this to be a very

20  sympathetic way to welcome somebody back to a job?

21      A.      I think it's just a documentation of the

22  actual meeting itself.  I think you go ahead, greet

23  somebody, speak with them.  How it's presented says

24  volumes about the way you go ahead and feel about

Page 146

1    Q.    Would it be fair to say that this document

2    states that Dr. Yu, Paul's doctor, had a

3    conflicting diagnosis with the worker's

4    compensation physician?

5    A.    Yes.

6    Q.    Did you send Paul for a third opinion?

7    A.    Not that I can recall.

8    Q.    Why not?

9    A.    I don't remember.

10    Q.    Would you deny that you sent him for a

11    third opinion?

12    A.    No.

13    Q.    Does this document state that you sent him

14    for a third opinion?

15    A.    No.

16    Q.    What was Paul's final day at work?

17    A.    I believe it was September 10th.

18    Q.    Had he had a third opinion at this point?

19    A.    Not that I can ascertain from this memo.

20    Q.    Would it be correct to say you testified

21    earlier that in a case such as this, you would send

22    an employee for an additional opinion?

23    A.    I believe what I said is that I would need

24    to go ahead and consult with our corporate office

Page 147

1    about the circumstances and get their feedback on

2    their recommendations.

3        Q.    Did you consult with the corporate office

4    in this case?

5        A.    I can't remember, but I would have to.   I

6    would be inclined to say yes, I did.

7        Q.    Who did you consult with?

8        A.    It would have been Chuck Wing, Stan

9    Williams.

10       Q.    Did either Chuck Wing or Stan Williams

11   tell you that Mr. Boulos could not have a third

12   opinion?

13       A.    I can't remember if they would have said

14   that or not.

15       Q.    Did Mr. Wing tell you that he wanted Omni

16   to terminate his employment?

17       A.    If that's what was recorded here in this

18   memo, yes.

19       Q.    Did you write this memo?

20       A.    No, I don't believe I wrote this memo.

21       Q.    Who wrote this memo?

22       A.    I believe it's from Jean.   It's from Jean.

23   I believe Jean wrote it.

24       Q.    Did you edit this memo?

1    Boulos.

2        Q.    Whose signature is in these blanks?

3        A.    Stacy Jackson from human resources, Jean

4    Allen, human resources, and my initials.

5        Q.    That little circle thing is your

6    signature?

7        A.    Yes, initials.

8        Q.    All right.  And can you tell me what is

9    written in the comments section?

10       A.    Involuntary resignation, was unable to

11   fulfill requirements of his position.

12       Q.    And under termination, there is a block

13   marked termination code, correct?

14       A.    Yes, there is.

15       Q.    Then there is a block that says

16   eligibility for rehire?

17       A.    Yes.

18       Q.    Can you tell me what is checked?

19       A.    For no eligibility for rehire, no looks

20   checked.

21       Q.    Didn't you tell me earlier you would've

22   rehired Paul?

23       A.    Yes.

24       Q.    Why is this box checked?

Page 150

1      A.    I can't remember.  Special circumstances.

2   I don't know what that would be.

3      Q.    Who checked this box?

4      A.    It would have been Jean Allen.

5      Q.    Did you tell Jean Allen to check no?

6      A.    I can't remember.

7      Q.    Do you deny that you told her to check no?

8      A.    No.

9      Q.    Isn't it true that you told Jean Allen to

10  check no or whoever checked this box because Paul

11  had supported Sandra Taylor?

12     A.    No.

13     Q.    You didn't want him to come back because

14  he was a problem employee?

15     A.    No.

16     Q.    But you can't explain why?

17     A.    Correct.

18     Q.    Did Paul ever try to come back to work for

19  the Omni Shoreham?

20     A.    Not that I know of.

21     Q.    While you were general manager?

22     A.    No.

23     MS. WALSH:  I am going to submit this as the

24  next exhibit.

Page 156

1    BY MS. WALSH:

2        Q.    Could you review this document, please,

3    and tell me if you've seen it before?

