# ORIGINAL

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                             :

SANDRA TAYLOR, et al.,         :
                             :

        Plaintiffs,        :

                             :

    vs.                 : Civil Action No.
                           : 1:05-CV-01175

                           :

OMNI HOTELS MANAGEMENT CORP. ,   : Judge
et al.,                 : Henry Kennedy

                           :

        Defendants.        :

                           :
- - - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, January 19, 2006

    The deposition of JEAN ALLEN, called for

examination by counsel for the Plaintiffs in the

above-entitled matter, pursuant to notice, at the

law offices of The Goldsmith Law Firm, 1900 L

Street, N.W., Suite 614, Washington, D.C., convened,

pursuant to notice, at 9:08 a.m., before Catherine

B. Crump, a notary public in and for the District of

Columbia, when were present on behalf of the

parties:

1      Q     They didn't bring counsel to the
2  hearing?

3      A     No.

4      Q     Okay.  What did Mr. Boulos say that day?

5      A     He provided his perceptions of what he
6  felt occurred.

7      Q     What did he state those perceptions to
8  be?

9      A     That he felt Sandra was a good employee.

10     Q     Did he state that she had been treated
11  unfairly?

12     A     I do not remember the specifics of what
13  he said during that unemployment hearing.

14     Q     Did he support Sandra Taylor's claim
15  that she had been discriminated against?

16     A     I do not remember if he was that
17  specific.

18     Q     Did he testify as to any remarks about
19  race or derogatory remarks Said may have made about
20  Sandra?

21     A     He brought up the neighborhood issue
22  again.

1         Q     Did he bring up anything about comments
2    in Arabic?
3         A     I do not remember that.
4         Q     Did he bring up any comments about race?
5         A     The comments I remember about race were
6    in the context of the neighborhood discussion.
7         Q     Had you ever before the hearing talked
8    to Mr. Boulos about Sandra Taylor's application for
9    unemployment?
10        A     No.
11        Q     Had Ms. Taylor filed for unemployment
12   compensation at the time of the first meeting with
13   Mr. Boulos?
14        A     No.
15        Q     At any time before the hearing, had you
16   discussed that she had filed for unemployment
17   compensation with Mr. Boulos?
18        A     No.
19        Q     How did you find out he was going to
20   testify?
21        A     I didn't know.
22        Q     How does that work for these hearings;

1        Q      Did Zurich terminate Mr. Boulos'

2    workers' comp benefits?

3        A      Yes, because it was determined that his

4    injury was based on a degenerative condition, not

5    the injury that he sustained during his employment

6    with Omni.

7        Q      Who determined this?

8        A      An independent physician.

9        Q      Who was this independent physician?

10       A      His name, I do not remember.

11       Q      How is it that Mr. Boulos ended up in at

12   an independent physician?

13       A      Because there was a discrepancy as far

14   as opinions of the other two physicians.  So in that

15   case, you go to an outside independent physician to

16   make a final determination.

17       Q      Who sent Mr. Boulos to an independent

18   physician?

19       A      It was part of the process for workers'

20   comp if there's a question.

21       Q      Who made the decision that Mr. Boulos

22   needed to go see another doctor?

1          A     I do not know who actually made that

2  decision.

3          Q     Was it someone at Omni?

4          A     I do not know.

5          Q     You don't know or you don't recall?

6          A     I don't recall.

7          Q     Okay.  How would it be that someone

8  would ever be sent to get a second opinion?

9          A     Because his physician is saying one

10 thing.  The physician with Zurich is saying another.

11 So in fairness to the individual, you say, okay,

12 we'll seek a third opinion.

13         Q     Did you seek a third opinion in Mr.

14 Boulos' case?

15         A     The independent physician whom I just

16 referenced.

17         Q     Okay.  Let me get this straight.  Mr.

18 Boulos had his own doctor who had one opinion?

19         A     Yes.

20         Q     Did Zurich send him to another doctor?

21         A     With any workers' comp, there is a

22 physician that he's also evaluated by.

```
 1              A F T E R N O O N     S E S S I O N

 2                                        [1:27 p.m.]

 3              BY MS. WALSH:

 4        Q     I think we left off talking about Mr.

 5 Boulos' termination.

 6        A     Okay.

 7        Q     And I want to make sure that I

 8 understand what's been said.  Just to revisit

 9 briefly, you and Mr. Austin jointly made the

10 decision?

11        A     Yes.

12        Q     To terminate Mr. Boulos?

13        A     His employment, yes.

14        Q     And did you tell me--would it be

15 accurate to say that one of the reasons that you

16 terminated his employment is because the independent

17 doctor said he could come back to work?

18        A     No.  That was not why we terminated his

19 employment.

20        Q     Tell me again why you terminated his

21 employment.

22        A     He could not fulfill the
```

1  responsibilities of his job.   That is the reason we

2  terminated his employment.

