**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| TAWFIK BOULOS,<br><br>                **Plaintiff,**<br><br>       **v.**<br><br>OMNI HOTELS MANAGEMENT<br>CORP.,<br><br>          **Defendant.** |

Civil Action 05-01175 (HHK)

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tawfik "Paul" Boulos brings this action against his former employer, Omni Hotels Management Corporation, ("Omni"), alleging that Omni retaliated against him for supporting a co-worker's allegations of racial discrimination against Omni in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 ("Section 1981"). Before the court is Omni's motion for summary judgment [#20].  Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that Omni's motion must be denied.

**I. BACKGROUND**

The facts pertinent to this action, presented in a light most favorable to Boulos, are as follows:

**A.      Taylor's Discrimination Complaint**

 Boulos was hired as the Director of Housekeeping at the Omni Shoreham Hotel in Washington, D.C., in January 2001.  At the time, Sandra Taylor, a Black woman, was the Assistant Director of Housekeeping.  Said Elkhodary, Director of Rooms and Boulos's direct supervisor, made several racist comments to Boulos about Black employees and about Taylor in

particular.  Elkhodary told Boulos not to live in College Park because it was "full of blacks" and

asked, "do you want your kids to go to school full of black kids?"  Boulos Dep. at 76.  Elkhodary

repeatedly referred to Taylor as "el abda," a racial slur meaning "slave" in Arabic, which both

Elkhodary and Boulos spoke.  Boulos Dep. at 78.[1]

In February 2001, Elkhodary demoted Taylor to Laundry Manager.  At the time, Boulos

complained to Nate Foxworth, the Human Resources Manager, about Elkhodary's racist

comments and said he believed that Taylor was demoted because of her race.  In June 2001,

Taylor was fired and filed a complaint with the Equal Employment Opportunity Commission

("EEOC") alleging that she was discriminated against on the basis of race and sex.  In her

complaint, she indicated Boulos had witnessed some of Elkhodary's comments.[2]  In late June and

early July 2001, Boulos spoke several times with Jean Allen, Omni's Director of Human

Resources, regarding Taylor's EEOC complaint.  Boulos told Allen that he believed that

Elkhodary harassed and discriminated against Taylor because of her race.

## B.    Boulos's Injury at Work

Meanwhile, on June 6, 2001, Boulos was injured at work while pushing heavy linen carts.

He notified Elkhodary of the injury on June 7 and continued to work until June 11, when

Elkhodary requested that he go to the emergency room at George Washington University

Hospital ("GWUH") for treatment.  The GWUH doctors advised Boulos not to work until June

14, 2001, at which point he could return to work with restrictions.  Those restrictions included no

---

[1] Boulos is Egyptian and his native language is Arabic.

[2] Taylor was originally a plaintiff in this suit but was dismissed in May 2006 after resolving her claims against Omni.

heavy lifting or carrying above ten pounds; no work above chest height; no pushing, pulling or twisting; and no bending or stooping.[3]  While adhering to restrictions when he returned to work, Boulos still experienced sharp pain in his back whenever he stepped on his right foot.  Therefore, while he completed the paperwork required by his job, attended all required meetings, and supervised the laundry, he avoided excessive walking due to the pain.

On June 26, 2001, Boulos saw Dr. Warren Yu, an orthopedist, who diagnosed Boulos as having a herniated disk and placed Boulos on limited duty, indicating that he should not do any lifting.  Not long thereafter, on July 3, 2001, Yu opined that Boulos should not work and Boulos remained on leave on workers' compensation through the end of July 2001.

In early August 2001, Omni's insurer, Zurich Insurance, sent Boulos for an independent examination by Dr. Robert Gordon.  Gordon rendered an opinion that any limitation that Boulos might have on his physical activity was not due to a work-related injury.  On August 24, 2001, Zurich informed Boulos that his benefits were being terminated immediately, that Zurich would no longer authorize medical treatment, and that Boulos was required to return to work without restrictions.

On August 27, 2001, Boulos spoke by telephone with Allen and Peter Austin, Omni's General Manager, regarding his ability to return to work.  He told them that he wanted to return to work but the "pain was incredible."  Pl.'s Ex. B (Allen Memo, Aug. 27, 2001) at 1822.[4]  When

---

[3] As Director of Housekeeping, Boulos's job duties included inspecting the rooms and public areas for cleanliness and maintenance issues, which required bending to closely examine rooms for cleanliness.