4        A.    Yes.

5        Q.    Could you identify this document?

6        A.    It looks like a letter of offer to Quentin

7    Legg dated September 14th of 2001.

8        Q.    Is this document signed by you?

9        A.    This document is signed by me, yes.

10        Q.    So when was Quentin offered the director

11    of housekeeping position?

12        A.    September 14th.

13        Q.    What day was Paul terminated?

14        A.    September 10th.

15        Q.    So how many days passed before you filled

16    Paul's position?

17        A.    It looks like four.

18        Q.    Does this refresh your recollection as to

19    when Mr. Legg was first contacted?

20        A.    No.  I still don't know when he was first

21    contacted.  Based on the chronology of this

22    particular letter, it would have had to have been

23    earlier obviously for interviews and whatever.

24        Q.    How long before September 10th did you

1      Q.    Do you know what day he testified for

2   Sandra Taylor at her unemployment compensation

3   hearing?

4      A.    I do not know the date.

5      Q.    If I told you that it was September 6th,

6   would you have any reason to doubt that?

7      A.    No.

8      MS. WALSH:   I will submit this as the next

9   exhibit.

10                      (Whereupon, Austin Deposition

11                       Exhibit No. 21 was marked for

12                       identification.)

13   BY MS. WALSH:

14      Q.    Would you review this please and tell me

15   if you have seen the document before?

16      A.    Yes.

17      Q.    And when and where have you seen this

18   document?

19      A.    At the Omni Shoreham Hotel.

20      Q.    And what is it?

21      A.    It's the meeting minutes for the Executive

22   Operating Committee dated April 2, 2002 written by

23   myself and distributed to members of the Executive

24   Operating Committee.

Page 159

1    Q.   Can you turn to the second page, please,

2    Bate's stamped 492?

3    A.   Yes.

4    Q.   Can you read the second bullet point under

5    Jean Allen/Human Resources?

6    A.   Light-duty program still in place.  It is

7    important that the medical provider knows what

8    positions are light duty and what they entail.  An

9    associate on light duty needs to provide a medical

10   note from their physician on a regular basis so

11   they can remain on light duty.

12   Q.   Thank you.  So isn't it the case that Omni

13   had a light-duty program?

14   A.   Yes.

15   Q.   And isn't it true that you testified

16   earlier that Omni had always had a light-duty

17   program?

18   A.   Yes.

19   Q.   Thank you.  That's all for that.

20   MS. WALSH:   I'm going to submit this as the

21   next exhibit.

22                      (Whereupon, Austin Deposition

23                       Exhibit No. 22 was marked for

24                       identification.)

1    work?

2         A.    Yes.

3         Q.    Could you have modified his job even

4    though he had been released by a doctor?

5              Could you, as general manager, at your

6    discretion alter his job duties, alter the job

7    duties of director of housekeeping?

8         A.    As released on light duty?

9         Q.    No.   Light duty aside, as general manager,

10   can you alter the job duties of director of

11   housekeeping?

12        A.    Yes.

13        Q.    Could you have altered Mr. Boulos' job

14   duties?

15        A.    Yes.

16        Q.    Could you have given the physical part of

17   his job duties to another employee to perform?

18        A.    Yes.

19        Q.    Could you have done this despite the fact

20   he was no longer on worker's compensation, did not

21   qualify for the light duty?

22        A.    Yes.

23        Q.    Did you, in fact, do this?

24        A.    No.

1    Q.    Can you explain why you did not?

2    A.    For continuity with all of our decision

3    making in terms of being able to make sure that

4    everybody was performing at the level they were

5    required to do by their job description.

6    Q.    So didn't you testify earlier you would

7    have let him come back had he performed at

8    50 percent?

9    A.    Yes.  If he is released on light duty,

10   absolutely -- maybe I'm getting confused.

11        That's key to me.  If he has been released

12   on light duty, I would certainly go ahead and do

13   everything to make sure that we can find a position

14   or at least change his responsibilities so he can

15   come back to the hotel.

16   Q.    But you wouldn't do that if he had gotten

17   a full release?

18   A.    A full release, correct.

19   Q.    Full release from the doctor, you would've

20   refused to alter his duties?