3         Q      Would you have terminated his employment

4  if he had not gotten a release?

5         A      Since he did get the release, I think

6  that's a difficult question for me to answer.

7         Q      Did the release factor into your

8  decision to terminate his employment?

9         A      Only that he was released to come back

10 to work full time to his assume his normal job

11 responsibilities.

12        Q      What did the release tell you?   Did you

13 believe the release?   Did you believe that he could

14 come back?

15        A      Yes.

16        Q      Why did you believe he could come back?

17        A      Because it had been determined after the

18 examination that he was in a condition that he could

19 come back and fulfill the responsibilities of his

20 position.

21        Q      And he came back; is that correct?

22        A      He came back and worked a day.

1  special circumstances.

2          Q     What were some of the codes?

3          A     Oh, gosh.  I don't remember them at the

4  time.

5          Q     Were they numbers or words?

6          A     They were letters.

7          Q     What would be the categories?  You don't

8  have to tell me what A, B, and C are.

9          A     It could be termination for gross

10 misconduct.  It could be abandonment of job, you

11 know, whatever label you wanted to give to quantify

12 somebody's reason for leaving.

13         Q     And there is a yes-no box next to the

14 words "eligibility for rehire"; is this correct?

15         A     That's correct.

16         Q     What box is checked?

17         A     On this form, the no box is checked.

18         Q     Why is the no box checked?

19         A     At the time, you know, I don't really

20 remember why we checked that no box, quite honestly.

21 I don't remember why it was checked.

22         Q     Was Paul Boulos a good employee?

1          A      I am not one to judge his employment.

2          Q      Why would you have checked that box?  I

3    mean how did you come to the decision to check this

4    box if you didn't know anything about him?

5          A      Typically, if somebody is terminated,

6    they're not eligible for rehire.

7          Q      But these are special circumstances.

8          A      I understand that.

9          Q      I'm sorry?

10         A      I understand that.

11         Q      Okay.  I'm a little confused on that.

12   If he had gotten well--he hadn't engaged in any

13   misconduct.  Correct?

14         A      As far as I know, he had not engaged in

15   any misconduct, correct.

16         Q      As far as you know, he hadn't been

17   insubordinate.  Correct?

18         A      To the best of my knowledge.

19         Q      Did Peter Austin tell you to check this

20   box?

21         A      No.

22         Q      It was your decision alone to check this

1   box?

2        A    I was following policy.

3        Q    And policy states that regardless of the

4   reason for termination, you can't be rehired?

5        A    It states that if somebody is terminated

6   for employment with the company, they are not

7   eligible for rehire.

8        Q    All right.  Would the H.R. director need

9   permission to terminate an employee?

10       A    Permission from?

11       Q    Well, I guess who would be above you?

12  Peter Austin.  Would you need permission from Peter

13  Austin to terminate an employee?

14       A    No, but I out of my relationship with

15  him would discuss it with him.

16       Q    Okay.  Would the H.R. director or Peter

17  Austin need permission from corporate to terminate

18  an employee?

19       A    No.

20            MS. WALSH:  Okay.  I'd like to submit

21  this as the next exhibit.

22                        [Allen Exhibit No. 2 was

1          A      That is correct.

2          Q      Would he have read this memo?

3          A      I don't know.

4          Q      Would he have received this memo if he

5     had been copied on it?

6          A      If he had been copied, he should have

7     received it, yes.

8          Q      You stated to me earlier that you didn't

9     discuss Sandra Taylor's unemployment compensation

10    filing or hearing with Paul Boulos; is that correct?

11         A      Her unemployment, yeah.  I did not--I

12    mean I don't remember the time line, but the

13    conversation with Paul Boulos dealt with the EEO

14    charge and how he was feeling.  It had nothing to do

15    with unemployment.

16         Q      Isn't it true that sometime between your

17    initial conversation with Paul Boulos and his

18    termination that you did talk to him about the fact

19    that Sandra Taylor is going to have an unemployment

20    compensation hearing?