[4] Boulos also reported that Dr. Gordon had "only spent three minutes" examining him, and that Gordon didn't speak to him during the examination other than to say hello.  Pl.'s Ex. B (Allen Memo, Aug. 27, 2001) at 1822; Boulos Dep. at 148.

3

Austin inquired when Boulos would be able to return to work, Boulos said he might be able to return in two weeks, but he would know better after an evaluation by Dr. Yu and an epidural injection which were to take place on September 25, 2001.

Sometime during August 2001, a letter was drafted by Allen or Austin notifying Boulos that he must resume his position by October 1, 2001, because it was not "feasible or economical" for Omni to continue without a Director of Housekeeping. Austin Dep. at 129–30, Ex. 9 (Letter). The letter also stated that Boulos would be considered for another position if he could not return by that date. The letter, however, was never sent.

Boulos called Austin and Allen again on August 31, 2001, to explain that he would return to work on September 8, 2001, after an epidural injection. Shortly thereafter, Allen called Boulos to inform him that Omni needed a release from Dr. Yu before Boulos could return to work. Boulos replied that Dr. Yu would not give him a release because it was his opinion that Boulos should not work. At no time during any of these conversations did anyone at Omni suggest that Boulos would be terminated.

## C.     Boulos's Testimony in Support of Taylor — September 6, 2001

In early September 2001, Allen spoke with Boulos about Taylor's unemployment claim. When Boulos told her that he had received a notice requesting that he appear at a hearing, Allen asked him how he would testify. Boulos told Allen that he would say that he believed Taylor had been harassed on account of her race. Allen then said, "as managers, we should stick together so we can benefit the corporation which we are working for." Boulos Dep. at 101. She repeated this comment several times during the conversation. *Id.* at 101–02.

4

On September 6, 2001, Boulos testified on Taylor's behalf in an unemployment hearing at the District of Columbia Department of Employment Services, which was attended by Allen and Elkhodary.  He testified that Taylor had been the victim of racial harassment and discrimination.

**D.    Boulos's Return to Work — September 8, 2001**

Sometime shortly before September 8, 2001, Allen and Austin spoke with Boulos by phone again to inquire when he would return to work.  Austin told Boulos he had three options: (1) to return to work with no restrictions, per Dr. Gordon's instructions; (2) resign; or (3) be terminated.  Allen and Austin repeatedly asked Boulos to get a release from Dr. Yu to return to work.  Boulos told them he would attempt to return to work on September 8, despite Dr. Yu's recommendations that he continue to recuperate.[5]

On September 8, 2001, Boulos returned to work and reported to Austin, who did not inquire as to Boulos's condition and was "hostile" towards him.  Boulos Dep. at 156, 161.  Austin handed Boulos three lists of duties — a list of twenty-six "Director of Housekeeping Expectations," a separate assessment of eighteen housekeeping issues to be addressed, and a handwritten list entitled "Director of Housekeeping Expectations" which stated that:

> Any evaluation of your performance will be based on your ability to complete the above [in reference to the other lists].  It is expected that you will do it successfully.  These are minimum requirements and not all inclusive.  Failure to move forward, with tangible results, will require the hotel to intervene in accordance with its progressive disciplinary process.

---

[5]  In her deposition, Allen indicated that she believed that Boulos had seen a third physician who reconciled the conflicting diagnoses frm Drs. Yu and Gordon, Allen Dep. at 90–91, but there is no evidence in the record to support this assertion.

5

Austin Dep., Ex. 10 (Handwritten Note).  The list of "Task Expectations" included numerous

clerical duties as well as "weekly walk through," and room inspections.  *Id.*, Ex. 12 ("Task

Expectations").  The housekeeping assessment was generated on September 7, 2001, and

contained eighteen housekeeping issues that Austin indicated in the handwritten note were

expected to be accomplished on a "short turn around."  Austin Dep., Ex. 10 (Handwritten Note).

In the handwritten note, Austin wrote that "most [of the issues] are carryovers from [the]

assessment of January 2001."  *Id.*  The assessment itself, however, indicates that only four of the

eighteen issues were outstanding since January.  *See id.*, Ex. 11 (Omni Shoreham Housekeeping

Assessment Sept. 7, 2001).  Boulos interpreted the manner and presentation of these documents

as a threat to his employment.