21   A.    Right.  Correct.

22   Q.    You would have said to him you have been

23   released to full duty, I am not altering your job,

24   come back and perform at 100 percent or don't come

*Letter never sent*

Paul Boulos
6200 Westchester Park Drive
Apartment  #1712
College Park, Maryland 20740

Dear Paul,

　　I have been reviewing your medical status through Human Resources and I hope you are feeling better at this point.  I am concerned because there seems to be no definitive time frame for your treatment nor a possible date of when you might be able to return to your position.  I am also concerned because you have not contacted Said or me regarding your status.

　　The absence of an Executive Housekeeper at this hotel has had a major impact on the department and the associates.  We have had a couple of Omni Task force Managers operating the department on a daily basis but it is not feasible or economical to continue with that practice.  Based on the forecast for the remainder of the year, I have made a decision that we need to have a full time Executive Housekeeper in place capable of maintaining our four diamond standards.  Based on this decision, I need you to resume your position as Executive Housekeeper by Monday, October 1, 2001.  If you are unable to return and perform the designated responsibilities of the position, your employment with the hotel will be terminated.  If you are able to return at later date, we will reconsider you candidacy for any comparable position that is available at the time.

　　Please feel free to contact me to discuss this issue further.

PeterAustin

General Manager
Omni Shoreham Hotel
2500 Calvert Street
Washington, D.C. 20008

002235



EXHIBIT
Austin
9
3-6-06
tabbies

## Director of Housekeeping Expectations

### Priority
Establish target dates to complete and maintain the solutions to the 18 issues in Susan Ortega's Housekeeping Assessment of Sept 7. Since most are carry overs from her assessment of January 2001, and since each have action steps, it is expected that a short turn around be accomplished. Target dates are to be established today, Sept 8.

### Check-list
• The 26 check list items are given to you so focus on task expectations can be readily accessible and understood.

### Evaluation
• Any evaluation of your performance will be based on your ability to complete the above. It is expected that you will do so successfully. These are minimum requirements and not all inclusive. Failure to move forward with tangible results, will require the hotel to intervene in accordance with its progressive disciplinary process

EXHIBIT
10

002224

## Omni Shoreham Hotel Housekeeping Assessment

Lucia Arteaga –July / August-2001
9/7/2001 5:30 PM

**Issue:** Setting up next day for coverage of all dirty rooms.
**Recommendation:** Although attempts are made to cover the day, the amount of call offs makes it virtually impossible to be consistently covered. The am dispatcher appears reluctant to use the correct formula to ensure the day is covered. All am dispatchers should be retrained on the correct formula. Anticipated dirty rooms to be cleaned that day should be multiplied by .57 (budgeted) and divide by 8 hours to come up with the appropriate number of guest room attendants needed for the day. Management has been retrained to check house counts and staffing levels the day prior in order to ensure more time is allotted to make necessary changes to the weekly schedule.

**Issue:** Room Status Updates (reporting accuracy)
**Recommendation:** On-going re-training of all guest room attendants is essential in turning rooms over on a more timely basis. The attendants should be made aware of the importance of accuracy in punching in rooms on a regular basis. Guestroom attendants need to be held accountable for dropping rooms or simply not documenting accurately. The scheduled inspectors should refocus their daily activities on expediting vacant clean rooms and reporting down to the dispatcher with departures and discrepancies on a more timely basis. Inspectors should be supplied with a daily check off report every morning. Expected departures, VIP arrivals and show rooms should be highlighted on the check off list. As the day goes on, the supervisor should ensure they are focusing on departures that way when the departure report is run at 11:30am, they already have an idea of the status of the majority of rooms thus providing the Front Office with information much quicker then they have become accustomed to. This requires constant monitoring by management.
*No change in this recommendation since the January assessment*

**Issue:** VIP room procedures
**Recommendation:** In house and VIP arrivals are now reviewed at the am stand up meeting. These rooms should be switched to dirty status in order to protect the room prior to being inspected by a Housekeeping manager (all show, care and VIP rooms should be inspected by a manager every day). Once the rooms have been inspected and approved by a manager, they should then be communicated to the Front Office.
*No change in this recommendation since January*

**Issue:** Reporting maintenance issues
**Recommendation:** This needs to become a daily routine with all housekeeping managers and associates. While this issue has improved from the last assessment, there are still visible maintenance needs that go unreported daily. Work order forms have been made readily available to associates. Associates should receive regular reminders on the expected items to place on work orders and those that should be called down immediately.