21         A      I really do not remember because I do

22    not remember when that took place.

1   Q So you didn't believe him when he looked

2 like he was in pain and said he was in pain?

3   A I did not say I didn't believe him.  I

4 do not know.

5   Q Wouldn't it be logical if you have an

6 employee sitting in front of you, saying I hurt too

7 much to work, what can we do to help you do your

8 job?

9   A I really cannot respond to that.

10   Q Isn't it true that you and Peter Austin

11 didn't offer Paul any assistance in coming back and

12 simply terminated him?

13   A No, that is not true.

14   Q Why is that not true?

15   A We offered him his job back.

16   Q Did you offer to alter the

17 responsibility of his job even temporarily so he

18 could perform?

19   A No.  It's not a type of job that can be

20 altered.

21   Q So he doesn't qualify, even if he had

22 been on workers' comp, for light duty?

1 stipulated that there was no light duty available

2 after September 11, 2001?

3       A    Well, that was an unusual circumstance,

4 and that's very true.  After 2001, we had to lay off

5 almost everybody in the hotel.  We had no business.

6 So we had no light duty program.

7       Q    Didn't you say you always had a light

8 duty program while you were there?

9       A    Yeah, but September 11th was a little

10 unusual.  We can't have a light duty program and

11 have people working if your own associates aren't

12 working.  Nobody was working in the hotel.

13       Q    Let me find what I'm looking for.

14            Here we go.  When did business start to

15 pick back up?

16       A    You mean after September 11th?

17       Q    Um-hum.

18       A    Probably not until the beginning of the

19 following year, 2002.  We had a lot of groups cancel

20 because nobody wanted to come to D.C.

21       Q    So would a light duty program been back

22 in place in the beginning of 2002?

9/10/01
DATE

FORM NO. HR 104.1 - 5/9

# OMNI HOTELS

## PERSONNEL INFORMATION FORM

| LAST NAME Boulous | FIRST NAME Tawfik | MI | DEPARTMENT |
|---|---|---|---|

| ADDRESS 1 | | CITY | STATE | ZIP |
|---|---|---|---|---|

| ADDRESS 2 | | CITY | STATE | ZIP |
|---|---|---|---|---|

| PHONE | SOCIAL SECURITY NUMBER | SEX | MARITAL STATUS | BIRTH DATE | EEO CODE |
|---|---|---|---|---|---|

## EMPLOYMENT STATUS

| TYPE OF EMPLOYMENT | | TRANSFER | |
|---|---|---|---|

**NON-EXEMPT**   **EXEMPT**

☐ FULL TIME ☐    JOB CODE _____

☐ PART TIME ☐    JOB TITLE _____

☐ TEMPORARY ☐

☐ CASUAL ☐    HIRE DATE _____

UNION_____    OUTLET NAME _____

FROM: _____   TO: _____

DEPT. _____   DEPT. _____

JOB TITLE _____   JOB TITLE _____

JOB CODE _____   JOB CODE _____

LOCATION _____   LOCATION _____

## COMPENSATION STATUS

| REASON FOR INCREASE | | | | SALARY REVIEW |
|---|---|---|---|---|

☐ MERIT   ☐ PROMOTION   ☐ TRANSFER   ☐ ADJUSTMENT

HOURLY RATE _____   % OF INCREASE _____

EFFECTIVE DATE _____

NEXT REVIEW _____

| LEAVE OF ABSENCE | | | REQUEST FOR VACATION | | | |
|---|---|---|---|---|---|---|
| Start Date | Return Date | Reason | Advance Pay Req. ☐ Y ☐ N | From (DATE) | To (DATE) | No. of days taken |

**IF LEAVE IS APPROVED, ASSOCIATE MUST READ AND SIGN:**

I AGREE TO RETURN TO WORK ON THE ABOVE STATED DATE. I REALIZE THAT FAILURE TO DO MAY BE CONSIDERED A VOLUNTARY RESIGNATION. THE ABOVE INFORMATION IS ACCURATE AND TRUE.