After attempting to work that day, Boulos went to Austin's office "in tears" to say he was

in too much pain to continue working, and Austin sent him home with instructions to return in

two days for a meeting.  Boulos Dep. at 158.

**E.      Boulos's Termination — September 10, 2001**

When Boulos returned to the Omni on September 10, 2001, Austin asked whether Boulos

could return to work "in the full capacity . . . without the talk about pain and all this.  And if you

cannot do that then this is an honorable way for you which is to resign."  Boulos Dep. at 160.

Otherwise, he would be terminated.  *See* Pl.'s Ex. E (Allen Memo, Sept. 10, 2001).  Boulos then

requested unpaid leave to recuperate, or a modification of job duties, which was refused.  Instead,

Austin terminated him**.**

6

## II. ANALYSIS

### A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56 (e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

### B.    Analytical Framework

For the purpose of resolving Omni's motion for summary judgment, the court employs the procedural framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804 (1973).[6]  Under the *McDonnell Douglas* framework, the court first determines whether

---

[6] While *McDonnell Douglas* established the framework for Title VII claims, it has been held to apply to Section 1981 claims.  *See Welzel v. Bernstein*, 436 F. Supp. 2d 110, 117 (D.D.C. 2006).

a plaintiff is able to establish a prima facie case of retaliation.  A plaintiff  may do this by

showing: (1) that he engaged in a protected activity; (2) that the employer took an adverse

personnel action; and (3) that a causal connection existed between the two.  If a plaintiff makes

out a prima facie case, the burden then shifts to the defendant to articulate a legitimate and non-

retaliatory reason for the challenged action.  If a defendant articulates a benign reason for the

challenged action, the plaintiff then bears the burden of presenting evidence on the basis of

which a reasonable jury could determine that the employer's articulated reason is mere pretext.

Omni concedes that Boulos is able to establish the first two elements of a prima facie

case of unlawful retaliation, that he had engaged in protected activity and that he was subjected

to an adverse employment action, but argues that Boulos cannot establish a causal connection

between the two.

### 1.    *Causal Connection*

A plaintiff may satisfy the causal connection element of a prima facie case by showing

that "the employer had knowledge of the employee's protected activity, and . . . the adverse

personnel action took place shortly after that activity."  *Holcomb v. Powell*, 433 F.3d 889, 903

(D.C. Cir. 2006) (internal quotation marks and citations omitted); *see also Gleklen v. Democratic

Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000) (concluding that a

supervisor's request that a plaintiff return to work full time only a few weeks after she disclosed

her pregnancy was "sufficiently close in time to infer a causal nexus").

Boulos asserts that Omni's failure to accommodate his requests for light duty, to provide

him with unpaid leave during his recuperation and, ultimately, his termination, were motivated

by retaliation for his support of Taylor in connection with her discrimination complaint against

Omni.  Among other things, on September 6, 2001, Boulos testified on Taylor's behalf at an unemployment compensation hearing which was attended by Allen and Elkhodary.  Two days later, Boulos was ordered to return to work or face termination and on  September 10, 2001, he was terminated.  The temporal proximity of these events is enough to raise an inference that Bpulos' termination was in retaliation for his support of Taylor's discrimination complaint.

Omni contends that the retaliatory inference created by the temporal proximity of these events is destroyed by intervening events that destroys the inference.  In support of its argument, however, Omni cites inapposite cases. These cases stand for the proposition that intervening events showing *positive treatment* of a plaintiff may destroy an inference of retaliation.  In *Manatt v. Bank of America, NA*, 339 F.3d 792, 802 (9th Cir. 2003), for example, the Ninth Circuit concluded that any inference of retaliation was rebutted by the nine months that elapsed between the plaintiff's protected activity and the adverse employment action and the employer's favorable treatment of the plaintiff in giving the plaintiff a raise and a prestigious assignment.  Here, the time lapse is much shorter (four days), and Boulos was not given any positive treatment in the intervening time that would rebut the inference of retaliation.