**Issue:** Productivity/Staffing
**Recommendation:** Associates must be held accountable for punching in and out accurately. Payroll / productivity issues have been noted due to associate's inability to punch properly. It is recommended that one-on-one rap sessions be conducted with habitual offenders in order to reduce future violations (counseling form provided to Angela).
The current amount of supervisory staff on the floors is inadequate to handle the expected cleanliness. It is recommended that floor inspector positions be raised to at least six floor inspectors (current supervisors: 3). The staffing increase recommended would ensure better quality of guest rooms. The administrative assistant position should be eliminated and replaced with a floor supervisor. Overstaff situations need to be monitored and associates sent home if needed.

**Issue:** Organization
**Recommendation:** The Director of Housekeeping office was found much the way it was left in January. There was no organized filing system. There was no visible purchases history, vendor information, productivity history, etc. The Director of Housekeeping office has now been reorganized. Office areas have been cleaned and should be kept clean. Daily records are now kept only four months out (previous records dated back three years). The daily task chart should be done daily and kept in the daily records.

002200



EXHIBIT
Austin
11
3-6-06

**Issue**: Laundry
**Recommendation:** A permanent Manager needs to be appointed to this area in order to alleviate the pressure of the Assistant Director of Housekeeping. **The current linen inventory is not adequate to handle the needs of the hotel.** On a daily basis the department is set up to fail. The current inventory must be raised above a two-par level in order to reduce frustrations felt by associates and guests. It is recommended that Food and Beverage linen inventories be conducted on a regular basis and information regarding variances to par levels be provided to the Director of Housekeeping. F&B linen par levels are currently not set. Laundry associates have worked under high pressure for a considerable amount of time and should be commended for their efforts.

**Issue**: Guest supplies inventories
**Recommendation:** Accurate record keeping has not taken place. Purchasing of need items is difficult to do since there is nothing to base history on. Pricing information should be updated.
Paul Boulos was trained on the guest supply consumption spreadsheet however it has not been used.

**Issue:** Daily tasks
**Recommendation:** A daily departmental task chart was provided in January however it was not used consistently. The daily task chart has been reintroduced and should be consistently used in order to ensure daily tasks are not forgotten.
*No change in this recommendation since January*

**Issue:** Incentive Programs
**Recommendation:** A copy of a point system incentive program for guestroom attendants was given to Paul. There is no record of any incentive program implemented since the last visit in January. It is recommended that a program be introduced in order to increase morale, ensure ownership of section assignments and track progress of guest room attendants. The supervisor inspection form was revised with scoring capabilities. Scoring inspection forms will aid management with the evaluation / counseling process.

**Issue:** Uniforms area cleanliness
**Recommendation**: It was recommended on the last visit that this work area be addressed as soon as possible. The area appeared untouched since my last visit in January. The uniform area has been completely organized and cleaned. Associates responsible for this area need to be held accountable for regular cleanliness.

**Issue:** Guest Room Cleanliness
**Recommendation:** The recommendation for an increase in supervisory staff (and appropriate training) cannot be stressed enough. There is an overall lack of leadership on the guest floors. The introduction of the point system inspection form will provide visible proof to the staff of inadequacies. The current new hire training process sets associates up to fail. A ten-day new hire training agenda has been provided for guest room attendants. Management must be involved in the new hire training process in order to ensure success for the associate and the department.

**Issue:** Documented weekly walk through
**Recommendation:** There is no record of a weekly walk through being conducted by the Director of Housekeeping. It is recommended that the Director of Housekeeping conduct a weekly documented walk through in order to communicate consistent expectation of cleanliness throughout the hotel.