SIGNATURE OF ASSOCIATE: _____

## COMMENT SECTION

Involuntary Resignation

Was unable to fulfill requirements of his position

## TERMINATION

LAST DAY WORKED

TERMINATION CODE   Special Circumstances

ELIGIBILITY FOR REHIRE  Y  ☒

### SIGNATURES

| ASSOCIATE | DATE |
|---|---|
| H.K. Story Jackson | 9/14/ |
| DIVISION HEAD | DATE |
| GENERAL MANAGER | DATE |
| HUMAN RESOURCES DIRECTOR | DATE |

## INSTRUCTIONS

000386

Please complete this form for:

Vacations
New Hires
Rate Changes

Leave of Absence
Termination
Transfer

Form NOT needed for:

Holiday
Sick Pay

Jury Duty
Bereavement Pay

ALLEN

EXHIBIT NO. 7

C. CRUMP 1/19/06



# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA<br>☒ EEOC | 100A10683 |

D.C. Office Of Human Rights _____ and EEOC
*State or local Agency, if any*    EEOC FIELD OFFICE

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Sandra E. Taylor    2001 JUN 12 A II 25 | (301) 931-0080 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 11236 Cherry Hill Rd., Beltsville, MD 20705  L ST NW | 01/04/1947 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Omni Shoreham Hotel | Cat D (501 +) | (202) 234-0700 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 2500 Calvert St., N.W., Washington, DC 20008 | 001 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN<br>☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER (Specify) | EARLIEST        LATEST<br>06/03/2001<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I.      On 4/5/99, I commenced working for Respondent as an Assistant Executive Housekeeper in the Housekeeping Department. I was qualified to hold this position with approximately ten years of prior executive housekeeping managerial experience with another hotel. In approximately 1/01, Said Elkhodary, a higher level Room Division Manager, told my supervisor, Paul Boulos, a lower level Executive Housekeeper, that he should not move to the "Beltsville/College Park area" because there are "too many Blacks there." Subsequently, in 2/01, I was unjustifiably demoted from Assistant Executive Housekeeper to Laundry Manager based upon Said Elkhodary's false accusation that I did not perform well enough. Moreover, a non-Black, male individual has been hired by Respondent to replace me as the Assistant Executive Housekeeper. On 6/3/01, I was forced to resign from my position as Laundry Manager due to this intolerable treatment.

II.     In 2/01, Paul Boulos told me that I was demoted because Said Elkhodary, Room Division Manager, had declared that my work was not good enough.

III.    I believe that I was discriminated against based upon my race, Black, and sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br><br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Month, day and year) |

Date *June 12 01*    *Sandra E Taylor*
Charging Party (Signature)

EEOC FORM 5 (Rev. 07/99)

000098                                            FILE COPY

OMNI SHOREHAM HOTEL

MEMORANDUM

To: File

From: Jean Allen

Re: Paul Boulos

Date: 6/29/01

On 6/28/01, Vicki and I called Paul Boulos at home. We inquired about his back and if he had been scheduled for his MRI. He told us that he was still waiting for confirmation and we told him that we would follow up with Walter. I then told Paul that Vicki and I wanted to discuss something confidential with him. I explained to him that Sandra Taylor had filed a charge of discrimination with EEOC and that he had been mentioned in the charge.

I began to read the charge when he interrupted me and said "no, I was not employed with the hotel on 1/01". I explained to him that the statement was prefaced as "approximately 1/01" and that it did not mean that it was the exact date. I then proceeded to read the statement regarding Said telling him "not to move to the Beltsville/College Park area 'because there are too many blacks there'". He responded "no" (inferring, but not stating that he did not say it), "would you like me to come in tomorrow to discuss it"? I told him that I would appreciate him coming in and reviewing the charge and the other references to him in the documentation.

When he came in on 6/29/01, he visibly appeared to be in pain based on his facial grimaces and that he seemed to be walking with a great deal of difficulty. Vicki and I met with him and asked how he was feeling. He stated that his doctor had released him to return to work, however there were restrictions regarding what he could lift. I told him based on how he appeared that maybe he should wait a few more days before returning to work. He said that he was in a lot of pain and hoping that his doctor could prescribe him something for the pain.

I told Paul that Vicki and I wanted to review the EEOC charge that I had discussed with him on the phone the day before. I began by stating that what we were discussing was confidential. He quickly responded by asking "who knows"? I told him that Mr. Austin, Charles, Said, Vicki and I were the only ones that knew about the charge. I read half of the first paragraph related to the charge and asked if he had relayed the statement regarding "too many blacks in the Beltsville/College Park area". He thought for a moment and then said that he

000001

ALLEN

EXHIBIT NO. 5

C. CRUMP 1/19/06

was concerned because either way he responded to the question there would be consequences. He voiced his concern regarding retaliation if he were to support Sandra's statement. He seemed to infer that the retaliation would come from Said because he was his manager. I explained to him that I was conducting an investigation related to the charge and I wanted an honest answer. I informed him that retaliation against an associate is illegal and not acceptable in the work environment. What was interesting to note during this discussion was that he changed his position, straightened up in his chair and had no expression of discomfort (related to his back pain). I told him that if he did not want to respond to the question, that he could choose not to answer. He said that he did not want to answer the question.