Omni also contends that the causal connection in this case was destroyed by a third-party's intervening action.  Omni asserts that Boulos was terminated for his failure to return to work following Zurich's August 24, 200, determination that Boulos was no longer entitled to worker's compensation benefits and was required to return to work.  Thus, Omni contends that its reliance on Zurich's intervening determination destroys any causal connection between Boulos's testimony and his termination.  It is true that a causal connection may be eroded where a third-party's intervening determination provides an independent basis for terminating an

9

employee.  *See Tenkku v. Normandy Bank*, 348 F.3d 737, 742 (8th Cir. 2003) (concluding that

there was a lack of causal connection when independent auditor's "specific criticisms" of

plaintiff after filing of complaint were "intervening unprotected" events cited as basis for adverse

actions).  As Boulos points out, however, Zurich's determination was not intervening — it was

issued on August 24, 2001, but Omni did not decide to act upon it until September 8, 2001, when

Boulos was ordered to return to work just two days after he testified against Omni on Taylor's

behalf.

    Finally, Omni contends that Boulos's failure to return to work on September 8, 2001,

constitutes "intervening unprotected conduct." which eroded the "causal connection that was

suggested by the temporal proximity" of Boulos' protected conduct and his termination.  *See Kiel

v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).  Again, Boulos's conduct in this

respect was not intervening.  Boulos had not been working since June 2001, but it wasn't until

September 8, 2001 — two days after he testified — that Omni ordered him to return to work or

face termination**.**

    In sum, Boulos has presented sufficient evidence establishing that there was a causal

connection between his protected activity and Omni's adverse employment actions against him.

### 2.    *Legitimate, Non-Retaliatory Reason*

    Turning to the question of whether Omni has articulated a legitimate non-retaliatory

reason for firing Boulos, the court concludes that it has. Omni asserts that its termination of

Boulos had nothing to do with his support of Taylor but resulted, understandably, from Boulos'

refusal to return after he had been cleared by Zurich's doctor's to do so.

### 3.    *Pretext*

While Omni clearly has carried its burden of articulating a lawful basis for its decision to terminate Boulos, it is just as clear that Boulos has presented evidence on the basis of which a reasonable jury could conclude that Omni's benign explanation is pretextual. Allen repeatedly urged him to "stick together" with the company when she learned that he was being called to testify at Taylor's hearing.  Prior to his testimony in favor of Taylor, Boulos had been granted leave since June 2001.  It is undisputed that at some point in August 2001, Austin and Allen had determined that it was "feasible" and "economical" to operate without a Director of Housekeeping until at least October 1, 2001. Yet sometime between the time that this letter was drafted and September 8, 2001, Omni decided that Boulos would be terminated immediately if he could not perform his job.  That change occurred after Boulos testified on September 6, 2001.

Similarly, up until September 5, 2001, Omni pressed Boulos for a release from his own doctor, even after receiving a release from Zurich.  Then, on September 8, 2001, Omni suddenly demanded that Boulos work in defiance of his doctor's orders.  Again, the only element that changed between those dates was Boulos' testimony.[7]

## III. CONCLUSION

---

[7]There is other evidence that could lead a jury to conclude that Omni's termination of Boulos was retaliatory .  There is no dispute that Boulos had no record of prior performance deficiencies, yet on Boulos's return, Austin suddenly presented him with three separate lists of tasks and duties, including a handwritten list of expectations that required a "short turn around." Austin Dep., Ex. 10 (Handwritten Note).  Moreover, Austin testified that a director of housekeeping could be placed on light duty, that his duties could be modified to accommodate his injury, and that the termination of Boulos's worker's compensation coverage had no effect on Omni's ability to accommodate him.   Boulos was only offered the opportunity to return at full capacity or face termination.

For the foregoing reasons, it is this 30th of March, 2007, hereby

**ORDERED** that defendant's motion for summary judgment [#20] is **DENIED**.

Henry H. Kennedy, Jr.
United States District Judge

Omni also contends that Zurich's determination that Boulos was required to return to

destroys the causal connection in this case.  It is true that an intervening determination by a third-

party that provides an independent basis for terminating an employee can erode a causal

connection.  *See Tenkku v. Normandy Bank*, 348 F.3d 737, 742 (8th Cir. 2003) (concluding that

there was a lack of causal connection when independent auditor's "specific criticisms" of plaintiff

after filing of complaint were "intervening unprotected" events cited as basis for adverse actions).