**Issue:** Site inspection preparedness
**Recommendation:** It is recommended that the site inspection form information be transferred to the communication log and relayed to the AM Manager to review at the morning stand up meeting. The show rooms should be inspected by management and turned over to the Front Office at an appropriate time.
*No change in this recommendation since January*

002201

**Issue:** Associate Documentation / Accountability

**Recommendation:** It is recommended that the standards set in my recent visits continue. The recent standards set are expected and required in order to ensure that the utmost service is provided to the external and internal guest. Allowing associates to continue to "abuse the system" is aiding the whole department to fail and only contributes to the animosities and negativities currently felt. All associates must be consistently held accountable for adhering to attendance and punctuality policies as well as treating each other with respect. Associates must come to a realization that it is not okay to raise voices and show hostile body language.

**Issue:** Management Technical ability

**Recommendation:** The lack of basic Excel and Kronos knowledge is holding current management back. . The current administrative assistant is just as lacking in basic computer skills as management. It is recommended that the administrative assistant position be eliminated since it has not proven beneficial to the department. It is recommended that the Director of Housekeeping and Housekeeping Managers go through Excel, Kronos, Word and e-mail training. Angela and Pablo appear unable to understand the department productivity measurable and how it affects the department on a daily, weekly and monthly basis. It is extremely important that these managers be trained on and understand this measurable in order to ensure that department productivity levels be brought back down to expected and most certainly attainable goals.
*Management training conducted on 8/15/01 (see agenda)*

**Issue:** Payroll

**Recommendation:** It is recommended that Naseem and Paul train in Kronos procedures and Angela re-train in order to ensure better payroll and coding accuracy. Associates are currently crossing over into other positions that are not cross coded in Kronos aiding to the inaccuracies of payroll. It is recommended that associates scheduled in several positions be cross-coded immediately via payroll action forms. The current extra pay tracking procedures have not provided associates with the needs they require. On a weekly basis paycheck issues arise due to inadequate checks and balances on extra pay tracking. The extra pay tracking procedure has been changed to ensure better accuracy on a daily basis.

**Issue:** Interview Process

**Recommendation:** It is recommended that Angela, Naseem and Pablo re-train on conducting effective interviews. The screening process needs to eliminate interviewees not suitable for our four diamond expectations. A list of standard questions to ask during the interview process has been provided. It is recommended that both Angela and Naseem interview potential new hires and involve supervisors and or seasoned sectional housekeepers in order to ensure a "good fit"and reduce potential high turnover.


Consistency in basic standards must above all be adhered to. Associates have been receptive to all expectations / accountabilities (including negative ones). There is a general need and welcome to any leadership shown. While most tasks proved challenging at the beginning of my employ here, I have been awarded with positive feedback from the majority of the staff. I accomplished nothing but the basic needs for the department. It is of the utmost importance that associates be shown leadership, accountability and care on a consistent level in order to ensure the success of the department. The department has been shown nothing but inconsistency from a department management level for far too long.

002202



## Director of Housekeeping Task Expectations

1) Complete involvement in weekly schedules
2) Complete involvement in tracking of extra pay records
3) Complete knowledge of payroll system (Kronos)
4) Complete involvement in daily payroll edits and final payroll
5) Follow up on associate payroll issues
6) Daily, weekly, monthly productivity tracking to Director of Rooms
7) Complete involvement in monthly purchasing of needed supplies
8) Use of corporate consumption tracking spreadsheet (to justify purchases)
9) Purchase order tracking of supplies ordered and received
10) Daily review of previous day records
11) Complete involvement in associate coach and council situations
12) Complete adherence of problem / solution process (i.e.: write up documentation)
13) Maintain an organized office area
14) Maintain a clean work environment
15) Inspect VIP and show rooms regularly
16) Documented weekly walk through (rooms and public areas)
17) Ensure attendance records (controller) are updated daily. Review attendance issues regularly.
18) Review and ensure proper staffing every day (no over or under staffing)
19) Check house counts throughout day, ensure rooms being turned in a timely manner
20) Ensure aware of all light duty associates (restrictions and due back on regular duty dates)
21) Ensure Moments of Service audits done regularly
22) Complete involvement in guest supply and linen inventories
23) Complete knowledge of property management system (Libica)
24) Complete involvement in associate evaluations
25) Ensure effective communication is taking place between department managers
26) Coordinate special projects