When I began asking him questions regarding Sandra's performance, he said that he felt she was a good performer. He implied that Said was the one that had issues with her performance. I asked him if he had discussed Sandra's move to the Laundry with her and explained that it was not a demotion. He said that he had spoken with Sandra and that she would not accept that it was not a demotion.

He stated that Sandra felt that Said had no respect for her and humiliated her on several occasions. I asked him if he had ever observed Said treating Sandra in this manner. He responded that an incident had occurred in the Laundry, prior to Sandra giving notice. He said that Sandra was in the middle of explaining something to Said and that Said did not allow Sandra to finish her statement and "snapped at her". I asked him what he had meant by "snapping at her" and he said that he "raised his voice" at her and then left the Laundry.

During our conversation, my perception was that Paul took very little ownership for Sandra's performance issues. It seemed (from what he had said) that Said was to blame for Sandra's feelings of discontent.

When we concluded the meeting with Paul, he stated that he "thought that I was mad because he would not answer the initial question of whether or not he quoted Said as making the comments about Beltsville and the black population". I told him that my concern was honesty. He said that he would think about it for a couple of days and then let us know if he wanted to respond to the question.

000002

**Human Resources**

# Memo

*Draft*

*Please review + I*
*will edit on Wednesday*
*+ haven't proofed!*

| | |
|---|---|
| **To:** | File |
| **Prepared By:** | Vikki Finn |
| **Present:** | Paul Boulos, Executive Housekeeper<br>Jean Allen, Director of Human Resources<br>Vikki Finn, Human Resource Manager |
| **CC:** | Mr. Austin, General Manager |
| **Date:** | 07/03/01 |
| **Re:** | Conversation of 06/29/01 with Paul Boulos regarding EEOC Claim submitted by Sandra Taylor, former Laundry Manager |

Jean Allen, Director of Human Resources asked Paul Boulos "When are you thinking of returning to work?"

Paul Boulos responded in the following manner: He said that he was supposed to be off for 2 days. He went to the doctor on June 18th and on June 26th. He started to feel lots of pain on the 18th and got a note from the doctor that advised "no work" for 2 days and then put on light duty for 5-6 days and then went back to the doctor a week later. They examined him and said that he needs to see an orthopedic ASAP. There were a couple of days where he was trying to obtain authorization Zurich for an MRI. He went to the doctor on the 26th and the doctor took several x-rays. The doctor said that it could be serious, and he might need an operation depending on the MRI results; this would be the decisive factor. Paul said, "I wanted to be at work as long as I have the medication (Tylenol 3). It was wonderful at home because the pain disappeared and I could sleep. I can't take the pain medication at work." Paul advised that the doctor never placed him on "can't work" status. When he went to the doctor, he didn't discuss work limitations, we need to go off what the original slip says. The doctor told him not to carry anything. He was surprised that he didn't get more medication (from the doctor) and was hoping to get more medication today or tomorrow and they should have given him more medicine. Paul advised that he was taking 4 Tylenol at a time. He said "I want to be at work. I am very concerned about Angela being here on her own." Paul is still waiting for the MRI to be scheduled. Vikki advised Paul that Walter has put Zurich in touch with the doctor's office and we brought Walter, benefits coordinator, into Jean's office to confirm this fact. Walter said that he had put the two parties in contact with each other, and we asked him to telephone to get a status on this. It was explained to Paul that there is sometimes a delay because the worker's compensation company needs to go through an approval process for MRIs and other procedures of this cost nature.

Paul appeared to be in severe pain when we were questioning him about his back. He couldn't seem to get comfortable and his facial expressions were indicating that he was experiencing much pain.

EXHIBIT NO. 6
C. CRUMP 1/19/06

• Page 1

best hotels and never have I worked in a hotel where there is so much paperwork accumulated on someone. Someone who was nominated for manager of the quarter and year. She has been here a long time without a director.

Jean Allen: Did you speak with her about her performance?