As Boulos points out, however, Zurich's determination was not intervening — it was issued on

20

August 24, 2001, but Omni did not decide to act upon it until September 8, 2001, when Boulos was ordered to return to work just two days after he testified against Omni on Taylor's behalf.

Finally, Omni contends that Boulos's failure to return to work on September 8, 2001, constitutes "intervening unprotected conduct" which eroded the "causal connection that was suggested by the temporal proximity" of protected conduct and a plaintiff's termination.  *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).  Again, Boulos's conduct in this respect was not intervening.  Boulos had not been working since June 2001, but it wasn't until September 8, 2001 — two days after he testified — that Omni ordered him to return to work or face termination.

Accordingly, the court concludes that Boulos has met his burden to prove a prima facie case that there was a causal connection between his protected activity and Omni's adverse employment actions against him.

**2.     Legitimate, Non-Retaliatory Reason**

Omni contends that its legitimate, non-discriminatory reason for firing Boulos is that he had been fully released by Zurich's doctor to return to work but he refused to do so.  In articulating a legitimate, non-retaliatory reason, the defendant's burden is only one of production, and it "need not persuade the court that [they were] actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  As Omni points out, it is undisputed that Boulos was unable to perform his duties after he had been cleared by Zurich's doctor.  Thus, Omni has met its burden of producing a legitimate, non-retaliatory reason.

**3.     Pretext**

Omni's legitimate reason, however, only takes it so far. A plaintiff may avoid summary judgment by pointing to "evidence from which a jury could find that [the employer's] stated reasons . . . were pretextual." *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999). The evidence in this case, construed in favor of Boulos, could be found by a reasonable trier of fact to indicate that Omni's proffered reason for his termination was pretextual. Allen repeatedly urged him to "stick together" with the company when she learned that he was being called to testify at Taylor's hearing. Boulos Dep. at 101–02. Prior to his testimony in favor of Taylor, Boulos had been granted leave since June 2001. It is undisputed that at some point in August 2001, Austin and Allen had determined that it was "feasible" and "economical" to operate without a Director of Housekeeping until at least October 1, 2001. Yet sometime between the time that this letter was drafted and September 8, 2001, Omni decided that Boulos would be terminated immediately if he could not perform his job. That change occurred after Boulos testified on September 6, 2001. Similarly, up until September 5, 2001, Omni pressed Boulos for a release from his own doctor, even after receiving a release from Zurich. Then, on September 8, 2001, Omni suddenly demanded that Boulos work in defiance of his doctor's orders. Again, the only element that changed between those dates was Boulos's testimony. Based on such evidence, a jury could reasonably conclude that Omni's legitimate reason is pretextual. *See Ferguson v. Small*, 225 F. Supp. 2d 31, 39–40 (D.D.C. 2002) (observing that when a defendant eschews termination for a given reason until immediately after a plaintiff engages in protected activity, a jury may find the employer's actions pretextual).

There are other factors that could lead a jury to conclude that Omni's action were based on retaliation. There is no dispute that Boulos had no record of prior performance deficiencies, yet

on Boulos's return, Austin suddenly presented him with three separate lists of tasks and duties, including a handwritten list of expectations that required a "short turn around."  Austin Dep., Ex. 10 (Handwritten Note).  Moreover, Austin testified that a director of housekeeping could be placed on light duty, that his duties could be modified to accommodate his injury, and that the termination of Boulos's worker's compensation coverage had no effect on Omni's ability to accommodate him.   Boulos was only offered the opportunity to return at full capacity or face termination.

While a jury could ultimately determine that Boulos has not met his burden in proving that Omni terminated him in retaliation for supporting Taylor, there is sufficient evidence that a reasonable jury could conclude that Omni's reason for terminating him is pretextual.  Because there is a genuine dispute as to whether Omni retaliated against Boulos, the court is compelled to conclude that summary judgment is inappropriate on this record.

### III. CONCLUSION

For the foregoing reasons, the court concludes that the defendant's motion for summary judgment must be denied.  Accordingly, it is this 30th of March, 2007, hereby

**ORDERED** that the defendant's motion for summary judgment [#20] is **DENIED**.

Henry H. Kennedy, Jr.
United States District Judge