002228



**EXHIBIT**
Austin
12
3-6-06

FORM NO. HR 104.1 - 5/9

9/10/01
DATE

# OMNI HOTELS

## PERSONNEL INFORMATION FORM

| LAST NAME Boulous | FIRST NAME Tawfik | MI | DEPARTMENT |
|---|---|---|---|

| ADDRESS 1 | | CITY | STATE | ZIP |
|---|---|---|---|---|

| ADDRESS 2 | | CITY | STATE | ZIP |
|---|---|---|---|---|

| PHONE | SOCIAL SECURITY NUMBER | SEX | MARITAL STATUS | BIRTH DATE | EEO CODE |
|---|---|---|---|---|---|

## EMPLOYMENT STATUS

### TYPE OF EMPLOYMENT

| NON-EXEMPT | | EXEMPT |
|---|---|---|
| ☐ | FULL TIME | ☐ |
| ☐ | PART TIME | ☐ |
| ☐ | TEMPORARY | ☐ |
| ☐ | CASUAL | ☐ |
| UNION_____ | | |

JOB CODE _____

JOB TITLE _____

HIRE DATE _____

OUTLET NAME _____

### TRANSFER

FROM: _____   TO: _____

DEPT._____   DEPT._____

JOB TITLE_____   JOB TITLE_____

JOB CODE _____   JOB CODE _____

LOCATION_____   LOCATION_____

## COMPENSATION STATUS

### REASON FOR INCREASE

☐ MERIT   ☐ PROMOTION   ☐ TRANSFER   ☐ ADJUSTMENT

HOURLY RATE _____   % OF INCREASE_____

### SALARY REVIEW

EFFECTIVE DATE_____

NEXT REVIEW _____

### LEAVE OF ABSENCE

| Start Date | Return Date | Reason |
|---|---|---|
| | | |

### REQUEST FOR VACATION

| Advance Pay Req. ☐ Y  ☐ N | From (DATE) | To (DATE) | No. of days taken |
|---|---|---|---|

IF LEAVE IS APPROVED, ASSOCIATE MUST READ AND SIGN:

I AGREE TO RETURN TO WORK ON THE ABOVE STATED DATE. I REALIZE THAT FAILURE TO DO MAY BE CONSIDERED A VOLUNTARY RESIGNATION. THE ABOVE INFORMATION IS ACCURATE AND TRUE.

SIGNATURE OF ASSOCIATE: _____

### COMMENT SECTION

*Involuntary Resignation*

*Was unable to fulfill requirements of his position*

### TERMINATION

LAST DAY WORKED        TERMINATION CODE   Special Circumstances

ELIGIBILITY FOR REHIRE   Y  ☒

### SIGNATURES

| ASSOCIATE   H.K. Stacy Jackson | DATE 9/14/ |
|---|---|
| DIVISION HEAD | DATE |
| GENERAL MANAGER | DATE 9/20/ |
| HUMAN RESOURCES DIRECTOR | DATE 9/20/ |

EXHIBIT
Austin
1  10-06
2  -06
3  06

## INSTRUCTIONS

000386

Please complete this form for:

Vacations
New Hires
Rate Changes

Leave of Absence
Termination
Transfer

Form **NOT** needed for:

Holiday
Sick Pay

Jury Duty
Bereavement Pay

**The George Washington University Hospital**

UHS

**Department of Emergency Medicine**
**Work Limitation Form**

791258

Name

MR# E/R INS 001
BOULOS, TAWFIK
Acct #04861976 MR 3204266
10-04-1952 DOS 06-18-01
6 DOB WESTCHESTER PAR MD
COLLEGE PARK 207400000
HC Date of Service -2346 SEX M
202-23 8709
Patient Identification

**Patient's Name:** _____

**Provisional Diagnosis/Medical Condition:** _____ back chain _____

---

### WORK STATUS CALENDAR

1. Please fill in today's date in the following calendar under the day of the week.
2. Please fill in the employee's work status in the calendar by indicating the appropriate abbreviation in the box of the calendar below.