Paul Boulos: She appeared to be a hard worker and Paul let her know that her move to the laundry was in no way a demotion. He let her know that basically "the move is being made because we have a huge challenge with the linen area."

Jean Allen: Why did she perceive that she was demoted? Did she ask why was she demoted?

Paul Boulos: Paul told her: "No. I don't want you to see this as a demotion." Paul didn't agree with Sandra Taylor's feeling that this was a demotion.

Paul said that he still used her as a resource for housekeeping. Paul feels that he made her feel like a vital part of the department.

Jean Allen: Then why did she resign?

Paul Boulos: This will take us to that day. Said Elkhodary and Paul Boulos went to the laundry and held a conversation about scheduling issues. The linen runner needed to be at a certain time; she made a change in the schedule and she let Paul Boulos know. Said Elkhodary asked why the changes, as discussed, ~~wasn't made~~? *were not made.* Said Elkhodary snapped at her and walked off.

Jean Allen: What ~~did he (Said) snap at her for?~~ *do you mean Said "snapped" at her?*

Paul Boulos: It was a loud tone. Paul could not hear, but he could see lots of indication that someone is irritated. Sandra was still talking when Said walked out of the laundry.
→ *INSERT A*

Paul Boulos said that he was standing behind Said Elkhodary and he couldn't see him directly as he was walking away, Sandra was still trying to explain to Said Elkhodary. Paul Boulos could see that she was very upset. Paul Boulos went to his office. About five minutes later, Sandra Taylor came to the office, and she looked ok at first. As soon as she closed the door, she started crying like a baby, she was holding the desk. She appeared to start to feel ill. Paul Boulos got security. Sandra Taylor was asked if she needed medical attention. She said she was having blood pressure problems.

She said she feels ridiculed and harassed by Said Elkhodary. She said no one says thank you. "It seems that Said doesn't appreciate what I'm doing." "I drive to work in fear. I don't want to be afraid of Said."

Jean Allen: Jean asked why Sandra would be afraid of Said Elkhodary *?*

Paul Boulos: According to Sandra, everything that she does is wrong. He humiliates her in public.

Jean Allen: Typically, if you're the manager, ~~you~~ *your* manager isn't in your department much. Why ~~didn't~~ *did* she have so much interactions with him *?* if you, Paul, are the boss?

*JA* ~~Paul Boulos:~~ Paul, did you ever witness a time when you felt there was any disrespect where feelings of hurt could result?

● Page 3

Paul said that "if I were treated this way, I would take it as disrespect."

Jean Allen:  Jean asked if it was the tone or the way things were said?

Paul answered:  It was probably the way it was said."

Insert
A

should go
here

000166

OMNI SHOREHAM HOTEL

MEMORANDUM

To:  File

From:  Jean Allen

Re:  Paul Boulos

Date:  8/27/01

    Peter Austin and I spoke with Paul on the phone this morning.  Paul had received a call from Zurich advising him that the independent physician had evaluated his medical documentation and determined that he was able to return to work, (the report is attached to this document).  He was upset stating that his doctor, Dr. Yu, feels that he needs the epidurale injections. He said that he is scheduled to see Dr. Yu again on 8/25/01.  Paul told us "I don't know what is going on".  He said that Dr. Yu is trying to help him relieve the pain and that he could not stand on his right foot.  He said that he was taking medication but it made him sleepy.

    I explained to him that it is Zurich's determination based on the findings of the independent physician that he be released to return to work. He asked "how can I come back to work"?  He stated that he did not want his condition to deteriorate any further in the future.  He expressed concern about returning to work when he did not feel he was physically able to assume his responsibilities.  He told us that Dr. Yu was very upset as well. He explained that his nerve was being pinched and that Dr. Yu felt the only relief would be the epidurale injections.  He said, "one doctor says 'yes' the other says 'no'".  He told us that the independent physician only spent three minutes with him.

    Paul repeated that he was worried about coming to work and the implication of doing "something wrong" and hurting himself.  He asked



EXHIBIT NO. 12

C. CRUMP

000004

for advice regarding how he should proceed. I informed him that it was his decision to make. He said that he wanted to return to work but that the "pain was incredible". He repeated that Dr. Yu was "very upset" and that he wanted Paul to have the epidurale injections. He told us that he is taking two medications and that one makes him very drowsy, but without it "the pain is incredible". He said that he did not know how he would get to work because he can not drive and it is difficult for him to walk. He restated that he wanted to be at work, but was concerned about the "serious implications" that "he would risk". He then mentioned that he might seek advice from an attorney.