   Abbreviations:   N=No work   A=Altered duty   R=Regular Duty

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| Week 1 | Week 1 A | Week 1 A | Week 1 A | Week 1 A | Week 1 A | Week 1 |
| Week 2 | Week 2 | Week 2 | Week 2 | Week 2 | Week 2 | Week 2 |

---

### ALTERED DUTY

Altered (light) Duty Restrictions (**Check all that are appropriate**):

- ☐ Must wear splint
- ☐ Use walking aid (cane or crutches)
- ☐ No use of _____ (part of body)
- ☑ No Walking
- ☐ Sitting work
- ☐ No work at heights/No climbing
- ☐ No climbing stairs/ladder
- ☑ No heavy lifting above _10_ pounds
- ☐ Other _____

- ☑ No work above chest height
- ☑ No pushing, pulling or twisting work
- ☐ Keep wound clean and dry. Elevate often.
- ☑ No Carrying above _10_ pounds
- ☐ No performing repetitive movements with _____ (body part)
- ☑ No standing
- ☑ No bending/stooping
- ☐ Elevate, Ice x 20 min 3-4x/d

**Follow Up Appt:** _Ortho pract s ASAP  491-1311_

I have read and understand the above instructions. X _____

PATIENTS SIGNATURE

_____
Attending Physician Signature

_____
Date

EXHIBIT
Austin
17
3-16-06

**The George Washington University Hospital**

UHS

Department of
Emergency Medicine
Work Limitation
Form

791258

| Name | E/R    INS  001 |
|---|---|
| | BOULOS ,TAWFIK |
| MR# | A# 104830922 MR 3204266 |
| | 10-04-1952  DOS  06-11-01 |
| Acct # | 6200 WESTCHESTER PAR  MD |
| | COLLEGE PARK      20740 |
| DOB | HOME  301-982-2346  SEX  M |
| | WORK  202-234-0700  F/C  I |
| Date of Service | |

Patient Identification

**Patient's Name:** Boulos Tawfik

**Provisional Diagnosis/Medical Condition:** _____
_____ lumbar strain, pm/b lumbar strain



## WORK STATUS CALENDAR

1. Please fill in today's date in the following calendar under the day of the week.
2. Please fill in the employee's work status in the calendar by indicating the appropriate abbreviation in the box of the calendar below.

Abbreviations:   N=No work   A=Altered duty   R=Regular Duty

EXHIBIT
Austin
10
3-6-06
tabbies®

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| Week 1 | Week 1 /NO WORK 6/11 | Week 1 /NO WORK | Week 1 2nd | Week 1 A | Week 1 A | Week 1 A |
| Week 2 A | Week 2 Return | Week 2 | Week 2 | Week 2 | Week 2 | Week 2 |

## ALTERED DUTY

Altered (light) Duty Restrictions (**Check all that are appropriate**):

- ☐ Must wear splint
- ☐ Use walking aid (cane or crutches)
- ☐ No use of _____ (part of body)
- ☑ No Walking minimal
- ☐ Sitting work
- ☑ No work at heights/No climbing
- ☑ No climbing stairs/ladder
- ☑ No heavy lifting above 10 pounds
- ☐ Other

- ☑ No work above chest height
- ☑ No pushing, pulling or twisting work
- ☐ Keep wound clean and dry. Elevate often.
- ☑ No Carrying above 10 pounds
- ☐ No performing repetitive movements with _____ (body part)
- ☐ No standing
- ☑ No bending/stooping
- ☐ Elevate, Ice x 20 min 3-4x/d

**Follow Up Appt:** 6/18/01 ED × 8-10 am for workers at ____ clinic

I have read and understand the above instructions. X _____

PATIENTS SIGNATURE
6/11/01

**Attending Physician Signature** _____                    **Date** _____

White - Medical Records    Yellow - Employer    Pink - Patient Copy    Gold - ER Copy