Peter asked Paul when he might be able to return to work. He said he did not know. He told us that he needed to speak with Dr. Yu and that there may be a possibility that one shot may relieve the pain. His perception is that the MRI showed that there is a herniated disc that is pressing on the nerve in his foot. He said that he maybe able to return in two weeks. I inquired about his evaluation on the 25th of September. He stated that he might feel better after the first injection and have his evaluation with Dr. Yu sooner that the 25th. He told us that the injections were his only option to surgery. He questioned the decision made by Zurich and his options. I responded that they must have an appeal process that he could follow and informed him that at this point there were financial implications for him. I explained that he would not be paid any additional monies for lost time and Zurich would cover no other medical expenses for this injury. He responded that "he was not worried about the financial impact". He told us that he should be able to return to work "after the first or second injection". I asked if he felt that he would be able to function at full capacity upon his return. He answered in the affirmative. He said "if they had approved the injections a month and a half ago, I would have been back to work".

Paul stated that "the place of work has a say", implying that we had input into the decision that was made by Zurich. I clarified our relationship with Zurich. I explained to Paul that Zurich is independent of the hotel and we have nothing to do with decisions made by Zurich. I told him that I was informed of their decision Friday, and that they had attempted to contact him on Friday but was unable to do so.

000005

He asked again for our advice. We informed him that it was his decision. He responded that he was going to speak with Zurich again and perhaps consult an attorney. Peter asked him when we could expect a more definitive answer regarding his date of return. He said that he would call us Monday, 9/3. I told him that was Labor Day and asked that he call us Friday.

Contact number 301-982-2346

    I spoke with Karen Treciak (Paul's case manager at Zurich) later in the day and she told me that she had explained the appeals process to Paul when she had spoken with him in the morning. She stated that she informed Paul that he could file an appeal with the Commission and ask for a hearing. She also told him that failure to return to work would be considered job abandonment.

Contact number 800-239-6851

    I spoke with Karen again on 8/30. She had talked with Paul earlier in the afternoon. He said that Dr. Yu was upset and wanted the number of the independent physician. She did not release his name. He told Karen that Dr. Yu refused to release him to work. He informed Karen that he was calling me and that "he might resign". She explained the process to appeal and request a hearing. He told Karen that Dr. Yu suggested that he "get a lawyer".

    Peter and I spoke with Paul on 8/31. He said that he was calling because "he was supposed to talk to us about returning to work". He informed us that he was going to have one injection before returning to

000006

work. He stated that he would pay for it out of pocket if it was not covered. He said he would be back on Saturday, 9/8/01. I suggested that he call our carrier to determine if the injection would be covered under our medical insurance. I asked him "what if you do not feel better, will that impact your date of return"? He referenced our earlier conversation with him and my comment about entering our busy session and the need to have an Executive Housekeeper in place. He said that Dr. Yu told him that "there was a big Chance that the nerve would be relieved by a single injection". Paul said that he had revisited him a couple of days ago and that Dr. Yu suggested that he contact our insurance carrier about covering the cost of the injection. I asked him if Dr. Yu felt that he would be operating at full capacity upon his return. He said that he has a herniated disc due to his joints moving and they are on a nerve. This pressure on the nerve impacts his right foot and when he steps on his right foot he has a sharp pain in his back. He added, "he did not know a lot about this".

He asked if he should report to someone on Saturday, 9/8/01. Peter responded, "you will be reporting to me". Paul thanked him and told him that he would see him on Saturday, 9/8/01.


I called Paul to remind him that we needed a release from Dr. Yu when he returned to work on Saturday, 9/9/01. He said that Dr. Yu would not release him to go back to work. He told me that he had asked Dr. Yu if he would amend his release. He said that Dr. Yu told him "you can not go back to work, I can not release you, it is too dangerous for you now". I asked Him if Dr. Yu would release him after the injection. Paul said "that is what he is saying, the injection should release the pressure and eliminate the pain".

He asked "what if I do not succeed in having the carrier approve the shot and I can not financially afford to pay for it, how do I get a release?" I told him that we needed the release from Dr. Yu and that he should contact me if he was unable to obtain a release or have the injection. I asked him if he would like Stacy to contact the carrier to glean some information for him. He replied in the affirmative. I told him that I would have Stacy contact him on Tuesday morning.